ORIGINAL

2011 OCT 11  AM 10: 21

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

1  MARICELA SEGURA, CA Bar No. 225999
   RAYMOND E. MCKOWN, CA Bar No. 150975
2  e-mail: msegura@ftc.gov and rmckown@ftc.gov
   FEDERAL TRADE COMMISSION
3  10877 Wilshire Blvd., Suite 700
   Los Angeles, CA 90024
4  Telephone: (310) 824-4343
   Facsimile: (310) 824-4380
5
6  Attorneys for Plaintiff
   FEDERAL TRADE COMMISSION
7

FILED
CLERK, U.S. DISTRICT COURT

OCT 11 2011

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION        BY DEPUTY

8
9              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
10
11  FEDERAL TRADE COMMISSION,          Case no.
                                       **ED CV 11 - 01623**
12                   Plaintiff,                         VAP SPX
13         v.
    RINCON MANAGEMENT              MEMORANDUM OF POINTS AND
14  SERVICES, LLC, a California limited   AUTHORITIES IN SUPPORT OF
    liability company, also d/b/a "Rincon  PLAINTIFF'S *EX PARTE*
15  Debt Management," "Rincon Filing   APPLICATION FOR TEMPORARY
    Services," and "Pacific Management  RESTRAINING ORDER AND
16  Recovery"; PRIME WEST            ORDER TO SHOW CAUSE WHY A
    MANAGEMENT RECOVERY, LLC, a    PRELIMINARY INJUNCTION
17  Delaware limited liability company;  SHOULD NOT ISSUE
    UNION MANAGEMENT SERVICES,
18  LLC, a California limited liability
    company, also d/b/a "Union Filing
19  Services"; NATIONAL FILING
    SERVICES, LLC, a California limited
20  liability company; CITY
    INVESTMENT SERVICES, LLC, a
21  California limited liability company;
    GLOBAL FILING SERVICES, LLC, a
22  California limited liability company;
    PACIFIC MANAGEMENT
23  RECOVERY, LLC, a Delaware limited
    liability company; JASON R.
24  BEGLEY, an individual; and WAYNE
    W. LUNSFORD, an individual,
25
26                   Defendants.
27
28

ORIGINAL

LODGED

1   MARICELA SEGURA, CA Bar No. 225999
2   RAYMOND E. MCKOWN, CA Bar No. 150975
    e-mail: msegura@ftc.gov and rmckown@ftc.gov
3   FEDERAL TRADE COMMISSION
    10877 Wilshire Blvd., Suite 700
4   Los Angeles, CA 90024
    Telephone: (310) 824-4343
5   Facsimile: (310) 824-4380
6   Attorneys for Plaintiff
    FEDERAL TRADE COMMISSION
7
8
9

FILED
CLERK, U.S. DISTRICT COURT

OCT 11 2011

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION    BY DEPUTY

10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case no. |
| Plaintiff, | **EDCV 11 - 01623 VAP** |
| v. | SPX |
| RINCON MANAGEMENT SERVICES, LLC, a California limited liability company, also d/b/a "Rincon Debt Management," "Rincon Filing Services," and "Pacific Management Recovery"; PRIME WEST MANAGEMENT RECOVERY, LLC, a Delaware limited liability company; UNION MANAGEMENT SERVICES, LLC, a California limited liability company, also d/b/a "Union Filing Services"; NATIONAL FILING SERVICES, LLC, a California limited liability company; CITY INVESTMENT SERVICES, LLC, a California limited liability company; GLOBAL FILING SERVICES, LLC, a California limited liability company; PACIFIC MANAGEMENT RECOVERY, LLC, a Delaware limited liability company; JASON R. BEGLEY, an individual; and WAYNE W. LUNSFORD, an individual, | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE |
| Defendants. | |

# TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.   Federal Trade Commission . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.   The Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.   Business Entity Defendants . . . . . . . . . . . . . . . . . . . . . . . 2

        2.   Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.   Defendants falsely represent that they are process servers
        seeking to serve the consumer with papers pertaining to
        a lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.   Defendants falsely represent that they are lawyers, or from
        a law or business office, handling the fictitious court case
        against the consumer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D.   Defendants falsely threaten that a lawsuit has been filed,
        or will imminently be filed, against the consumer to coerce
        the consumer into paying Defendants. . . . . . . . . . . . . . . . . . 11

    E.   Defendants falsely threaten consumers with arrest, or
        seizure, garnishment, or attachment of a consumer's
        property or wages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    F.   Defendants collect fictitious attorneys' fees and court
        costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    G.   Defendants violate various provisions of the FDCPA . . . . . . . . . . . 15

    H.   Defendants operate as a "common enterprise" . . . . . . . . . . . . . . . 17

    I.   Consumer injury is substantial and ongoing . . . . . . . . . . . . . . . . . 20

IV.  LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.   Defendants Violate Section 5 of the FTC Act (Count One) . . . . . . . 21

    B.   Defendants Violate the FDCPA (Counts Two, Three, Four,
        and Five) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1.  Defendants engage in prohibited communications
    with third parties in violation of Section 805 of the FDCPA
    (Count Two) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2.  Defendants engage in harassment, oppression, and abuse
    of consumers in violation of Section 806(6) of the FDCPA
    (Count Three) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3.  Defendants make false or misleading representations
    in violation of Section 807 of the FDCPA (Count Four) . . . . . 25

4.  Defendants fail to provide validation notices in violation
    of Section 809 of the FDCPA (Count Five) . . . . . . . . . . . . . . 28

C.  This Court is authorized to grant the requested relief . . . . . . . . . . . 28

D.  A TRO and preliminary injunction against Defendants are
    warranted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    1.  The FTC is likely to succeed on the merits  . . . . . . . . . . . . . . 30

    2.  The equities weigh in favor of granting injunctive relief . . . . . 31

E.  An asset freeze, immediate access to the business premises,
    expected discovery, and appointment of a receiver are necessary . . . 32

F.  Defendants are liable for each other's deceptive acts and practices
    because they are operated together as a common enterprise . . . . . . . 33

G.  The Court should hold the individual defendants personally
    liable for both injunctive and monetary relief  . . . . . . . . . . . . . . . . . 34

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

1

## TABLE OF AUTHORITIES

2

### CASES

3
*Flynt Distrib. Co., Inc. V. Harvey,*
    734 F.2d 1389, 1394 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

4
*FTC v. Affordable Media,*
    179 F.3d 1228 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 34, 35

5
*FTC v. Amy Travel Serv., Inc.,*
    875 F.2d 564 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 34, 35

6
*FTC v. Beatrice Foods Co.,*
    587 F.2d 1225 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

7
*FTC v. Data Med. Capital, Inc.,*
    2010 WL 1049977 (C.D. Cal Jan. 15, 2010) . . . . . . . . . . . . . . . . . . . . 21

8
*FTC v. Figgie Int'l, Inc.,*
    994 F.2d 595, 605 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

9
*FTC v. Gem Merchandising Corp.,*
    87 F.3d 466(11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 29, 34, 35

10
*FTC v. GTP Mktg., Inc.,*
    1990 WL 54788 (N.D. Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

11
*FTC v. H.N. Singer, Inc.,*
    668 F.2d 1107 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . 2, 28, 29, 32

12
*FTC v. J.K. Publications,*
    99 F. Supp. 2d 1176 (C.D. Cal. 2000) . . . . . . . . . . . . . . . . . . . . 17, 33, 34

13
*FTC v. Lancaster Colony Corp.,*
    434 F. Supp. 1088 (S.D.N.Y. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

14
*FTC v. Pantron I Corp.,*
    33 F.3d 1088 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

15
*FTC v. Publishing Clearing House, Inc.,*
    104 F.3d 1168 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

16
*FTC v. Sec. Rare Coin & Bullion Corp.,*
    931 F.2d 1312 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

17
*Removatron Int'l Corp. v. FTC,*
    884 F.2d 1489 (1st Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18
*FTC v. SlimAmerica, Inc.,*
    77 F. Supp. 2d 1263 (S.D. Fla. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 21

19
*FTC v. U.S. Oil & Gas Corp.,*
    748 F.2d 1431 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

20
*FTC v. USA Bevs., Inc.,*
    2005 U.S. Dist. LEXIS 39075 (S.D. Fla. Dec. 5, 2005) . . . . . . . . . . . . . . . 32

21
*FTC v. Warner Comm., Inc.,*
    742 F. 2d 1156 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

22
*FTC v. World Travel Vacation Brokers, Inc.,*
    861 F.2d 1020 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

23
*FTC v. World Wide Factors, Ltd.,*
    882 F.2d 344 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

24
*Fuller v. Becker & Poliakoff, P.A.,*
    192 F. Supp. 2d 1361 (M.D. Fla. 2002) . . . . . . . . . . . . . . . . . . . . . . . 22

25
*Hawtorne v. Mac Adjustment, Inc.,*
    140 F.3d 1367 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

26
*Heideman v. S. Salt Lake City,*
    348 F.3d 1182 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

27

28

*In re Nat'l Credit* Mgmt.,
   21 F. Sup. 2d 424 (D.N.J. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35
*Jeter v. Credit Bureau, Inc.*,
   760 F.2d 1168 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
*Kraft, Inc. v. FTC*,
   970 F.2d 311 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
*Porter v. Warner Holding Co.*,
   328 U.S. 395 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
*SEC v. First Fin. Group of Tex.*,
   645 F.2d 429 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
*SEC v. Manor Nursing Ctrs., Inc.*,
   458 F.2d 1082 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
*SEC v. R.J. Allen & Assoc., Inc.*,
   386 F. Supp. 866 (S.D. Fla. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
*Standard Educators, Inc. v. FTC*,
   475 F.2d 401 (D.C. Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
*United States v. Laerdal Mfg.*,
   73 F.3d 852 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
*United States v. Odessa Union Warehouse Co-op*,
   833 F.2d 172 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
*FTC v. Medicor LLC*,
   217 F. Supp. 2d 1048 (C.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
*Watch Co. v. FTC*,
   332 F.2d 745 (2d Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
*West v. Costen*,
   558 F. Supp. 564 (W.D. Va. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## STATUTES AND REGULATIONS

15 U.S.C. § 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
15 U.S.C. § 45(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,21
15 US.C. § 53(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,28
15 US.C. § 1692 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,22,23
15 U.S.C. §§ 1692-1692p . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
15 U.S.C. §1692(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
15 U.S.C. § 1692a(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
15 U.S.C. §1692c(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
15 U.S.C. §1692k(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
15 U.S.C. §1692d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
15 U.S.C. §1692e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
15 U.S.C. §1692e(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
15 US.C. §1692e(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
15 US.C. §1692e(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
15 U.S.C. § 1692e(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
U.S.C. §1692g(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## I.    INTRODUCTION

Plaintiff, Federal Trade Commission, brings this emergency action to halt a shake-down debt collection enterprise.  Defendants extort payments from consumers nationwide through false threats of legal proceedings in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) ("FTC Act"), and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*

Defendants' collectors call a consumer's employer, family members, friends, neighbors, or sometimes the consumer himself, posing as a process server seeking to serve the consumer with a fictitious lawsuit.  Defendants intend this ruse to create enough anxiety on the part of the consumer that he will call the office handling the lawsuit in the few hours he has before service is effected.  When the consumer calls the telephone number provided by the "process server," he is connected to another of Defendants' collectors who then poses as a lawyer or employee of the office handling the purported lawsuit.  This second-level collector then escalates the threat of legal action, often adding that the consumer faces arrest, wage garnishment, or property seizure if he does not make an immediate payment on a purported debt that, in many instances, the consumer does not owe.  Defendants carefully scripted their scheme, from the fictitious process server call, to "pointers" on how to deal with people who ask too many questions: *"when doing a standard talk off and the person on the phone is prying... it is best to say you are a process server and due to the federal privacy act you are not given that information."*  Defendants have operated their deceptive and abusive scheme since March 2009.  Since that time, Defendants have been unjustly enriched by more than $9.4 million.

To put an immediate stop to Defendants' illegal activities and preserve assets for possible redress and disgorgement, the FTC seeks an *ex parte* temporary restraining order ("TRO") pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).  The FTC's requested order enjoins Defendants from continuing their illegal collection practices, grants ancillary equitable relief, including an asset freeze, the

1

1  appointment of a temporary receiver, immediate access to Defendants' business

2  premises and records, an accounting, limited expedited discovery, and an order to

3  show cause why a preliminary injunction should not issue and why a permanent

4  receiver should not be appointed.  These measures are necessary to prevent

5  continued consumer injury, dissipation of assets, and the destruction of evidence,

6  thereby preserving this Court's ability to provide effective final relief.

7  **II.    THE PARTIES**

8      **A.    Federal Trade Commission**

9      Plaintiff **Federal Trade Commission** is an independent agency of the United

10  States created by the FTC Act. 15 U.S.C. §§ 41 et seq.  The FTC enforces Section

11  5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts and

12  practices in or affecting commerce.  The FTC also enforces the FDCPA, 15 U.S.C.

13  §§ 1692-1692p, which prohibits abusive, deceptive, and unfair collection practices.

14  The FTC Act and the FDCPA, authorize the FTC, through its own attorneys, to

15  initiate U.S. District Court proceedings to seek permanent relief to enjoin violations

16  of the FTC Act and the FDCPA, and to secure such other equitable relief as may be

17  appropriate in each case, including consumer redress. 15 U.S.C. §§ 53(b),

18  56(a)(2)(A), 56(a)(2)(B), 57b, and 1692*l*(a); *see, e.g., FTC v. H.N. Singer, Inc.*, 668

19  F.2d 1107, 1110-13 (9th Cir. 1992).

20      **B.    The Defendants**

21          **1.    Business Entity Defendants**

22      **Pacific Management Recovery, LLC** ("Pacific Management") is a Delaware

23  limited liability company that was formed in March 2009.  Gale ¶ 15,[1] Attachment

24  ("Att.") 4.  Pacific Management was also registered in California as a limited

25  liability company in April 2009, but dissolved its status in California in May 2010.

26  Gale ¶ 15.e., Att. 4 at p. 388.  Pacific Management is a debt collection company that

27

28      [1] All citations to declarations will refer only to the last name of the declarant.

collects consumer debt, typically credit card debt.  Gale ¶ 2; Delbridge ¶ 4.  Pacific Management holds itself out as doing business out of the following business addresses: 980 Montecito Drive, Suite 205, Corona, CA 92879 (Gale ¶ 31, Att. 17 at p. 450); 355 N. Sheridan St., Corona, CA 92880.  *Id.* at p. 448.  As shown below, the 980 Montecito address is shared with all of the other business entity defendants.  Pacific Management has also used the following business address: 541 N. Main St., #104-261, Corona, CA 92882.  Gale ¶ 15, Att. 4 at p. 378.  This address is a United Parcel Service ("UPS") private mail box that was shared with Prime West Management Recovery, LLC; Union Management Services, LLC; and City Investment Services, LLC.  Gale ¶¶ 60, 61, Att. 36.  This UPS location is now closed.  Gale ¶ 61.

**Prime West Management Recovery, LLC** ("Prime West") is Delaware limited liability company formed in January 2010 that is also registered as a limited liability company in California.  Gale ¶ 16, Att. 6.  Prime West is a debt collection company that collects consumer debt.  Gale ¶ 2.  Prime West holds itself out as doing business out of the following business addresses: 980 Montecito Drive, Suite 205, Corona, CA 92879 (Gale ¶ 31, Att. 17 at p. 452) and 109 N. Maple St., Suite C, Corona, CA 92880 (Gale ¶ 16, Att. 6 at p. 392.  Prime West also uses or has used the following private mail box addresses: 1191 Magnolia Ave., #D-381 or D-396, Corona, CA 92879 (*see e.g.,* Gale ¶ 60, Att. 36 at p. 607, Burge ¶ 18, Att. 8 at pp. 274, 275) and 541 N. Main St. #104-261, Corona, CA 92882.  Gale ¶ 16, Att. 6 at p. 396.  Prime West shares, or has shared these UPS private mail box addresses with business entity defendants: Pacific Management; Union Management Services, LLC; City Investment Services, LLC; Rincon Management Services, LLC; National Filing Services, LLC; and Global Filing Services, LLC.

**City Investment Services, LLC** ("City Investment") is a California limited liability company formed in March 2010.  Gale ¶ 18, Att. 8.  City Investment is a debt collection company that collects consumer debt.  Gale ¶ 2.  City Investment

3

holds itself out as doing business out of 980 Montecito Drive, Suite 205, Corona, CA 92879. Gale ¶ 31, Att. 17 at p. 457. City Investment also uses, or has used, the following private mail box addresses: 1191 Magnolia Ave., #D-381 or D-396, Corona, CA 92879 (Gale ¶ 60, Att. 36 at p. 607; Burge ¶ 22, Att. 12 at pp. 306, 307, 308) and 541 N. Main St. #104-261, Corona, CA 92882. Gale ¶ 18, Att. 8 at p. 406.

**Rincon Management Services, LLC** ("Rincon") is California limited liability company formed in June 2010. Gale ¶ 14. Rincon identifies itself to consumers and third parties as "Rincon Debt Management," "Rincon Filing Services," and "Pacific Management Recovery," which are unregistered trade names. Gale ¶¶ 26, 27. Rincon is a debt collection company that collects consumer debt. Gale ¶ 2. Rincon holds itself out as doing business out of the following business addresses: 495 E. Rincon St., Suites 201 and 204, Corona, CA 92879 (Gale ¶ 64, Att. 37 at pp. 616, 619; *see also* Delbridge ¶ 3) and 980 Montecito Drive, Suite 205, Corona, CA 92879, (Gale ¶ 60, Att. 36 at p. 607). Rincon also uses or has used the following private mail box address: 1191 Magnolia Ave., #D-381 or D-396, Corona, CA 92879. *Id.* at p. 607; *see also* Stump ¶¶ 8, 19, Att.2, Shane III ¶ 14, Att. 2, Robertson, Scottie ¶¶ 9, 10, Att. 3.

**Global Filing Services, LLC** ("Global Filing") is a California limited liability company formed in August 2010. Gale ¶ 19, Att. 9. Global Filing is a debt collection company that collects consumer debt. Gale ¶ 2. Global Filing holds itself out as doing business out of 980 Montecito Drive, Suite 205, Corona, CA 92879. Gale ¶ 35, Att. 21 at p. 492. Global Filing also uses the following private mail box address: 1191 Magnolia Ave., #D-381 or D-396, Corona, CA 92879. Gale ¶ 60, Att. 36 at p. 607.

**National Filing Services, LLC** ("National Filing") is a California limited liability company formed in August 2010. Gale ¶ 20, Att. 10. National Filing is a debt collection company that collects consumer debt. Gale ¶ 2. National Filing holds itself out as doing business out of 980 Montecito Drive, Suite 205, Corona,

CA 92879. Gale ¶ 20, Att. 10 at p. 418. National Filing also uses the following private mail box address: 1191 Magnolia Ave., D-381, Corona, CA 92879. Gale ¶ 60, Att. 36; *see also* ¶ 13, Att. 2 at p. 375.

**Union Management Services, LLC** ("Union Management") is a California limited liability company formed in March 2010. Gale ¶ 17, Att. 7. Union Management identifies itself to consumers and third parties as "Union Filing Services," which is an unregistered trade name. *See e.g.,* Bergmann declaration ¶ 13, Att. 2 at p. 19; Gale ¶ 28. Union Management is a debt collection company that collects consumer debt. Gale ¶ 2. Union Management holds itself out as doing business out of the following business addresses: 980 Montecito Drive, Suite 205, Corona, CA 92879 (Gale ¶ 31, Att. 17 at p. 459) and 355 N. Sheridan St., Suite 115, Corona, CA 92880. Gale ¶ 31, Att. 17 at p. 455. Union Management also uses, or has used, the following private mail box addresses: 1191 Magnolia Ave, Ste. D-381, Corona, CA 92879 (Gale ¶ 60, Att. 36 at p. 607; *see also* Smith, Donna ¶ 5) and 541 North Main Street, 104-261, Corona, CA 92882. Gale ¶ 17, Att. 7 at p. 407.

## 2.    Individual Defendants

**Jason R. Begley** ("Begley") is variously identified as the CEO, president, or managing member of all of the business entity defendants. *See* Gale ¶ 14, Att. 3, ¶ 15, Att. 4, ¶ 16, Att. 5, ¶ 17, Att. 7, ¶ 18, Att. 8, ¶19, Att. 9, ¶ 20, Att. 10 (California Secretary of State filings for business entity defendants); Gale ¶ 34, Att. 20 at p. 482 (Bank of America signature card for Rincon). Begley also controls bank accounts belonging to all of the business entity defendants. Gale ¶ 30, Att. 16, ¶ 34, Att. 20. Begley has funneled over $1.3 million from bank accounts held by the business entity defendants to Bagels Consulting Firm, Inc., another entity he controls, and Skyridge Legacy and Trust, a trust that is based out of his home. Gale ¶¶ 43, Att. 27, ¶ 44, ¶ 45, Att. 28, ¶¶ 46, 50. Begley has entered into contracts on behalf of the business entity defendants and is held out as the principal contact for the companies. *See e.g.,* Gale ¶ 60, Att. 36 at p. 607,

¶ 64, Att. 37 at p. 616.

**Wayne W. Lunsford** ("Lunsford") is variously identified along with Begley on California Secretary of State documents as one of two managers/members of all of the entities except Pacific Management. *See* Gale ¶ 14, Att. 3, ¶ 15, Att. 4, ¶ 16, Att. 5, ¶ 17, Att. 7, ¶ 18, Att. 8, ¶19, Att. 9, ¶ 20, Att. 10 (California Secretary of State filings for business entity defendants); Gale ¶ 34, Att. 20 at p. 482 (Bank of America signature card for Rincon). Lunsford also has control over bank accounts belonging to all of the business entity defendants, including Pacific Management. Like Begley, Lunsford has also funneled money from the business entity bank accounts to other entities he controls. Gale ¶ 40, Att. 26, ¶ 41, ¶ 47, Atts. 29, 30, ¶ 50. In total, Lunsford has made payments from bank accounts held by the business entity defendants to Lunsford Investment and Management Services, Inc., an entity over which he serves as CEO (*see* Gale ¶ 24, Att. 3), and WAL Legacy Gift and Trust, a trust over which Lunsford serves as trustee. Gale ¶ 47, Att. 30. These payments total over $1 million. Gale ¶ 51. After Begley, Lunsford is held out as a secondary contact for the business entity defendants. Gale ¶ 64, Att. 37 at p. 616.

## III.   STATEMENT OF FACTS

### A.   Introduction

Defendants collect debts by engaging in an elaborate deceptive scheme to lead the consumer into believing that he is a defendant in a lawsuit. In many instances the consumer does not even owe the debt that Defendants are attempting to collect. This is because the debt was previously paid by the consumer, it was discharged in bankruptcy, or it was never incurred by the consumer in the first place.

### B.   Defendants falsely represent that they are process servers seeking to serve the consumer with papers pertaining to a lawsuit

Defendants' collection scheme begins with a call from a first-level

collector, often to a consumer's employer, or a consumer's family, friends, or neighbors, in which the collector poses as a process server seeking to serve the consumer with papers pertaining to a lawsuit. Delbridge ¶¶ 5, 7, 9, Att. 1("Job Rebuttal Answers," "STO Rebuttal Answers," "NEW HIRE POINTERS"); Gale ¶ 3, Att. 1 at p. 369-70 (certified translation of "Spanish STO"); *see also* Bergmann ¶ 2;  Borey ¶¶ 2, 3; Byrd ¶ 2; Calhoun ¶ 2; Feldman ¶ 2; Fisher ¶¶ 2, 3; Hong ¶¶ 2, 7; Hunter ¶ 2; Jackson ¶ 2; Mandle ¶ 2; Savage ¶ 2; Shane III ¶¶ 2, 3; Smith, Donna ¶ 2, 3, Att.1; Tehrani ¶ 2; Torok ¶ 2; Underwood ¶ 2; Wafer ¶ 4; Wells ¶ 2; Wesner ¶ 2; Weisz ¶ 2; *see also* Gale ¶¶ 7, 8.

In instances when the collector does not have a third-party contact for the consumer, the collector will call the consumer directly and also masquerade as a process server. Beaver ¶¶ 2, 4; Gattorno ¶¶ 2, 15; Marovic ¶¶ 2, 3; McNamara ¶¶ 2, 5; Padleford  ¶ 2; Ratner ¶ 2; Robertson, Scottie ¶¶ 2, 3; Stump ¶ 2; *cf.* Guidry ¶ 4 (caller told her daughter and ex-husband she would be arrested); Lawson Jackson ¶ 3 (caller was from a "processing center").

This fictitious process server call is scripted and collectors read from what Defendants refer to as Standard Talk Offs ("STOs"). Defendants provide their collectors with STOs in Spanish and English. Delbridge ¶ 5. The STOs are intended for calls with a consumer's employer and other third parties, as well as for calls directly to the consumer. Delbridge ¶ 5, Att. 1 at p. 53 ("Abbreviations"). The translation of Defendants' Spanish STO instructs collectors to say the following:

> I am *(Miguel Davis/Veronica Garcia)* and am calling to see if there will be someone at home to receive legal documents to go to court.
>
> Sir/Madam the service processors will try to serve these documents twice (2x).
> Sir/Madam must respond or appear in court.  If unable to do so, [they] should say so immediately.
>
> What I will do is give you the number of the legal office and the case

*number. Do you have pencil and paper?*

*The phone number is 1(???)???-???? and the case number is (10??-?????).*

*Now I'm going to write down now that I spoke to _____ and if Sir/Madam do not say anything I will have the processor deliver these legal documents.*

Gale ¶ 3, Att. 1 at p. 369-70. Collectors are provided with a similar script in English. Delbridge ¶ 5.

The purpose of this call is to cause the consumer enough embarrassment and anxiety about the lawsuit, that he or she will immediately call the legal office seeking to take care of the lawsuit. Delbridge ¶¶ 10, 5, Att. 1 at p. 45. During this call-back, the consumer is connected to a second-level collector who extracts a payment from the consumer in "settlement" of the action. Delbridge ¶¶ 5, 6, 7, 8, 9, 10, 11, 12. Ensuring the call-back is essential, thus, Defendants carefully train their collectors to correctly deliver the deceptive statements during the initial call. For example, Defendants arm their collectors with rebuttal answers to frequently asked questions. Defendants' guideline called "JOB REBUTTAL ANSWERS" provides in part:

*QUESTION: WE DON'T PASS INFORMATION TO THE EMPLOYEES*
*A. LOOK I AM TRYING TO HELP YOUR COMPANY. THIS MATTER IS SERIOUS AND WILL CAUSE PROBLEMS AT THE JOB. GRAB A PEN AND GET THIS REDIRECTED TO THE EMPLOYEES [sic] HOME.*
*B. STILL NO – (STRONGLY ASK) WHAT IS YOUR NAME AND YOUR POSITION IN THE COMPANY? WE WILL DOCUMENT FOR THE RECORD THAT YOU MADE THE DECISION FOR THE [DEBTOR] TO BE SERVED AT HIS PLACE OF EMPLOYMENT.*
*. . .*

*QUESTION: WE DON'T VERIFY EMPLOYMENT OR GIVE OUT PERSONAL INFORMATION.*
*A. I AM NOT ASKING YOU TO VERIFY EMPLOYMENT. I AM TELLING YOU I HAVE A COURT ORDER HERE AGAINST ONE OF YOUR EMPLOYEES.*
*B. I AM NOT ASKING FOR ANY INFORMATION. I AM TELLING YOU WE*

> *HAVE A COURT ORDER. I AM TRYING TO SET UP SERVICE. GRAB A PEN GET [DEBTOR] TO REROUTE THIS CASE TO HIS HOME. HELP YOURSELF AND YOUR EMPLOYEE.*

Delbridge ¶ 5, Att. 1 at p. 39, *see also* Delbridge ¶ 8.

Similarly, the guideline "STO REBUTTAL ANSWERS," which is directed at calls with a consumer's personal contacts, such as family, friends, or neighbors provides, in part:

> *QUESTION: I HAVE NO CONTACT WITH [DEBTOR]*
> *A. WHY IS HE USING YOUR ADDRESS? HOW LONG SINCE YOU HAVE HAD CONTACT? WOW THEY ARE COMING TO YOUR HOUSE AFTER 2 ATTEMPTS THIS COURT PROCEEDING WILL GO ON WITHOUT THEM THEY WILL GET A FAILURE TO APPEAR. GRAB A PIN. [sic]*
>
> *QUESTION: WHO ARE YOU AND WHAT COUNTY ARE YOU CALLING FROM?*
> *A. I AM WITH THE PROCESS SERVICE DIVISION CALL FROM [sic] ------ -COUNTY.*

Delbridge ¶ 5, Att. 1 at p. 40-41; *see also* ¶ 9.

Defendants' primary goal is to hit the consumer at work because those calls yield a "70%" callback rate. Delbridge ¶ 10, ¶ 5, Att. 1 at p. 45 ("when first coming to an account it is always best to call the [place of employment] first"), p. 53 ("Abbreviations"). However, if a collector does not have a current work telephone number, he will call other people close to the consumer. Delbridge ¶ 5, Att. 1 at p. 45.

Consumers report receiving embarrassing messages from co-workers and bosses stating that he or she is in legal trouble and must return the process server's call. For example, consumer Sang Hong reported that a collector told his boss that the call involved a "debt related case" and if Mr. Hong "did not call the number back by 12:00 p.m. . . . . a warrant would be issued and [he] would be arrested and taken to jail." Hong ¶¶ 2, 5, 6. Similarly, consumer George Marovic stated a collector, claiming to be from sheriff's department, disclosed to his co-worker that he owed

1   money on a credit card debt and that he was about to receive a summons to appear in

2   court. Marovic ¶ 2. In another incident, one of Defendants' collectors called the

3   superintendent's office at the school district where consumer Donna Smith worked

4   claiming to the secretary that a "criminal/civil case" had been filed against Ms.

5   Smith. Smith, Donna ¶¶ 2, 3, Att. 1; *see also* Byrd ¶ 2; Feldman ¶ 2; Savage ¶ 2;

6   Sims ¶ 2, Att. 1; Wolfe ¶ 2.

7        Other consumers report receiving anxious calls from elderly parents, ex-

8   spouses, siblings, children, and other family members or friends relaying the

9   message that he or she is being sued. *See* Abbot ¶ 2; Bailey ¶ 2; Bergmann ¶ 2;

10  Borey ¶ 2; Fisher ¶ 2; Garza ¶ 2; Gonzalez ¶ 2; Guidry ¶ 4; Hunter ¶ 2; Mandle ¶ 2;

11  Marovic ¶ 5; O'Keefe ¶ 2; Pickelsimer ¶¶ 2, 4, 5, 10; Robertson, Kristie ¶ 11;

12  Robertson, Scottie ¶ 11; Shane III ¶ 2; Smith, Beverly ¶¶ 2, 3; Smith, Brian ¶¶ 2, 3;

13  Tehrani ¶ 2; Torok ¶ 2; Underwood ¶ 2; Wafer ¶ 2 Weisz ¶ 2; Wells ¶¶ 2, 4.

14       Some of these family members and friends have provided the FTC with

15  declarations stating that the collector made threats of dire legal consequences if the

16  consumer did not immediately call the number left for him or her. For example,

17  Bonita Rhoads reported the caller threatened that "if [her] daughter did not call

18  within three hours, he would take out a warrant and send someone to her house to

19  arrest her." Rhoads ¶ 3. Declarant James Howard Shane Jr. stated the caller

20  threatened that if his daughter-in-law or son did not call back immediately, "the

21  sheriff would come to [his] house and serve [him]." Shane Jr. ¶ 5. Similarly, Vicki

22  Taylor reported receiving multiple calls regarding her friend Sylvia Moore

23  Pickelsimer, and that on one such call Defendants threatened that if Ms. Pickelsimer

24  did not call back within a few hours she would be arrested. Taylor ¶¶ 2, 3, 4; *see*

25  *also* Byrd ¶¶ 2, 3, 4; Underwood ¶ 4; Waterstreet ¶ 2, 3; Wesner ¶¶ 2, 3, 9. Other

26  consumers report receiving this urgent process server call directly. Barleycorn ¶ 2;

27  Beaver ¶ 4; Calhoun ¶ 2; Gattorno ¶ 2; Guidry ¶ 2; Jackson ¶ 2; Lawson ¶¶ 2, 3, 4, 5,

28  6; Marovic ¶ 2; McNamara ¶ 2; Padelford ¶ 2; Ratner ¶ 2; Robertson, Scottie ¶¶ 2, 3;

Stump ¶ 2.

On these calls, the collector will typically provide the third party or the consumer with a fictitious court case number and a callback telephone number for the "legal office" handling the case, but no other information. Delbridge ¶ 5, Att. 1 at p. 38 (Spanish STO); Gale ¶ 3, Att. 1 at p. 369-70 (certified translation).

### C. Defendants falsely represent that they are lawyers, or from a law or business office, handling the fictitious court case against the consumer.

When consumers call the telephone number left for them by the "process server," they are connected to one of Defendants' second-level collectors. On these calls, the second-level collector, a "closer," often poses as a lawyer, or employee of a law office handling the complaint. Delbridge ¶¶ 11, 12 (on incoming calls from consumers, the collector would answer the phone "law office."); *see also* Bergmann ¶ 5; Fisher ¶ 5; Gattorno ¶¶ 4, 12; Savage ¶ 3; Shane III ¶ 7; Weisz ¶ 4; Wolfe ¶ 2; *cf.* Ratner ¶ 8 (collector claimed he "sued people every day."); Underwood ¶ 3 (collector stated "her client was going to file a lawsuit against [Underwood]").

In support of this fiction, collectors have put some consumer declarants on hold while they "confer" with an attorney on the debt settlement amount. *See* Delbridge ¶ 14; Fisher ¶ 5. In other instances, collectors will represent that they are from a business office, or a "filing" office handling the lawsuit. *See* Abbott ¶ 3; Bailey ¶¶ 5, 6, 7; Borey ¶¶ 4, 5, 7; Fisher ¶ 3, Hong ¶¶ 7, 8; O'Keefe ¶ 3; Ratner ¶ 2; Shane III ¶ 7; Stump ¶ 3; Tehrani ¶¶ 3, 5, 6; Smith, Beverly ¶ 5; Smith, Brian ¶ 5; Wells ¶ 6; *cf.* Marovic ¶¶ 3, 4 (collector answered the phone claiming to be from a criminal investigation bureau, or something similar); Sims ¶ 4 (collector stated that he "represented Chase Bank."). On these calls, Defendants' collectors do not reveal that they are, in fact, debt collectors calling on behalf of a collection agency.

### D. Defendants falsely threaten that a lawsuit has been filed, or will imminently be filed, against the consumer to coerce the consumer into paying Defendants.

Defendants' collectors threaten consumers with fictitious legal actions in

11

order to extract a payment. For example, consumer Edie Abbot was threatened that paying Defendants was the "only way [she] could stop a lawsuit and [her] possible arrest." Abbott ¶ 4. Another collector told consumer Chastity Beaver that if she did not agree to a payment within four days, she "would be served with a court summons" and would be liable for thousands of dollars in "court fees and processing charges." Beaver ¶¶ 2, 3. Consumer Tiffany Fisher was threatened that she had until Monday to settle her account, or she would be served with legal papers in connection with an imminent lawsuit. Fisher ¶ 5; *see also* Delbridge ¶ 5, Att. 1 at pp. 39, 40, 41, 45; Bailey ¶¶ 5; 8; Barleycorn ¶¶ 4, 5,7; Bergmann ¶¶ 2, 6; Borey ¶ 4; Byrd ¶ 3; Calhoun ¶ 2;, ¶¶ 11, 12; Feldman ¶ 2; Garza ¶¶ 2, 3; Gattorno ¶¶ 2, 3, 4, 7, 9, 12; Gonzalez ¶ 3; Guidry ¶¶ 2, 3, 4, 5; Hong ¶¶ 2, 5, 7; Hunter ¶¶ 3, 4; Jackson ¶¶ 2, 4, 5, 7; Mandle ¶ 3; Marovic ¶¶ 3, 4, 5, 7, 8; McNamara ¶¶ 2, 3, 5; Niday ¶¶ 3, 7; O'Keefe ¶¶ 2, 3, 4, 6; Padelford ¶ 2, 3, 5; Pickelsimer ¶¶ 5, 13; Ratner ¶¶ 2, 3, 4, 7, 8, 10; Rhoads ¶ 3; Robertson, Kristie ¶ 3; Robertson, Scottie ¶ 4; Savage ¶¶ 2, 4, 5; Shane III ¶ 9; Shane Jr. ¶ 5; Smith, Beverly ¶¶ 5, 6, 10; Smith, Brian ¶¶ 5, 6; Smith, Donna ¶¶ 2, 3, Att.1,¶ 6, ¶ 10; Stump ¶¶ 2, 6, 7, 12; Tehrani ¶¶ 5, 6, 12; Torok ¶ 3; Underwood ¶¶ 3, 4; Wafer ¶¶ 5, 6, 8; Waterstreet ¶¶ 2, 3; Wells ¶¶ 6, 7, 14, 16; Wesner ¶¶ 3, 4, 8; Weisz ¶¶ 2, 4; Wolfe ¶¶ 2, 3.

To those consumers who indicate that they are willing to "settle" the matter, Defendants have sent form settlement letters, which further suggest legal action has been taken. These letters are titled "OFFER OF SETTLEMENT" and state the amount that Defendants' "client" is willing to settle for. *See e.g.,* Bergmann ¶ 8, Att. 2. One such form settlement letter states that Defendants will "file a dismissal of the action" upon receipt of certified funds. *See* Garza ¶ 4, Att. 1.

The lawsuit that Defendants threaten has been filed or will imminently be filed is a complete fabrication. Defendants have not filed lawsuits against these consumers, and do not intend to file lawsuits. Although Defendants' collectors threaten consumers that service of a summons would take place in a few hours, or

that a lawsuit would imminently be filed, consumers testify that they have not been served with a lawsuit and, to their knowledge, sometimes after calling the relevant authorities, they find there is no action pending against them.  *See* Abbott ¶ 4; Bailey ¶¶ 5, 8; Barleycorn ¶¶ 4, 5,7; Beaver ¶¶ 4, 9;Bergmann ¶¶ 2, 6; Borey ¶¶ 2. 4; Byrd ¶ 3;.Calhoun ¶ 2;  Feldman ¶ 2; Fisher ¶¶ 2, 3, 4, 5, 8, 9, 10; Garza ¶¶ 2, 3; Gattorno ¶¶ 2, 3, 4, 7, 9, 12; Guidry ¶¶ 2, 3, 4, 5; Hong ¶¶ 2, 5, 7; Hunter ¶¶ 3, 4, 7; Jackson ¶¶ 2, 4, 5, 7; Mandle ¶¶ 3, 6; Marovic ¶¶ 3, 4, 5, 7, 8; McNamara ¶¶ 2, 3, 5; O'Keefe ¶¶ 2, 3, 4, 6; Padelford ¶ 2, 3, 5; Wells ¶ 6; Niday ¶¶ 3, 7, 8; Pickelsimer ¶¶ 5, 13; Ratner ¶¶ 2, 3, 4, 7, 8, 10; Rhoads ¶ 3; Robertson, Kristie ¶ 3; Robertson, Scottie ¶ 4; Savage ¶¶ 2, 4, 5; Shane III ¶ 9; Shane Jr. ¶ 5; Smith, Beverly ¶¶ 5, 6, 10; Smith, Brian ¶¶ 5, 6; Smith, Donna ¶¶ 2, 3, Att.1,¶¶ 6, 10; Stump ¶¶ 2, 6, 7, 12; Tehrani ¶¶ 5, 6, 12; Torok ¶ 3; Underwood ¶¶ 4, 12; Wafer ¶ 6, 11; Waterstreet ¶¶ 2, 3; Weisz ¶¶ 2, 4; Wells ¶¶ 6, 7, 14, 16; Wesner ¶¶ 3, 4, 8; Wolfe ¶¶ 2, 3.  Moreover, an "all states" search of the LEXIS judgment and liens database failed to uncover any instance in which a judgment was entered on behalf of any of the business entity defendants.  Gale ¶ 69.

In fact, it is unlikely that Defendants would be able to sue on many of the alleged debts they attempt to collect.  In many instances, consumer declarants have stated that they do not owe the debt because they paid off the account with the original creditor, settled the debt with another debt collection agency, discharged the debt in bankruptcy, or never incurred the debt in the first place.  *See* Borey ¶ 5; Byrd ¶ 3; Calhoun ¶ 10; Feldman ¶ 5; Fisher ¶ 6; Garza ¶ 5; Jackson ¶¶ 3, 4, 5, 6; Padelford ¶ 4; Pickelsimer ¶ 14; Robertson, Scottie ¶¶ 4, 6; Beverly Smith ¶¶ 6, 7; Brian Smith ¶ 8; Stump ¶¶ 20, Att.9, 21; Torok ¶¶ 3, 4, Att.1; Weisz ¶ 4; Wesner ¶ 8; Wolfe ¶¶ 4, 6, Att. 2, 7.

**E.    Defendants falsely threaten consumers with arrest, or seizure, garnishment, or attachment of a consumer's property or wages.**

In numerous instances, Defendants' collector also threatens the consumer with

13

arrest, or seizure, garnishment, or attachment of the consumer's property or wages, if he or she does not promptly settle the debt. For example, consumer Robin Barleycorn testified the collector left a threatening voicemail message for her, stating that if she did not call back, she would "face serious consequences, including [her] arrest, seizure of [her] assets, and that he would personally come find [her] at [her home] and publicly embarrass her." Barleycorn ¶ 4. When consumer Joshua Calhoun, asked the collector to provide him with more information about the debt, the collector grew impatient warning that he had "30 minutes to decide if [he] wanted to go to jail or not." Calhoun ¶ 5. Consumer David Savage was threatened that if he did not pay, the company "would contact law enforcement to issue a bench warrant, arrest [him], garnish [his] wages, and collect court fees . . . in addition to collecting the principal debt." *See also* Abbott ¶¶ 2, 4 (threat of arrest); Bailey ¶¶ 3, 5 (threats of arrest and seizure of assets); Barleycorn ¶¶ 4, 7, 9 (threats of arrest, seizure of assets and wage garnishment); Borey ¶ 2 (threatened with jail time); Calhoun ¶¶ 2, 5 (threat of arrest); Gattorno ¶¶ 9, 12 (threat of wage garnishment); Guidry ¶¶ 2, 4, 5, 6 (threat of arrest); Hong ¶ 5 (threat of arrest); Lawson ¶¶ 2, 3, 4, 6 (threat of arrest); Mandle ¶ 3 (collector claimed consumer was to be served with a warrant); Niday ¶ 2 (threat of arrest); O'Keefe ¶¶ 2, 3 (collector threatened consumer would be served with a warrant); Pickelsimer ¶¶ 2, 4, 11, 13 (threat of arrest); Rhoads ¶ 3 (threat of arrest); Savage ¶¶ 2, 4 (threats of arrest, wage garnishment and assessment of court fees); Smith, Beverly ¶ 3 (threat of arrest); Smith, Brian ¶ 3 (threat of arrest); Stump ¶ 2 (threat of arrest); Taylor ¶¶ 4, 7 (threat of arrest); Underwood ¶ 4 (threat of criminal charges); Waterstreet ¶¶ 2, 3 (threat of arrest); Wells ¶ 2 (threat of arrest); Wesner ¶¶ 3, 4, 8 (collector threatened the alleged debtor and family members with arrest); *see also* Delbridge ¶ 14 (collectors threaten immediate arrest if consumer did not make a payment); *cf.* Bergmann ¶ 6 (sherrif would be coming to his home because of a case on a credit card debt he owed). These threats, however, are empty threats and these consumers have not been

14

1   arrested, had their assets seized, or wages garnished.  Moreover, similar to the

2   fictitious lawsuit discussed above, Defendants do not have a legal basis to carry

3   through with the threatened action.  *See* consumer declarations cited in Section III.D.

4   *supra*.

5         **F.**    **Defendants collect fictitious attorneys' fees and court costs.**

6         Once a consumer has been intimidated by Defendants' threats of legal action,

7   and, in some instances, potential jail time, Defendants extract as much money as

8   they can from the consumer.  In addition to the amount of the purported debt,

9   collectors demand that consumers pay an additional amount of money, for what

10  Defendants often claim are "court costs and legal fees."  Delbridge ¶ 12; ¶ 5, Att. 1

11  at p. 44 (discussion of "spiff" payments); *see also* Beaver ¶ 3; Borey ¶ 4; Marovic ¶¶

12  7, 8; McNamara ¶ 3; Ratner ¶ 4; Robertson, Scottie ¶ 4; Wafer ¶5; Wells ¶ 7.  In

13  other instances, collectors claim that the additional fees are penalties, interest, and

14  finance charges.  Garza ¶ 3; Fisher ¶ 3; Padelford ¶ 4.  These additional amounts are

15  referred to internally by Defendants as "spiff" money.  On a typical account,

16  Defendants' collectors bring in spiff amounts from $1,000 to $1,500.  Delbridge

17  ¶ 15.  Defendants induce their collectors to seek these additional fees by paying an

18  80% commission on any spiff collected, once the collector reaches a certain

19  collection threshold.  Delbridge ¶ 5, Att. 1 at p. 44.  A document titled "Pay

20  Structure," authenticated by former collector Mr. Delbridge, provides "[s]piff money

21  is $500 collected over total balance principal and interest . . . Collector gets 80% of

22  that = $400 the other 20% = $100 goes to the manager of the office.  You don't get

23  spiff until hitting 10K regular money collected for the month."  Defendants further

24  tout "SPIFF MONEY IS HOW YOU CAN MAKE THE MOST MONEY" (*id.* at

25  Att. 1, p. 44) referring to their collections enterprise as "HHSMB= heavy hitter spiff

26  money business." *Id.*

27        **G.**    **Defendants violate various provisions of the FDCPA**

28        As discussed in Sections III.A.-F., *supra*, Defendants' business model is based

on making the consumer believe the call relates to a legal proceeding against him and is not just another run-of-the-mill collections call. Thus, by design, Defendants' collector does not provide the consumer with meaningful disclosure of his identity, a statement as to the purpose of his call, or notification of the consumer's right to dispute and obtain verification of the debts. These omissions violate the FDCPA.

Typically, Defendants' collector does not even provide the consumer with the name of his employer. Many consumer complainants only discover the name of the entity that called them by searching Defendants' callback number or address over the Internet. *See* Abbott ¶ 5; Barleycorn ¶ 8; Feldman ¶ 7; Gattorno ¶ 10; Lawson ¶ 8; Padelford ¶ 7; Pickelsimer ¶ 3; Sims ¶ 6; Underwood ¶ 4; *cf.* Calhoun ¶ 6 (H&R Block Emerald Card account statement indicated "Pacific Management" had withdrawn funds); Jackson ¶ 6 (first learned about "Prime West Management Recovery" from looking at his credit report showing the company made on inquiry on his credit report); Wafer ¶ 9 (the BBB provided Wafer with the company's name based on their address and telephone number). Thus, for every consumer that was able to determine Defendants' identity, and did complain to the FTC, their State Attorney General, or the BBB, there are no doubt numerous other victims who are still in the dark about Defendants' identity. The few instances in which Defendants have provided consumers with a business name or address occur upon a consumer's indication that he or she is willing to pay Defendants. At that point, Defendants send the consumer the Offer of Settlement letter, discussed in Section III.D. *supra*. This letter, often, however, does not contain the legal name of the business, but some variation of Defendants' business name and a mail drop address. *See e.g.*, Bergmann ¶ 13, Att. 2 at p. 19; Calhoun ¶ 8, Att. 1 at p. 29; Gale ¶ 13, Att. 2 at p. 372.

Finally, Defendants also do not validate debts as required under the FDCPA. Defendants do not inform consumers that they have the right to dispute and obtain verification of their debts, either in their initial communication with consumers or within five days thereafter. *See* Abbott ¶¶ 5, 6, 7; Bailey ¶¶ 7, 9, 10; Barleycorn

16

¶¶ 5, 6, 9; Beaver ¶¶ 3, 8, 9; Bergmann ¶¶ 8, 11, 13, 15; Borey ¶¶ 4, 5, 6, 7; Byrd ¶¶ 3, 5; Calhoun ¶¶ 4, 5, 11; Feldman ¶¶ 5, 10; Fisher ¶¶ 3, 4, 5, 10; Gattorno ¶¶ 3, 4, 7, 9, 18; Gonzalez ¶¶ 5, 11; Hong ¶¶ 8, 10; Hunter ¶¶ 3, 4, 7; Jackson ¶¶ 3, 4, 8; Lawson ¶¶ 5, 10; Marovic ¶¶ 3, 8, 9, 11; McNamara ¶¶ 3, 5; O'Keefe ¶¶ 3, 4, 6; Padelford ¶¶ 3, 9; Pickelsimer ¶¶ 6, 8, 17; Ratner ¶¶ 6, 7, 10; Robertson, Kristie ¶¶ 8, 16; Robertson, Scottie ¶¶ 8, 9, 16, Att. 1; Shane III ¶¶ 10, 12; Sims ¶¶ 4, 7, 8; Smith, Brian ¶¶ 10, 13; Smith, Donna ¶¶ 2, 3, Att.1, 6, 8, Att.3; Stump ¶¶ 3, 4, 5, 6, 7, 11, 12; Tehrani ¶¶ 4, 5, 6, 7, 12; Torok ¶¶ 2, 7; Wafer ¶¶ 4, 5, 6, 7; Weisz ¶ 2, 4, 8, 9; Wells ¶¶ 9, 14; Wolfe ¶¶ 4, 5, Att.1, ¶ 7. Some consumers who have asked the collector for information about the debt were not provided the information. *See* Barleycorn ¶¶ 6, 9, Beaver ¶ 3; Calhoun ¶ 4; Hong ¶ 8; Hunter ¶¶ 3, 4; Lawson ¶¶ 3, 4, 5; O'Keefe ¶ 4; Pickelsimer ¶ 6; Robertson, Scottie ¶ 8; Stump ¶ 12; Wells ¶ 9. In other instances, the collector told the consumer that the information would be sent, but only sent the offer of settlement letter setting forth nothing more than consumer's payment schedule on the purported debt. *See* Calhoun ¶¶ 4, 8, Att. 1 at p. 29; Hunter ¶¶ 3, 4, 5, Att. 1; Ratner ¶¶ 3, 7, Att. 1; Wolfe ¶¶ 4, 5, Att.1.

## H.    Defendants operate as a "common enterprise"

Business entity defendants Rincon, Prime West, Pacific Management, National Filing, City Investment, Global Filing, and Union Management are operating together as a common enterprise. Factors for determining the existence of a common enterprise are: (i) common control; (ii) sharing office space; (iii) transacting business through interrelated companies; and (iv) commingling of funds. *See, e.g., FTC v. J.K. Publications*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000). All these factors are present here.

The first factor is met because all of the business entity defendants are owned and controlled by Begley and Lunsford. As discussed in Section II.B.2, *supra*, Begley and Lunsford are the two people identified in the companies' corporate filings. The two also have signing authority over the entities' bank accounts, and

1    have exercised control over the money gained from the collection scheme. Both

2    Begley and Lunsford have moved millions of dollars from the accounts held by the

3    business entity defendants into accounts for other entities under their control and for

4    their benefit. *See* Gale ¶¶ 37, Att. 23, 40, Att. 25, 41, 42, 43, Att. 27, 44, 45, Att. 28,

5    46, 47, Att. 30, 48, 49, Att. 31, 50. Also, Begley has entered into contractual

6    agreements on behalf of the business entity defendants. He opened private mail

7    boxes in the name of the business entity defendants, and also contracted with a

8    service provider of toll-free numbers on behalf of some of the entity defendants. *See*

9    Gale ¶¶ 60, Att. 36, 64, Att. 37. Begley is noted as the primary contact for these

10   entities. Gale ¶ 64, Att. 37 at p. 616. After Begley, Lunsford is as the secondary

11   contact for the entities. *Id*.

12        The second factor is satisfied because all of the entity defendants share at least

13   one physical address, as well as a UPS private mail box. All of the entity defendants

14   have held themselves out as operating out of the following physical address: 980

15   Montecito Drive, Suite 205, Corona, CA 92879. Gale ¶ 31, Att. 17, ¶ 60, Att. 36,

16   ¶ 35, Att. 21, ¶ 20, Att. 10. Almost all of the entity defendants, except for Pacific

17   Management, hold themselves out as using the following private mail box addresses:

18   1191 Magnolia Ave, D-381, D-396, Corona, CA 92879. Gale ¶ 60, Att. 36.

19   Previously, four of the entity defendants, including Pacific Management, held

20   themselves out as using the following private mail box: 541 North Main Street,

21   #104-261, Corona, CA 92882. This UPS store is now closed. Gale ¶ 15, Att. 4,

22   ¶ 16, Att. 8, ¶ 18, Att. 8, ¶ 17, Att. 7. In addition to these addresses, two or more of

23   the business entity defendants share one or more toll-free telephone numbers to

24   conduct their business. Gale ¶¶ 65, 66.

25        The business entity defendants also operate as interrelated companies, thus

26   meeting the third factor of the *J.K. Publications* test. In addition to shared

27   management, control, and office space, the entities use the same scripts, form letters,

28   and employee "desk names." Most consumers victimized by the business entity

18

defendants report the same fictitious process server call and being threatened with a lawsuit. *See* Gale ¶ 8; *see also* evidence cited *supra* Sections III.B.-D. Also, a number of consumers, including some of the consumer declarants, indicate that they dealt with a person named "Mike Davis," (Gale ¶¶ 67, 68), which Mr. Delbridge states is a "desk name" used by collectors that was in one of the scripts he was provided. Delbridge ¶ 5. The business entity defendants also use the same form letters in their correspondence to consumers and third parties. *See e.g.,* Gale ¶ 13, Att. 2 at pp. 372, 373; Burge ¶ 18, Att. 8 at p. 274, *compare* ¶ 22, Att. 12 at p. 303. The BBB response letters from Prime West and City Investment are all signed by "Richard McKinley," a purported director for the companies. *See e.g.,* Burge ¶ 18, Att. 8, ¶ 22, Att. 12. Richard McKinley is not identified as a director in any of the business entity defendants Secretary of State filings, thus, it is also likely to be a "desk name."

Finally, the fourth factor is met because Defendants' banks record show that the business entity defendants' funds are commingled. Bank records for accounts held by some of the business entity defendants show payments made directly from one entity to another. Gale ¶ 36, Att. 22. In addition, the records reveal that the business entity defendants made payments of millions of dollars to other entities controlled by Begley and Lunsford. Between December 2010 to July 2011, six of the seven entities have deposited over $1.6 million into an account held by a limited partnership called Portfolio Investment Group, LP ("Portfolio"). Gale ¶ 38, Att. 24, ¶ 39. The bank records also show money flowing from the Portfolio account to accounts held by National Filing Services, Prime West Management Recovery, and Rincon Management Services. *Id.* Portfolio is not a debt collection company, but seems to be a repository for some of the money earned from this scam. Begley is noted on Portfolio's corporate filing as the partnership's President (Gale ¶ 22, Att. 11 at p. 420), and Begley and Lunsford are the only individuals with signing authority over the Portfolio account into which the money was deposited. Gale ¶ 30,

Att. 16 at p. 446.  Portfolio, in turn, has wired over $2 million to a company called BAL Financial, LLC ("BAL Financial"), a debt buyer/seller, likely to purchase the debt that Defendants collect.  Gale ¶ 53, Att. 33.

Moreover, between May 2009 and August 2011, Begley has authorized over $1.3 million in payments from the bank accounts held by the business entity defendants to Skyridge Legacy Trust, a trust that is located out of Begley's home, and Bagels Consulting Firm, Inc. ("Bagels Consulting"), a company over which he serves as CEO.  *See* Gale ¶ 50, ¶ 45, Att. 28, ¶ 23 Att. 12.  Lunsford has similarly exercised control over the proceeds of the scam.  Between February 2010 and August 2011, Lunsford has authorized over $ 1 million in payments from the bank accounts held by the business entity defendants to Lunsford Investment and Management Services, Inc. ("Lunsford Investment"), where he serves as the CEO and WAL Legacy Trust, a trust over which he serves as trustee.  *See* Gale ¶ 51, ¶ 24, Att. 13, ¶ 47, Att. 30.  The records for the account held by Lunsford Investment suggest that Lunsford uses the business account as a personal checking account.  Gale ¶ 40, Att. 26 pp. 526-30.

## I.    Consumer injury is substantial and ongoing

Intimidated by Defendants' threats of a legal action, arrest, wage garnishment, and/or property seizure, consumers are compelled to pay Defendants, sometimes thousands of dollars (Delbridge ¶ 15), to settle fictitious cases over what are often non-existent debts.  Although we do not know the full extent of the consumer injury in this case, there are several proxies to suggest that it is significant.  In the approximately two year period between April 2009 and June 2011, Defendants' charges to consumers' VISA credit cards totaled approximately $7,490,117.  Gale ¶ 55, Att. 34, ¶ 56.  This amount was collected through 23,530 separate charges.  *Id.* at ¶ 56.  In addition, between September 2009 and July 2011, Defendants' charges to consumers' MasterCard credit cards totaled approximately $2,070,536.  Gale ¶ 57, Att. 35, ¶ 58.  This amount was collected through 6,304 separate charges.  *Id.* ¶ 58.

1  Taken together, Defendants charges to consumers' MasterCard and VISA credit

2  cards total approximately $9,479,653, collected through a total of 29,834 separate

3  charges. Gale ¶ 59.

4  **IV.  LEGAL ARGUMENT**

5       Plaintiff asks the Court to enter a TRO that prohibits Defendants from making

6  material misrepresentations and violating the FDCPA in the collection of debts,

7  freezes Defendants' assets, grants immediate access to Defendants' business

8  premises, orders an accounting, grants limited expedited discovery, appoints a

9  temporary receiver, and orders Defendants to show cause why a preliminary

10 injunction should not issue and why a permanent receiver should not be appointed.

11      **A.    Defendants Violate Section 5 of the FTC Act (Count One)**

12      Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in

13 or affecting commerce." 15 U.S.C. § 45(a). An act or practice is deceptive under

14 Section 5(a) if it involves a material representation, omission, or practice that is

15 likely to mislead consumers, acting reasonably under the circumstances, to their

16 detriment. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994); *Kraft, Inc.*

17 *v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992). The FTC need not prove reliance by

18 each consumer misled by Defendants. *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595,

19 605 (9th Cir. 1993); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1275 (S.D. Fla.

20 1999). A representation or omission is material if it is likely to affect a consumer's

21 decision. *Figgie*, 994 F.2d at 606 (citations omitted). Express claims, or

22 deliberately made implied claims, used to induce a consumer's action, are presumed

23 to be material. *SlimAmerica*, 77 F. Supp. 2d at 1272; *Pantron I*, 33 F.3d at 1096.

24 Moreover, consumer reliance on express claims is presumptively reasonable. *FTC v.*

25 *Data Med. Capital, Inc.*, 2010 WL 1049977, at *28 (C.D. Cal Jan. 15, 2010)

26 (citations omitted). To establish a claim under Section 5(a) of the FTC Act, the FTC

27 need not prove that Defendants' misrepresentations were made with an intent to

28 defraud or deceive, or were made in bad faith. *See, e.g., FTC v. World Travel*

*Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1495 (1st Cir. 1989).

As discussed in Section III.B.-E., *supra*, Defendants misrepresented the following to consumers and third parties: (1) that Defendants' collector is a process server seeking to serve the consumer with pleadings or legal papers pertaining to a lawsuit filed against the consumer; (2) that Defendants' collector is an attorney, or Defendants' communication is from an attorney; (3) that nonpayment of the debt will result in the consumer's arrest, or in the seizure, garnishment, or attachment of the consumer's property or wages; and (4) that Defendants have filed or intend to file a lawsuit against the consumer. These representations are presumed to be material because Defendants make them expressly, and to the extent they are implied claims, they are deliberately made. By making misrepresentations likely to mislead consumers acting reasonably, Defendants have engaged in deceptive acts or practices in violation of Section 5 of the FTC Act.

## B.    Defendants Violate the FDCPA (Counts Two, Three, Four, and Five)

Defendants are debt collectors engaging in deceptive and abusive practices violate the Fair Debt Collection Practices Act.[2] Congress enacted the Fair Debt Collection Practices Act in 1977 "to protect consumers from debt collectors' abusive debt collection practices." *Fuller v. Becker & Poliakoff, P.A.,* 192 F. Supp. 2d 1361, 1366 (M.D. Fla. 2002) (citing *Hawtorne v. Mac Adjustment, Inc.,* 140 F.3d 1367 (11th Cir. 1998)). Congress found that "[a]busive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss

---

[2] The FDCPA defines "debt collector" as those persons who operate a business "the principal purpose of which is the collection of any debts." *FTC v. Check Investors, Inc.,* 502 F.3d 159, 173 (3rd Cir. 2007); 15 U.S.C. §1692a(6). An assignee of a debt is a debt collector subject to the FDCPA, if the debt is in default at the time of the assignment. *Pollice v. National Tax Funding, L.P.,* 225 F.3d 379, 403-404 (3rd Cir. 2000).

of jobs, and to invasions of individual privacy." 15 U.S.C. §1692(a).

The FDCPA sets forth a nonexclusive list of unlawful debt collection practices and provides for public enforcement by the FTC.  Although Defendants violate several provisions of the FDCPA, a single violation is sufficient to establish civil liability.  *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2nd Cir. 1993), 15 U.S.C. §1692k(a) (establishing liability for "any debt collector who fails to comply with any provision of this subchapter.").  Violations of the FDCPA also violate the FTC Act for purposes of the FTC's enforcement of the FDCPA.  15 U.S.C. §1692*l*; *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1174 n.5 (11th Cir. 1985).

1.  <u>Defendants engage in prohibited communications with third parties in violation of Section 805 of the FDCPA (Count Two)</u>

Section 805(b) of the FDCPA bars debt collectors from communicating with third parties other than for the purpose of obtaining a consumer's home or workplace address or telephone number, unless the consumer consents to the third-party communication or the communication is reasonably necessary to effectuate a post-judgment remedy.  15 U.S.C. §1692c(b).  Prohibited third-party communications include contacts with family members such as parents, grandparents, aunts and uncles, siblings, and children.  *See e.g., West v. Costen*, 558 F. Supp. 564, 575 (W.D. Va. 1983).

Defendants' written guidelines establish that it is their practice to contact consumers' place of employment, or consumers' family, friends, or neighbors, not for the purpose of obtaining consumer contact information, but to pressure consumers to pay through embarrassment and harassment.  Delbridge ¶ 10.  This is evidenced by the written guidelines "JOB REBUTTAL ANSWERS" and "STO REBUTTAL ANSWERS," as well as a document titled "New Hire Pointers."  Delbridge ¶ 5, Att. 1 at pp. 39, 40, 41, 45.

As discussed in Section III.B., *supra*, third-party declarants report that Defendants' collectors have called them and threatened their family member or friend with service of a lawsuit and sometimes arrest, if the consumer did not call

23

1   back within a few hours.  One collector went so far as to threaten Julie Byrd that

2   because she was a co-signer on her boyfriend's account, "the sheriff was about to

3   serve a summons on her in connection with a civil lawsuit."  These and other third

4   party and consumer declarations, the declaration of Defendants' former collector,

5   and Defendants' script and written guidelines establish Defendants' widespread and

6   egregious violations of Section 805(b).

7          2.    Defendants engage in harassment, oppression, and abuse of
               consumers in violation of Section 806(6) of the FDCPA (Count
8              Three)

9          Section 806 of the FDCPA bars debt collectors from engaging in "any conduct

10  the natural consequence of which is to harass, oppress, or abuse any person in

11  connection with the collection of a debt."  15 U.S.C. §1692d.  Section 806(6)

12  specifically prohibits debt collectors from placing telephone calls without

13  meaningful disclosure of the caller's identity.  *Id.* §1692d(6).  Courts have

14  interpreted Section 806(6) to require the caller to "[s]tate his or her name and

15  capacity, and disclose enough information so as not to mislead the recipient as to the

16  . purpose of the call."  *Hosseinzadeh v. M.R.S. Associates, Inc.*, 387 F. Supp. 2d 1104,

17  1112 (C.D. Cal. 2005) (citations omitted).  Defendants consistently violate Section

18  806(6).

19         The consumer declarants who received the first-level collector call report that

20  the collector stated or implied that he or she was a process server, or worked for a

21  law enforcement agency such as the sheriff's department.  *See* consumer declarations

22  cited in Section III.B. *supra.*  In perpetuating the deception, the collector does not

23  provide the consumer with his or her name, or the name of the collection company

24  that he or she is working for.  The collector also does not tell the consumer that the

25  call is a collection call.  Under Section 806(6), when dealing directly with the debtor,

26  the collector must disclose that information, but Defendants do not.  Many consumer

27  declarants who complained to the FTC or to the BBB only learned the identity of the

28  entity that called them by searching the callback telephone number provided by the

24

"process server" through and Internet search. Other consumers learn this information when the company sends the consumer an offer of settlement letter after he or she expresses a willingness to pay Defendants. *See* consumer declarations cited in Section III.G. *supra*.

### 3. Defendants make false or misleading representations in violation of Section 807 of the FDCPA (Count Four)

Section 807 of the FDCPA prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. §1692e. Section 807 lists examples of activities that violate its strictures, but provides the prohibited actions are not limited to these examples. *Id.* In determining whether a statement or practice is deceptive, courts use the "least sophisticated consumer" standard to ensure that the FDCPA "protects all consumers, the gullible as well as the shrewd." *Clomon*, 988 F.2d 1318.

#### a. *Defendants violate Section 807(2) of the FDCPA*

Section 807(2) of the FDCPA bars collectors from falsely representing the "character, amount, or legal status of any debt." 15 U.S.C. §1692e(2). Defendants' violate all parts of Section 807(2).

Falsely representing the character of any debt. Defendants, in many instances, falsely characterize the money being collected as a "debt" the consumer owes. Several of the consumer declarants state that Defendants are attempting to collect a debt that they do not even owe because it had been paid to the original creditor, or another debt collection agency, was discharged in bankruptcy, or the debt was never incurred in the first place. *See* consumer declarations cited in Section III.D. *supra*.

Falsely representing the amount of any debt. As discussed in Section III.E., *supra*, Defendants' collectors inform consumers that they are obligated to pay fictitious court costs and attorneys' fees on any debt collected. *See* evidence cited in Section III.F. *supra*. Mr. Delbridge, Defendants' former collector, states that, in his experience, the typical "fees" collected on an account were anywhere between $1,000 to $1,500. Delbridge ¶ 15. Thus, even for debts that were legitimately owed

by the consumer, collectors misrepresent the total amount of the debt and collect the additional fees whenever possible. Defendants' induce their collectors to bilk consumer of these additional "fees" by paying out large commissions on any additional amounts collected. Delbridge ¶ 5, Att. 1 at p. 44.

Falsely representing the legal status of any debt. Defendants' entire collection scheme is based upon misrepresenting the legal status of the debt as the subject of a pending lawsuit, or some other legal action. As discussed in Section III.D., *supra*, Defendants falsely threaten that a lawsuit has been filed against the consumer, or will soon be filed. Defendants have even instructed collectors to threaten that a judgment has been entered against the consumer: "I AM TELLING YOU I HAVE A COURT ORDER HERE AGAINST ONE OF YOUR EMPLOYEES . . . I AM TRYING TO SET UP SERVICE." Delbridge ¶ 5, Att. 1 at p. 39. In a number of instances, collectors threaten the consumer with arrest, implying that the debt is also the subject of a criminal action. In other instances, collectors threaten that if the debt is left unpaid, the court will seize the consumer's assets or attach the consumer's wages. *See* discussion and evidence cited in Section III.E. *supra*.

> b.  *Defendants violate Section 807(3) of the FDCPA*

Section 807(3) of the FDCPA bars the false representation or implication that any individual is an attorney or that any communication is from an attorney. 15 U.S.C. §1692e(3). Defendants violate Section 807(3). As discussed in Section III.C., *supra*, Mr. Delbridge and a number of consumer declarants state that Defendants' collectors have represented that they are attorneys, or work for the law office that is handling the complaint against the consumer. Collectors have even gone so far as to engage in a fake negotiation between the consumer and the "lawyer" handling the case. *See* evidence cited in Section III.C. *supra*.

> c.  *Defendants violate Section 807(4) of the FDCPA*

Section 807(4) of the FDCPA bars collectors from falsely representing or implying that nonpayment will result in a consumer's arrest, imprisonment, or

1   seizure or garnishment of a consumer's property or wages.  15 U.S.C. §1692e(4).

2   Representations that a consumer will be arrested or imprisoned, or that the

3   consumer's property will be seized or garnished, violate this section "unless such

4   action is lawful and the debt collector or creditor intends to take such action." *Id.*

5        Consumer declarants state that Defendants collectors made threats of arrest

6   against them, or their friends or family members. *See* discussion evidence cited in

7   Section III.E. *supra.* Mr. Delbridge corroborates that collector threatened consumers

8   with arrest if the consumer did not immediately pay the debt. Delbridge ¶ 14.  In

9   addition, some consumer declarants stated that collectors threatened their assets

10  would be seized, or their wages would be garnished if they did not pay the debt. *See*

11  *e.g.,* Bailey ¶¶ 3, 5; Barleycorn ¶¶ 4, 7, 9; Byrd ¶ 3; Gattorno ¶¶ 9, 12.  A number of

12  these consumers claim that they do not owe the debt being collected, thus, as to

13  those consumers, it is clear that Defendants' threats are unlawful.

14       In addition, Defendants have no intention of carrying out these threats.  This is

15  established both by Mr. Delbridge's statement that the threats of arrest are made-up

16  by collectors, Delbridge ¶ 14, and by consumer statements that these threats of dire

17  legal consequences do not come to pass when they challenge the collection attempt

18  and do not pay. *See* consumer declarations cited in Section III.D. *supra.*

19            d.    *Defendants violate Section 807(5) of the FDCPA*

20       Section 807(5) of the FDCPA bars threats to take any action that cannot

21  legally be taken or is not intended to be taken. 15 U.S.C. §1692e(5).  It includes

22  threats to file a suit were there is not intention to sue. *Id.*

23       As discussed in detail in Sections III.D.-E., *supra,* Defendants' collectors

24  make empty threats of lawsuits, arrest, property seizure, and wage garnishment that

25  they either cannot take, or do not intend to take.  Consumer declarations and

26  complaints, as well as Mr. Delbridge's testimony, provide ample proof of

27  Defendants' Section 807(5) violations.

28            e.    *Defendants violate Section 807(10) of the FDCPA*

Section 807(10) is a catch-all provision, barring the use of any false representation or deceptive means to collect or attempt to collect a debt.  The FTC Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50098-50110 ( 13, 1988), Section 807(2) (hereinafter "FTC Staff Commentary") to the FDCPA explains that "violation of any part of [S]ection 807 will usually also violate subsection (10)."  In addition to the other Section 807 violations discussed herein, Defendants also violate Section 807(10) by representing to consumers and third parties that they are process servers.  *See* discussion and citations in Section III.B. *supra*; *see also* Gale ¶¶ 7, 8.

    4.   <u>Defendants fail to provide validation notices in violation of Section 809 of the FDCPA (Count Five)</u>

Section 809(a) of the FDCPA requires that a debt collector, within five days of the initial communication with the consumer, provide the consumer with a written notice containing the amount of the debt and the name of the creditor, along with a statement that the debt collector will send a verification of the debt or a copy of the judgment if the consumer timely disputes the debt in writing, and a statement that upon the consumer's written request the collector will provide the consumer with the name and address of the original creditor if different from the current creditor.  15 U.S.C. §1692g(a).  The consumer declarants have not received validation notices concerning the purported debts Defendants are collecting.  *See* consumer declarations cited in Section III.G.

**C.**    **This Court is authorized to grant the requested relief**

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes this Court to issue the temporary and preliminary relief that the FTC seeks.  The second proviso of Section 13(b) authorizes the FTC to seek, and this Court to issue, a permanent injunction "in proper cases."  A "proper case" includes any matter involving a violation of a law that the FTC enforces.  *FTC v. H.N. Singer*, 668 F.2d 1107, 1113 (9th Cir. 1982).  A common fraud case such as this one qualifies as a "proper case" for injunctive relief under Section 13(b).  *Id.* At 1111.

28

1       Section 13(b) also permits the Court to grant whatever additional, temporary,

2  or preliminary relief is necessary to preserve the possibility of effective final relief.

3  *Singer*, 668 F.2d at 1113-14. Such relief may include a temporary restraining order

4  enjoining practices and a preliminary injunction. *See, e.g., id.*; *see also FTC v. U.S.*

5  *Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984) ("Congress did not limit the

6  court's powers under the [second] proviso of § 13(b) and as a result this Court's

7  inherent equitable powers may be employed to issue a preliminary injunction,

8  including a freeze of assets, during the pendency of an action for permanent

9  injunctive relief."). In fact, Congress observed that Section 13 "authorizes the FTC

10  to file suit to enjoin any violations of the FTC Act. The FTC can go into court ex

11  parte to obtain an order freezing assets, and is also able to obtain consumer redress."

12  S. Rep. No. 103-30, at 15-16 (1993), *reprinted in* 1994 U.S.C.C.A.N. 1776, 1790-

13  91. The exercise of this broad equitable authority is particularly appropriate where,

14  as here, the public interest is at stake. *Porter v. Warner Holding Co.*, 328 U.S. 395,

15  398 (1946); *United States v. Laerdal Mfg.*, 73 F.3d 852, 857 (9th Cir. 1995); *FTC v.*

16  *World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989). When the public

17  interest is implicated, this Court's equitable powers "assume an even broader and

18  more flexible character than when only a private controversy is at stake." *FTC v.*

19  *Gem Merchandising Corp.*, 87 F.3d 466, 469 (11th Cir. 1996) (quoting *Warner*

20  *Holding*, 328 U.S. at 398).

21       In addition, Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), authorizes

22  the FTC to enforce violations of the FDCPA in the same manner as it prosecutes

23  violations of an FTC trade regulation rule. Section 19(b) of the FTC Act, 15 U.S.C.

24  § 57b, authorizes this Court to grant relief as it finds necessary to redress injury to

25  consumers resulting from violations of a trade regulation rule. Congress has

26  provided in the FTC Act that such relief may include, but should not be limited to,

27  "rescission or reformation of contracts, the refund of money [and] return of property

28  . . . ." *Id.* § 57b(b).

**D.    A TRO and preliminary injunction against Defendants are warranted**

Unlike litigation between private parties, the traditional four-pronged injunctive relief test is inapplicable to § 13(b) actions. *See FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999).  Instead irreparable injury is presumed in a statutory enforcement action, *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175-76 (9th Cir. 1987), and the Court need only "1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities." *Affordable Media*, 179 F.3d at 1233 (9th Cir. 1999).  In weighing the public and private equities, the public interest should receive greater weight. *FTC v. Warner Comm.*, Inc., 742 F. 2d 1156, 1165 (9th Cir. 1984) (per curiam).  In particular, requiring defendants to comply with the FTC Act, to refrain from fraudulent representations, or to preserve their assets from dissipation or concealment is not an oppressive hardship. *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989).

1.    The FTC is likely to succeed on the merits

Generally, the FTC "meets its burden on the likelihood of success issue if it shows preliminarily, by affidavit or other proof, that it has a fair and tenable chance of ultimate success on the merits." *FTC v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C. Cir. 1978) (quoting *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1090 (S.D.N.Y. 1977)).  This can be shown "by a prima facie showing of illegality." *FTC v. GTP Mktg., Inc.*, 1990 WL 54788, *4 (N.D. Tex. 1990).  The FTC can prove its claims through a small number of injured consumers, from which a court can infer a pattern or practice of deceptive behavior. *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991); *see also FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989).  Moreover, in considering an application for a temporary restraining order or preliminary injunction, the Court has the discretion to consider hearsay evidence. *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (even inadmissible evidence may be given some weight when to do

1  so serves the purpose of preventing irreparable harm before trial); *see also*

2  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal

3  Rules of Evidence do not apply to preliminary injunction hearings."). As discussed,

4  *supra*, the FTC is indeed likely to succeed on the merits of all five Counts of the

5  Complaint.

6  As demonstrated in Sections III.B.-G., *supra*, Defendants have repeatedly

7  violated Section 5 of the FTC Act and the FDCPA. The evidence shows that

8  Defendants have made numerous material misrepresentations to consumers

9  concerning their identity, the purpose of their call, and consumers' financial, civil,

10  and criminal liability. Defendants have also committed multiple violations of the

11  FDCPA. Therefore, there is a likelihood that the FTC will prevail on the merits of

12  this action.

13       2.    <u>The equities weigh in favor of granting injunctive relief</u>

14  The public equities in this case overwhelmingly warrant preliminary and

15  ancillary injunctive relief. The proposed TRO and preliminary injunction would

16  prohibit Defendants from continuing to violate the FTC Act and the FDCPA. An

17  injunction will prevent further harm to consumers by enjoining Defendants' false

18  and deceptive collection practices, as well as their violations of the FDCPA. If the

19  asset freeze, immediate access to the business premises, and expedited discovery are

20  also granted, they will preserve Defendants' assets for equitable monetary relief for

21  injured consumers, and will preserve necessary evidence. Defendants' past conduct

22  and the consumer complaints demonstrate that they wil not stop their deceptive and

23  abusive conduct unless forced to do so. *See* Sections III.B.-I., *supra* and Section

24  IV.G., *infra*. Moreover, the conduct prohibitions contained in the proposed TRO

25  would work no hardship on Defendants, as they have no right to engage in practices

26  that violate the law. *See World Wide Factors*, 882 F.2d at 347. Because the

27  injunction will preclude only harmful, illegal behavior, the public equities

28  supporting the proposed injunctive relief outweight any burden imposed by such

31

1    relief on Defendants. *See e.g., Nat'l Soc'y of Prof'l Eng'rs v. U.S.*, 435 U.S. 679,

2    697 (1978).

3    **E.    An asset freeze, immediate access to the business premises,**
          **expedited discovery, and appointment of a receiver are necessary**

4

5    Defendants' assets should be frozen. The Ninth Circuit has held that an asset

6    freeze may be imposed when a likelihood of dissipation of assets exists. *Johnson v.*

7    *Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Further an asset freeze is

8    appropriate to preserve those assets for possible restitution of monies fraudulently

9    obtained. *H.N. Singer*, 668 F.2d at 1113. Where defendants have committed fraud,

10   a court may conclude there is a likelihood that assets will be dissipated. *SEC v.*

11   *Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972). The magnitude of

12   Defendants' ultimate liability also warrants the entry of an asset freeze. *FTC v. USA*

13   *Bevs., Inc.*, 2005 U.S. Dist. LEXIS 39075, at *24-25 (S.D. Fla. Dec. 5, 2005).

14   In this case, an asset freeze is warranted because Defendants' business is

15   permeated by fraud, and because Defendants face a potential liability of over $ 9.4

16   million. *See* Gale ¶ 59, Section III.I. *supra*. These facts give them ample motivation

17   to hide their funds. Moreover, if Defendants' potential liability exceeds the amount

18   of assets in their possession, any expenditure by Defendants will dissipate the

19   already insufficient pool of assets that is likely available to redress the consumer

20   injury they have caused. A TRO that freezes Defendants' assets would preserve the

21   possibility of full and effective relief for defrauded consumers by preserving the

22   status quo pending a hearing on the preliminary injunction.

23   In addition, immediate access to Defendants' business premises is warranted

24   to allow Plaintiffs to locate, copy, and preserve relevant evidence. Expedited

25   discovery is also needed so that Plaintiffs can locate all of Defendants' assets and

26   business records. As the Declaration of FTC Counsel shows, when Defendants learn

27   of an FTC action to enjoin their unlawful behavior and to seek monetary relief for

28   injured consumers, they often dissipate assets and destroy documents. *See*

     Declaration of FTC counsel Maricela Segura ¶¶ 12-16 filed concurrently herewith.

Finally, appointment of a receiver is a sound equitable remedy in cases involving deception. *In the Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1997). The appointment of a receiver is necessary to take control of the business entity defendants' operations, prevent the destruction of documents and computer records, help identify injured consumers and the extent of consumer harm, determine the entity defendants' financial status, and locate, marshal, and safeguard corporate assets. *See SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 438 (5th Cir. Unit A May 1981); *see also McGaughey*, 24 F.3d at 907. A receiver is necessary here because, as discussed in Sections III.B.-G. *supra*, Defendants' business is permeated by fraud. *See SEC v. R.J. Allen & Assoc., Inc.*, 386 F. Supp. 866, 878 (S.D. Fla. 1974) ("in circumstances of egregious fraud . . . the appointment of a receiver is necessary to prevent diversion or waste of assets to the detriment of those for whose benefit, in some measure, the injunction is brought.") (quotations and citations omitted). Here it is clear that the individual defendants must be temporarily divested of control of the entities to preserve the status quo, and to protect consumers who have been injured by Defendants' activities. The FTC has identified a candidate for receiver in a concurrently-filed pleading.

**F.     Defendants are liable for each other's deceptive acts and practices because they are operated together as a common enterprise**

Defendants who act jointly as a common enterprise are jointly liable for the violations of each other. Courts have found common enterprises in a variety of FTC actions under Section 13(b) where there has been common corporate control, shared office space, shared employees and officers, interrelated funds, and other factors. *See, e.g., FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000); *FTC v. Marvin Wolf*, 1996 WL 812940, *8 (S.D. Fla. 1996). Indeed, where "the same individuals were transacting an integrated business through a maze of interrelated companies[,] . . . 'the pattern and frame-work of the whole enterprise must be taken into consideration'" and the companies may be held jointly liable as a common enterprise. *J.K. Publications*, 99 F. Supp. 2d at 1202 (quoting *Delaware*

33

1  *Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964)).

2       As discussed in Section III.H., *supra,* Begley and Lunsford operate and

3  control the business entity defendants. The business entity defendants share at least

4  one physical address and one or more addresses that are merely mail drops. The

5  business entity defendants also share scripts and form letters in their correspondence

6  with consumers and consumer protection agencies. Finally, the evidence shows that

7  the companies commingle funds. Thus, the Court should hold the business entity

8  defendants jointly liable for each other's violations of the FTC Act and the FDCPA.

9

10  **G.  The Court should hold the individual defendants personally liable
        for both injunctive and monetary relief**

11       To obtain an injunction against an individual for corporate practices, the FTC

12  must show that the individual: (1) directly participated in the violative acts; (2)

13  played a role in controlling, directing, or formulating the policies and practices

14  which resulted in the violative acts; or (3) had the authority to control the unlawful

15  activities or participated directly in them. *In re Nat'l Credit Mgmt.*, 21 F. Supp. 2d

16  424, 461 (D.N.J. 1998), *see also Affordable Media*, 179 F.3d at 1234-35; *Gem*

17  *Merchandising*, 87 F.3d at 470; *Amy Travel*, 875 F.2d at 573-74; *FTC v. Medicor*

18  *LLC*, 217 F. Supp. 2d 1048, 1055 (C.D. Cal. 2002); *see also J.K. Publications*, 99 F.

19  Supp. at 1203 (citing *FTC v. Publishing Clearing House, Inc.,* 104 F.3d 1168, 1170

20  (9th Cir. 1997)). In general, an individual's status as a corporate officer gives rise to

21  a presumption of liability to control a small, closely-held corporation. *Standard*

22  *Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973). More particularly,

23  assuming the duties of a corporate officer is probative of an individual's

24  participation or authority. *Amy Travel*, 875 F.2d at 573; *see also J.K. Publications*,

25  99 F. Supp. 2d at 1203-4. This standard has been applied to determining the

26  individual liability of members of limited liability companies, as well as corporate

27  officers and directors. *In re National Credit Management Group*, 21 F. Supp. 2d

28  424, 461 (D.N.J. 1998).

34

An individual may be held liable for monetary redress for corporate practices if the individual had, or should have had, knowledge or awareness of the corporate defendants' misrepresentations. *Affordable Media*, 179 F.3d at 1231; *Gem Merchandising*, 87 F.3d at 470; *Amy Travel*, 875 F.2d at 574. The requisite degree of knowledge can be demonstrated by showing actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of the misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth; the Commission need not show intent to defraud. *Publishing Clearing House*, 104 F.3d at 1171. In short, the issue is whether the individual defendants knew or should have known of the entity's misrepresentations. Moreover, the extent of an individual's involvement in the business affairs of a company engaged in deception "is sufficient to establish the requisite knowledge for personal restitutionary liability." *Affordable Media*, 179 F.3d at 1235.

Defendant Begley: Begley is the CEO, president, or managing member of all of the business entity defendants. He has filed documents with the California Secretary of State and the Delaware Secretary of State organizing the business entity defendants. Begley controls the entities' bank accounts, and has entered into contracts on behalf of the business entity defendants.

Moreover, as a corporate officer and director of the business entity defendants, he has access to the companies' business records and thus had, or should have had, knowledge of the companies' unlawful business practices. Defendants' collectors are provided scripts and written instructions for the purpose of deceiving consumers in the collection of debts. These scripts are provided to collectors by the collection room supervisor on their first day of employment. Delbridge ¶ 5. In the over two years that Defendants have been in operation, they have generated well over 200 consumer complaints. *See* Gale ¶ 5; *see also* Burge ¶ 12, Att. 2, ¶ 14, Att. 4, ¶ 16, Att. 6, ¶ 18, Att. 8, ¶ 20, Att. 10, ¶ 22, Att. 12, ¶ 24, Att. 14, ¶ 26, Att. 16, ¶ 28, Att. 18. These complaints echo the deceptive scheme laid out in Defendants'

collection scripts and written guidelines. *See e.g.,* Gale ¶ 6. They also demonstrate that the deception is widespread, and that the unlawful conduct is continuing. In addition, Defendants have been sued numerous times by individual consumers for their deceptive collections practices. Gale ¶ 70, Atts. 38, 39, ¶ 71, Att. 40, ¶ 72, Atts. 41, 42. In response to these complaints, Defendants do not appear to have reformed their practices, and in some instances allow default to be entered against them. Gale ¶ 70, Atts. 38, 39, ¶ 71, Att. 40, ¶ 72, Att. 42. Thus, notice of Defendants illegal practices cannot have escaped Begley's attention. The evidence clearly shows that Begley has the authority to control and direct the companies' activities; has participated in those activities; and has had knowledge of, or should have had knowledge of, the companies' deceptive and abusive conduct.

Defendant Lunsford: Lunsford along with Begley is one of two managers/members of six of the seven business entity defendants (all but Pacific Management). He has filed documents with the California Secretary of State and the Delaware Secretary of State organizing these business entity defendants. Lunsford also controls the bank accounts for all of the business entity defendants, including Pacific Management, and is held out as a contact person for the entities.

Lunsford, as a principal of the business entity defendants, has also had access to the companies' business records and thus, has known, or should have known of the numerous consumer complaints and lawsuits evidencing the companies' deceptive business practices. Similarly, the widespread use of scripts and written guidelines, that are *per se* unlawful, cannot have escaped the attention of the individual defendants even if they later claim that they did not authorize their use.

Both Lunsford and Begley have authority to control, participate in, and know, or should have known, about the business entity defendants' wrongful acts. The relief requested in the proposed TRO is thus appropriate against the individual defendants, as well as against the business entity defendants.

## V.   CONCLUSION

Defendants have engaged in deceptive and egregious collection practices that have caused injury to consumers. The injury will continue to grow absent the Court's intervention. The FTC thus requests that this Court issue the proposed temporary restraining order and order to show cause why a preliminary injunction should not issue and why a permanent receiver should not be appointed.

Dated: October 10, 2011                    Respectfully submitted,

                                           Maricela Segura
                                           Raymond E. McKown
                                           Attorneys for Plaintiff
                                           FEDERAL TRADE COMMISSION

37