1  MARICELA SEGURA, CA Bar No. 225999
2  RAYMOND E. MCKOWN, CA Bar No. 150975
   e-mail: msegura@ftc.gov and rmckown@ftc.gov
3  FEDERAL TRADE COMMISSION
   10877 Wilshire Blvd., Suite 700
4  Los Angeles, CA 90024
   Telephone: (310) 824-4343
5  Facsimile: (310) 824-4380

6  Attorneys for Plaintiff
   FEDERAL TRADE COMMISSION

7
8
9             UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
10

FEDERAL TRADE COMMISSION,          Case no.
11
                    Plaintiff,     ED CV 11 - 01623  VAP  SPx
         v.
12
   RINCON MANAGEMENT            DECLARATIONS IN SUPPORT OF
13 SERVICES, LLC, a California limited    PLAINTIFF FTC'S *EX PARTE* TRO
   liability company, also d/b/a "Rincon   APPLICATION
14 Debt Management," "Rincon Filing
   Services," and "Pacific Management   VOLUME ONE
15 Recovery"; PRIME WEST         (Consumer and Third-party Witness
   MANAGEMENT RECOVERY, LLC,    Declarations)
16 a Delaware limited liability company;
   UNION MANAGEMENT
17 SERVICES, LLC, a California limited
   liability company, also d/b/a "Union
18 Filing Services"; NATIONAL FILING
   SERVICES, LLC, a California limited
19 liability company; CITY
   INVESTMENT SERVICES, LLC, a
20 California limited liability company;
   GLOBAL FILING SERVICES, LLC,
21 a California limited liability company;
   PACIFIC MANAGEMENT
22 RECOVERY, LLC, a Delaware limited
   liability company; JASON R.
23 BEGLEY, an individual; and WAYNE
   W. LUNSFORD, an individual,

24                  Defendants.
25
26
27
28

ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT
OCT 11 2011
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION
BY DEPUTY

CLERK, U.S. DISTRICT COURT
OCT 11 2011
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION
BY DEPUTY



1  MARICELA SEGURA, CA Bar No. 225999
2  RAYMOND E. MCKOWN, CA Bar No. 150975
   e-mail: msegura@ftc.gov and rmckown@ftc.gov
3  FEDERAL TRADE COMMISSION
   10877 Wilshire Blvd., Suite 700
4  Los Angeles, CA 90024
   Telephone: (310) 824-4343
5  Facsimile: (310) 824-4380

6  Attorneys for Plaintiff
   FEDERAL TRADE COMMISSION

FILED
CLERK, U.S. DISTRICT COURT
OCT 11 2011
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

ORIGINAL

LODGED
CLERK, U.S. DISTRICT COURT
OCT 11 2011
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION
BY DEPUTY

          UNITED STATES DISTRICT COURT
          CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,          Case no.

               Plaintiff,          ED CV 11 - 01623 VAP SPX

          v.

13 RINCON MANAGEMENT              DECLARATIONS IN SUPPORT OF
   SERVICES, LLC, a California limited   PLAINTIFF FTC'S *EX PARTE* TRO
14 liability company, also d/b/a "Rincon   APPLICATION
   Debt Management," "Rincon Filing
15 Services," and "Pacific Management   VOLUME ONE
   Recovery"; PRIME WEST            (Consumer and Third-party Witness
16 MANAGEMENT RECOVERY, LLC,       Declarations)
   a Delaware limited liability company;
17 UNION MANAGEMENT
   SERVICES, LLC, a California limited
18 liability company, also d/b/a "Union
   Filing Services"; NATIONAL FILING
19 SERVICES, LLC, a California limited
   liability company; CITY
20 INVESTMENT SERVICES, LLC, a
   California limited liability company;
21 GLOBAL FILING SERVICES, LLC,
   a California limited liability company;
22 PACIFIC MANAGEMENT
   RECOVERY, LLC, a Delaware limited
23 liability company; JASON R.
   BEGLEY, an individual; and WAYNE
24 W. LUNSFORD, an individual,

                    Defendants.

# TABLE OF CONTENTS

## Declarations - Volume One

<u>Consumer and Third-party witness Declarations</u>

Declaration of consumer Edie Abbott . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Declaration of consumer David Bailey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Declaration of consumer Robin Barleycorn . . . . . . . . . . . . . . . . . . . . . . . . . 7

Declaration of consumer Chastity Beaver . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Declaration of consumer Matthew Bergmann . . . . . . . . . . . . . . . . . . . . . . . . 13
   Attachment 1: City Investment Services' BBB Response . . . . . . . . . . . . 17
   Attachment 2: Union Filing Services' email and Offer of Settlement . . . . 18
   Attachment 3: Bergmann email to Union Filing Services . . . . . . . . . . . . 20

Declaration of consumer Ryan Borey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Declaration of Julie Byrd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Declaration of consumer Joshua Calhoun . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   Attachment 1: Pacific Management "paid in full" letter . . . . . . . . . . . . . 29

Declaration of former employee Russell Delbridge . . . . . . . . . . . . . . . . . . . . 30
   Attachment 1: Rincon's script and instruction sheets . . . . . . . . . . . . . . . 38

Declaration of consumer Charolott Feldman . . . . . . . . . . . . . . . . . . . . . . . . . 57
   Attachment 1: City Investment Services' BBB Response . . . . . . . . . . . . 59

Declaration of consumer Tiffany Fisher . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
   Attachment 1: National Filing Services' email and Offer of Settlement . . 63

Declaration of consumer Wendy Garza . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
   Attachment 1: Prime West management email and Offer of Settlement . . 67

Declaration of consumer Denise Gattorno . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Declaration of consumer Daniel Gonzalez . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Declaration of consumer Dana Guidry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Declaration of consumer Sang Hong . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Declaration of consumer Laurie Hunter . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
   Attachment 1: Global Filing Services' Offer of Settlement . . . . . . . . . . . 85

Declaration of consumer Bob Jackson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Declaration of consumer Robert Lawson . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Declaration of consumer Luke Mandle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

i

| | | |
|---|---|---|
| 1 | Declaration of consumer George Marovic . . . . . . . . . . . . . . . . . . . . . . . . | 94 |
| 2 | Declaration of consumer Shannon McNamara . . . . . . . . . . . . . . . . . . . . . . | 98 |
| 3 | Declaration of consumer Ronald E. Niday . . . . . . . . . . . . . . . . . . . . . . . | 101 |
| | Attachment 1: West Managements' Offer of Settlement . . . . . . . . . . . . | 104 |
| 4 | Attachment 2: Bank Account Statement for Niday . . . . . . . . . . . . . . . . | 105 |
| 5 | Declaration of consumer Colin O'Keefe . . . . . . . . . . . . . . . . . . . . . . . . . . | 108 |
| 6 | Declaration of consumer Christy Padelford . . . . . . . . . . . . . . . . . . . . . . | 110 |
| 7 | Declaration of consumer Sylvia Moore Pickelsimer . . . . . . . . . . . . . . . . . . | 113 |
| 8 | Declaration of consumer Stacy Ratner . . . . . . . . . . . . . . . . . . . . . . . . | 118 |
| | Attachment 1: Global Filing Services' Offer of Settlement . . . . . . . . . . | 121 |
| 9 | | |
| 10 | Declaration of Bonita Rhoads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 122 |
| | Declaration of Kristie Robertson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 124 |
| 11 | | |
| 12 | Declaration of consumer Scottie Robertson . . . . . . . . . . . . . . . . . . . . . . | 128 |
| | Attachment 1: Robertson's letter to Rincon Filing Services . . . . . . . . . . | 133 |
| 13 | Attachment 2: Returned envelope . . . . . . . . . . . . . . . . . . . . . . . . . . | 135 |
| | Attachment 3: Certified mail receipt . . . . . . . . . . . . . . . . . . . . . . . . | 136 |
| 14 | Attachment 4: Personal notes of contacts with Rincon Filing Services . . | 137 |
| 15 | Declaration of consumer David Savage . . . . . . . . . . . . . . . . . . . . . . . . | 138 |
| 16 | Declaration of Howard Shane Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 142 |
| 17 | Declaration of Howard Shane III . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 144 |
| | Attachment 1: Shane III's letter to Rincon Management Services . . . . . . | 148 |
| 18 | Attachment 2: Certified mail receipt . . . . . . . . . . . . . . . . . . . . . . . . | 149 |
| 19 | Declaration of consumer Latonya Sims . . . . . . . . . . . . . . . . . . . . . . . . | 150 |
| | Attachment 1: Email to Sims' mother regarding the process server call . | 152 |
| 20 | Attachment 2: Email to Sims from her mother regarding the "case" . . . . | 153 |
| | Attachment 3: Letter from Sims to Prime West Management . . . . . . . . . | 154 |
| 21 | Declaration of Beverly Smith. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 155 |
| 22 | Declaration of consumer Brian Smith. . . . . . . . . . . . . . . . . . . . . . . . . . | 158 |
| 23 | Declaration of consumer Donna Smith . . . . . . . . . . . . . . . . . . . . . . . . | 162 |
| | Attachment 1: Email to Smith from co-worker . . . . . . . . . . . . . . . . . . | 164 |
| 24 | Attachment 2: Smith's Experian credit report page print out . . . . . . . . | 165 |
| | Attachment 3: Smith's Letter to Pacific Management Recovery, LLC . . | 166 |
| 25 | | |
| 26 | Declaration of consumer Kimberly Stump . . . . . . . . . . . . . . . . . . . . . . | 167 |
| | Attachment 1: Bank account print out showing payment of debt . . . . . . | 173 |
| | Attachment 2: Rincon Filing Offer of Settlement . . . . . . . . . . . . . . . . | 175 |
| 27 | Attachment 3: Stump's Bank Statement. . . . . . . . . . . . . . . . . . . . . . . | 176 |
| | Attachment 4: Stump's dispute of charge by Rincon Mgt. Serv. . . . . . . | 177 |
| 28 | Attachment 5: Bank's response to Stump's dispute . . . . . . . . . . . . . . . | 179 |

ii

Attachment 6: Stump's complaint to the Virginia Attorney General .... 180
Attachment 7: Virginia Attorney General's response ................ 186
Attachment 8: Rincon Filing's response to Stump's complaint ........ 188
Attachment 9: Paid in full letter from Goldman Roth Acquisitions ..... 190

Declaration of Vickie Taylor. ....................................... 191

Declaration of consumer Saeed Tehrani........................... 193

Declaration of consumer Victoria Torok. ......................... 196
        Attachment 1: Email from Torok to Prime West Recovery ........... 199

Declaration of consumer Christina Underwood ...................... 202

Declaration of consumer Christina Wafer ......................... 206
        Attachment 1: City Investment Services' BBB response ............ 209

Declaration of Alan Waterstreet .................................. 210

Declaration of consumer Andrew Weisz ........................... 211

Declaration of consumer Tracey Wells ............................ 214

Declaration of Ralph Wesner ..................................... 218

Declaration of consumer Pamela Wolfe ........................... 222
        Attachment 1: Prime West Recovery email and Offer of Settlement .... 225
        Attachment 2: Email exchange regarding zero balance on account ..... 227

Better Business Bureau Declaration

Declaration of Kim Burge, BBB, Southland, Inc. .................... 229
        Attachment 1: Business Review for Rincon Management Services ..... 239
        Attachment 2: Rincon Management Services' consumer complaints and
company responses ............................................... 241
        Attachment 3:Business Review for Pacific Management Recovery ..... 245
        Attachment 4: Pacific Management Recovery's consumer complaints and
company responses ............................................... 247
        Attachment 5: Business Review for Pacific Management ............ 250
        Attachment 6: Pacific Management's consumer complaints .......... 252
        Attachment 7: Business Review for Prime West Management ........ 261
        Attachment 8: Prime West Management's consumer complaints and
company responses ............................................... 263
        Attachment 9: Business Review for National Filing Services ......... 279
        Attachment 10: National Filing Services' consumer complaints and company
responses ....................................................... 282
        Attachment 11: Business Review for City Investment Services ...... 301
        Attachment 12: City Investment Services' consumer complaints and
company responses ............................................... 303
        Attachment 13: Business Review for Union Management ........... 328
        Attachment 14: Union Management's consumer complaints .......... 330
        Attachment 15: Business Review for Union Filing Services ......... 331
        Attachment 16: Union Filing Services' consumer complaints and company
responses ....................................................... 333

iii

Attachment 17: Business Review for Global Filing Services . . . . . . . . . . . . . .  334
Attachment 18 Global Filing Services' consumer complaints and company
responses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  336

**Declarations - Volume Two**

Declaration of FTC Investigator

Bruce P. Gale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  338
        Attachment 1: Certified translation of Spanish script . . . . . . . . . . . . . .  369
        Attachment 2: Customer documents provided to the FTC . . . . . . . . . . .  371
        Attachment 3: CA Secretary of State Filing (Rincon)  . . . . . . . . . . . . . .  376
        Attachment 4: CA Secretary of State Filing (Pacific Management) . . . . .  378
        Attachment 5: DE Secretary of State Filing (Prime West) . . . . . . . . . . .  390
        Attachment 6: CA Secretary of State Filing (Prime West) . . . . . . . . . . .  392
        Attachment 7: CA Secretary of State Filing (Union Management) . . . . .  400
        Attachment 8: CA Secretary of State Filing (City Investment) . . . . . . . .  404
        Attachment 9: CA Secretary of State Filing (Global Filing)  . . . . . . . . . .  412
        Attachment 10: CA Secretary of State Filing (National Filing) . . . . . . . .  416
        Attachment 11: CA Secretary of State Filing (Portfolio Investment) . . . .  420
        Attachment 12: CA Secretary of State Filing (Bagels Consulting) . . . . .  422
        Attachment 13: CA Secretary of State Filing (Lunsford Investment)  . . .  428
        Attachment 14: CA Secretary of State Filing (Heavy Hitters) . . . . . . . . .  434
        Attachment 15: Citibank custodian of records declaration . . . . . . . . . . .  440
        Attachment 16: Citibank signature cards (City Investment, Pacific
Management, Prime West, Union Management, Portfolio Investment, Lunsford
Investment accounts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  442
        Attachment 17: Citibank bank statements excerpts (City Investment, Pacific
Management, Prime West, Union Management, Portfolio Investment) . . . . . . .  448
        Attachment 18: Citibank signature cards (other bank accounts over which
Begley and Lunsford have signatory authority) . . . . . . . . . . . . . . . . . . . . .  463
        Attachment 19: Bank of America custodian of records declaration . . . . .  480
        Attachment 20: Bank of America signature cards (Rincon, National Filing,
Global Filing) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  482
        Attachment 21: Bank of America bank statements excerpts (Rincon, National
Filing, Global Filing) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  490
        Attachment 22: Cancelled checks showing payments between business entity
defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  496
        Attachment 23: Cancelled check showing payment from Pacific Management
to Lunsford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  501
        Attachment 24: Cancelled checks showing payments between Portfolio and
business entity defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  502
        Attachment 25: Cancelled checks showing payments to Lunsford Investment
from business entity defendants  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  513
        Attachment 26: Cancelled checks showing payments from Lunsford
Investment to business entity defendants and for personal services . . . . . . . . .  521
        Attachment 27: Cancelled checks showing payments to Bagels Consulting
from business entity defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  531
        Attachment 28: Cancelled checks showing payments to Skyridge Trust from
business entity defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  540
        Attachment 29: Cancelled checks showing payments to WAL Trust from
business entity defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  548
        Attachment 30: Cancelled check showing payment to Lunsford Investment
from WAL Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  555
        Attachment 31: Cancelled checks showing payments to Heavy Hitters from

iv

business entity defendants and Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . 556
    Attachment 32: Citibank documents showing wire transfers to BAL
Financial, LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 567
    Attachment 33: BAL Financial website page pdf print outs . . . . . . . . . . 570
    Attachment 34: VISA CID return   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 573
    Attachment 35: MasterCard CID return   . . . . . . . . . . . . . . . . . . . . . . . . . 587
    Attachment 36: United States Postal Service records . . . . . . . . . . . . . . . 607
    Attachment 37: Cbeyond Communications CID return excerpts . . . . . . . 614
    Attachment 38: *Pepion v. Global Filing Srvs, LLC* complaint, docket report
and default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 622
    Attachment 39: *Therrien v. Global Filing Srvs., LLC* complaint, docket report
and default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 632
    Attachment 40: *Constantine v. Union Mgt. Srvs., LLC* complaint, docket
report and judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 642
    Attachment 41: *Garay v. Prime West Mgt. Srvs., LLC* complaint and docket
report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 652
    Attachment 42: *Taylor v. Pacific Mgt. Srvs., LLC* complaint, docket report
and default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 663
    Attachment 43: Defendants' Craigslist job postings as of 6/28/11 . . . . . . 673
    Attachment 44: Defendants' Internet job postings as of 9/9/11 . . . . . . . . 675

Abbott, Edie

DECLARATION OF EDIE ABBOTT

1.     My name is Edie Abbott, I am over 18 years of age, and I reside in Joplin, Missouri. The following statements are within my personal knowledge.

2.     Sometime in March 2011, my sister who lives in Arkansas received a telephone call from someone who told her that I would be arrested if I did not make a payment on a credit card debt that was in my name. My sister called me and told me about this upsetting telephone call. She told me that the caller said that I should call, 888-906-3101, if I did not want to be arrested. My sister also passed on to me a case number I should use when I called back. My husband also received a similar call in which he was told that if I did not call back within three hours an arrest warrant would be issued for me.

3.     I then called 888-906-3101 and someone answered "corporate headquarters" or something like this. I identified myself by name and with the case number given to my sister. I was then transferred to another person, who told me this number was incorrect, but she managed to locate my "file" anyway. She said that I owed $3,000 on a Chase credit card, but that she was willing to reduce this amount to $2,500 if I agreed to make arrangements to pay this debt. She told me that she had obtained my sister's name because I had given my sister's name and phone number as a reference when I opened the Chase credit card account. This was simply not true. She then asked me to agree to an initial payment of $475 on or around March 21, 2011, a second payment of $125 on or around April 20, 2011, and payments of $200 per month due the 15th of each month thereafter. This woman said that debt arose from charges on my Chase credit card between 2002 and 2008. To the best of my recollection, any account that I had with Chase was closed more than seven years ago.

1

4.     The representative insisted that I give her a credit card number or a checking account number to pay off the debt. I told the representative that I did not have enough money in my bank account to make the payment she was requesting. She assured me that if I gave her my account number, she would not take anything out of the account until March 29, 2011. The representative said that making a payment on this debt was the only way I could stop a lawsuit and my possible arrest. I agreed to make a payment because I did not want to be arrested. I felt thoroughly intimidated by the caller and her threats.

5.     About a week later, I received a letter in the mail from National Filing Services of Corona, California that contained the offer of settlement that the agent had made during my initial call. This letter was merely a demand for payment and did not confirm any details regarding the dates and amounts charged on the Chase card. Nor did the letter contain any information to show that the company National Filing Services was authorized to collect on the alleged Chase credit card debt. After further reflection, I determined that this company was not legitimate because of how old the alleged debt was and the caller's failure to provide proof that National Filing Services was acting on behalf of Chase Bank. I closed the Master Card account that was to be used to pay the installments on this supposed debt.

6.     On or around March 29, 2011, when the first payment to National Filing Services did not go through because I cancelled my Master Card account, the company called our phone number and my husband answered. He told the National Filing Services representative that we decided that we were not going to make any payments to the company on the debt until it sent us more information about the debt. The representative quickly got upset and called my husband a "low life piece of trash" when he requested that National

2

**2**

1  Filing Services provide him with a statement showing specifically what
2  charges had been incurred on the Chase credit card and when those charges
3  were made.

4       7.     My husband told the representative that National Filing Services
5  had to send us a full accounting for the alleged Chase debt or no payment
6  would be made. He then told the representative that he would file a complaint
7  with the Federal Trade Commission. He told the representative that our
8  request for an accounting of the debt was a reasonable request that the
9  company should comply with. He asked the representative also to stop calling
10 our relatives about this matter. My husband told the representative that he
11 knew what National Filing Services was doing was illegal. After that, the
12 representative hung up on my husband and refused to take his call when he
13 called her back.

14      8.     My husband then filed a complaint with the Federal Trade
15 Commission and posted information about this company on a website that
16 reported on debt collection harassment. While we were looking into debt
17 collection harassment over the Internet, we saw a number of other complaints
18 similar to ours against National Filing Services.

19     I declare under penalty of perjury that the foregoing is true and correct.
20 Executed on _August 8, 2011_, at Joplin, Missouri.

23 _Edie Abbott_
24 Edie Abbott

3

**3**

Bailey, David

## DECLARATION OF DAVID BAILEY

I, David Bailey, make the following statement:

1.      I am more than 18 years of age.  I reside in Gig Harbor, Washington.

2.      On or about May 19, 2010, I received a phone call from my ex-wife, Christine Doolittle.  She told me that she had just received a call from someone claiming to be from the Sheriff's Department.  She said the caller had asked if I, David Bailey, was going to be around so I could be served with legal paperwork. The caller told her that I should call 1-866-668-0012 and reference "Case Number 1022-00327."

3.      The caller told her that if I did not respond by calling that number within three days, a bench warrant would be issued for my arrest.

4.      I called the number, and was connected with an individual who told me his name was Kevin Durran, with "Pacific Management Recovery."  He told me its address was PO Box 792, Riverside, CA 92501.

5.      I gave Mr. Durran the "case number" that had been given to me by my ex-wife.  He put me on hold and told me he would look it up.  After a few minutes he came back on the phone, and told me that a lawsuit had been filed against me by HSBC Orchard Bank ("Orchard Bank"), and that a settlement agreement had been reached in January 2010.  He told me the original amount of the Orchard Bank credit card debt was around $5,000, but that the January agreement included reducing the principal to $2,500.  However, Mr. Durran told me that if I agreed to pay 25% down, and make monthly payments of about $250, Pacific Management Recovery would knock the principal amount down to $1,995.  Mr. Durran said if I did not pay, Pacific Management Recovery was going to seize my assets, and that I was under investigation.

6.      I asked Mr. Durran who had made the settlement offer.  He told me

1

4

1 "The Director," whoever that was. I asked him why Pacific Management

2 Recovery had called my ex-wife claiming to be the Sheriff's Department and

3 asserting that I had three days to respond before a bench warrant for my arrest

4 would be issued.

5       7.     Mr. Durran denied having any knowledge of any such statement to my

6 ex-wife by any agent or employee of Pacific Management Recovery. He claimed

7 that Pacific Management Recovery's "Processing Service Center" in New York

8 had called my ex-wife. He also said that Pacific Management Recovery's agents

9 use a script.

10       8.     Prior to me calling Mr. Durran back, I did some independent research

11 but I was unable to find any record of any lawsuit being filed by Pacific Recovery

12 against me in Pierce County Superior Court. During my call with Mr. Durran I

13 told him that I couldn't find any record of Pacific Management Recovery's suit

14 against me. There was a very long pause, after which he admitted that no such

15 lawsuit had been filed. Instead, he told me that the lawsuit was "in process."

16       9.     I let Mr. Durran know that I was very upset because Pacific

17 Management Recovery had called my ex-wife - a third party - and relayed

18 derogatory information about me to her without my knowledge or consent. I told

19 him that Pacific Management Recovery had threatened to imprison me by claiming

20 that the Sheriff's Department was going to arrest me. I also told him that Pacific

21 Management Recovery had impersonated a law enforcement officer and that I had

22 not been properly served with notice of the lawsuit even as Pacific Management

23 Recovery claimed that I had been sued and that a settlement had been reached. I

24 also told him that Pacific Management Recovery had threatened to seize my assets

25 and had asserted that I was under investigation. Mr. Durran did not respond to my

26 accusations. At that point the phone call ended.

27

28                         2

**5**

10.     About two days later I filed an online complaint against Pacific Management Recovery with the Federal Trade Commission.  As of today, I have not heard anything further from Pacific Management Recovery.

I state under penalty of perjury that the foregoing statement is true and correct. Executed on July _18_, 2011, at Gig Harbor, Washington.

David Bailey

3

**6**

Barleycorn, Robin

## DECLARATION OF ROBIN BARLEYCORN

I, Robin Barleycorn, make the following statement:

1.     I am more than 18 years of age. I reside in Denham Springs, Louisiana.

2.     I first had contact with a company named "Rincon Management Services" ("Rincon") on the morning of April 27, 2011, when a man began leaving telephone messages on my answering machine. The first call arrived sometime around 7:30 a.m. or 8:00 a.m. After that call, I received about four or five more messages from Rincon over the course of the morning and early afternoon.

3.     A few days earlier, several neighbors had told me they were receiving phone calls from a man who asked for me. I assumed that those calls were from the same company, but I am not certain about that.

4.     The man leaving the voice messages at my house did not leave his name or identify who he worked for. In the messages the man left me a telephone number, 877-717-9946, and a case number, which I do not remember. He also threatened that if I did not call him back before the close of business, I would face serious consequences, including my arrest, seizure of my assets, and that he would personally come find me at my house and publicly embarrass me. The caller did not say why I would be subject to arrest or any of these other terrible things, but only said that he was calling about a very important matter and that I should call back immediately.

5.     The man continued calling me all day, so I finally decided to pick up the phone when he called again around 2:30 p.m. The man gave me his name, but I did not write it down. He did not identify what company he was with, but told me he was calling about a credit card debt that I supposedly owed. This surprised me because I keep my finances "cash only" and have not had an open credit card account for about 16 years. For that reason, I am certain that either the debt he was calling about was very old, or the man had just mistaken me for someone else.

1 7

1  When I asked the caller to tell me who the original creditor was and the amount of
2  the debt, and to provide me information in writing about the debt, he refused and
3  told me he could not disclose that information.  Instead, he gave me the same case
4  number and telephone number that he had left in his previous voice messages, and
5  urged me to call that number that same day.

6      7.      The caller's tone on our call and in the voice mail messages was very
7  threatening.  He repeatedly said that he was going to come find me in person, have
8  me arrested and seize my assets if I did not call and settle my debt that day.

9      8.      Before calling the number the caller provided, I did a search of the
10  phone number on the Internet.  I came across several websites, including
11  www.ripoffreport.com and www.800notes.com, where I found numerous
12  complaints from others who have received calls from Rincon.  Those complaints
13  described experiences similar to mine, where the caller attempted to collect an old
14  or non-existent debt and threatened frightening legal consequences like arrest and
15  wage garnishment.  In the complaints, the company was also described by various
16  names which were similar to one another, these names were "Rincon," "Rincon
17  Management Services," "Rincon Filing Services" and "National Process Servers."
18  After reading those complaints online, I decided not to call the company back.

19      9.      The day of that first call with the Rincon representative, I filed a
20  complaint against the company with the Federal Trade Commission.  Since filing
21  that complaint, I have received two more calls from Rincon.  One call was on June
22  7, 2011, and was apparently from the same man who called me back in April
23  because I recognized his voice.  On this call, the caller identified himself as "Mike
24  Davis."  The last call I received was on June 22, 2011, which was from a different
25  person whose name I did not get.  Although neither caller said they were calling
26  from Rincon, I know it was related to Rincon because Mr. Davis and the other
27  caller said essentially the same thing that I had been told before on the calls and
28  messages I received from the company in April.  Mr. Davis and the other caller

1 gave me the same toll-free number to call, 877-717-9946, and a case number to
2 reference and said that if I did not call the number, my file would be turned over to
3 the sheriff's department and I would be subject to arrest. Because the callers had
4 said they were calling about an old credit card debt that I did not remember owing, I
5 told them that if they identified the original creditor and could provide me with
6 more details about the nature of the debt, I would be glad to continue the
7 conversation. Both Mr. Davis and the other caller refused to provide me with that
8 information, and after I continued pressing them for it, both became frustrated and
9 hung up on me.

10      11.      I never called the toll-free number that I was given by the Rincon
11 agents. Despite their threats, I have not been arrested, served with a lawsuit, had
12 my wages garnished, or had my assets seized.

13      I declare under penalty of perjury that the foregoing statement is true and
14 correct. Executed on June 2011 at Denham Springs, Louisiana.

15
16
17                              Robin Barleycorn
18
19
20
21
22
23
24
25
26
27
28

3 9

Beaver, Chastity

## DECLARATION OF CHASTITY BEAVER

I, Chastity Beaver, make the following statement:

1.      I am more than 18 years of age, and I reside in Colorado Springs, Colorado.

2.      On or about December 17, 2011, my husband told me he had received a call from a man who told him his name was "James." James told my husband that I was going to be served by a process server with a summons to appear in court. James gave my husband a case number, "103800575," and a call back number and told him that the case involved a debt. James warned my husband that I had two hours to call back, or the process server would be dispatched. My husband called me at work and told me what James had told him.

3.      I immediately called James and asked him what this was all about. James said that I had an unpaid debt, and that if I did not set up a payment arrangement within four days, I would be served with a court summons. I asked James for information about the debt and requested that he provide me with a verification notice. James responded that he would not provide me with verification until after I had agreed to a payment schedule, and provided him with a debit card or checking account number. James said that I had a balance due of $1,547. He said if I did not pay-off the debt in a lump sum, the amount due would be more than $6,000 because of court fees and processing charges. James repeated that I had a few days to get back to him on this and settle my debt. I told James that I would have to look into this further.

4.      On or about Monday, December 20, 2010, I received a phone call at work from a man who told me he was a process server and that he wanted to serve me with papers at my job. I recognized that this was related to the debt that I spoke to James about a few days before. I had no idea how this process server had obtained my work telephone number. The process server told me that in order to stop the summons from being served, I would have to call James and settle it. The

1  process server threatened that he would be showing up at my job later that day to
2  serve me. I responded, "go ahead and serve me" and told him I would be at work
3  until 5:00 p.m. That day, I was at the office until 5:00 p.m., but no one arrived to
4  serve me with papers.

5      5.    The next thing I did was to call James back. My call with him was
6  pretty brief. James told me that he would give me until December 27, 2010 to
7  either pay the entire debt, or set up a payment schedule. I asked James for his
8  company's name and address. James responded that his company was called
9  Global Filing Services, and their office was located at 1191 Magnolia Avenue,
10  Suite D-381, Corona, California 92879. I again asked for verification of the debt
11  and the only thing James would tell me about the debt was that it was for a debt
12  from 2002.

13      6.    After talking to James, I did a search on www.google.com for "Global
14  Filing Services." My search did not pull up really any information about the
15  company. I then searched the phone number for the company, and that brought up
16  a number of complaints by people who had been called by the company to collect
17  debts through threats of lawsuits and arrest. I also searched the address James had
18  given me, 1191 Magnolia Avenue, Suite D-381, Corona, California. The address
19  search showed that the address was a UPS office, not the office of Global Filing
20  Services as James had claimed.

21      7.    After that, I obtained copies of my credit report from the three major
22  credit reporting agencies. Although, admittedly, I had some credit problems in the
23  past, I did not see any reference to a debt of $1,547 on any of my three credit
24  reports.

25      8.    Several days later, I called James again. I told James that without
26  verification of the debt I would not pay it. He told me that he would speak to a
27  manager about my request. I then told him to remove my work number from his
28  company's database and ended our conversation.

9.    Global Filing Services never sent me the verification of the debt that I requested, and I have not received any more calls from the company.

    I state under penalty of perjury that the foregoing statement is true and correct. Executed on _August 8_ 2011, in Colorado Springs, Colorado.

_Christy Beaver_
Chastity Beaver

Bergmann Matthew

<u>DECLARATION OF MATTHEW BERGMANN</u>

1   I, Matthew Bergmann, make the following statement:

1.   I am more than 18 years of age, and I reside in Concord, North Carolina.

2.   In early May, 2011, my sister-in-law, brother-in-law, and father-in-law all told me they had received telephone calls from a woman who told them she was calling from a process servers' office, and was attempting to find me and serve me with legal papers. The woman calling told them she wanted them to give me a telephone number and "case number." My brother-in-law gave me the phone number she had left, along with the "case number." The phone number that the company gave my brother-in-law was 877-571-5190.

3.   After my brother-in-law gave me the telephone number, I entered the number into an Internet search engine. I found numerous complaints from people who discovered that the company was attempting to collect money from them. The Internet complaints talked of the company threatening people with lawsuits to get them to pay money on debts they did not owe. I do not recall seeing the name of the company on my Internet search – but the telephone number for the company was the same as the one that my brother-in-law had given me to call. From the complaints I read, the company appeared to be a scam.

4.   I decided to call the number that had been given to me by my in-laws to see for myself what the company would say about this lawsuit. A woman answered and I asked her what was going on. I explained that my relatives had been called earlier with a phone number and a "case number."

5.   The representative told me they might have a case against me. She said, "Let me put you on hold and get an attorney." She put me on hold for a couple minutes, then got back on the line. Ultimately, the representative did not put the attorney on the phone as I thought was going to happen. I asked the

1
**13**

1  representative for the company name and address, and she told me it was "Union

2  Filing Services," and their address was 1191 Magnolia Avenue, Suite D-381,

3  Corona, California 92879. Interestingly, the representative never asked for my

4  address or phone number, which ostensibly was the reason she had called my in-

5  laws in the first place because she couldn't find me and needed my telephone

6  number and current address.

7      6.    I asked the representative what this was all about and she asked me if

8  the sheriff had come to my home yet. I told her that no one from the sheriff's

9  department had come to my home. The representative then told me that the sheriff

10  would be coming in the next few days because of a case involving an MBNA

11  credit card debt from 1996 that I owed. The representative told me, however, that

12  she could "take care" of this if I paid a settlement of approximately $5,000. I

13  declined to pay that amount, and ended our call.

14      7.    On or about May 4, 2011, I filed a complaint with the Better Business

15  Bureau ("BBB") in Corona, California. When I filed my complaint I entered the

16  phone number in the BBB complaint system, and was given a series of choices of

17  company name that the BBB proffered. Union Filing Services was not on the

18  BBB's list, so I clicked on "City Investment Services," which had the same

19  telephone number as the I had called.

20      8.    In mid-May, 2011, the BBB mailed me a letter they had received from

21  a company called "City Investment Services" located at 1191 Magnolia Avenue,

22  Suite D-396, Corona, California. The letter, addressed to the BBB, stated that I did

23  not have any account with their office. The company also stated they only receive

24  inbound telephone calls. **Attachment 1** is a true and correct copy of the letter from

25  City Investment Services, dated May 10, 2011, which was sent to me by the BBB.

26

27

28

1    9.    I responded to the BBB on or about May 16, 2011. I stated that it was
2    true that the company did not contact me, but they had an alleged process server
3    harass my family.

4    10.    In mid June 2001, my brother-in-law called and told me that the
5    "process server" had again called him, and asked him to have me call them back.

6    11.    I then called the number that had been given to my brother-in-law.
7    The number was the same one that had been given to him earlier. The
8    representative that I spoke with told me that I owed about $10,000, but he could
9    "take care" of this if I paid a settlement of approximately $5,000. I did not agree to
10   pay this amount, but I requested that the representative send me a verification of
11   the debt, so that I could have proof that it was valid. Our conversation basically
12   ended with that request.

13   12.    Shortly after my conversation with the Union Filing Services
14   representative, I obtained a copy of my credit report online. My credit report did
15   not list an MBNA credit card debt of $5,000. My social security number had been
16   stolen in 2000; it is possible that the debt might have resulted from a credit card
17   illegally opened in my name, but I have no knowledge of an unpaid debt of $5,000.

18   13.    That same day, I received an email from
19   Customer.Service@unionmanagement.biz attaching an Offer of Settlement letter.
20   **Attachment 2** is a true and correct copy of the email I received and the attached
21   Offer of Settlement Letter from Union Filing Services dated June 24, 2011. The
22   Offer of Settlement letter stated that Union Filing Services would accept a
23   "settlement amount" of $10,376.19 paid in installments, or a one-time payment of
24   $5,357.82.

25   14.    That day, I replied to the email and asked Union Filing Services for
26   information about the account in question. I asked for copies of statements, or a
27   copy of the letter from MBNA because I had never had an MBNA account. My

28

3
**15**

1    email, however, was returned with the note "Domain name not found."

2    **Attachment 3** is a true and correct copy of the email response that was returned to

3    me, as well as a copy of my email to Union Filing Services at

4    Customer.Service@unionmanagement.biz.

5        15.    Union Filing Services never sent me the verification of the debt that I

6    requested.

7        I state under penalty of perjury that the foregoing statement is true and

8    correct. Executed on ___7/ 25___ 2011, in Concord, North Carolina.

10                                           Matthew Bergmann

4

*Response*

# CITY INVESTMENT SERVICES

1191 Magnolia Ave, Ste D-396
Corona, CA 92879
Ph (877) 866-1313  Fax (951) 272-1727

*Personal and Confidential*

May 10, 2011

The Better Business Bureau
P.O. Box 970
Colton, CA 92324
Attn: Complaint Department

RECEIVED
MAY 1 2 2011

**Re: Matthew Bergmann**
**Complaint ID: 98608257**

To Whom It May Concern,

We received a letter from your offices in regards to the individual listed above on May 4, 2011.  After reviewing our records we see that Mr. Matthew Bergmann does NOT have an account with our office. Furthermore, City Investment Services only receives inbound calls.

If there are any further issues regarding this matter please feel free to call my office directly.

Respectfully,

Mr. Richard McKinley
Director

---------- Forwarded message ----------
From: <Customer.Service@unionmangement.biz>
Date: Fri, Jun 24, 2011 at 7:59 PM
Subject: Offer of Settlement
To: ████████████████████

Attached you will find the Offer of Settlement letter that you requested. For more information, please contact our office at the number listed below.

Sincerely,
Customer Service Department
Tel: 877-696-8121
Fax: 951-272-1727
Email: Customer.Service@unionmangement.biz

**18**

**Bergmann Attachment 2**

7/18/2011

# Union Filing Services

### 1191 Magnolia Ave  Ste D-396
### Corona, CA 92879
#### Tel:  877-696-8121   Fax: 951-272-1727

***Personal and Confidential***

URGENT:  SIGN AND RETURN TO Union Filing Services

June 24, 2011

**MATTHEW BERGMANN**

CHARLOTTE, NC

Original Creditor:   MBNA
Original Account #:
File Number:   HHI1069-06918

## OFFER OF SETTLEMENT

We will accept a settlement amount of $10,376.19 with a down payment of $2,594.05 due on 6/30/2011.We will establish a payment plan with 9 Monthly payments of $778.00 and a final payment of $780.14 due on 4/30/2012.

or

Our client is willing to accept a onetime payment at a reduced settlement amount of $5,357.82 if the sum is paid in full by 6/30/2011.  Once a payment plan arrangement has been accepted, this reduced settlement amount is no longer valid.

**Upon receipt of certified funds and your authorized signature, the file will be closed.**

We shall notify our client that the obligation has been paid and satisfied and you will receive the proper documentation needed to notify the credit bureaus and update the credit account to a PAID IN FULL status.

Sincerely,

Union Filing Services
Administrative Department

*YOUR AUTHORIZED SIGNATURE IS REQUIRED TO UPHOLD ANY SETTLEMENT AGREEMENT BETWEEN YOU AND UNION FILING SERVICES.  FAILURE TO DO SO WILL RENDER THIS SETTLEMENT OFFER NULL AND VOID.*

AUTHORIZED SIGNATURE:   _____

** PLEASE MAIL OR FAX THIS PAGE OF YOUR DOCUMENT TO UNION FILING SERVICES **

*Federal law requires we notify you that this communication is from a debt collector in an attempt to collect a debt and any information obtained will be used for that purpose.*  **Bergmann Attachment 2**

---------- Forwarded message ----------
From: **Mail Delivery Subsystem** <mailer-daemon@googlemail.com>
Date: Fri, Jun 24, 2011 at 8:27 PM
Subject: Delivery Status Notification (Failure)
To: ███████████████████

Delivery to the following recipient failed permanently:

    Customer.Service@unionmangement.biz

Technical details of permanent failure:
DNS Error: Domain name not found

----- Original message -----

Received: by 10.229.88.198 with SMTP id b6mr2936654qcm.208.1308961639870;
    Fri, 24 Jun 2011 17:27:19 -0700 (PDT)
Return-Path: <███████████
Received: from [192.168.1.2] (cpe-098-024-020-143.carolina.res.rr.com ███████████)
    by mx.google.com with ESMTPS id l36sm1970581qck.31.2011.06.24.17.27.19
    (version=TLSv1/SSLv3 cipher=OTHER);
    Fri, 24 Jun 2011 17:27:19 -0700 (PDT)
Subject: Re: Offer of Settlement
References: <20110625000025.26706C14FD@Spam.Evarus.com>
From: Matthew Bergmann ██████████████████
Content-Type: multipart/alternative;
    boundary=Apple-Mail-1--58042922
X-Mailer: iPad Mail (8J3)
In-Reply-To: <20110625000025.26706C14FD@Spam.Evarus.com>
Message-Id: <745003D1-FF1D-4C46-A88A-B5BF00DC5CD7@gmail.com>
Date: Fri, 24 Jun 2011 20:27:15 -0400
To: "Customer.Service@unionmangement.biz" <Customer.Service@unionmangement.biz>
Content-Transfer-Encoding: 7bit

**20**

**Bergmann Attachment 3**

Mime-Version: 1.0 (iPad Mail 8J3)

Could I get more information about the account in question?  Could I get statements or a copy of the letter from MBNA?  I'm not familiar with this account - I've never had an MBNA account. I would like to confirm because I'm concerned there has been a mix up.

If you need to reach me, my number is ███████████

Thank you!

On Jun 24, 2011, at 7:59 PM, Customer.Service@unionmangement.biz wrote:

> Attached you will find the Offer of Settlement letter that you requested. For more information, please contact our office at the number listed below.
> Sincerely,
> Customer Service Department
> Tel: 877-696-8121
> Fax: 951-272-1727
> Email: Customer.Service@unionmangement.biz
>
> <63864052306242011 45931 PM.pdf>

Bergmann Attachment 3

7/18/2011

Borey, Ryan

## DECLARATION OF RYAN BOREY

I, Ryan Borey, make the following statement:

1.      I am more than 18 years of age, and I reside in North Charleston, South Carolina.

2.      In late March or early April, 2010, both my grandmother and my uncle told me they had received telephone calls from a woman who wanted to verify my location. They were both told, on separate calls, that they needed to verify my location so that a process server could serve papers to me because I had not paid my debts. My grandmother and uncle were given a case number and a phone number. The phone number was 877-527-9806. I do not remember the case number. The woman told them to get in touch with me and have me call the number. She said to my grandmother to make sure that I called the number so I "could avoid going to jail where I belonged." The woman who called would not give her name or company name to either my grandmother or my uncle.

3.      When my grandmother told me what had happened, I told her I didn't know what the call was about, but apologized to her for the treatment she had received, and told her I would call the number that was given to her.

4.      When I called the number given to my grandmother, I asked the name of the company I had reached. The person answering the phone immediately hung up on me. I then called back, and gave them the "case number" that had been given me by my grandmother. At that point, I was then transferred to a woman who told me her name was Ashley. Ashley told me I owed $5,000 on a Chase Visa card, and if I didn't come to an agreement with them, they were going to take me to court, and then the amount due would be $7,500. She said that the additional money would be due to processing charges, court costs and attorneys' fees. Ashley warned that I wouldn't be able to evade them for 10 years.

5.      I told Ashley I had already paid off the debt she was trying to collect. I also told her that I knew that what her company was doing was illegal. I made

1   clear to Ashley that I was not afraid of the company's strong-arm tactics.  At that

2   point, Ashley hung up on me.

3        6.      After talking to Ashley, I decided I would write the company a letter

4   requesting that they not contact me.  I called the company back to ask for an

5   address, but each time I asked for this information, the representatives hung up on

6   me.

7        7.      Finally, after making possibly as many as ten calls to the company to

8   get their name and address, I decided to try something different.  I called the

9   company phone number and told the person answering the phone that I wanted to

10   send them a payment, and needed the company name and address to mail it.  The

11   representative I talked to said that the company name was "Global Filing

12   Services," and that it was located at 1191 Magnolia Avenue, D-3896, Corona,

13   California 92879.

14        8.      I have heard nothing from the company since my last call with the

15   company.  I subsequently did a search of the telephone number, 877-527-9806,

16   given to my grandmother on www.google.com and found numerous complaints

17   against Global Filing Services.

18        9.      On or about April 11, 2011, I filed a complaint online with the

19   Federal Trade Commission against Global Filing Services.

20        I state under penalty of perjury that the foregoing statement is true and

21   correct.  Executed on ___8/4/2011___, 2011, in North Charleston, South Carolina.

22

23

24   Ryan Borey

25

26

27

28

Byrd, Julie

<u>DECLARATION OF JULIE BYRD</u>

1.      My name is Julie Byrd.  I am over 18 years old and I reside in Santa Cruz, California.  The following statements are within my personal knowledge.

2.      Sometime in January 2011, Laura French who worked for my employer's Human Resources Department received a telephone call from Ms. Corona who told her that she was from the sheriff's department and wanted to know whether my employer would allow me to be served a summons at my work site in connection with a pending lawsuit against me.  Laura went to my office, closed the door, and told me about this call.  Laura told me that Ms. Corona had informed her that the Sheriff's Office was going to serve me with a summons within the next four hours.  Laura said that she told Ms. Corona that I would prefer to be served at home and wrote down Ms. Corona's telephone number.

3.      I subsequently called 866-988-1001.  The person who answered the telephone said "Sheriff's Office."  I identified myself and the receptionist said that I would be connected to Ms. Corona.  Ms. Corona told me that the sheriff was about to serve a summons on me in connection with a civil lawsuit. She said that I was the subject of a lawsuit because I was a co-signer with my boyfriend, George Marovic, on a credit account with an overdue balance from 2007.  Ms. Corona threatened me with wage garnishment and property seizure if I did not immediately pay this debt.  I did not know what she was referring to and told her I would have George call her back.  I believe that Ms. Corona described the amount of the debt and said that I could pay a certain amount immediately to avoid the summons and the lawsuit.  I do not recall the specific amounts that Ms. Corona mentioned.

4.      I felt threatened and frightened by the thought that I was involved in some legal action that the sheriff's department was calling me about.  I

1  called George and told him what had happened and gave him the telephone
2  number that the person from the "Sheriff's Office" had given to me.

3       5.    George later told me that the number I gave him was for a
4  company called Prime West Management and that he had done some research
5  on-line and found that the company was operating a debt collection scam by
6  pretending to be from the sheriff's department.  Since the call in January 2011,
7  I have not heard back from the company, Prime West Management again.  I
8  have not been sued by Prime West Management, nor has the sheriff's
9  department contacted me in any capacity in relationship to this supposed debt.

10       I declare under penalty of perjury that the foregoing is true and correct.
11  Executed on _August 15, 2011_, at Santa Cruz, California.

12
13
14
15
16
17  Julie Byrd
18
19
20
21
22
23
24
25
26
27
28

Calhoun, Joshua

## DECLARATION OF JOSHUA CALHOUN

I, Joshua Calhoun, make the following statement:

1.     I am more than 18 years of age.  I reside in Texarkana, Arkansas.

2.     During the first week of February 2010, I received a threatening phone call from an individual who claimed to work for a company somehow associated with the local sheriff's department.  I was told that if I did not verify my H&R Block Emerald Card number for payment for a debt I supposedly owed I would be arrested immediately.  I was surprised that they apparently knew about my H&R Block Emerald card, and I had no idea how they obtained that information.  The caller gave me no information on the debt, but threatened me with a lawsuit of $9,000 and imprisonment if I did not give him the information within one hour.

3.     I had absolutely no idea what this debt might have been about.  I did have some debts resulting from a divorce several years earlier, but as far as I knew I was aware of all debts resulting from my divorce, and had been in contact with representatives for the firms that I owed money to.  None of them had previously threatened me with imprisonment.  I couldn't believe that someone could be threatened with imprisonment for a debt.

4.     I asked the person calling to please give me a description of the debt.  His response was laced with profanity, and he offered no description of the debt.  He only told me that he needed me to pay $9,000 immediately.  I then asked to speak to a supervisor.

5.     The caller transferred me to a supervisor.  The supervisor, whose name I do not remember, merely verified my personal information – my name, address, email address and telephone number.  She did not give me any information on the debt, or tell me to whom I owed money, but told me that I had

1

1   30 minutes to decide if I wanted to go to jail or not.  She told me she knew that I

2   had an H&R Block Emerald Card.  She then told me the card account number and I

3   confirmed it.  I confirmed to her that the card number she had was my card, but I

4   told her I still didn't know what the debt was for.  After I verified the card number,

5   she immediately hung up.  Apparently she had gotten the information she wanted.

6   At no time did I give her permission to withdraw money from the card, and she

7   provided me with no information on the debt she claimed I owed.

8       6.      The following day I checked my online H&R Block Emerald Card

9   balance, and found that $1,000 had been withdrawn by a company called "Pacific

10   Management."  The amount that company had withdrawn – $1,000 – was the daily

11   limit for withdrawals from my card.

12      7.      In my experience no creditor has ever threatened me with arrest and

13   imprisonment if I did not pay.  Nor has any creditor ever refused to identify what

14   the debt pertained to, or withdrawn money out of my personal accounts without my

15   permission.  Pacific Management's actions were completely out of line with what I

16   thought was permissible and legal, so I decided to close my H&R Block Emerald

17   Card account to avoid future unauthorized withdrawals by this firm.  I then closed

18   the card, so that no more money would be taken out of it by Pacific Management.

19      8.      Several days later I received an email from Pacific Management and

20   Recovery that attached a letter.  **Attachment 1** is a true and correct copy of the

21   letter that was attached to the company's email.  The letter signed by "Pacific

22   Management & Recovery" and dated February 3, 2010, stated that I was released

23   from claims and liabilities relating to an HSBC GM card.

24      9.      I called H&R Block Emerald Card, and filed a dispute of Pacific

25   Management's withdrawal on my account on the amount Pacific Management &

26

27

28                                        2

**27**

1    Recovery had taken from my account.  Several weeks later I was told by Emerald

2    Card that my claim had been denied, since it was for a credit card I had opened.

3         10.    I then contacted Emerald Card and told them that my wallet had been

4    stolen, and the HSBC GM Card referenced by Pacific Management & Recovery

5    had not been opened by me.  I provided a copy of the police report regarding the

6    stolen wallet.  Emerald Card then told me that because the police report for the

7    card was more than a year old, they would not accept my claim, and would not

8    refund the money Pacific Management & Recovery had taken from my Emerald

9    card.

10        11.    In my experience no creditor has ever threatened me with arrest and

11    imprisonment if I did not pay.  Nor has any creditor ever refused to identify what

12    the debt pertained to, or withdrawn money out of my personal accounts without my

13    permission.  Pacific Management & Recovery's actions were completely out of

14    line with what I thought was permissible and legal, so I decided to close my H&R

15    Block Emerald Card account to avoid future unauthorized withdrawals by this

16    firm.

17        12.    On November 17, 2011, I filed an online complaint against the

18    company with the Federal Trade Commission.  I also disputed the charge with the

19    H&R Block Emerald Card fraud department.

20        I state under penalty of perjury that the foregoing statement is true and

21    correct.  Executed on July 27 , 2011, in Texarkana, Arkansas.

22

23                           *Joshua Calhoun*

                           Joshua Calhoun

24

25

26

27

28                        3

Attachment 1

# **Pacific** Management
### 541 North Main Street, Suite 104-261, Corona CA 92880
### PH# (888)332-0080

Date: February 3rd, 2010

\*Personal and Confidential\*

Debtor:  JOSHUA CALHOUN
Address: ████████████
City, State, Zip:  WAKE VILLAGE, TX ████

RE: Original Creditor:  HSBC GM CARD
Original Account: # ███████████
File No:  1013-01001
Balance: $ 0.00

As of Date: February 3rd, 2010 Pacific Management has released you from all claims and
liabilities pertaining to the above referenced account.  Furthermore, our trade line with major
credit reporting bureaus will be updated to **Paid in full.**

Please contact us should you have any questions.

Sincerely,

Pacific Management & Recovery
THIS IS AN ATTEMPT TO COLLECT A DEBT BY A DEBT COLLECTOR AND ANY INFORMATION OBTAINED WILL
BE USED FOR THAT PURPOSE.

**29**      **Calhoun declaration Attachment 1**

Delbridge, Russell

## DECLARATION OF RUSSELL DELBRIDGE

I, Russell Delbridge, state as follows:

1.    I am over eighteen years of age and reside in Corona, California.

2.    In or around January 2011, I worked as a collector for Rincon Debt Management ("Rincon") for approximately three days. I believe the company also went by the name "Rincon Filing Service." Prior to working at Rincon, I had been working as a debt collector with other companies off and on since January 2000. During that time, I had worked for generally larger more-established companies, such as HSBC, but also worked for some smaller debt collection companies as well.

3.    In or around mid-January 2011, I had been out of full-time work for about six months. Just prior to that, I was working part-time for a company called Superior Manufacturing in their accounts receivable, which was basically their collections department. I worked for Superior Manufacturing on and off from approximately April 2006 to approximately January 2011. I left Superior Manufacturing because it was a part-time job and I needed full-time work to make more money. The economic downturn had taken a toll on me and by January 2011 I felt an urgent need to find full-time employment. I saw an ad on Craigslist for a debt collection company in Corona, California. The Craigslist ad did not specify the name of the employer. I called the following number from the ad, 909-771-9752, and spoke directly to a man named John Cook. I recall that we had a very brief telephone interview where we talked about my collections experience and then Cook asked me to come in for an in-person interview. He gave me the following business address: 495 E. Rincon Street, Unit 201, Corona, CA 92879.

4.    When I got to the office, I met with Cook, who said that he was the supervisor of that office and about three other collections companies in Corona. The other collections companies were operated out of other offices in Corona. Cook hired me on the spot. He then gave me a short run-down of the job. Cook

1

1   said that Rincon collected on old credit card debt, which he described as "top level

2   paper" from banks, such as Bank of America.  The term "top level paper" meant

3   that the debtor probably at one time had good credit, but had since become

4   delinquent on one or more credit accounts.  These types of accounts were more

5   lucrative for collectors because the debtors generally paid their debts.

6        5.     My training at Rincon consisted of talking to Cook for about 45

7   minutes and then sitting with other collectors for a couple of hours to listen in on

8   their calls.  I was hired to start at Rincon as an "opener."  Cook said my job was to

9   call a debtor's place of employment and pretend that I was a process server seeking

10  to serve the debtor with court papers relating to a lawsuit.  Cook then gave to me a

11  packet of documents, including some scripts, rebuttal sheets with answers to

12  common questions from debtors' employers or family members, abbreviations

13  used at the job, and other documents containing information about the company

14  itself, such as the pay structure, policies and procedures, and some documents

15  intended to motivate employees.  **Attachment 1** is a true and correct copy of most

16  of the documents that Cook gave me during that first meeting.  The attached are

17  not all of the documents I was given that day.  For example, I no longer have the

18  English version of the "standard talk off" script ("STO"), which said generally the

19  same thing as the Spanish STO.  I took Spanish in high school so I could

20  understand most of the wording in the Spanish script and saw that it was similar to

21  the English script I had been given.  One of the main differences between the

22  Spanish and the English scripts I recall was that in the English standard talk off

23  script, male collectors were instructed to identify themselves as "Mike Davis"

24  whereas the Spanish script contained the name "Miguel Davis."  If on my calls

25  with debtors I reached a Spanish speaker, I was instructed to hand off the call to

26  one of the two Spanish-speaking collectors in the room.  While I was at Rincon, I

27  do remember hearing these collectors speaking Spanish on their calls.

28       6.     During my first day at Rincon, Cook stressed that my goal was to

2

**31**

1  convince the debtor's employer that I worked at a process server's office and was

2  simply seeking some information on how to best serve their employee with court

3  papers at the job.  In order to be convincing, Cook gave me pointers on the tone of

4  voice I should use on my calls, stating that I should sound like a typical telephone

5  operator with a "nasaly" tone and a tight throat.  Cook then demonstrated the tone

6  of voice for me.

7      7.  Cook said then when calling a debtor's employer I should ask the

8  receptionist, or whoever answered the phone, whether they had a policy or

9  procedure for serving the employee with court papers on site.  I was told doing this

10  would assure that I would be connected with someone either in the human resource

11  department or an on-site manager who would then validate the debtor's

12  employment.  I was then supposed to explain to the human resource person, or the

13  debtor's supervisor, that we were going to send a sheriff to the workplace to serve

14  the employee with papers on behalf of a company that was pursuing litigation

15  against the employee.  Cook said, and it was my experience in my three days at

16  Rincon, that employers did not want a sheriff coming to the workplace, so they

17  would generally agree to pass along a message to the employee.

18      8.  If the person at the debtor's employer pushed back and did not want to

19  verify employment, or would not agree to pass along a message to the employee, I

20  was instructed to use the "JOB REBUTTAL ANSWERS" script as a guide in

21  convincing the employer that this was a serious matter and needed to be relayed to

22  the employee immediately.  Cook said that all I needed to do was to threaten that a

23  uniformed officer was going to come down to the work place within two hours if

24  we did not get a hold of the employee and the employer would usually agree to

25  pass along a message to the employee.

26      9.  In my position as an opener, my job was to contact the debtor's

27  employer first, not the debtor directly, even though we often had the debtor's

28  phone number.  In all calls our first point of contact was to be the debtor's

3

**32**

1    employer, then if we could not get a hold of the employer, our second point of

2    contact would be the debtor's references. As I understand it, the debtor's

3    references are people whose names come from a debtor's credit application. These

4    people were usually a debtor's friends and family. If on calls with the debtor's

5    friends or family, the person on the other line refused to pass along information to

6    the debtor, or would resist our requests for information, I was instructed to use the

7    "STO REBUTTAL ANSWERES" (sic) in those calls. Basically, if a debtor's

8    family member or friend refused to provide me with information about the debtor,

9    I was supposed to create a sense of anxiety by telling that person that there was

10    pending litigation and that the debtor some how involved them in the issue. I was

11    to stress that the debtor had better call back or else a sheriff would be on his way to

12    the home of the friend or family member to arrest the debtor if he ignored the calls.

13         10.    In a nutshell, Rincon's debt collection practice was to collect through

14    embarrassment and harassment, and it was understood that calling a debtor's place

15    of employment would result in a high level off call backs from the debtor. Cook

16    explained that on calls where we reached the debtor's current employer, we would

17    get a call back from the debtor within an hour 70% of the time. He said that

18    generally the debtor would be willing to pay whatever he needed to pay to stop any

19    further contact to his employer.

20         11.    On my calls with the debtor's employer, or their family members or

21    friends, I was instructed to leave a fake case number, which was a Rincon account

22    number, and a callback telephone number, which was a toll-free number that I

23    cannot recall. Cook said that when the debtor called the telephone number, a

24    "closer" would answer the phone and say "law office." Cook explained to me the

25    process of how a closer would go about collecting on the account, and in the time I

26    worked at Rincon I managed to overhear closers collecting on these accounts again

27    and again.

28         12.    On incoming debtor calls, the closer would tell the debtor that the

1    process server should not have called him, but that the office did have the
2    complaint. The closer would then pretend to look up the complaint against the
3    debtor and would tell the debtor that the case involved a debt with whatever credit
4    card company the debtor owed money to. The closer would tell the debtor that
5    they could settle the debt then and there and that they would take the case off
6    calendar, or something to that effect. The closer would then tell the debtor the
7    amount owed, which was generally the amount of the original credit card debt plus
8    an additional amount of money for what the closer would claim were court costs
9    and legal fees. These additional fees, which Cook called "spiff" money, were
10   completely made up by the closer. Collectors were highly encouraged to collect
11   spiff money and were allowed to keep 80% of any spiff amount collected on an
12   account, which would then be split between the openers and the closers.

13         13.    The closer would try to convince the debtor that he needed to pay the
14   full amount over the phone immediately with a checking account or credit card to
15   avoid further legal action. Closers told debtors that in order to take the case off
16   calendar that payment had to be made that day or within a few hours, otherwise the
17   debtor would have to present himself in court. If the debtor could not pay the full
18   amount, then the closer would try to get the debtor on a payment plan with a
19   preauthorization to charge the debtor's bank account or credit card a set amount of
20   money every month. The closer would try to front-load the payments so that the
21   debtor paid more of the money up front. To do this, a closer would try to get the
22   debtor to pay 50% of what the closer claimed he owed that day and then set up a
23   payment plan of two more payments over the following months. To justify the
24   high up-front payment, I heard some closers say to debtors that the large payment
25   was necessary to show the court that the debtor had the full intention of
26   "reestablishing [his] rights as a consumer." I believe Rincon's closers accepted
27   payment in the form of debit cards, electronic checks, credit card payments and
28   even Western Union payments.

14.     In my three days of work at Rincon I saw closers get creative in negotiating payment with debtors.  Some closers would sometimes put the debtor on hold while he conferred with a made-up lawyer on a settlement amount and would pretend to do a back and forth negotiation between the debtor and the lawyer.  Other closers would take a more aggressive tone with debtors and would yell and threaten immediate arrest if he did not make a payment arrangement on the call.

15.     Cook explained that the pay for openers and closers ("collectors") at Rincon was strictly commission based.  The commissions that collectors were paid on accounts are outlined in the document titled "Pay Structure," which is part of Attachment 1.  The amount of the original credit card debt was called "regular money."  Collectors were paid a commission of 33% of all regular money collected.  As discussed above, the amount collected above the original debt for the fake court costs and legal fees was called spiff money.  Collectors were paid 80% of all spiff money collected.  The average balance on the credit card accounts I was provided to collect on was somewhere between $1,200 to $2,000, and on average the additional spiff amount closers would collect was anywhere from $1,000 to $1,500.  Closers were supposed to split the entire commission with the openers, so everyone seemed to keep track of how much money an account was going to pay.

16.     During my three-day employment I worked out of two collections offices.  Both were located at 495 E. Rincon Street in Corona, CA 92879 and the offices were right next door to each other.  One of the offices was in suite 201, and I believe the second office was in suite 202.  Both offices contained long desks with partitions on them separating each collector's telephone and computer.  The first office where I worked for most of the time was pretty cramped.  There were about 10 collectors there, comprising four openers and six closers from what I recall.  The second office where I worked for one day was a little larger and there were maybe 14 collectors there.

17.    Both offices had a sales board in the front of the room with the collector's name and the amount of money each collector brought in.  The collection amounts were listed by day, by week and by month.  The top performers were at the top of the sales board.  I recall that the top collectors brought in anywhere between $1,500 to $2,500 a week.

18.    Also posted in the front of the room was an 8 ½" by 11" sheet of paper listing collections companies, including Rincon, and ranking the performance of those companies against each other.  I remember there being somewhere between maybe seven to eight different company names on that sheet. I understood from Cook, and from talking to the other collectors, that Rincon Debt Management was just one of a number of collections companies in Corona that was owned by the same people.  I never heard the name of the owner or owners of these companies.  I also do not remember the names of all the other collections businesses on the ranking sheet, but I know that one of them was "Global Filing Services."  I recall that another of the businesses contained the word "national" in its name.  I think the full name of that business may have been "National Filing Services" or something similar to that.  Cook told me that he ran at least three of the Corona collections offices, so making sure that his offices ranked high on the sheet was important to him.

19.    At Rincon, each opener and closer had a computer terminal in front of him.  On that computer we had a program called "Prime Debt Soft."  From what I recall, this program provided us with information about the debtor, such as their name, last known telephone number, address, the name of the creditor and the total amount the debtor owed to the creditor, which was the amount we were collecting. The program also contained the debtor's last known employer and the employer's phone number, as well as the debtor's references and their contact information.  It also contained information about whether the debtor's credit reports had been pulled by creditors.  In some instances, we had access to those credit reports if they

7

36

1  had been pulled by the creditor.

2       20.    Ultimately, my conscience got the best of me and I decided to quit

3  working at Rincon by my third day of employment. In my prior work as a debt

4  collector, I had been provided training on what the Fair Debt Collection Practices

5  Act ("FDCPA") allowed debt collectors to say on calls to debtors and to third

6  parties. I knew that lying about a fake lawsuit probably violated a lot of other laws

7  in addition to the FDCPA. I was surprised to find a collections business engaging

8  in such blatant violations of the law. While at Rincon, I made collections calls for

9  maybe one and a half days because some of my time was spent talking to Cook

10  about the job and shadowing other collectors. From my calls, I was credited with

11  $150 commission. I learned this from the person who closed the account. I was

12  never paid the $150 and, frankly, did not want to touch that money because it was

13  tainted by the way Rincon did business.

14      I declare under penalty of perjury that the foregoing is true and correct.

15  Executed on _7/22_, 2011 in Corona, California.

16

17                           *Russell Delbridge*

18                           Russell Delbridge

19

20

21

22

23

24

25

26

27

28