Hong, Sang

1

## DECLARATION OF SANG HONG

2     I, Sang Hong make the following statement:

3     1.     I am more than 18 years of age.  I reside in Oakmont, Pennsylvania.

4     2.     On or about October 14, 2010, I received an email from a co-worker'

5 Keri Lambert, informing me that a male caller had contacted her at work and was

6 looking for me.  This person, Mike Davis, told her that he was a process server and

7 needed to contact me regarding a subpoena filed against me.  He asked my co-

8 worker to have me return his phone call at telephone number (866)767-8814.

9     3.     I had never been in contact with this co-worker prior to this incident.

10 I work for a very large corporation that has multiple offices in various cities.  She

11 works at an office in Philadelphia, and I work at one in Pittsburgh.

12     4.     After I received this email from my co-worker, I called Mr. Davis at

13 the phone number he provided.  However, when I spoke to Mr. Davis, he refused

14 to give me any information regarding the case against me.  He claimed that his

15 company was not actually involved with the case, so he only knew that a subpoena

16 had been filed against me and nothing else.  He explained that his company "uses"

17 Union Management, and it was that company who called my co-worker, not him.

18 Mr. Davis was very vague and would not answer any more of my questions.  At

19 that point, I told him that if there were any future problems, to please communicate

20 with me personally, or to have an attorney call me.

21     5.     On March 2, 2011, approximately six months after my initial contact

22 with Mike Davis, I received a phone call from my boss, who is also a regional

23 manager for the company that I work for.  My boss informed me that someone

24 called his office and was looking for me.  He said the caller referenced a debt

25 related case, case number 103502143, that had been filed against me.  The caller

26 gave my boss a phone number and told him that if I did not call the number back

27 by 12:00 p.m. that a warrant would be issued and I would be arrested and taken to

28 jail.  It was apparently 9:00 a.m. when my boss received that call.

6.     My boss also informed me that prior to calling me, he had contacted his boss, the vice president of my company, because he was not sure what to do with the information he just received.  His boss told him to explain the situation to the company's Human Resource Department.  My boss, his boss, and Human Resources department representative discussed the situation and decided that this was a personal matter, not a business matter, and that I had not broken any laws.  The Human Resources representative then told my boss that he could tell me about the call he received.  I was embarrassed that my bosses and the Human Resources department had to get involved in this situation and that they now thought I owed money on a debt.  I was scared that they thought I was a criminal.

7.     When my boss told me about the call, I had no idea what debt this caller was referring to.  Therefore, I called the phone number given to my boss to find out about the debt.  When I spoke to someone at the agency, I was advised that their office "does not make outgoing calls" and that it "was the process server" that called my employer.  I asked for the process servers contact information and was advised to contact the county courthouse.  I checked the court docket and there was no pending action by this agency. To date, no action has been filed.

8.     Later that same day, I called the number that was given to my boss.  The receptionist used the name "Union Management" when she answered the phone.  I was transferred to a representative, who gave me the run around and refused to answer any of my questions regarding the debt I supposedly owed or the case filed against me.

9.     During this phone call I told the representative that either company needs to change their procedures, and contact me directly next time, or else I will report them to Federal Trade Commission or to the State Attorney General.  Once I made this threat the representative hung up on me.  I called the same number back, but this time the company pretended like I was never contacted by their company and told me that no one there had ever spoken to me before.

10.     After that call, I never heard from Union Management again.  Nor did I ever receive any letters providing information about the debt I supposedly owed, or the case filed against me.

11.     I wanted to send Union Management a letter asking their company to not contact me again, however, I could not find their address when I conducted a search on the internet, I could only find a P.O. Box number.

I state under penalty of perjury that the foregoing statement is true and correct.  Executed on ~~July~~ August 3, 2011, at ~~Winter~~ Oakmont, Pennsylvania.

Sang Hong

Hunter, Laurie

## DECLARATION OF LAURIE HUNTER

1.     My name is Laurie Hunter.  I am over 18 years of age, and I reside in Cedar Park, Texas.  The following statements are within my personal knowledge.

2.     In mid-July, 2011, I received a telephone call from my mother who told me that a process server had called her.  She told me that the process server was rude, and had demanded my current address.  The process server told her he was ready to serve me, and needed my current address.  She would not give him my current address, but agreed to pass on the 877-527-9806 telephone number and a "case number" that he gave her.  My mother told me the process server called her twice.  She said she had also received a telephone call from her mother-in-law who reported that the process server had called her too and said that I needed to contact them about a case.  Her mother-in-law said the process server provided her with a case number and the same 877-527-9806 telephone number that was provided to my mother.  My mother also told me the case number she had been given matched the case number her mother-in-law had been given.  My mother urged me to call the process server.

3.     I called 877-527-9806 number the process server left for me to call and spoke to a woman who did not identify the name of her company.  I gave the woman my case number and she could not find any information for me using the number, but was able to pull up my information by my name.  The woman told me she was trying to help me and said that I owed some money, and that she could help me avoid a lawsuit.  I asked the woman the name of the company I allegedly owed money to and she responded that these documents were "legally sealed" and she did not have that information, but she then said she would transfer my call to a man who could help me.

4.     The man I was transferred me to told me his name was Brian Meyers.  Mr. Meyers told me he did not know who was suing me, but the amount was $1,888.  Mr. Meyers then got rude with me and threatened to post my name in the newspaper with a notice of my debt and his company's intent to sue me if I did not

82

pay. He said that I was being sued for the debt, but that his company would accept a settlement offer. I told Mr. Meyers that I could not pay the debt until I received a verification letter with information on the debt. In a very sarcastic tone he responded, "Would you want me to pay your debt as well?" Mr. Meyers then told me, "Good luck in court if you don't pay the bill." Our call was on a Friday, and Mr. Meyers said he would extend the date legal action would be taken against me until the following Monday. After asking Mr. Meyers several times to tell me who the debt was owed to, he responded that it was a bill was from a Saks Fifth Avenue account from 1999. Mr. Meyers then asked for my email address, and I gave it to him. I thought it was so that he could send me verification of the debt.

5. After ending my call with Brian Meyers, I received an email from a company called "Global Filing Services." **Attachment 1** is a true and correct copy of the attachment to the email I received with my personal information redacted. The letter was titled "Offer of Settlement" and it was from Global Filing Services. This was the first I learned that the name of the company that was threatening to sue me was called Global Filing Services. The attached letter was the not the verification of the debt that I had requested, but merely appeared to be setting forth a payment schedule to settle the debt.

6. The following Monday I received a call back from the Mr. Meyers. This time he identified himself as Brad Meyers, not Brian Meyers. On this call, I told "Brad" that I would not pay Global Filing Services.

7. To the best of my knowledge, no lawsuit has been filed against me by Global Filing Services, or others concerning the alleged debt. I have heard nothing

1  further from Global Filing Services since the last telephone call I received from

2  Mr. Meyers, which I discuss in paragraph 6 above.

3       I state under penalty of perjury that the foregoing statement is true and

4  correct.  Executed on  8 /17  2011, in Cedar Park, Texas.

5

6

7

8  Laurie Hunter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**84**

Attachment 1

# Global Filing Services

**1191 Magnolia Ave  Ste D-396**
**Corona, CA 92879**
**Tel: 877-527-9806  Fax: 951-272-1727**

***Personal and Confidential***

July 22, 2011

URGENT:  SIGN AND RETURN TO Global Filing Services

LAURIE LOPEZ

CEDAR PARK, TX

| | |
|---|---|
| Original Creditor: | HOUSEHOLD RETAIL SAKS |
| Original Account #: | |
| File Number: | HHI1071-01758 |

## OFFER OF SETTLEMENT

We will accept a settlement amount of $1,888.42 with a down payment of $472.10 due on 7/28/2011.We will establish a payment plan with 5 Monthly payments of $236.00 and   a final payment of $236.32 due on 1/19/2012.

or

Our client is willing to accept a onetime payment at a reduced settlement amount of $1,388.42 if the sum is paid in full by 7/28/2011.   Once a payment plan arrangement has been accepted, this reduced settlement amount is no longer valid.

**Upon receipt of certified funds and your authorized signature, the file will be closed.**

We shall notify our client that the obligation has been paid and satisfied and you will receive the proper documentation needed to notify the credit bureaus and update the credit account to a PAID IN FULL status .

Sincerely,

Global Filing Services
Administrative Department

*YOUR AUTHORIZED SIGNATURE IS REQUIRED TO UPHOLD ANY SETTLEMENT AGREEMENT BETWEEN YOU AND GLOBAL FILING SERVICES.  FAILURE TO DO SO WILL RENDER THIS SETTLEMENT OFFER NULL AND VOID.*

AUTHORIZED SIGNATURE: _____

** PLEASE MAIL OR FAX THIS PAGE OF YOUR DOCUMENT TO GLOBAL FILING SERVICES **

*Federal law requires we notify you that this communication is from a debt collector in an attempt to collect a debt*

Jackson, Bob

## DECLARATION OF BOB JACKSON

1.     My name is Bob Jackson.  I reside in Victoria, Texas.
The following statements are within my personal knowledge.

2.     On or about October 14, 2010 I got a call from some who
identified himself as a "process server from the Victoria County Sheriff's
Office."   This person asked for my address in order to serve a court summons
on me.  When I questioned him, he gave me reference number 3501339 and
told me to call 1-866-866-1313 to obtain additional information.

3.     I then called this number and the man answered the phone and
asked me if I had a Social Security number or a court case number.  I gave him
the reference  number 3501339 given to me by the person who told me that he
was a process server with the county sheriff's office.  I was then put on hold.
A woman then spoke to me and identified herself as Shannon.  She informed
me that she was a supervisor.  She told me that I had an outstanding debt of
$3,170 from a Providian account that was opened in 2001 and charged off in
2007, meaning that Providian had written off the debt.  Shannon told me that
the last payment that was made on the account was dated March 27, 2003.
When she said this, I knew the dates did not sound right and that I did not
make a payment on a Providian account in March 2003.

4.     Shannon spoke very rapidly and claimed someone had bought the
account from Providian and then sold it to her "Client."  She was insistent that
we resolve it right then and asked if I could make a one time payment of
$1,637.24 or $264.24 a month for 12 months.  I told her I have received no
documentation or monthly statements regarding the Providian account.  I
asked Shannon to verify the amount  that I owed.  She then got angry and told
me that now I was upsetting her and advised me that if I delayed and let this
matter go to court, I would lose and have to pay $3,170 plus $3,078 interest,
$1,500.00 in attorneys' fees, and $1,000 for court costs.  She said it was all up

1

1    to me how this matter was resolved. Shannon told me that I must be doing

2    pretty well financially because my credit report showed that I had bought a

3    new Harley-Davidson motorcycle and had recently purchased a new truck.

4         5.     I explained to Shannon that I would gladly pay an outstanding

5    debt if I owed it, but I was really sure that the Providian account she was

6    talking about was not my debt. I again asked for documentation which she

7    refused. Shannon told me the only way to see the "documentation" is when it

8    is served with the summons to appear in court because "documentation" was

9    on microfiche. I asked her why she was getting upset at me for asking for

10    proof of the debt. She replied "because I am bending over backwards to help

11    you and now you are doubting me." During this telephone conversation

12    Shannon periodically put me on hold and then continued to insist that I resolve

13    my debt problem by remitting to her the amount I owed with a postdated

14    check or bank card charge. I refused to give access to either. I wanted proof

15    of the account because I had several accounts that were charged off in earlier

16    years that I have been paying off slowly.

17         6.     After my conversation with Shannon, I went online to check my

18    email and noticed that I had received an offer from freecreditreport.com to

19    check the information reported by the various credit bureaus. I subsequently

20    obtained information from freecreditreport.com indicating that a company

21    called "Prime West Management Recovery" was monitoring my credit report

22    and found that it had made a hard inquiry on my credit report on October 14,

23    2010. I also noticed that the account that Shannon referred to was not on my

24    credit report as an active or non active account.

25         7.     I called Shannon back and explained to her that I was working out

26    of state working at the time and could not fully address this issue at that

27    moment. I told her that I would call her the following week when I returned

28    home. Shannon again responded that she was losing her cool with me and that

1   I would just have to go to court to settle this if I could not do anything right

2   now and for me to call her back the next day.  Shannon then hung up on me.

3         8.    I never received anything from Shannon documenting the debt

4   that she was trying to collect.  I could find no record of my owing any money

5   to Providian.  I only learned that Shannon was actually working for Prime

6   West Management Recovery by looking at the hard inquiry reported in my

7   credit report and by searching telephone number 866-866-1313 on the Internet

8   using my web browser.   I learned that many other people were receiving

9   similar threatening calls from Prime West Management Recovery's "sheriff's

10  office."

11        9.    On October 15, 2010, I filed a complaint with the Federal Trade

12  Commission.

13        I declare under penalty of perjury that the foregoing is true and correct.

14  Executed on____7/11/11_____, at Victoria, Texas.

15

16

17

18

19

20  Bob Jackson

21

22

23

24

25

26

27

28

3

Lawson, Robert

## DECLARATION OF ROBERT LAWSON

I, Robert Lawson, make the following statement:

1.     I am more than 18 years of age. I reside in Apex, North Carolina.

2.     I received a telephone call on my mobile phone on Friday, April 8, 2011. The man calling me told me there was a warrant for my arrest, and he gave me a case number and phone number that I needed to call. It was my understanding that an outstanding warrant normally meant that someone was wanted for criminal charges. I had absolutely no idea what those charges could possibly be.

3.     I asked him what the matter was about. He told me he could only tell me to call. He wouldn't tell me anything about the warrant, or even what it was for. Nor did he tell me who requested the warrant, or had a case against me. All he said that was that he was calling from the processing center handling the warrant.

4.     I asked him what jurisdiction the warrant was under. He told me he was calling from "**your** county." I asked him what that county was, and he couldn't give me a specific name, he just repeated that he was calling from "**your** county." That raised my suspicions because if he couldn't tell me what county I was in, it was unlikely that he had the "warrant" that he claimed to be holding.

5.     He finally admitted that he was calling about money that I owed. I had been divorced a few years ago, and unfortunately did have some bills that I couldn't pay, but as far as I knew I was aware of each of my unpaid debts, and had not had creditors calling me about any of them. He did not give me any further information about the debt that I allegedly owed.

6.     The caller then gave me a "case number" for me to reference and a telephone number for me to call, which was: 951-824-5265. The caller said that if

1

89

1  I did not call the number he gave me, I would soon be arrested. I am familiar with

2  the legal framework in North Carolina, and I instantly realized that the "case

3  number" that he gave did not match the North Carolina legal case numbering

4  system in that two letters were missing. The case number given was also too long.

5        7.      I then told the caller that, as far as I could tell, the information he had

6  given me was false, and his company did not have a "warrant" or a "case" against

7  me. I told him to not call me back, or my attorney would sue him.

8        8.      After I got off the phone with him, I checked out the phone number

9  the man who called me had given me. I entered the telephone number on

10 www.google.com and the search turned up that the number belonged to Pacific

11 Management Recovery. My Google search came up with a number of consumer

12 complaints on this company.

13       9.      I have immediate Internet access to my credit report through a credit

14 protection plan with my bank. Shortly after I received the call from this

15 representative, I accessed my credit reports to see if there was a debt or a

16 collections item that I had not previously been aware of. There were none.

17 However, a hard inquiry from a few days earlier from Pacific Management

18 Recovery appeared on my credit report. A hard inquiry is a request for full credit

19 information from ones credit report, and can be detrimentally viewed by some

20 credit grantors. I believe this inquiry may have been how they obtained my name

21 and telephone information.

22       10.     Pacific Management Recovery has not called me again since their

23 previous call.

24 //

25 //

26 //

27

28                                                  2

11.     On April 14, 2011, I filed an online complaint against the company with the Federal Trade Commission.

I state under penalty of perjury that the foregoing statement is true and correct.  Executed on July ____, 2011, in Apex, North Carolina..

Robert Lawson

3

91

Mandel, Luke

1

<u>DECLARATION OF LUKE MANDLE</u>

2      1.     My name is Luke Mandle and I am over 18 years of age.  I reside

3 in Rochester, Minnesota.  The following statements are within my personal

4 knowledge.

5      2.     Sometime in April 2011, my 13-year-old daughter received a

6 telephone call at our home from someone who told her that she was a process

7 server who wanted to serve legal papers and take me to court.  This individual

8 told my daughter that if I did not respond, a default judgment would be

9 entered against me.  This person said that I should call back immediately at

10 "888-906-3101" and gave my daughter a case number that I should give to the

11 agent who answered the telephone.  My daughter was very upset about this

12 because I was not home at the time.  She called me on my cell phone give me

13 the phone number that the caller had left with her.

14      3.     After talking to my daughter I called the 888-906-3101 phone

15 number.  The receptionist answered the phone said "corporate headquarters"

16 or something like that.  I gave the representative my name and the case

17 number and asked why this company was calling my daughter.  The

18 receptionist transferred me to a person named Candice Wright.  Ms. Wright

19 told me that my home phone was called because a "warrant" and "judgment"

20 were to be served on me.  She said that I owed money on an HSBC credit card.

21 Ms. Wright then informed me I could just pay off the outstanding balance to

22 avoid having the summons served at all.  I believe that she asked me for a

23 bank card number to pay this debt.

24      4.     I knew that I had no outstanding debt and understood that if a

25 summons were issued to appear in a real court, I would have been served

26 proper papers in person.  I was also doubtful of Ms. Wright's description of

27 herself as a "process server" and assumed that she must have been working for

28 some type of collection agency.  Her failure to provide me with the name of

her agency and some formal information to prove that she was authorized to collect a debt raised another red flag.

5. I subsequently conducted a search on www.google.com of the 888-906-3101 phone number and learned that Ms. Wright was working for "National Filing Services," a company located in Corona, California. I also discovered other people had experiences similar to mine with this shady business that attempts to bully people into giving it money as means of avoiding "going to court" when in fact there is no court case.

6. On or about April 18, 2011, I filed a complaint about National Filing Services with the Federal Trade Commission. I have received a last one call from National Filing Services since I filed my complaint with the Federal Trade Commission, but I have not received any correspondence from the company.

I declare under penalty of perjury that the foregoing is true and correct. Executed on ___9/6/11_____, at Rochester, Minnesota.


Luke Mandle

2

93

Marovic, George

## DECLARATION OF GEORGE MAROVIC

1.     My name is George Marovic.  I am over 18 years old and I reside in Santa Cruz, California.  The following statements are within my personal knowledge.

2.     In January 2011, various persons called me at my work and cell numbers claiming to be process servers from the sheriff's department.  On one occasion, someone from the "sheriff's department" disclosed that I owed money on a credit card debt and was about to receive a summons to appear in court to another employee and my place of work.  Each time these people called they left a call-back number.  I did not respond right away to the first call, but I continued to receive these calls.

3.     After a few of these calls, I called the number back and the person who answered the phone and said something like "Criminal Investigation Bureau."  The person I spoke with said that I owed about $1,385 on an overdue balance on a credit card.  The "sheriff's agent" then told me that this amount was from a 2007 credit card balance.  I asked for a verification of this debt be sent to me and the person responded that I could get it only when I agreed to submit a payment.  I told the sheriff's agent that, unless I receive a formal verification of this debt, I would not pay anything.  I also demanded that all calls to my work number stop, and said that their agents should not provide information regarding my personal finances to anyone else but me.  After I refused to pay the alleged debt without any written proof that it was indeed my debt, our call ended.

4.     Even after I refused to pay the debt, these calls continued to come in to my work phone number and my cell phone.  To best of my recollection, I received about three calls on my work number and numerous calls on my cell phone from people claiming to be working for law enforcement.  I recall on at least one occasion, when I responded to a call, that the person answering it

said that I would be referred to the "detective" assigned to my case.  Because

the caller refused to provide me with a verification of the debt, I assumed that

the caller was not calling about a real debt that I owed.

5.     Around this same time, my girl friend, Julie Byrd, received a

telephone call at her work number from someone claiming to be from the

sheriff's department.  The caller told her that the sheriff was about to serve a

summons on her in connection with a civil lawsuit.  This person said that Julie

was the subject of a lawsuit because she was a co-signer with me on a credit

account with an overdue balance from 2007.  The caller threatened her with

wage garnishment, property seizure, and arrest she if she did not immediately

pay this debt.  The caller said that Julie was equally responsible for ensuring

payment on the debt as I was.  The caller left Julie a telephone number and

told her to tell me to call them immediately to resolve this.

6.     Julie was very upset and gave me the telephone number that the

person from the "sheriff's office" had given her.  I recognized she was being

called by the same people who were harassing me on my work and cell phone

numbers.  I knew that this debt had nothing to do with Julie and that it was

impossible for her to be a co-signer on any account from 2007 because we

were not even together at that time.  I was outraged that someone had

threatened Julie with wage garnishment, attorneys' fees, and court costs when

she had nothing to do with my credit.

7.     I called the number Julie had given me and identified myself by

name.  The first person I talked to asked me for my social security number and

I refused to give it to her.  As in my prior calls to this company, the

receptionist was able to locate my "file" and disclosed that my social security

number was in it.  I was then transferred to a person who identified herself as

Ms. Corona.  Ms. Corona told me that her company had acquired the right to

1   collect on a 2007 balance on a Best Buy credit card. She said that I owed

2   $1,385 on what was an original debt of $730. Ms. Corona told me that the

3   additional charges represented late fees, penalties, and court costs. I

4   recognized that this balance arose from charges made my ex-wife and told the

5   agent that Julie had nothing to do with this. Miss Corona admitted that her

6   company had made a mistake by having the "sheriff's office" put Julie's name

7   on the court summons. Consequently, I asked her to remove Julie's name

8   from the summons and serve me instead because Julie had nothing to do with

9   this matter. She refused to do this and warned me that I would have to go to

10  court and ask the judge to take Julie's name off the summons.

11       8.      I asked Ms. Corona to provide me with verification of this debt.

12  She refused to do so and mocked me by calling me a "deadbeat" and a "loser."

13  She again threatened me with a lawsuit and the prospect of paying much more

14  than the $730, which she was willing to offer me as a settlement in full of the

15  Best Buy balance. Ms. Corona then told me that if I did not pay the overdue

16  balance that day that her agency would seek additional court penalties. I asked

17  her what was the name of her employer. When she told me that she worked

18  for Prime West Management in Corona, California, I asked her for her

19  agency's debt collector's license number, but she refused to provide it to me. I

20  then asked the spelling of her name and again she refused to provide that as

21  well. Ms. Corona insisted that I mail a check to Prime West Management in

22  Corona, California. I then entered the name and address she had given me into

23  www.google.com and discovered that Prime West Management was subject to

24  many customer complaints relating to its attempts to collect money from

25  people by claiming that it was "sheriff's department." At this point I was

26  convinced that all the calls that I received were part of a scam operation that I

27  wanted nothing to do with.

28

3

96

9.    The next day I received a call from Roger Smith from Prime West Management.  Mr. Smith asked me to send in money immediately, and I answered that I would not comply with his request because of his company's failure to provide any verification of the debt.  I told him that I knew that his company was falsely claiming to be associated with the sheriff's department.

10.    I was truly upset that Prime West Management threatened to have the sheriff's department serve me and my girl friend with a summons.  I was angry about how its agents tried to use threats and verbal abuse in their collection calls.  I am still flabbergasted at this whole situation and about how they managed to get Julie's phone number.  After Julie and I moved to a new address, we stopped receiving the collection calls.  Although I received many collection calls, including the one made to Julie, I never received any written verification from Prime West Management concerning the debt I supposedly owe.  On January 28, 2011, I filed a complaint with the Federal Trade Commission.

11.    I have not been sued by Prime West Management, nor has the sheriff's department contacted me in any capacity in relationship to this supposed debt.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on 8/5/11                    , at Santa Cruz, California.



George Marovic

4

McNamara, Shannon

## DECLARATION OF SHANNON M. MCNAMARA

1. My name is Shannon M. McNamara. I reside in Tracy, California. The following statements are within my personal knowledge.

2. I received a telephone call on November 18, 2010 at 1:28 p.m. according to my caller ID from 214-628-3880. I continued to receive calls from this number at the following times: 1:30 P.M., 1:33 P.M., 1:53 P.M., 3:26 p.m., 3:27 p.m., 3:31 p.m., 3:33 p.m., 3:34 p.m., and 3:39 p.m. I answered the last call and was told by the man who had called me that he was a process server who was trying to serve me with legal papers at my employer's previous address (my employer had moved shortly before I received the call). I asked what the legal papers dealt with and the man told me it was a summons to appear in court. He then instructed me to call 866-988-1001 to obtain additional information. In addition to the telephone number, he gave me a "docket number" of 1042-00993. He also said that he could arrange for me to be served at another location and that the person serving me would be a uniformed sheriff from a local station.

3. I called 866-988-1001, and a person answered "corporate office." After I gave the docket number, I was transferred to someone who identified herself as Lisa Lopez. She told me her company was demanding I appear in court for a civil lawsuit resulting from an amount I owed HSBC Bank. I did have an HSBC credit card and a debt on that card from about 2005 or 2006. I was unable to keep up with the payments because I was out of work at the time. I subsequently received collection calls from several different agencies, but it had been long time since I had heard anything about it and assumed that the debt had been written off. Lisa told me her agency was seeking to get a judgment in the amount of $4,052.83, which included penalties, attorneys fees, and court costs. She said I could make payment arrangements, but I would need to put 25% down, which, according to her calculations, was $500. Lisa said that I would need to send her this amount within 24 hours or my case would be filed and I would be served

1 | immediately by the sheriff at my place of employment. When I asked for further
2 | information about the debt, Lisa told me in an insulting manner that she did not
3 | have to provide anything other than an offer to settle this matter using a payment
4 | plan. She did tell me that she worked for "Prime West Management," but she gave
5 | me no reason to believe that Prime West Management was authorized to collect the
6 | HSBC debt. I told her that I would think about it and call her back.

7 |     4.    I subsequently searched the company Prime West Management on the
8 | Internet and learned that other people had been receiving similar threatening calls
9 | from Prime West Management. From what I learned, I realized that Prime West
10 | Management should not have threatened me with a lawsuit. I called back Prime
11 | West Management and insisted that it and its agents cease calling me at my place
12 | of employment.

13 |     5.    The entire manner in which Prime West Management was trying to
14 | obtain money from me for an old HSBC credit card debt seemed to be an outright
15 | scam. I believe that this company had no basis to claim that I was about to be sued
16 | on such an old debt. The next day, November 19, 2010, I filed a complaint with
17 | the Federal Trade Commission. As of today, I have not received any written
18 | confirmation of any debt from Prime West Management. In addition, HSBC Bank
19 | has not filed a lawsuit against me. Furthermore, no one from the sheriff's
20 | department has ever appeared at my residence, or my place of business to serve
21 | legal papers on me. I subsequently received another telephone from Prime West
22 | Management from another individual who made the same threats as Lisa. I told
23 | this person that I had previously asked not to receive collection calls from Prime
24 | West Management. This person said something to the effect that "we are not debt

25
26
27
28

1 | collectors; we are process servers."  I told the "process server" not to call me
2 | again.  After this call, I have had no further contact with Prime West Management.
3 |          I declare under penalty of perjury that the foregoing is true and correct.
4 | Executed on_____7/22/11_____, at Tracy, California.
5 |
6 |
7 |
8 |
9 |                            Shannon M. McNamara
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

Niday, Ronald E.

## DECLARATION OF RONALD E. NIDAY

1.      My name is Ronald E. Niday.  I reside in Garden City, Kansas.  The following statements are within my personal knowledge.

2.      In or around mid-May 2010, I received a call on my personal cell phone from a person claiming I had a debt that needed to be taken care of within three hours or I would be arrested by the Sheriff's department.  This person gave me the number, 866-769-7222 to call and set up a payment plan for the account.  I contacted the number that evening and spoke with a representative by the name of Toni with Prime West Management ("Prime West").  The Prime West representative gave me specific information concerning a delinquent Home Depot credit card account with Citibank.  I recognized the account, but I had no idea that it was delinquent.  The last time I spoke with someone from Citibank was in 2004, and I believe that this account had been settled at that time.

3.      The information the representative gave me about the supposedly delinquent Home Depot account was the account number, the balance due on the account, my last known payment and payment date.  The fact that Prime West Management had my personal account information made me think that it was a legitimate company that was collecting a debt that I somehow did not know about.  I made the assumption that Prime West Management would not have access to my personal account information if it were not entitled to collect on that account.  The Prime West representative  told me that if I paid approximately $1,544, the account would be paid in full and I would not have to pay any additional fees.  She also said that all collection efforts would stop.  I explained to the representative that I was not in a position to make such a payment, but would be more than happy to take care of the debt if I could pay it off in installments.  The Prime West representative responded that I would accrue interest on a payment plan, and that my new balance with the accrued interest would be approximately $2,574.  She added that if I did not make a payment that day, a lawsuit would be immediately

1    filed incurring court costs and attorney fees, bringing the total balance due to

2    $3,692. The representative told me I would need a $500 down payment and

3    subsequent payments of $266 per month for 12 months. I informed her I would

4    have to consult with my wife to insure we could actually budget that much. I told

5    the Prime West representative that I would get back to her back the next day by

6    noon with the answer. The Prime West representative sent an email to me

7    attaching a letter titled "Offer of Settlement" setting out the terms described above.

8    **Attachment 1** is a true and correct copy of the settlement offer from Prime West

9    that I signed with my personal identifying information redacted.

10         4.      I called the Prime West representative the next morning and set up

11    automatic payments via my debit account. The first payment would be debited on

12    May 24, 2010 for $500 and subsequent payments would be taken out on the 9th of

13    each month beginning in June. Prime West Management received a total of $1032

14    from my checking account in the form of one payment in the amount of $500 dated

15    May 27, 2010 and two payments of $266 each dated June 11 and July 12, 2010.

16    **Attachment 2** is a true and correct copy of portions of my bank statements

17    showing the relevant charges by Prime West Management with personal

18    identifying information redacted. In August 2010, Prime West Management

19    attempted to withdraw another payment of $266. This forced us to cancel our debit

20    card in order to stop this payment.

21         5.      On or about July 19, 2010, I filed a complaint with the Federal Trade

22    Commission. At this point I determined not to make any more payments to Prime

23    West Management because of the threats and misleading statements made by its

24    agents and my growing doubts that it was a legitimate company. I was also

25    contacted by First National Credit, another collection agency trying to collect on

26    the same Home Depot credit card account with Citibank. I then filed a complaint

27    with the Kansas State Attorney General's office.

28         6.      Someone from the Kansas Attorney General's office called us and

              advised

**102**

1  us that Prime West Management would cease collection if we could prove First

2  National Credit was working with us to collect the debt. A few days later, someone

3  from First National called us to inform us that it had to close our account because

4  Prime West Management was responsible for collecting this debt. We never called

5  First National Credit to request closing this account.

6        7.     I received one call from Prime West Management after I discontinued

7  making any further payments to the company. The agent mentioned that Prime

8  West Management had been contacted by the Kansas State Attorney General's

9  office and stated that I should continue to make payments. This individual told me

10  that I had to continue making payments in order to avoid a lawsuit being filed

11  against me, which would result in additional costs due to penalties, interest, and

12  court fees. I declined to do this.

13        8.     I have received no calls, letters, or emails from Prime West

14  Management since I stopped making payments last year. I have never received any

15  documents from Prime West Management or Citibank indicating that Prime West

16  Management had filed a lawsuit against me relating to Citibank credit card account

17  that I believe was closed in 2004.

18        I declare under penalty of perjury that the foregoing is true and correct.

19  Executed on _____, at Garden City, Kansas.

20

21

22

23

24

25  Ronald E. Niday

26

27  Michelle Niday

28

**103**

Attachment 1

# WEST Management

**541 North Main Street Suite 104-261**
**Corona, CA 92880**
**(866)883-8681**

DATE: May 18th, 2010

*Personal and Confidential*

Name: RONALD E NIDAY

City, State, Zip: GARDEN CITY, KS ████

RE: Original Creditor: CITIBANK HOME DEPOT
Original Account: ██████████
File No: 1019-00902
Current: $3,686.76

As of May 18th, 2010 West Management Group is prepared to settle this account in full for the balance of $3,686.76 to satisfy the above referenced account, provided that the funds are received **NO LATER THAN** May 9th, 2011 in the form of 13 payments.

| 05/25/10 | 06/09/10 | 07/09/10 | 08/09/10 | 09/09/10 | 10/09/10 | 11/09/10 | 12/09/10 | 01/09/11 | 02/09/11 |
|----------|----------|----------|----------|----------|----------|----------|----------|----------|----------|
| $300.00 | $266.00 | $266.00 | $266.00 | $266.00 | $266.00 | $266.00 | $266.00 | $266.00 | $266.00 |

| 03/09/11 | 04/09/11 | 05/09/11 |
|----------|----------|----------|
| $266.00 | $266.00 | $260.76 |

There is no grace period. If funds are not received in our office by the due date, this settlement offer agreement will be considered **NULL and VOID.**

Once the funds for the above referenced account have cleared your bank and we receive the authorized signature, the West Management Group will release you from all claims and liabilities pertaining to this account and our trade line with the major credit bureaus will be updated to **PAID IN FULL.**

If you are unsure of whether the payment will be received in our offices on or before the due date, you may contact the undersigned Account Manager to obtain instructions for sending funds via OVERNIGHT DELIVERY SERVICES, or CREDIT CARD. Please feel free to contact us at any time if you should have any questions regarding your account.

Sincerely,
West Management & Recovery
THIS IS AN ATTEMPT TO COLLECT A DEBT BY A DEBT COLLECTOR AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Credit Card Number

| X | X | X | X | X | X | X | X | X | X | X | X | ████ |
|---|---|---|---|---|---|---|---|---|---|---|---|------|

Exp Date
████

Authorized Signature: _Ronald E. Niday_

West Management and Recovery
Fax# 951-272-1727
541 N. Main St.
Suites 104-261
Corona, CA 92880

**Niday Declaration Attachment 1**


**CHISHOLM TRAIL STATE BANK**     **Account Statement**

IF YOU HAVE ANY QUESTIONS
CONCERNING YOUR STATEMENT,
PLEASE CALL: (316) 744-2035
BOX 4658, WICHITA, KS  67204
24 HOUR EXPRESS BANKING
(316) 744-3841
VISIT US AT WWW.CHISHOLMBANK.COM
MEMBER FDIC

RONALD EUGENE NIDAY AND MICHELLE NIDAY,                                      PAGE     1
TRUSTEES OF THE REVOCABLE TRUST AGREEMEN
T OF RONALD EUGENE NIDAY AND MICHELLE
GARDEN CITY KS ██████████

E-Z CHECKING                                        ACCOUNT NO        ████████
                                          STATEMENT DATE    06/25/2010
                                     LAST STATEMENT DATE    05/25/2010

           1                         STATEMENT PERIOD



PREVIOUS BALANCE
  5 DEPOSITS/CREDITS
 52 CHECKS/WITHDRAWALS
ENDING BALANCE
TOTAL SRV CHG TODAY

|                                  | TOTAL FOR THIS PERIOD | TOTAL YEAR TO DATE |
|----------------------------------|-----------------------|--------------------|
| TOTAL OVERDRAFT FEES             |          ████         |        ████        |
| TOTAL RETURNED ITEM FEES         |                       |                    |

**DEPOSITS**

| DATE     | DESCRIPTION | AMOUNT |
|----------|-------------|--------|
| 06/02/10 |             |        |
| 06/03/10 |             |        |
| 06/08/10 |             |        |
| 06/18/10 |             |        |
| 06/22/10 |             |        |

**WITHDRAWALS**

| DATE     | DESCRIPTION                                              | AMOUNT |
|----------|---------------------------------------------------------|--------|
| 05/27/10 | PURCHASE   05-25 PRIME WEST MANAGEMENT                   | 500.00 |
|          | 951-8245265, CA              VNT 037000 1               |        |
| 05/28/10 |                                                         |        |
| 06/01/10 |                                                         |        |
| 06/01/10 |                                                         |        |
| 06/01/10 |                                                         |        |



# CHISHOLM TRAIL STATE BANK

**Account Statement**

IF YOU HAVE ANY QUESTIONS
CONCERNING YOUR STATEMENT,
PLEASE CALL: (316) 744-2035
BOX 4658, WICHITA, KS  67204
24 HOUR EXPRESS BANKING
(316) 744-3841
VISIT US AT WWW.CHISHOLMBANK.COM
MEMBER FDIC

RONALD  EUGENE  NIDAY  AND  MICHELLE  NIDAY,                    PAGE     2

ACCOUNT

WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 06/01/10 | | |
| 06/01/10 | | |
| 06/02/10 | | |
| 06/02/10 | | |
| 06/02/10 | | |
| 06/03/10 | | |
| 06/03/10 | | |
| 06/03/10 | | |
| 06/04/10 | | |
| 06/07/10 | | |
| 06/07/10 | | |
| 06/07/10 | | |
| 06/07/10 | | |
| 06/07/10 | | |
| 06/10/10 | | |
| 06/10/10 | | |
| 06/11/10 | | |
| 06/11/10 | PURCHASE    06-09 PRIME WEST MANAGEMENT | 266.00 |
| | CORONA, CA                  VNT 037000 1 | |
| 06/14/10 | | |
| 06/14/10 | | |
| 06/14/10 | | |
| 06/14/10 | | |
| 06/15/10 | | |
| 06/15/10 | | |
| 06/16/10 | | |

Niday declaration Attachment 2



**CHISHOLM TRAIL STATE BANK**

**Account Statement**

IF YOU HAVE ANY QUESTIONS
CONCERNING YOUR STATEMENT,
PLEASE CALL: (316) 744-2035
BOX 4658, WICHITA, KS  67204
24 HOUR EXPRESS BANKING
(316) 744-3841
VISIT US AT WWW.CHISHOLMBANK.COM
MEMBER FDIC

RONALD EUGENE NIDAY AND MICHELLE NIDAY,                    PAGE    2

ACCOUNT   ███████

WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 07/06/10 | | |
| 07/06/10 | | |
| 07/06/10 | | |
| 07/07/10 | | |
| 07/08/10 | | |
| 07/12/10 | | |
| 07/12/10 | | |
| 07/12/10 | | |
| 07/12/10 | PURCHASE    07-09 PRIME WEST MANAGEMENT<br>CORONA, CA              VNT 037000 1 | 266.00 |
| 07/12/10 | | |
| 07/13/10 | | |
| 07/13/10 | | |
| 07/14/10 | | |
| 07/14/10 | | |
| 07/14/10 | | |
| 07/16/10 | | |
| 07/19/10 | | |
| 07/19/10 | | |
| 07/19/10 | | |
| 07/19/10 | | |
| 07/19/10 | | |
| 07/20/10 | | |
| 07/20/10 | | |

O'Keefe, Colin

## DECLARATION OF COLIN O'KEEFE

1. My name is Colin O'Keefe. I reside in Virginia Beach, Virginia. The following statements are within my personal knowledge.

2. Sometime in January 2011, my elderly mother received a telephone call at her home from someone who appeared to her to be working for a debt collection agency. According to my mother, she was told that I was going to be served with a warrant at my residence in Virginia Beach. My mother was very alarmed and telephoned me to give me the phone number that the caller had left with her.

3. I called the 866-676-2140 telephone number that my mother had given me. The person who answered my call did not give the name of the entity I was calling and said something like "corporate headquarters." I gave my name and asked why this company was calling my mother. I was then transferred to a person who identified himself as Ken. Ken told me that my mother was contacted because a warrant and judgment were to be served on me. He told me that the judgment arose from a debt that I owed on an HSBC credit card, which was 15 years old. The representative demanded that I provide my home address so that this summons could be served on me. Ken then offered that I could just pay off the outstanding balance to avoid having the summons served at all and asked me for my bank card number.

4. I do not recall ever having an account with HSBC Bank. Also, because I am a paralegal, I knew that there was something very strange about this collection effort and the alleged "warrant" and "judgment" that were to be served on me. I felt that the representative was just throwing around legal terms to get me to believe a case had been filed against me. I then asked the representative to provide written validation on this alleged debt. The representative responded "we don't have to validate anything." I then told the representative that there was no way that I would send any to an unidentified

1   company without official verification of debt.

2      5.     The way that this company went about trying to obtain payment

3   on the alleged HSBC debt left me very suspicious.  After my conversation

4   with Ken, I went online and searched the 866-676-2140 telephone number that

5   I had called.  I then discovered that the firm who called my mother and that I

6   had spoken with was called "Prime West Management" and that its address

7   was 1191 Magnolia Avenue, Suite D-381, Corona, California 92864.  I

8   searched information about the address and found that it was actually a United

9   Parcel Service Store.  My search of the phone number also pulled up

10  complaints from a number of other people who were complaining on internet

11  websites, such as www.ripoff.com that had complained about receiving

12  threatening calls from Prime West Management.

13     6.     Prime West Management never sent me with a letter validating

14  the HSBC debt it was attempting to collect, or any information on the alleged

15  warrant and judgment that it had against me.

16     7.     On or about March 16, 2011, I filed a complaint about Prime

17  West Management with the Federal Trade Commission.

18     I declare under penalty of perjury that the foregoing is true and correct.

19  Executed on ___8/9/11_____, at Virginia Beach, Virginia.

20

21

22

23                                    _Colin O'Keefe_____

24  Colin O'Keefe

25

26

27

28                                    2

**109**

Padelford, Christy

## DECLARATION OF CHRISTY PADELFORD

I, Christy Padelford, make the following statement:

1.     I am more than 18 years of age.  I reside in Port St. Lucie, Florida.

2.     My first contact with Rincon Management Services was on the afternoon of May 3, 2011, when a man who did not identify himself called my mobile phone.  I was at work at the time, and my workplace phone forwards all calls to my mobile phone.  The call appeared on my caller identification as coming from an unavailable number.  The caller told me he had a subpoena with which he had been trying to serve me for two weeks.  I found that hard to believe because I home-school my daughter and I am home all day, so I would have known if someone had tried to serve me with papers.  Nevertheless, the caller told me that my case had been "red-flagged" because the company had not been able to contact me, and that my case was scheduled for a hearing in court in two days.  He gave me a "case number," which I do not remember, and a phone number, 877-717-9946, which he told me to call immediately.

3.     Although I was skeptical of the caller's threat of a subpoena, his call alarmed me and I immediately called the number he provided.  A receptionist answered, and when I gave her the case number, she transferred me to a woman who identified herself as Debra Jones.  Ms. Jones did not identify herself as either a debt collector or a process server.  However, she told me that her company planned to take me to court because I had signed a credit card agreement with PayPal that allowed Ms. Jones' employer to sue me if I did not pay my bill.  To the best of my recollection, Ms. Jones did not identify the name of her employer.

4.     Ms. Jones told me that my total debt from that credit card was about $1,700.  I recognized that I had an unpaid PayPal credit card balance, but the amount she cited was much higher than the $511 balance I carried when I defaulted on that card.  Ms. Jones told me the higher amount reflected additional finance charges I had accrued since I defaulted.  I told Ms. Jones that was not a valid debt

1   because I declared bankruptcy on January 4, 2010, and I had settled that credit card

2   debt in the course of the bankruptcy process.  Ms. Jones told me that she could see

3   on my credit report that I had filed for bankruptcy, but that my PayPal credit card

4   bill was not among the accounts I settled in bankruptcy.

5        5.      At first, Ms. Jones urged me to immediately agree to pay, threatening

6   that if I did not, her company would take me to court.  She told me that I could

7   either settle the debt immediately for an amount I remember being somewhere

8   between $500 and $700, or else agree to a paying the entire $1,700 in two

9   installments.  Ms. Jones threatened that if her company were forced to take me to

10  court, I would also be liable for court costs and attorney fees.

11       6.      Once I brought up my bankruptcy proceeding, Ms. Jones also told me

12  I needed to send to her by fax before the next morning all of my bankruptcy

13  paperwork to confirm that my PayPal debt had been discharged.  She also told me

14  that if I could show that debt had been discharged, Rincon would discontinue its

15  collection efforts.

16       7.      Soon after I hung up with Ms. Jones, I looked up her company's toll-

17  free number on www.google.com.  Among the search results I found several

18  websites listing numerous complaints from other consumers.  Those complaints

19  described attempts by the company to collect debts by making legal threats and

20  harassing consumers' friends and relatives.  On those websites, I also learned that

21  the company's name was Rincon Management Services and found the company's

22  address and fax number.

23       8.      I called my bankruptcy lawyer's office after the same day after

24  talking to Ms. Jones.  I spoke to the receptionist there, who told me that the

25  Rincon call sounded like a scam and that I should not send the company any

26  personal information.

27       9.      That same day, I faxed Rincon a letter, in which I demanded that the

28  company immediately stop calling me.  I provided Rincon with my attorney's

2111

1  contact information and requested that all future communication be directed to my

2  attorney.  I did not hear from Rincon again after that.  I do not know whether

3  Rincon ever attempted to reach my attorney.

4        10.    Also that same day, I filed complaints against Rincon with the

5  Federal Trade Commission, the Florida Office of Financial Regulation and the

6  Florida Department of Agriculture and Consumer Services.

7        I state under penalty of perjury that the foregoing statement is true and

8  correct.  Executed on July  7 , 2011 in Port Saint Lucie, Florida.

9

10                                               Christy Padelford

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pickelsimer, Sylvia

## DECLARATION OF SYLVIA MOORE PICKELSIMER

I, Sylvia Pickelsimer, make the following statement:

1.    I am more than 18 years of age. I reside in Winter Haven, Florida.

2.    About one year ago, I received a call from my son, Matthew Moore. Matthew told me that for several months, he had been receiving calls from someone asking for me. The caller left Matthew a callback number and what the caller described as a "case number." I do not remember either of the two numbers. The man also threatened Matthew that I would be arrested if I did not call the number back.

3.    This was over a year ago so I do not recall much of what Matthew had told me about the calls. I did not, however, call back the phone number that was left for Matthew because he told me that he had done some research about the laws on debt collection and had come to the conclusion that how the caller was behaving and what the caller had said to him was not right. My son also looked up on the Internet the callback number the caller had left him and he learned that the number belonged to a company named "Rincon." I think this is when I first learned the company's name. Matthew told me that he found several websites with complaints from other people who had received similar calls from Rincon, and many of those complaints warned that the calls were a scam. Matthew told me that based on those complaints and on the laws he had looked up, he had decided to stop answering Rincon's calls.

4.    Matthew told me that the calls stopped for some time once he started ignoring them. About three or four months later, however, Matthew told me that he had received more calls. The call sounded like it came from the same company because just like the previous caller had, this caller also left a case number and a callback number, and threatened to arrest me if I did not call back. Matthew said that he yelled at the caller and told the caller that he knew the company was

1  behaving unlawfully and demanded that the caller never call him again. To my
2  knowledge, Matthew did not receive any more of these calls.

3       5.     This past February, I received a call from my daughter, Karrielinn
4  Cadle, who lives in Texas. Karrielin told me that she had me on a three-way call
5  and that on the line was a man who had called her looking for me. I do not
6  remember the man's name or the specific details of that call, but what I do
7  remember was that the call had an urgent tone. The man on the line told me he was
8  calling to collect an unpaid debt. I do not remember the exact amount the man
9  claimed I owed, or whether he told me the company to which I owed the original
10  debt. On the call the man said that I could settle the debt for a lesser amount and
11  he threatened that I would be arrested if I did not agree to settle.

12       6.     I was hesitant to pay this man any money because I did not recognize
13  the debt that the man claimed I owed. I had also remembered that my son had
14  previously warned me about collections calls he had received about me from what
15  he thought was not legitimate debt collection agency. I asked the man on the
16  phone to provide me information in writing about the debt, but he refused to send
17  me any written confirmation until after I had paid him some money. This made me
18  even more wary. I told the man that I would not agree to the settlement until I saw
19  written proof of the debt. However, Karrielinn, who was also on the phone, was
20  frantic and urged me to settle my supposed debt with the caller so that I would not
21  risk going to jail. Karrielinn told me that she had faced imprisonment several years
22  ago for failing to pay a debt, and that she did not want the same thing to happen to
23  me. The man on the phone was insistent that I would be in real trouble if I did not
24  pay, so I too started to worry that this could be true and that I could possibly face
25  jail time for a debt I did not remember. I felt confused and overwhelmed
26  throughout the course of that call. Pressured by the man's threats and my
27  daughter's insistence that my safest option was to pay, I finally relented. I gave the
28  man my Social Security number and my bank account information. He told me

1    they would charge my account about $100 each month until I had paid off the

2    entire settlement.  I think the payment plan was for two payments of about $100

3    each.

4         7.    After hanging up the phone with Karrielinn and the collector, I had a

5    chance to collect my thoughts and again remembered Matthew's warning that this

6    company may not be legitimate.  I also felt uneasy that I had just given my account

7    information to someone who refused to provide the name of his company.  Because

8    I felt nervous about what had just taken place, I called Matthew and told him what

9    had happened. He insisted that I call the company back and cancel the transaction

10   because he was sure that this was a scam.

11        8.    I called the man back at a toll free number he had provided to me and

12   gave them my case number.  The operator told me that the person handling my

13   case was out of the office, and instead transferred me to a different person.  This

14   new Rincon representative, whose name I cannot recall, became very upset when I

15   told him that I wanted to cancel my settlement transaction; however, he agreed to

16   cancel the payment.  When I asked him for written proof that I had cancelled my

17   payments, he told me that would not be necessary because we were talking on a

18   "federal line" and our entire conversation had already been taped.  The man then

19   hung up on me.

20        9.    Immediately after that call, I called my bank and requested that it

21   block the payment transaction that I had previously authorized.  I suspected that the

22   man and his employer would still try to charge my account for the settlement

23   amount, and was nervous about what would happen when they learned that

24   payment had been blocked.  A few weeks later, I called my bank and was told that

25   no one ever tried to make a $100 charge against my account, so I assumed that I

26   would not hear from the collector or his employer again.

27        10.   On or about February 22, 2011, I received a call from my friend

28   Vickie Taylor.  I do not remember the exact date she called me, but it was either

1   the same day or within a few days that I filed a complaint with the Federal Trade

2   Commission, which was on February 22nd.

3       11.   Vickie told me she had received a call from someone who had asked

4   for me. She described the conversation she had with the caller, and the caller

5   Vickie talked to said essentially the same thing as the people who had called

6   Matthew and Karrielinn a few months earlier. Vickie said the caller left a callback

7   number, 877-717-9946, and a case number, 106204442. Vickie said that the caller

8   told her that if I did not call back right away, I would be arrested. She also said

9   that she did not know who the caller was because the caller had refused to identify

10  herself or the company she worked for. Vickie also said that the caller told her it

11  involved a debt. Vickie was very upset about these calls because she was getting

12  them repeatedly and the caller was rude to her.

13      12.   I called the number Vickie gave me and the person who answered the

14  phone did not identify the company by name but said that I had reached

15  "administration," or something to that effect. I gave this person the case number

16  that Vickie had provided to me and I was transferred to a woman whose name I

17  remember as "Debbie" or "Debra" Jones.

18      13.   Debbie said she assumed I was calling because I had received a

19  summons to appear in court. I told her that I was not calling about a summons, and

20  explained that I was calling because someone from her office had called my friend

21  asking for me and left a case number and her telephone number for me to call. I

22  also told her that my friend Vickie was told that I would be arrested if I did not call

23  back. Debbie responded that this could not be true because she worked for the

24  "administrative department" and had not called my friend Vickie. Debbie said that

25  I must have received paperwork informing me that I could go to jail. I told Debbie

26  that I had received no such notice and that the only reason I was on the phone with

27  her was because she or someone from her company called my friend and

28  threatened that I could be arrested.

14.     At that point, Debbie's tone became very rude.  She told me that I owed money from a credit card balance dating back to August two years ago, which was approximately 2009.  I told her that could not be right because my last husband died in 2006 and the last credit card account I had was closed before his death.

15.     Debbie never told me who she worked for.  Nor did she explain how much money I supposedly owed or to what company.  Debbie ended the conversation soon after I told her that she had no right to harass me, Vickie, or anybody else about this, and that I thought that her behavior was unlawful.  Debbie responded that she knew that I had received court paperwork from an officer, and that if I did not act soon, I would go to jail.  Debbie then hung up the phone.

16.     I was not really worried that I would go to jail because, given Debbie's tone, what she told me, and how she went about contacting me, I felt that she was not calling from a legitimate collection company.  However, the situation really bothered me because Vickie told me that even after I spoke to Debbie, she continued receiving the same harassing calls.

17.     I never received a summons or any other document from Debbie or her employer.  I have not received any other calls from her or any other similar calls from anyone else.

18.     Not long after I spoke with Debbie I filed a complaint with the Federal Trade Commission because I suspected that I was dealing with a scam.  I also called my local television news channel to tell them about this, but they never followed up with a story.

I declare under penalty of perjury that the foregoing statement is true and correct.  Executed on June 28 , 2011, at Winter Haven, Florida.

*Sylvia Moore Pickelsimer*

Sylvia Moore Pickelsimer