Ratner, Stacy

## DECLARATION OF STACY RATNER

I, Stacy Ratner, make the following statement:

1.     I am more than 18 years of age, and I reside in Raleigh, North Carolina.

2.     On or about May 30, 2011, I received a telephone call at work from a woman who told me she was calling from a "processing center." She told me her office was attempting to serve me with a summons to appear in court. The caller would not answer any questions regarding the case, but said that I needed to call the legal department at 877 527-9806 with the case number HHI1071-02813.

3.     I called the number the "processing center" representative gave me, and the person who answered the phone said "corporate." I explained to the man, who introduced himself as Kurt that I was calling regarding a phone call I received regarding a summons to appear in court. Kurt explained to me that I was being sued for a past due credit card debt from HSBC bank in the amount of $4,800. I had previously had an HSBC credit card account, but I did not believe there was any amount owing on the closed account. I asked Kurt for more information about the debt, all he said was that if I paid him the full amount of $4,800, we could settle out of court. He did not provide me with any further information about the debt.

4.     I told Kurt that I remember the HSBC card having a very low maximum credit limit of around $500. I said there was no way that I could see how, even if I did not pay the card, the debt might have gone from $500 to $4,800. Kurt explained that the additional amount was for interest, attorney's fees and filing fees. He then told me he could set me up on a payment schedule, but they would need a "heavy" payment up front, and monthly payments of $200 each month. I told him that was not possible; I could not pay that much. After negotiating with Kurt a little, he told me they could lower the total amount owed to $600. Because it was a holiday weekend, and the banks were closed Monday. I

118

1  told Kurt I would have to pay it on Tuesday.  He agreed, and told me he would

2  contact me after noon on Tuesday.  We then ended our call.

3      5.      I gave the matter some thought and concluded that something seemed

4  wrong about the whole situation, starting with the supposed summons.  I also

5  wanted more information about the alleged debt.

6      6.      On Tuesday, Kurt called me regarding the credit card that I was going

7  to use to pay off the account.  I told him that I wanted debt verification regarding

8  the debt, how the amount was calculated, the statute of limitations on collecting

9  debts, whether his company was licensed to collect debts in my state, and whether

10 his company was actually owed the money they were attempting to collect.  Kurt

11 responded that after I gave him my credit card information, he would email me all

12 the information I requested.

13     7.      I gave Kurt my credit card information for payment of the debt, and

14 my email address.  Shortly after that call, I received an email from Global Filing

15 Services attaching a letter.  This was the first moment I learned that Kurt worked

16 for a company called Global Filing Services.  The letter did not have any of the

17 information I requested above.  Instead of the information on the debt that I had

18 requested, the letter only stated that they were willing to settle for $600.

19 **Attachment 1** is a true and correct copy of the letter attached to email I received

20 from Global Filing Services.

21     8.      After reviewing Global Filing Services letter, I immediately called my

22 bank and had a stop placed on the credit card account I had given Kurt.  I then

23 called Kurt, and explained that I would not pay until I received the information I

24 requested.  Kurt then got extremely angry, and threatened to have me arrested and

25 a judgment put on my record if I didn't pay.  He told me that he sued people every

26 day.  He claimed he had bent over backwards to help me out.  He told me I would

27 be sorry, and apparently slammed the phone down.

28

9.      After that heated call with Kurt, I pulled my credit report on-line.  My credit report did not show Global Filing Services as being owed this debt.  However, my credit report did show an inquiry from Pacific Management Recovery on May 1, 2010.  After that, I then filed a complaint with the North Carolina Attorney General, and the Federal Trade Commission.

10.     I have heard nothing further from Global Filing Services, or Pacific Management Recovery, and have not been served with any court papers regarding a lawsuit or a judgment.  To the best of my knowledge there is no such lawsuit or judgment pending against me.

I state under penalty of perjury that the foregoing statement is true and correct.  Executed on Aug 8   2011, in Raleigh, North Carolina.


*Stacy Ratner*
Stacy Ratner

Attachment 1

# Global Filing Services

1191 Magnolia Ave  Ste D-396
Corona, CA 92879
Tel:  877-527-9806  Fax: 951-272-1727

***Personal and Confidential***

May 31, 2011

URGENT:  SIGN AND RETURN TO Global Filing Services

STACY A RATNER
██████████████
RALEIGH, NC ████████

Original Creditor:  <u>Household</u>
Original Account #:  ████████████
File Number:  <u>HHI1071-02813</u>

## OFFER OF SETTLEMENT

This office has been retained to collect an outstanding balance owed on the above referenced account.  Any information obtained will be used for that purpose.

Our client is willing to settle any known or unknown obligations in this matter with respect to the above mentioned account for the sum of $600.00, if paid by 5/31/2011

Upon receipt of certified funds and your authorized signature, the file will be closed.

We shall notify our client that the obligation has been paid and satisfied and you will receive the proper documentation needed to notify the credit bureaus and update the credit account to a PAID IN FULL status.

Sincerely,

Global Filing Services
Administrative Department

GLOBAL FILING SERVICES IS WILLING TO SETTLE THE REFERENCED ACCOUNT, ON YOUR BEHALF, FOR THE AMOUNT THAT YOU HAVE AGREED UPON.  YOUR AUTHORIZED SIGNATURE IS REQUIRED TO UPHOLD ANY SETTLEMENT AGREEMENT BETWEEN YOU AND GLOBAL FILING SERVICES. FAILURE TO DO SO WILL RENDER THIS SETTLEMENT OFFER NULL AND VOID.

AUTHORIZED SIGNATURE: _____

** PLEASE MAIL OR FAX THIS PAGE OF YOUR DOCUMENT TO GLOBAL FILING SERVICES **

*Federal law requires we notify you that this communication is from a debt collector in an attempt to collect a debt
and any information obtained will be used for that purpose.*

Rhoads, Bonita

## DECLARATION OF BONITA RHOADS

I, Bonita Rhoads, make the following statement:

1.     I am more than 18 years of age. I reside in Sunbury, Pennsylvania

2.     I first heard of Rincon Management Services when they called my house on the afternoon of Friday, April 15, 2011. A man called asking for my daughter, Angelina Mikkelsen [~~Michaelson~~], who has not lived with us for several years. He referred to my daughter by her maiden name, which is Angelina Rhoads.

3.     When I told the man that our daughter did not live with us anymore, he told me I had to call her and tell her that she had three hours to call to respond to a summons by calling the following number: 877-717-9946. He also gave me what he described as a case number, which I do not remember. The man said that if my daughter did not call within three hours, he would take out a warrant and send someone to her house to arrest her.

4.     I asked the man what this was about, but he refused to provide any additional details. He also refused to give me his name or the name of his employer and did not explain why he could not give me that information. The caller just insisted that I pass on the message to my daughter and that I have her call back right away.

5.     Before calling my daughter, I entered the telephone number the man gave me into www.google.com and discovered that the number belonged to a company named Rincon Management Services. I then called my daughter's house and spoke to her husband. When I told my son-in-law what had happened, he told me that he and my daughter had recently received a similar call from Rincon. I do not know any details about their conversation with Rincon, although to the best of my recollection, my son-in-law told me the caller refused to provide him with any additional details about why he or she was calling.

6.     I never again heard from Rincon, whether by phone, in person or in writing. I do not know whether my daughter or my son-in-law ever called the

1   number that the Rincon agent left me. To my knowledge, my daughter has not

2   been sued or arrested, as the man who called me threatened would happen.

3        7.    On April 19, 2011, a few days after spoke with Rincon, I filed a

4   complaint against the company with the Federal Trade Commission.

5       I state under penalty of perjury that the foregoing statement is true and

6   correct. Executed on June ˍˍˍ, 2011, at Sunbury, Pennsylvania.

7

8                                                   Bonita Rhoads

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Robertson, Kristie

## DECLARATION OF KRISTIE ROBERTSON

I, Kristie Robertson, make the following statement:

1.  I am more than 18 years of age. I reside in Lincolnton, North Carolina.

2.  My family's first contact with Rincon Filing Services was on the afternoon of April 25, 2011, when a woman who identified herself as Debra Jones called my husband, Scottie Robertson. My husband was at home at the time, and the call came in on his mobile phone.

3.  Scottie told me Ms. Jones said she was a process server employed by Rincon Filing Services, and asked him if he had been served with papers or warrants by the sheriff. My husband asked her exactly what she was calling about. Ms. Jones responded that Scottie owed a credit card debt that has been past-due since 2007, and that unless he paid it immediately, he would receive within 48 hours a summons to appear in court. Ms. Jones gave Scottie an "account reference number," 6011767013147994. She also gave him a telephone number, 877-717-9946, to call immediately to arrange to pay all or some of the $1,600 he owed. Ms. Jones told my husband he could avoid being served if he agreed to settle for $1,200, made a $600 down payment on the spot and agreed to pay the rest in monthly installments.

4.  My husband was taken aback by this news because we do not have any credit card debt. I know we have no outstanding debt because we recently obtained a mortgage, and if our lender had seen a delinquent charge for that amount on our credit reports, that would have caused us trouble during our mortgage application.

5.  Immediately after he hung up with Ms. Jones, Scottie called me and told me the details of his conversation with Ms. Jones. Because I am the more assertive person in our relationship in these kinds of situations, I told Scottie that I would call the company myself and find out what was going on.

6.      Before returning the call, I looked up Rincon Filing Services on google.com. I was looking for the company's business address because we wanted to send the company a letter demanding that it stopped contacting our family until it had sent me a notice validating the debt in writing. On the Internet, I found an address listed for Rincon at 1191 Magnolia Avenue, Suite D381, Corona, California, 92879.

7.      That same afternoon of April 25th, I called the phone number the caller had left Scottie. A woman answered the phone with the greeting, "Rincon, how may I direct your call?" I told her I needed to speak with Debra at extension 243. The woman who had answered the phone told me she was Debra Jones. I asked her whether she was a process server or a receptionist, but she did not respond. I then told her that I wanted to send her company a letter requesting validation of the debt, and asked her to confirm whether the address I had found on the Internet was correct. Ms. Jones told me that it was not, and told me that I should mail the letter to 495 East Rincon Avenue, Corona, California, 92879.

8.      Scottie and I wrote a letter asking Rincon to validate within 30 days the debt it claimed my husband owed to demonstrate that it owns the debt or is entitled to collect on the debt. We also requested that Rincon only communicate with me and my husband in writing. We sent the letter to the address Ms. Jones provided to me, and we also sent a copy to the 1191 Magnolia Avenue, Suite D381 address I found on the Internet. A true and correct copy of that letter is attached to Scottie's declaration. We mailed both copies by U.S. Postal Service certified mail and requested a return receipt.

9.      The letter we mailed to the 495 East Rincon Avenue, Corona, California, 92879 address Ms. Jones had given me came back as undeliverable. A true and correct copy of that envelope, with the label stating "undeliverable as addressed," is attached to Scottie's declaration.

10. On May 1, 2011, I received a U.S. Postal Service receipt, signed and printed in illegible handwriting, showing that the letter we sent to the 1191 Magnolia Avenue, Suite D381, Corona, California, 92879 address I found on the Internet had been received by an agent of Rincon on April 29th. A true and correct copy of the return receipt for that letter is attached to Scottie's declaration.

11. On May 3rd, Scottie's brother left us a message saying Rincon had called Scottie's sister-in-law, Robin Robertson, who lives in South Carolina that day. Scottie's brother told us that the caller was trying to track down Scottie to serve him because he was delinquent on a debt. He said that the caller was asking for Scottie's phone number and address. Scottie's brother told us that the caller ended the conversation after Robin asked the caller why he was talking to her if he was not planning to serve her with any documents.

12. After we received that message from Scottie's brother, I called Rincon again. A man answered the phone and asked how he could direct my call. I told him that the company had violated our request that it only communicate with me and my husband in writing when it called my sister in law. I explained that our request was made in writing in a letter that Rincon received on April 29th. I asked to speak to a supervisor, but the man refused to connect me and insisted that there was "no supervisor present." When I asked for his name, he replied that his name was of no concern to me. When I repeated that I needed to get either the man's name and extension or else speak to a supervisor, he told me I was being "very rude" and hung up on me.

13. Immediately after that, Scottie called Rincon and the same man answered the phone. As soon as Scottie asked for the man's name and extension, the man hung up on him.

14. We waited thirty minutes before I tried calling Rincon again. A woman answered the phone. She said her name was Victoria Moss, but she refused to give me her extension number. When I told her about the letter we had

1  sent, she told me that the company must not have received the letter because it had
2  moved out of the address I found on the Internet and was now located at 1911
3  Magnolia Avenue, Suite D396. I found that hard to believe because the new
4  address she provided was almost identical to the old address, and because someone
5  at Rincon had signed for our letter at the previous address only four or five days
6  before.

7       15.    I asked Ms. Moss to let me speak to a supervisor, but she told me that
8  there was no supervisor available. I told her I wanted to know more about her
9  company and asked who its president was. She said the company president was
10 named "Wayne," but insisted that she did not know Wayne's last name, address or
11 telephone number. Ms. Moss told me she did not know of any way we could get a
12 hold of Wayne. Instead, she provided a fax number where she suggested that we
13 send our credit report and credit card information to pay for the debt my husband
14 supposedly owed. I ended the conversation soon after that.

15      16.    We have not had any more contact with Rincon since that
16 conversation. On May 3rd, we filed a complained against Rincon with the Federal
17 Trade Commission.

18      17.    We took notes of every contact my family and I have had with Rincon
19 since they received our letter on April 29, 2011. A true and correct copy of our
20 notes of the calls we had with Rincon is attached to Scottie's declaration.

21      I declare under penalty of perjury that the foregoing statement is true and
22 correct. Executed on June 29 , 2011, at Lincolnton, North Carolina.

24      _Kristie Robertson_

27

28

Robertson, Scottie

## DECLARATION OF SCOTTIE ROBERTSON

I, Scottie Robertson, make the following statement:

1. I am more than 18 years of age. I reside in Lincolnton, North Carolina

2. My first contact with Rincon Filing Services ("Rincon") was around 5:30 p.m. on April 25, 2011, when I received a call on my mobile phone from a woman asking me where I could be served with paperwork. I was not sure exactly what the caller meant by "served with paperwork," but I took it to mean that I was being sued.

3. The call made me very upset because I have never been involved in anything that could result in me being served with a lawsuit, so I asked the caller for more details on the situation. She told me that she was calling about an unpaid Citibank credit card debt I had incurred in 2000. This startled me because I did not remember even having held a Citibank credit card, so I asked her for more information about the debt. When she did not give me any more details, I asked her to transfer me to someone who could give me more information.

4. The caller transferred me to another woman, who identified herself as Debra Jones. Ms. Jones told me more or less the same thing: that I had opened a credit card account with Citibank in 2000 and failed to pay the balance, and that the account had been closed in 2007. Ms. Jones said I owed a balance of $1,600, which consisted of an original unpaid balance plus attorneys' fees and court costs. She did not tell me how much of the $1,600 was the original balance and how much of that was the attorneys' fees. Ms. Jones then told me I would be served within 48 hours, but that I could avoid going to court if I agreed to settle the debt that day for about $1,200. She told me I could make a $600 down payment and pay the rest in monthly installments.

5. Ms. Jones gave me an "account reference number," 6011767013147994, and a telephone number, 877-717-9946. She said I should

1    call that number to arrange to make my payment.  She also told me that if I called

2    Citibank and gave them that account number, they would verify my debt.  I was

3    very alarmed and confused, so I told Ms. Jones that I would have to call her back

4    the next day.

5        6.    I did not call Citibank with the account number Ms. Jones provided

6    because I am certain that I have never held a credit card account with that bank.  I

7    called my wife, Kristie Robertson, to tell her what had happened because she

8    handles all the bills in our household.  We checked our personal files when Kristie

9    came home, and she agreed that we have never had a Citibank card, much less one

10   that was delinquent.  We are certain of this because we recently bought a home,

11   and if we had a delinquent credit account on our credit reports, we would have run

12   into problems when we applied for a mortgage.

13       7.    Before calling the company back, Kristie and I looked up "Rincon" on

14   the Internet and found various websites that listed complaints from others who had

15   dealt with the company and warned that its calls are a scam.  Many of those

16   complaints described behavior similar to what we experienced, including threats of

17   arrest and legal action to pressure people into paying debts.  On the Internet, we

18   also found Rincon's address listed at 1191 Magnolia Avenue, Suite D381, Corona,

19   California, 92879.

20       8.    Kristie and I called the company back two or three times that same

21   evening.  Our experience with the Rincon operators over the phone made us even

22   more suspicious about the company.  For example, the same woman, Debra Jones,

23   who had told me she was a process server when she first called, answered the

24   phone when my wife called, but she identified herself as a receptionist.  When we

25   asked for the company's address so we could send them a letter asking them to

26   "validate" the debt, the employees we spoke to did not seem to know the address,

27   or were not willing to provide it.  When we asked to speak to a supervisor, the

28   employees either refused to transfer us or said they did not know who their

1  supervisor was. Eventually, Ms. Jones told Kristie that the address we had found

2  on the Internet was incorrect, and that we should mail our letter requesting "proof

3  and validation" of my debt to 495 East Rincon Avenue, Corona, California, 92879.

4      9.      Kristie and I sent two letters via United States Postal Service certified

5  mail and requested a delivery receipt. In the letters, we asked Rincon to

6  communicate with us only in writing and asked them to verify that we did in fact

7  owe the debt and that Rincon was authorized to collect it. **Attachment 1** is a true

8  and correct copy of our letter to Rincon, which I sent to the address Ms. Jones

9  provided to Kristie, and which we also copied to the 1191 Magnolia Avenue, Suite

10 D381 address we found on the Internet. The letter we sent to the 495 East Rincon

11 Avenue, Corona, California, 92879 address that Ms. Jones gave us came back as

12 undelivered due to a non-existent address. **Attachment 2** is true and correct copy

13 of that envelope, with the label stating "undeliverable as addressed."

14     10.     We received a receipt on May 1 informing us that Rincon had

15 received our other letter addressed to 1191 Magnolia Avenue, Suite D381, Corona,

16 California, 92879. a few days earlier. **Attachment 3** is a true and correct copy of

17 the return receipt for that letter.

18     11.     On or about May 3rd, a few days after we learned that Rincon had

19 received our letter, my brother left me a message. In the message, my brother said

20 that Rincon had called my sister-in-law, Robin Robertson, that day on her mobile

21 phone looking for me and asking where they could serve me with documents

22 related to a delinquent debt. My brother said Robin did not take very kindly to the

23 call and also felt that it might be a scam. I do not know how this company got my

24 sister-in-law's mobile phone number because even Kristie and I do not know it. It

25 really made me angry that they called her.

26     12.     After we received that message from my brother, Kristie called

27 Rincon again. A man answered the phone and asked how he could direct her call.

28 Kristie told him that the company had violated our request that it only

communicate with us in writing when it called my sister in law. Kristie explained

that our request was made in writing in a letter that Rincon received on April 29th.

Kristie asked to speak to a supervisor, but the man refused to connect her and

insisted that there was "no supervisor present." When Kristie asked for his name,

he replied that his name was of no concern to her. When she repeated that she

needed to get either the man's name and extension or else speak to a supervisor, he

told her that she was being "very rude" and hung up on her.

13.    Immediately after that, I called Rincon and the same man answered

the phone. As soon as I asked for the man's name and extension, the man hung up

on me.

14.    We waited thirty minutes and Kristie tried calling Rincon again. A

woman answered the phone. She said her name was Victoria Moss, but she

refused to give Kristie her extension number. When Kristie told her about the

letter we had sent, Ms. Moss told Kristie that the company had moved out of the

address we found on the Internet and was now located at 1911 Magnolia Avenue,

Suite D396.

15.    Kristie asked Ms. Moss to let her speak to a supervisor, but Ms. Moss

told her that there was no supervisor available. Kristie told Ms. Moss that she

wanted to know more about her company and asked who its president was. Ms.

Moss said the company president was named "Wayne," but insisted that she did

not know Wayne's last name, address or telephone number. Ms. Moss told Kristie

she did not know of any way we could get a hold of Wayne. Instead, Ms. Moss

provided a fax number where she suggested that we send our credit report and

credit card information to pay for the debt I supposedly owed. Kristie ended the

conversation soon after that.

16.    Kristie and I have not heard from Rincon again since that last

conversation. To my knowledge, they have not contacted any more of our friends

1    or relatives, either.  They have not served me or tried to serve me, and have not

2    notified me in any other way of an ongoing or pending lawsuit.

3        17.    Kristie and I took notes of every contact we have had with Rincon

4    since they received our letter on April 29, 2011.  **Attachment 4** is a true and

5    correct copy of our notes of the calls we had with Rincon.

6        I declare under penalty of perjury that the foregoing statement is true and

7    correct.  Executed on June 29, 2011, at Lincolnton, North Carolina.

8

9                                    Scottie Robertson

Scottie Robertson

April 26, 2011

Rincon Filing Services (Rincon Management and all other operating names by this agency)
495 E. Rincon Ave
Corona, CA 92879
    and/or
1191 Magnolia Ave Ste D 381
Corona, CA 92879

Re: Acct Ref. 6011767013147994 (# given via phone call on 4/25/11)

To Whom It May Concern: ·

This letter is being sent to you in response to phone call received yesterday from Rincon Filing Services (Debra Jones, 877-717-9946 ext 243). This is a notice sent pursuant to the Fair Debt Collection Practices Act, 15 USC 1692g Sec. 809 (b) that your claim is disputed and validation is requested.

This is NOT a request for verification or proof of my mailing address, but a request for VALIDATION made pursuant to the above named Title and Section. I respectfully request that your offices provide me with competent evidence that I have any legal obligation to pay you. The following items are to be sent to me via USPS within 30 days:

1. What the money you say I owe is for
2. Explain and show me how you calculated what you say I owe
3. Provide me with copies of any papers that show I agreed to pay what you say I owe
4. Provide a verification or copy of any judgment if applicable
5. Identify the original creditor
6. Prove the Statute of Limitations has not expired on this account
7. Show me that you are licensed to collect in my state
8. Provide me with your license numbers and Registered Agent
9. Proof that the collection company owns the debt or has been assigned the debt.
10. Show you are legally entitled to collect this particular debt from me.
11. Complete payment history, starting with the original creditor. (I need to have proof of my payment history with original Creditor, what the amount of the debt was when the creditor assigned the debt to your company, and what fees/interest has been tacked on to this debt and how you/they determined these fees.) This requirement was established by the case Fields v. Wilber Law Firm, Donald L. Wilber and Kenneth Wilber, USCA-02-C-0072, 7th Circuit Court, Sept 2004..
12. Copy of the original signed loan agreement or credit card application. (My contract with the original creditor establishing the debt between us.)
13. Show that I am in fact the debtor and not an authorized user of said account. If for some reason I am found as an authorized user of any accounts remove my information  immediately as I am not responsible for any accounts such as this. According to section 603 of the FCRA, only information on credit issued to a consumer is allowed. If I am an authorized user, I do not fall under these

**133**

categories, I am not responsible for the debt and did not receive credit. An authorized user doesn't have credit on this account and it's only the signor that is responsible. Here's the exact text to which I refer:
*FCRA Section 603. Definitions; rules of construction [15 U.S.C. 1681a] (what credit lines can be reported*

At this time I will also inform you that if your offices have reported invalidated information to any of the 3 major Credit Bureau (Equifax, Experian or TransUnion) this action might constitute fraud under both Federal and State Laws. Due to this fact, if any negative mark is found on any of my credit reports by your company or the company that you represent I will not hesitate in bringing legal action against you for the following:
*Violation of the Fair Credit Reporting Act
*Violation of the Fair Debt Collection Practices Act
*Defamation of Character

If your offices are able to provide the proper documentation as requested above in its entirety, I will require at least 30 days investigating this information and during such time all collection activity must cease and desist.

Also during this validation period, if any action is taken which could be considered detrimental to any of my credit reports, I will consult with my legal counsel for suit. This includes any listing of any information to a credit reporting repository that could be inaccurate or invalidated or verifying an account as accurate when in fact there is no provided proof that it is. If your offices fail to respond to this validation request within 30 days from the date of your receipt, all references to this account must be deleted and completely removed from my credit file and a copy of such deletion request shall be sent to me immediately. If your offices fail to provide proof of debt as outlined above within 30 days all references to this account must be deleted and completely removed from my credit file and a copy of such deletion request shall be sent to me immediately.

I would also like to request, in writing, that no telephone contact be made by your offices to my home, to my place of employment, to my family, friends, acquaintances, or anyone regarding this matter. If your offices attempt telephone communication with me or anyone regarding this matter, including but not limited to computer generated calls and calls or correspondence sent to or with any third parties, it will be considered harassment and I will have no choice but to file suit. All future communications with me MUST be done in writing and sent to the address noted in this letter by USPS.

Best Regards,

Scottie Robertson

Lincolnton, NC

Scottie Robertson

Lincolnton, NC

Rincon Filing Services

495 E. D~~ ~~

Corona

CHARLOTTE NC 281

28 JANUARY 2011 8 T

NIXIE       917   DC 1      DO 05/06/11

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 28092417251        *2140-09215-28-42

→ * returned letter from
1st Address given to me"

• 495 E. Rincon Ave
Corona, CA 92879

**Robertson declaration Attachment 2**

135

■ Complete items 1, 2, and 3. Also complete
Item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

A. Signature

X _____ ☑ Agent
☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
D. Tela                            4/28/11

1. Article Addressed to:

Rincon Filing
1141 magnolia Ave
Ste D 381
Corona, CA 92879

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:          ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7009 2250 0003 1136 7851

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

——> ✳ certified letter that was
delivered.

**136** Robertson declaration Attachment 3

Rincon Filing Services documentation on phone calls/correspondence after 4/29/11

\* 877-717-9946

05/08/2011 8:48pm called Rincon after receiving a message from Robin Robertson (sister-in-law in SC) that someone from Rincon called her requesting information on Scottie; phone number, address, if she was going to see him, etc. This was after Rincon had signed for the certified letter for proof of debt and to cease all phone calls on April 29, 2011.

Spoke with a man at Rincon who refused to give his name, would only respond with asking what my name was and said his name was of no concern to me. Asked this man to speak with a supervisor and he responded with there "was no supervisor present" to speak with. He informed me that I was being rude and hung up the phone. Scottie called back and got the same man on the phone, he again asked for his name and the man refused and hung up.

Called back for a third time. A woman answered this time, did give her name as Victoria Moss. I asked Ms. Moss for a supervisor and she responded the same as the first man; "a supervisor was not available." I asked her for a mailing address to Rincon's office and was given:

1191 Magnolia Ave
Ste D <u>396</u>
Corona, CA 92879

This was a different address than I had, when questioned about the validity of the address that I had sent a certified letter to (1191 Magnolia Ave Ste D <u>381</u> Corona, CA 92879) she responded with "they moved." I asked Ms. Moss for the CEO/president's name, she said his name was Wayne, she didn't know his last name and said she didn't have a phone number or address for him.


Kristie W. Robertson

Scottie E. Robertson

Robertson declaration Attachment 4

Savage, David

## DECLARATION OF DAVID SAVAGE

I, David Savage, make the following statement:

1.      I am more than 18 years of age.  I reside in Yucaipa, California, and I am employed by DS Waters of America, Inc., which is located in Riverside, California.

2.      The first notice I had that City Investment Services was interested in me was in approximately August 2010 after my employer's Human Resources Department called me in and told me that an unidentified male, who I later learned was a representative for City Investment Services ("City Investment"), had called our Human Resources Generalist, Jackie Zapata.  Ms. Zapata told me that a company had called and its representative told her that a bench warrant either had been or would be issued or for my arrest.  Shortly thereafter my wife told me she had received a call from a caller identifying himself as the San Bernardino County Sheriff informing her that he would issue a bench warrant for my arrest if I did not promptly call back.

3.      I then called the number that the caller had given to my wife.  When I asked for the man who had left his name with my wife, I was immediately transferred to a representative who told me he was in the legal department, but he did not state the name of the company.

4.      The representative stated that I owed a debt of approximately $1400 or more and told me that if I did not pay it, the company would contact law enforcement to issue a bench warrant, arrest me, garnish my wages, and collect court fees from me in addition to collecting the principal debt.

5.      The representative also cited bank account numbers that belonged to me, so I thought the company seemed to be legitimate.  The representative reminded me that he would contact law enforcement to have me arrested if I didn't agree to pay the debt.

1    6.    I knew I had some outstanding debts but I didn't recall the exact

2    amounts.  This debt, like all my debts, was over ten years old at the time the

3    company began calling to collect it.   Despite the representative's threats, I did not

4    agree to pay any amount to the company during the phone call.  I asked the

5    representative to stop calling me at work about the debt because we are not allowed

6    to take those kinds of calls at work.  After the initial phone call, I may have

7    received a letter from the company disclosing the amount of the debt and identity

8    of the creditor, but I cannot say for certain whether or not I received such a letter.

9    7.    After that call, I received calls about six to seven times a day about the

10   same debt that was the subject of the earlier calls, on my personal cell phone and

11   on my work-related cell phone, including during business hours, for about two

12   weeks.  Several times I asked the representatives to stop calling me, especially

13   during business hours, but the company continued to call me on my personal cell

14   phone and my work-related cell phone, often during business hours.

15   8.    One day a representative called me at work when I was very busy.

16   The representative offered to settle the debt for approximately $1135.  Fed up with

17   the harassment, I agreed to pay that amount in order to get the company to stop

18   calling me.  I agreed to make three or four payments to pay off the agreed upon

19   $1135.  Since the company already had my checking account information, I agreed

20   that the company could withdraw, on certain agreed upon dates, the payments from

21   a checking account that I shared with my wife.

22   9.    After that conversation the company sent me a letter which confirmed

23   the payment arrangement, although I no longer have the letter.  I believe the letter

24   stated it was from "City Investment Services" and listed a telephone number, but I

25   do not believe the letter stated an address for the company.  However, I remember

26   looking up the telephone number that was stated in the letter in a reverse directory

27   that indicated that City Investment was located in Corona, California.  The letter

28

1   and my reverse directory investigation revealed to me for the first time the name of

2   the company that had been harassing me.

3        10.    On the agreed upon date, August 14, 2010, City Investment withdrew

4   the first payment of $370 from our checking account.  On my bank statement, the

5   company name appeared as "City Investment Servic Corona CA" and the reference

6   number was 24071050227987140345285.  After I made the first payment, the

7   constant phone calls stopped.  About two to four weeks after the first payment,

8   City Investment attempted to withdraw the second payment from my checking

9   account, but I had insufficient funds in our account at that time and the payment

10  was not made.  City Investment representatives then resumed calling me multiple

11  times a day on my personal cell phone and my work-related cell phone, many

12  times during business hours.  I again asked the company to stop calling me, but the

13  calls continued.

14       11.    Thereafter I deposited more money into our account and City

15  Investment withdrew the second payment, this time a payment of $500, from our

16  account on September 14, 2010.  On our bank statement, the company that

17  withdrew the money was again listed as "City Investment Servic Corona CA."

18       12.    Before the third payment was scheduled to be withdrawn from our

19  account, I became more suspicious of the company and I began to doubt that the

20  company's actions were legal.  At that point my wife transferred money out of our

21  checking account so that City Investment could not withdraw the third payment

22  from our account.  When the third payment was unsuccessful, the constant

23  collection calls began again.  City Investment called me multiple times a day on

24  my personal cell phone and my work-related cell phone, including during working

25  hours, for about two days.  Again, fed up with the harassing calls, I finally gave in

26  and transferred money back into our checking account so City Investment could

27  collect its final payment.  On September 21, 2010, City Investment Services

28

1 | collected its final payment of $265. On our bank statement, the company name
2 | was again listed as "City Investment Servic Corona CA."

3 |     13.    After I paid the entire agreed upon amount of $1135, I did some
4 | research on debt collection practices and realized that the company had violated
5 | several regulations while collecting my debt, so I filed a complaint with the Federal
6 | Trade Commission.

7 |     I state under penalty of perjury that the foregoing statement is true and
8 | correct. Executed on July 24, 2011, at Yucaipa, California.

10 |     David Savage

Shane, Jr. James

## DECLARATION OF JAMES HOWARD SHANE JR.

I, James Howard Shane Jr., make the following statement:

1.    I am more than 18 years of age.  I reside in Eastland, Texas.

2.    I have been receiving telephone calls from the same company about once every four to six months for the past two years.  Every time, the people who call ask to speak to my son's wife.  The callers always refer to her as Marla Baxter, which was her name from a previous marriage.  Although the callers have never identified themselves, I know they are calling from the same company because they always say more or less the same thing and ask the same questions, to the extent that it sounds to me like they are reading from the same script.  The callers always ask for Marla Baxter, and they almost always insist that I deliver an urgent message to her with instructions that she call back a specific toll-free number and reference a case number.

3.    For about the first year or so, all I would tell the callers is that Marla does not live with me and that she lives with my son, who lives in a different city but is also named James Howard Shane.  At first, that information seemed to satisfy the callers, because they would hang up soon after I told them that.  Eventually, the callers' tone became more hostile and they began to insist that Marla needed to get a hold of them.

4.    I tried telling the callers that they should try contacting Marla directly instead of calling me, and I gave the callers Marla's and my son's address and phone number.  I found it odd that the callers did not seem interested in that information, and would instead leave messages with me insisting that Marla call back a toll-free number they provided.  I may have written that phone number down at some point, but I have since thrown it away or misplaced it.  Because the callers did not sound very interested in calling Marla themselves, I did not pass on their message to her either.

5.    It was not until the company called me again in February 2011 that I really started to get fed up with the phone calls. On that call, the caller again gave me a telephone and case number, and she also threatened that if Marla or my son did not call that number back immediately, the sheriff would come to my house and serve me. I did not take those threats seriously because it did not make sense to me that they would serve me with a complaint against Marla. I told Ltold the caller, "Fine, send the sheriff over. I know him." Still, the increasingly pushy tone of the calls had started to annoy me, so I decided that I had to do something to make them stop. I wrote down the case number and telephone number the caller gave me and decided to pass these along to my son so that he could deal with the issue. Soon after that call, I called my son and described the telephone calls to him. I gave him the phone number and case number I had been given, and told my son that he needed to take care of these calls because they were getting out of hand.

6.    To the best of my knowledge, my son did call that number back. I am not familiar with the details of his conversation with this company, except that I remember he told me the calls seemed to be about a credit card debt that Marla's ex-husband had incurred in her name prior to their divorce.

7.    Neither the sheriff nor anyone else has come to my house to serve me, as the caller had threatened. I have not heard from that company since that last conversation in February.

I declare under penalty of perjury that the foregoing statement is true and correct. Executed on July  _6_ , 2011, at Eastland, Texas..

_James Howard Shane Jr._
James Howard Shane Jr.

Shane, III James

## DECLARATION OF JAMES HOWARD SHANE III

I, James Howard Shane III, make the following statement:

1.      I am more than 18 years of age and reside in Austin, Texas.

2.      Rincon Management Services ("Rincon") first contacted me through my 77 year-old father, James Howard Shane Jr., who called me on or about February 27, 2011, to tell me I should call the company immediately. My father told me that he had been receiving calls from the same company for months, and that the company was apparently trying to reach my wife and had made legal threats against him.

3.      My father told me he had repeatedly told the company that my wife did not live with him, and that he had given them my name and phone number. My father said the company continued calling him despite the fact that he had given the company my contact information. On the day my father called me, a woman named Ms. Jones had told him that if I did not call her company within two hours, they would show up at his house and serve him with papers.

4.      Ms. Jones left a message for me with my father, including her name, telephone number (877-717-9946), and a "reference number," which I do not remember. My father urged me to call the company right away because he was upset about the threat that someone would show up at his door with court papers.

5.      I called the phone number within a few hours of speaking with my father, gave the operator the reference number and asked to speak with Ms. Jones. The operator told me that Ms. Jones had gone home for the day, which surprised me because my father had spoken to her only about two hours before. The operator told me that because the case involved a debt that belonged to my wife, he was not authorized to speak to me about the matter unless I got my wife on the line.

6.      I asked the operator how I could resolve this matter if Ms. Jones was not there. I explained that Ms. Jones had threatened to serve my father with papers

1   if I did not speak to her within two hours.  At that point, the operator transferred

2   me to another representative, who did not identify herself.  I told the representative

3   I had my wife on the line, but she said that she could resolve the matter directly

4   with me.  To the best of my recollection, I first learned the name of the company

5   was Rincon Management Services during my conversation with the operator who

6   answered the phone.

7         7.      The Rincon representative did not identify her employer as a

8   collection agency.  I do not remember the exact words she used, but to the best of

9   my recollection, she said that she worked for a filing service.  What I understood

10   from her description of her employer was that she worked for something like the

11   legal department of a debt collection agency, and that she was in charge of filing

12   lawsuits against debtors.

13         8.      The Rincon representative told me that her company was calling me

14   about an unpaid debt in my wife's name that dated back to 2006.  The only debt

15   my wife and I could recall having was from my wife's previous marriage, when

16   my wife's ex-husband ran up some debts in her name, some of which might have

17   remained unpaid.  My wife and I got married in 2003, so those debts must have

18   been older than that.  I knew that even if the debt dated only to 2006, as the woman

19   claimed, it was no longer a debt for which Rincon could sue us because the statute

20   of limitations on credit card debt in Texas is only four years.

21         9.      I remember the woman telling me that the original debt amount

22   ranged somewhere between $2,000 to $3,000, but that my wife and I now owed

23   more than that due to interest that had accrued.  I do not remember the exact

24   amount she mentioned, but to the best of my recollection it was about $17,000.

25   The woman told me that I or my wife would be sued if we did not pay that amount

26   immediately.  I responded that $14,000 or more in interest charges sounded

27   outrageous to me.  At that point, the Rincon representative told me that she would

28   have to check with her supervisor, but that it might be possible to pay off the debt

1  in installments if I agreed to a payment plan. She placed me on hold for several

2  minutes. When she returned on the line, she told me that I could avoid a lawsuit by

3  making a down payment immediately and agreeing to a payment plan. She then

4  asked for my credit card information so that she could charge me for that down

5  payment.

6        10.    The Rincon representatives's request for my credit card information,

7  and the knowledge that the debt was so old that the company probably could not

8  sue my wife, made me suspect that she was not calling about a legitimate debt. I

9  asked the woman to send me a notice in writing verifying the debt. The woman

10  told me she had already sent me that two months before, but we have not received

11  any such notice. She also told me that she could not send me the notice again

12  because that would "set back the clock" and give me an additional 30 days to

13  respond before her company could serve me, and she did not want to wait that

14  long. I told her that if that was the case, we would have to settle the matter in

15  court. I believe the Rincon representative responded to that by saying that if I did

16  not pay immediately, I would be served. I told the Rincon representative that they

17  could go ahead and serve me. She responded, "We will!" and hung up.

18        11.    The woman's tone throughout the conversation was rude and

19  argumentative.

20        12.    Contrary to the Rincon representative's threats, neither my father, nor

21  my wife or I have been served with any papers in connection with the alleged debt

22  Rincon called us about. We have not heard from Rincon since the call in which the

23  representative threatened we would be served with papers.

24        13.    At some point after I learned that the name of the company was

25  Rincon Management Services, I looked up the company on www.google.com. The

26  results from my search consisted mostly of websites such as

27  www.ripoffreport.com, which listed complaints from other consumers who had

28  dealt with Rincon. Many of the complaints described experiences similar to mine,

1  in which the company harassed consumers' friends and family and demanded

2  payment for apparently invalid debts.  I also found the company's address listed on

3  at least one of these complaint websites.

4       14.    A few days before March 1, 2011, I called the Texas Office of the

5  Consumer Credit Commissioner to lodge a complaint.  The operator with the office

6  advised me to file a complaint with the Federal Trade Commission, which I did

7  that same day.  The operator also advised me to send the company a letter

8  demanding that Rincon stop contacting me, my wife, my father and any other of

9  our friends and relatives. **Attachment 1** is a true and correct copy of that letter.  On

10  March 1, 2011, I received a return receipt notifying me that an "S. Diaz" received

11  my letter at Rincon's address.  **Attachment 2** is a true and correct copy of that

12  return receipt.

13       I declare under penalty of perjury that the foregoing statement is true and

14  correct.  Executed on July  13  , 2011, in Austin, Texas.

15

16                                            Shane

17                                   James Howard Shane III

18

19

20

21

22

23

24

25

26

27

28

February 28th, 2011

Rincon Management Services
1191 Magnolia Ave Ste D-381
Corona California 92879-3215

Re: Case # 105403312 (Marla Baxter)


Dear Rincon Management Services:

Pursuant to my rights under federal debt collection laws, I am requesting that you cease and
desist any and all communications with me, my wife and all of my family including my father,
James Howard Shane Jr., of Eastland Texas, as well as any other relatives or friends of ours you
have in your database in relation to this and all other alleged debts you claim to be owed by one
Marla Baxter.


Be aware that complaints have been filed with the Office of the Consumer Credit
Commissioner of Texas for violations of  Chapter 392.00 of the Texas Finance Code, as well as
with the Federal Trade Commission for violations of the Fair Debt Collection Practices Act.


Sincerely,



James Howard Shane III

**Shane declaration Attachment 1**

omplete items 1, 2, and 3. Also complete
m 4 if Restricted Delivery is desired.
int your name and address on the reverse
that we can return the card to you.
tach this card to the back of the mailpiece,
on the front if space permits.

☐ Agent
☐ Addressee

B. Received By ( Printed Name)          C. Date of Delivery

ticle Addressed to:

LINCON  MANAGEMENT  SVCS.
191  MAGNOLIA  AVE.
SUITE  D-391
COROWA,  CA  91879-3215

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

ticle Number
ansfer from service label)      7011 0110 0002 1963 5339

orm 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

149      Shane declaration Attachment 2

Sims, Latonya

## DECLARATION OF LATONYA SIMS

1.     My name is LaTonya Sims.  I reside in Columbia, South Carolina. The following statements are within my personal knowledge.

2.     On or about March 21, 2011, my mother, Virginia Gail Sims, told me that someone claiming to be a process server for the Richland County Sheriff's Department contacted her employer, International Paper, and stated that he was about to subpoena her to appear in court.  This individual explained to Walt Partrich, an employee at the  department of human resources at International Paper's Eastover Mill, that if my mother called the Sheriff's Office immediately, a deputy would not need to serve her at work.  The deputy instructed Mr. Partrich to have my mother call his office at 866-676-2140 and identify herself by case number 106-676-2140.  **Attachment 1** is a true and correct copy of an email dated March 21, 2011 from Mr. Partrich to my mother.

3.     My mother told me that after Mr. Partrich relayed the message she called the number and spoke to someone who stated that a lawsuit had been filed on behalf of Chase Bank against her.  My mother did not have an account at Chase Bank and assumed that debt in question belonged to me.  **Attachment 2** is a true and correct copy of an email dated March 21, 2011 from my mother informing me of the Chase Bank lawsuit.

4.     After my mother told me about the telephone calls, I called 866-676-2140 and identified myself with the case number and my name.  I was referred to an agent who identified himself as John Anthony.  Mr. Anthony told me that he represented Chase Bank and informed me that I owed about $5,000 including penalties and court costs on an unpaid Chase credit card balance.  I believe that the original balance was $1,126, which included interest and penalties.  Mr. Anthony told me that if I did not agree to a payment plan by the end of the month, I would be sued and have my wages garnished.  I asked him to provide verification that he was authorized to collect on any debt owed to the Chase Bank.  He refused to do so

1    and insisted that I give him my debit card so that I could begin making monthly
2    payments to settle this case.

3        5.    I subsequently contacted Chase Bank and a credit bureau and
4    determined that this was a very old debt that was beyond the three-year statute of
5    limitations in South Carolina, which made the debt uncollectible.

6        6.    My brother, Ricky Sims, searched the internet for the telephone
7    number 866-676-2140 and learned that Mr. Anthony was employed by Prime West
8    Management ("Prime West"), which apparently is a collection agency located in
9    Corona, California.  On March 22, 2011, I filed a complaint with the Federal Trade
10   Commission.  I was particularly upset that Prime West had called my mother and
11   her employer and gave false information to both parties by claiming that lawsuits
12   had been filed or were about to be filed on what was obviously an uncollectible
13   debt.

14       7.    On May 5, 2011, I sent via Certified Mail a letter to Prime West
15   requesting that it stop communicating with me.  I have not received any calls from
16   Prime West since I sent that letter.  Attachment 3 is a true and correct copy of the
17   letter mailed to Prime West Management on May 5, 2011 with personal
18   information redacted.

19       8.    I have not been sued by Prime West Management, nor has the
20   sheriff's department contacted me in any capacity in relationship to this supposed
21   debt.

22       I declare under penalty of perjury that the foregoing is true and correct.
23   Executed on __8/7/2011_____, at Columbia, South Carolina.

24
25
26
27       _LaTonya S Sims_
         LaTonya Sims
28

**151**

**From:** Walt Partrich
**Sent:** Monday, March 21, 2011 2:08 PM
**To:** Gail Sims
**Subject:** Subpoena
**Sensitivity:** Confidential

Gail,

A Richland County process server called the mill, and asked that you be provided with the phone# and case# below so that you can call and get information about a subpoena to appear in court. If you call quickly a deputy will not need to serve you with a subpoena at work.

Please reply to confirm that you received this info.

Phone #: 866-676-2140
Case #: 106 402 197

Walt

**Sims declaration Attachment 1**

****Tonya,

Chase Bank is trying to take me to court for charges against this account. Just so you will know, there has been a civil suit filed in my name. I don't have an account with Chase Bank, so this must be yours.
Please advise.

V. Gail Sims
International Paper - Eastover Mill
████████████

"We Have Not Because We **ASK** Not"

Sims declaration Attachment 2

May 5. 2011

LaTonya Sims

████████████████████
Columbia, SC ██████

Primewest Management
1191 Magnolia Ave d-396
Corona, CA 92879

Re: #106402197 Account # ████████████

Dear Debt Collector:

Pursuant to my rights under federal debt collection laws, I am requesting that you cease and desist communication with me, as well as my family and friends, in relation to this and all other alleged debts you claim I owe.

You have identified yourself as a bank representative [March 21, 2011], admitted to running a credit check without consent [March 21, 2011], provided information to third parties regarding these alleged debts at their workplace [March 21, 2011] with threats of being served to-court-as-a-representative from the process server as well as via voicemail [May 4, 2011], threatened to garnish wages, as well as refusing to substantiate the allegation by providing proof of the debt owed, which I dispute.

You are hereby notified that if you do not comply with this request, I have already filed a complaint with the Federal Trade Commission, contacted an attorney, and will immediately file a complaint with the South Carolina Attorney General's office. Civil and criminal claims will be pursued.

Sincerely,


LaTonya Sims

**Sims declaration Attachment 3**