Taylor, Vickie

## DECLARATION OF VICKIE TAYLOR

I, Vickie Taylor, make the following statement:

1.      I am more than 18 years of age.  I reside in Polk City, Florida.

2.      Over the course of two weeks in early February 2011, I received several calls on my home phone from a woman asking for my friend Sylvia Moore Pickelsimer.  I estimate that over the course of those two weeks, I received about three or four calls, which usually arrived in the afternoon.

3.      Each time the woman called and asked for Sylvia, I explained to her that Sylvia does not live with me.  I would also ask her where she was calling from and what she was calling about.  Because this took place several months ago, I do not remember exactly what the woman said during each of the conversations.   In general, however, I recall that the woman avoided answering my questions, and that on one of the calls she did tell me she was calling about a debt that Sylvia owed.  She refused to tell me the name of her employer or explain in any further detail why she needed to speak to Sylvia. On my caller identification, her calls always showed up as coming from an unidentified number.

4.      On the first or second of these calls, the woman gave me a telephone number, 877-717-9946, and a case number, 106204442.  She told me that if Sylvia did not call that number within the next few hours, she would be arrested.  I told the woman that I was not responsible for Sylvia, and that whatever this happened to involve was not my problem, but this did not stop the woman from calling me again.

5.      I do not understand how this woman ever came to associate me with Sylvia,  how they obtained my phone number, or why they thought they could find Sylvia at my house.  For that reason, after the first or second call I received from this woman, I called Sylvia and told her to stop giving out my number to

1

1  whomever she was having financial problems with.  Sylvia insisted that she had

2  not given out my number to anybody.  I gave Sylvia the phone number and case

3  number the woman had left me and told her to call them so that they would stop

4  bothering me.

5       6.     Even after I talked to Sylvia, the same woman still called me again

6  about two or three times.  Even though the woman never told me her name, I know

7  it was the same person because I recognized her voice and because she said

8  essentially the same thing.  These phone calls made me angry because the woman

9  spoke rudely to me.  For example, whenever I told her Sylvia was not at my home,

10 her words and her tone suggested to me that she though I was lying.

11      7.     The last time the woman called, I lost my temper with her.  In an

12 attempt to end the conversation, I had told her that I had to get off the phone

13 because I needed to attend to a family emergency.  The woman ignored me and

14 continued demanding to speak to Sylvia.  She was pressing me for information

15 about where she could find Sylvia, and threatened that she was going to have

16 Sylvia arrested.  After a few minutes of this I yelled at the caller and demanded that

17 she never call me again.

18      8.     I have not received any other phone calls from the woman since that

19 last conversation.

20      I declare under penalty of perjury that the foregoing statement is true and

21 correct.  Executed at on June 7 - 1 , 2011, at Polk City, Florida.

22

23

24                     Vickie Taylor

25

26

27

28                          2

**192**

Tehrani, Saeed

## DECLARATION OF SAEED TEHRANI

I, Saeed Tehrani, make the following statement:

1.   I am more than 18 years of age, and I reside in Union City, California.

2.   On or about November 23, 2010, I was told that my brother's ex-wife had been called by a man who told her that I was being sued. She was told that someone from the sheriff's office was going to serve papers on me. She was given a "case number" and a telephone number for me to call, which I do not recall. She was told to have me call back immediately.

3.   My brother relayed the information on to me. I called the telephone number that had been given to my brother's ex-wife.

4.   The person who answered when I called said "City Services." I explained that someone from the sheriff's office had phoned my brother's ex-wife and told her that I was being sued, and someone from the sheriff's office was going to serve me with legal papers. The man who answered the phone explained that his office only served papers; he said I would have to call another office to get information about the lawsuit. He gave me a second number to call, which I believe was 877 571-5190.

5.   I called the second number. I spoke to a man who told me that I was being sued because of an unpaid credit card debt from 2003 or 2004. He told me I owed $1,000. I told him that I vaguely recalled some debts from that time period, but it was my understanding that the credit card company had charged off the debt, and was no longer making an effort to collect. The agent told me I needed to pay off the debt right then or else the lawsuit would proceed. He told me I needed to give him my debit card or checking account number immediately. I told him I would not give out my debit card number over the phone to someone I did not know unless he provided some paperwork about the debt.

6.   When I asked for paper work regarding the debt, the representative told me that it was nearly the end of the month, and that his company could not

1  send anything out to me. I then asked him if he could fax me paperwork about the

2  debt, and he responded that his company could not do that. The representative then

3  continued to press for my debit card number or checking account number.

4       7.     I asked the representative for the name and address of his company.

5  He told me the company name was "City Investment Services," and their address

6  was 1191 Magnolia Avenue, Suite D-381, Corona, California. I then ended the

7  phone call.

8       8.     After I ended the call, I searched the company name and address over

9  the Internet. I found a number of complaints about the company by other people

10  who said the company did not have a business license and that it was a collection

11  agency. I checked out the address on Google maps, and the website showed it to

12  be a UPS maildrop, not a business office location. Because of these complaints I

13  decided not to contact or speak with the company any further.

14       9.     After that, I then called the county sheriff's department in Hayward to

15  see if they had papers to serve me. I explained to the person at the sheriff's

16  department that someone had called me and someone who knows me to state that

17  the sheriff wanted to serve me with papers. The person at the sheriff's department

18  took my name, and apparently searched their records, because then I was told that

19  they had nothing for me. The person at the sheriff's department then said that if

20  someone from the department intended to serve me with papers, they would not

21  call me first, they would just send someone out to server me. This person said that

22  whomever called and claimed to be from the sheriff's department was not telling

23  the truth.

24       10.    On or about December 2, 2010, I filed a complaint with the Better

25  Business Bureau.

26       11.    Since my telephone call to City Investment Services, I have received

27  about seven or eight additional calls from the company. My telephone has caller

28

1    ID, and when I see the company's telephone number come up, I do not answer the
2    call.
3         12.    I have not received any paperwork concerning the alleged debt, or any
4    written communications from City Investment Services.
5         I state under penalty of perjury that the foregoing statement is true and
6    correct.  Executed on  07, 26  2011, in Union City, California.
7
8                                          Saeed Tehrani
9                                          Saeed Tehrani
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Torok, Victoria

## DECLARATION OF VICTORIA TOROK

1.   My name is Victoria Torok. I reside in San Juan Capistrano, California. The following statements are within my personal knowledge.

2.   On or about March 24, 2010, my disabled mother who resides in Louisiana received a telephone call from someone claiming to be working for a law enforcement agency who wanted to deliver legal papers in connection with a lawsuit against me. This very much alarmed my mother who then took the phone number, 866-866-1313, from this individual and gave it to me.

3.   I then called this number, identified myself, and was connected with Anthony Jacobs. When I brought up what my mother had told me, Mr. Jacobs stated that he had not called my mother. He then informed me that his company had been assigned to collect a debt of around $2000 that I owed on a Providian Visa card. He demanded that I give him my address so that he could send someone from the police department to serve papers on me, which I took to mean that they were filing a lawsuit. I was quite upset about this threat and told him that I recognized that I had at one time owed money on my Providian Visa account, but that I had settled this debt with another collection agency. I asked Mr. Jacobs to provide me a way of contacting his company so that I could prove that this had been settled. Mr. Jacobs said I should send my proof to primewestrecovery@gmail.com. This was when I learned the company I was dealing with was called "Prime West Recovery."

4.   I immediately contacted Central Services, LLC, a collection agency located at 31 S. Calvert Street, 6th Floor, Baltimore, Maryland 21202. This is the collection agency, with which I settled the Providian Visa card debt. I asked the Central Services representative for proof that my Providian Visa account had been paid. I received an email dated March 24, 2011 from Dorethea Knight of Central

1    Services reading in part "The Creditor and Debtor agree that the payment of
2    $716.70, which pays this account in full.  This agreement for debt settlement shall
3    be binding upon the Creditor, Debtor and their successors and assignees."  On or
4    around March 26, 2010, I forwarded to Prime West Recovery the response from
5    Central Services informing them that this provided proof that my Providian Visa
6    account had been settled.  I attached to the email a copy of my Chase online
7    account reflecting the two payments that I made to Central Services.  **Attachment**
8    **1** is a true and correct copy of my email to Prime West Recovery forwarding the
9    email from Central Services and the attachment with personal identifying
10   information redacted.

11        5.      I subsequently called Mr. Jacobs at Prime West Recovery to find out
12   whether I had satisfied them that the Providian account was settled.  Mr. Jacobs
13   told me that I had been ripped off because Central Services had no right to collect
14   on the Providian account, which had been exclusively assigned to Prime West
15   Recovery.  This did not seem right to me, so I ended our call.

16        6.      After talking to Mr. Jacobs, I spoke to maybe two other Prime West
17   Recovery representatives on the phone in an effort to convince the company that
18   my Providian debt had been paid.  Each representative I spoke to claimed that
19   Prime West Recovery had been assigned to collect the debt on behalf of Providian.

20        7.      Although I requested a formal verification of debt from Prime West
21   Recovery, I never received anything from this company substantiating its claim to
22   be the agent for Providian Visa.  I continued to receive collection calls even after I
23   had provided proof that this matter had been settled through Central Services.

24

25

26

27

28                                          2

                                        **197**

1        8.     On October 22, 2010, I filed a complaint with the Federal Trade

2    Commission.

3        I declare under penalty of perjury that the foregoing is true and correct.

4    Executed on _____7/21/11_____, at San Juan Capistrano, California.

5

6                                 _Victoria Torok_

7                                 Victoria Torok

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

BALTIMORE, MD 21202

████████████   ████████████

March 24, 2010
Victoria Torok
████████████
San Juan Capistrano, CA ████████

RE: PROVIDIAN FINANCIAL CORP
Our file # 4.55952E15
Amount Owing: 716.70

The Creditor and Debtor agree that the payment of $716.70, which pays this account in full. This agreement for debt settlement shall be binding upon the Creditor, Debtor and their successors and assignees.

**This is an attempt to collect a debt any information obtained will be used for that purpose.**

Central Services, LLC

Torok declaration Attachment 1

**Chase Online**

Friday, March 26, 2010

**Search Results FREE EXTRA CKING** ▮▮▮▮

Transaction type: All Transactions
Amount range: $357.00 - $359.00

**Search Results 1 - 2**

| Date | Type | Description | Debit | Credit |
|------|------|-------------|-------|--------|
| 03/03/2010 | Debit Card Transaction | CENTRAL SERVICES LLC BAL 03/01CENTRAL S | $358.35 | |
| 02/16/2010 | Debit Card Transaction | CENTRAL SERVICES LLC BAL 02/11CENTRAL S | $358.35 | |

© 2010 JPMorgan Chase & Co

**Torok declaration Attachment 1**

Underwood, Christina

## DECLARATION OF CHRISTINA UNDERWOOD

1.    My name is Christina Underwood. I am over 18 years of age, and reside in Antler, North Dakota. The following statements are within my personal knowledge.

2.    Sometime in late June 2011, my brother-in-law received a telephone call at home from someone who appeared to be working for a law enforcement agency. The person who called told him that I was about to be served with legal papers. He left a telephone number and a case number and asked my brother-in-law to tell me to call back right away. This individual called a second time and spoke to my sister, telling her about an outstanding debt I owed on an HSBC credit card. The caller gave the same telephone number and a case number and instructed my sister to tell me to call back immediately to avoid further trouble. My sister was very alarmed and telephoned me to give me the phone number and the case number that the caller had left with her.

3.    I called the 888-906-3101 telephone number that my sister had given me. The person who answered my call did not give the name of the entity I was calling and said something like "corporate offices." I gave my name and case number and asked why this company was calling my relatives. I was then transferred to a person who identified herself as Mary Rusch. She said that she had previously mailed a letter to me concerning my failure to pay a debt. I told her that I had received nothing in the mail from her. Mary then told me that my sister was contacted because her client was going to file a lawsuit against me because of a $1,363 debt I owed on a Herberger's HSBC credit card. She gave me the last four digits of the credit card, which I recognized as the one I opened with the Herberger's store in Minot, North Dakota. Ms Rusch told me that the amount she was trying to collect included penalties and interest. I knew that I had an unpaid balance on this card of

1   about $220, and that the collection company National Recovery Solutions had

2   previously tried to collect on this debt.

3        4.    Ms. Rusch told me that HSBC would file a lawsuit against me

4   within two hours, if I did not resolve this debt.  She demanded that I provide

5   my home address so that this summons could be served on me.  Mary warned

6   me if I did not pay now, she would walk upstairs and transfer my case to her

7   legal department.  Mary then offered that I could just pay $800 to settle this

8   matter and avoid having the summons served at all.  She also warned me that

9   criminal charges would be filed if I did not make a payment within two hours,

10   and that I would be liable for attorneys' costs.  I felt completely intimated and

11   gave her my checking account number because I was afraid that someone

12   could arrest me.  I asked Ms. Rusch that she allow me to pay this off in two

13   payments of $400 each.  She agreed to this and sent an email with a settlement

14   offer reflecting that I was obligated to make two payments of $400 each to

15   "National Filing Services."  It was upon receiving this email that I learned that

16   Ms. Rusch's company was National Filing Services.

17        5.    I called the 888-906-3101 telephone number a few days later to

18   determine whether National Filing Services had received the money from my

19   checking account.  The person who answered the phone said something like

20   "corporate offices" and again did not identify the company as National Filing

21   Services.  I gave my name and case number and was transferred to someone

22   who said it was a fortunate coincidence that I called because my account was

23   about to be transferred to the lawyer's office due to the fact that  my checking

24   account had declined to make a payment to National Filing Services.  I then

25   gave the National Filing Services representative a different card number to

26   avoid being sued.

27        6.    A few days later, someone from my bank called me to confirm

28

1    that I had authorized a payment of $400 to National Filing Services.  This

2    individual told me that National Filing Services appeared on the bank's fraud

3    list.  I told the caller that I had authorized the charge because I believed that

4    National Filing Services was acting on behalf of HSBC Bank.

5         7.      What the bank representative told me raised my suspicion, so I did

6    an Internet search for "National Filing Services" and learned that many

7    individuals had complained about the company misrepresenting themselves for

8    being associated with law enforcement, and generally using illegal methods to

9    collect debts.

10        8.      Within a week or so after that, I called National Recovery

11   *Solutions* Services, the debt collector who had previously called to collect on the HSBC

12   credit card to obtain additional information about that debt.  The National

13   Recovery *Solutions* Services representative told me that they had sold my account to

14   another collection agency and was no longer handling my account.  The

15   representative said that the debt collection agency that now owned the debt was

16   called Platinum Holdings, and gave me the company's telephone number,

17   which was 866-897-9080.  I called that number and someone answered with

18   the phrase "corporate offices," which was basically the same greeting used by

19   National Filing Services.  I decided then to hang up the phone.

20        9.      After that call, I immediately called my bank to cancel my debit

21   card so that another $400 would not be taken out of my bank account by

22   National Filing Services.  I then filed a complaint against National Filing

23   Services with the Federal Trade Commission.  I have also filed a complaint

24   with the North Dakota state authorities.

25        10.     In retrospect, I believe that the $800 settlement offer made by

26   National Filing Services was perhaps based on the $800 credit line limit I had

27   with Herberger's HSBC credit card, and not the $220 that I actually owed on

28

the card.  I am very upset with the debt collection practices of National Filing Services, especially their telling my sister that I owed a debt, and for threatening me with a lawsuit and criminal charges.  I never received anything in writing from National Filing Services justifying the $1,363 that Ms. Rusch had initially tried to collect from me, or the $800 settlement offer she made.

      11.    I subsequently received another call from someone at National Filing Services.  This person tried to convince me to authorize another payment of $400.  I said that I did not want to be any part of National Filing Services' fraud.  The caller insisted that National Filing Services was not a fraud.  I then said goodbye and hung up the phone.

      12.    To the best of my knowledge, National Filing Services has not filed a lawsuit against me for payment of the debt, nor have criminal charges been brought against, as the company threatened would happen if I did not pay.

      I declare under penalty of perjury that the foregoing is true and correct. Executed on *August 17, 2011*            , at Antler, North Dakota.

Christina Underwood

1          <u>DECLARATION OF CHRISTINA WAFER</u>

2          I, Christina Wafer, make the following statement:

3          1.     I am more than 18 years of age, and I reside in Red Oak, Texas.

4          2.     On or about April 21, 2011, my parents called me and told me that a

5    company had called and told them that they were calling about a debt and were

6    taking me to court.  My parents are elderly, and I was upset that anyone would

7    request that my parents relay such distressing information to me.  The caller gave

8    my parents a case number and telephone number, but did not leave a company

9    name.

10         3.     I called the telephone number the caller gave to my parents.  The

11   telephone wasn't answered with a company name, the person answering said

12   "filing services," or something similar to that.  I was asked to give the case number

13   that had been given to my parents, which I did.

14         4.     I told the representative that I had not lived with my parents for many

15   years, but the company had nonetheless left a phone message with them.  The

16   representative told me that her company does not make outbound telephone calls.

17   She said the person who called my parents must have been a court clerk calling to

18   serve papers.  I then asked for the company name.  The representative would not

19   give me a company name, but told me I would have to set up a payment schedule

20   for a debt that I owed.  I told the representative that I would not set up a payment

21   schedule for a charged off debt.  The representative then asked me if I had a copy

22   of my credit report, and I responded that I had a copy, and could send her a copy if

23   she wanted.  She asked if I was going to make a payment that day.  When I told her

24   "no," she hung up on me.

25         5.     I called again the following day, and spoke to another representative,

26   this time a male.  He asked me if I had ever had an account with Sears.  I told him I

27   had a Sears account several years ago, but that it had been charged off after my

28

1    account had been closed. He told me that his company had purchased the debt. He

2    told me with their fees and "legal fees," the debt was now over $10,000, and that I

3    was being sued for this amount. I asked for more information about the debt, I

4    believe he was attempting to either put me on hold to obtain more information, or

5    transfer my call to another employee when we were accidentally cut off. I tried

6    calling back, but it was late in the evening, and no one answered the call.

7         6.    I called the number back the next day and I was connected to a

8    woman. I gave her my name, and this representative told me that I could avoid the

9    lawsuit if I just paid her over the phone. I responded that I was not going to pay

10   anything without written documentation confirming that I owed the debt. I also

11   told her I that I wanted to consult my attorney first. When I said that she hung up

12   on me.

13        7.    The following day, I called the company again hoping to speak with a

14   manager who could explain to me how the company could legally charge me

15   thousands of dollars of fees for a debt that it chose to purchase. When I called, the

16   first employee I spoke with did not give me his name. This representative

17   indicated that he wanted to know whether I was calling to pay my debt. I told him

18   no, and he too hung up on me. I decided to call back again to obtain an address for

19   the company so that I could give the information to my attorney. The

20   representative I spoke with told me that his company's address was 1191 Magnolia

21   Avenue, Suite D-381, Corona, CA 92879, but he did not identify the company by

22   name. I searched the address over the Internet and found that it belonged to a UPS

23   store, not to any particular business.

24        8.    On or about May 5, 2011, my parents told me they received another

25   call and this time the representative said that I had three hours to call back before I

26   would be served with papers for court. The representative left a case number and

27   telephone number for me to call. My elderly parents were told that if I did not call

28

1   back, I would be served papers and would be sued.  The telephone number given to

2   my parents was the same number that had been given to them during the call my

3   parents had received in April. I did not return the call.

4         9.    On or about May 5, 2011 I filed an online complaint with the Better

5   Business Bureau ("BBB").  Based on the information I provided to the BBB about

6   the company's address and telephone number, the BBB was able to identify the

7   company as "City Investment Services."

8         10.    Several weeks later, the BBB forwarded to me a letter it had received

9   from City Investment Services responding to my complaint.  City Investment

10   Services indicated that it was handling a past due account of mine, but the

11   company denied that it made outbound telephone calls.  This statement was untrue,

12   however, because my parents received at least two calls from this company.

13   **Attachment 1** is a true and correct copy of the letter from City Investment

14   Services, dated May 18, 2011, sent to me by the BBB.

15         11.    I have not received written documentation from City Investment

16   Services concerning the debt.  Furthermore, I have not been served with papers

17   pertaining to any lawsuit as the City Investment Services representatives threatened

18   would happen if I did not pay the debt.  I have had no further communications with

19   City Investment Services since April 2011.

20         I state under penalty of perjury that the foregoing statement is true and

21   correct.  Executed on August 28 2011, in Red Oak, Texas.

22

23

24   Christina Wafer

25   Christina Wafer

26

27

28

3
**208**

*Response*

# CITY INVESTMENT SERVICES

1191 Magnolia Ave, Ste D-396
Corona, CA 92879
Ph (877) 696-8521 Fax (951) 272-1727

MAY 2 0 2011

*Personal and Confidential*

May 18, 2011

The Better Business Bureau
Complaint Department
P.O. Box 970
Colton, CA 92324

**Re: Christina Wafer**
Complaint ID: 98608730

To Whom It May Concern,

We received a letter from your offices dated May 5, 2011 in regards to the individual listed above. After reviewing the file we see that Ms. Christina Wafer does have a case on file in regards to the debt she incurred with Sears Premier Card. The outstanding balance will remain due if left unpaid. However, there must be a misunderstanding as for any additional complaints and/or misconduct; City Investment Services does not make outbound calls, nor do we ever disclose any information to a third party. We can ensure you that City Investment Services is operating by all rules and regulations and in no way takes part in unlawful practices. It is our goal to satisfy our clients and resolve misunderstandings like this as quickly and efficiently as possible. If Ms. Wafer has additional questions about her account, she can call the corporate number above and reference case#1069-00368.

If there are any further issues regarding this matter please feel free to call my office directly.

Respectfully,

Mr. Richard McKinley
Director

Waterstreet, Alan

## DECLARATION OF ALAN WATERSTREET

1.      My name is Alan Waterstreet.  I reside in Wichita, Kansas.  The following statements are within my personal knowledge.

2.      I am the former husband of Dana Guidry.  In June 2010 someone called my home telephone number informing me that the police were going to arrest Dana.  The caller said that Dana needed to call the phone number 866-866-1313 immediately, or she would be arrested.  I told the caller that Dana did not live with me.  The caller did not provide any details about the reason why Dana was supposedly going to be arrested.  After that call, I gave Dana the message and provided her with the call back number.

3.      After that, in September 2010, I received another similar call in which the caller was threatening to arrest Dana if she did not call back and deal with some unspecified legal issue.  I again told the caller that Dana did not live with me, and relayed the message to Dana.

I declare under penalty of perjury that the foregoing is true and correct. Executed on _August 1, 2011_, at Wichita, Kansas.

Alan Waterstreet

1

**210**

Weisz, Andrew

## DECLARATION OF ANDREW WEISZ

I, Andrew Weisz, make the following statement:

1.     I am more than 18 years of age.  I reside in Bradenton, Florida.

2.     My first contact with Union Management was on the evening of November 12, 2010, when a man called my neighbor's cell phone at around 8:45 p.m.  The caller asked my neighbor if he knew me.  After my neighbor said yes, the caller explained that he was a process server and that he needed to reach me immediately regarding a five-party criminal lawsuit pending against me, case number #104101037.  The caller told my neighbor that if I did not call the following toll-free number, (866)767-8814, within the next three hours, then the sheriff was going to come to my home and arrest me.  The caller provided my neighbor with his name, which I do not recall, but apparently did not identify the name of his company.  My neighbor immediately called me to tell me about this incident.  I do not know how this caller got my neighbor's cell phone number.

3.     That same evening, after talking to my neighbor, I called the (866)767-8814, that was provided to my neighbor.  The receptionist answered the phone, with the name, "Union Management," although I am not certain, and then she asked for my case number.  I gave her the case number that was given to my neighbor and then asked to speak to the man who called my neighbor by name. The receptionist responded that they did not have an employee there by that name. She then transferred me to a male representative.

4.     The male representative that I spoke to inferred that he worked for a legal firm.  He informed me that the case filed against me was debt related and that I owed HSBC $8,000.  The representative then offered me a settlement of the debt, which was a discount of the original debt amount that I recall being somewhere around $6,500.  Although I recognized the name of the original creditor, I knew that I no longer owed HSBC money because I had filed for Chapter 7 Bankruptcy. I explained this to the representative.  The representative explained that he did not

1

**211**

1  care about that, and that I needed to pay the debt anyway.  The representative then
2  threatened to take a summons out against me if I did not pay.  I again explained
3  that I had filed bankruptcy and that I owed nothing.  This is when the
4  representative became verbally abusive.  He responded, "You have to pay your
5  debts.  You are a deadbeat.  I guess your mother never taught you how to take care
6  of your bills."  At that point, I hung up the phone.

7       5.     On November 13, 2010, the day after my initial contact with Union
8  Management, I filed a complaint with the FTC and I sent a letter to the then
9  attorney general of California.

10      6.     In total, Union Management called my neighbor at least four times,
11  and called me on my home phone number two times.  Each time they called they
12  called me, the company left a message with the same toll-free number.  I called
13  back every time Union Management called.  When I would call back, it was the
14  same woman who would answer the phone.  I think that she was given my case to
15  handle.

16      7.     Every time I spoke with the woman who handled my case, I would
17  ask her to stop calling my neighbor about this issue, and she would explain that
18  they could call whomever they wanted.  I repeatedly explained to her that I had
19  filed bankruptcy and did not owe this debt; however, she did not care.  Union
20  Management did not stop calling me or my neighbor despite my do not call
21  requests.

22      8.     During one of my last phone conversations with the Union
23  Management representatives, I said to her, "I do not know what you want from me,
24  why don't you put it in a letter and send it to me?"  After that, she sent me a
25  settlement proposal in the mail.  The letterhead stated "Union Management" or
26  "Union services" and a P.O. box number and a toll-free phone number across the
27  top, although I am not certain because I did not keep a copy of the letter.  I recall
28  that the settlement proposal was for about $6,500.  After the representative sent me

1   the letter, she called to ask if I had received it.  I told her that I had, but that I
2   would not be paying their settlement, so they could just come arrest me.
3       9.      The last time I talked to Union Management was in February 2011.  I
4   called the toll-free number for the company, which I did not retain, and asked that
5   Union Management not call me on my cell phone number again.  After that call,
6   my neighbor and I never heard from Union Management again.
7       I declare under penalty of perjury that the foregoing statement is true and
8   correct.  Executed on Aug 15, 2011, at Bradenton, Florida.

Andrew Weisz

3

**213**

Wells, Tracy

# DECLARATION OF TRACEY WELLS

I, Tracey Wells, make the following statement:

1.     I am more than 18 years of age.  I reside in Lawrenceville, Georgia.

2.     My first contact with Rincon Filing ("Rincon") was on or about May 3, 2011.  That evening, my mother-in-law, Georgia Smith, called my wife and said that her nephew, Dana, who lives on Georgia's property, had been receiving telephone calls from someone who was looking for me.  Georgia said that earlier that day, a person claiming to be a process server had called Dana asking for me and said that I would be arrested if I did not call the company back immediately. Georgia said the caller instructed Dana to relay an urgent message to me that included a "case number" and instructions that I immediately call back a toll-free number.  The phone number was 877-717-9946 and the case number was 1060030590.  My wife said Georgia sounded very upset because she was genuinely worried that I would be arrested.

3.     I did not return the call immediately because something about the threats and the urgent tone of the call raised suspicions in my mind about whether the company was legitimate.

4.     The next day, Georgia called my wife and said that the same company had called Dana again and made the same threats as before.  I was very surprised that they were calling Dana asking for me because we rarely speak and we do not even have each other's contact information.  I was also surprised that they had tied Dana to me at all and obtained his contact information.

5.     On the afternoon of May 5, 2011, I called the phone number the caller had left with Dana.  A woman, who sounded like she was a receptionist, placed me on hold twice before transferring me to a second woman, who identified herself as Debra Jones.

6.     Ms. Jones did not provide her job title, but she told me that she worked in the service filing department of a company named Rincon Filing, which

1  handles the files of debtors who have been served with a lawsuit as a result of their
2  delinquent status.  When I told her that I had not been served at all, Ms. Jones
3  responded, "Well, we've tried."  I told Ms. Jones that was impossible, because I
4  work from home and do not leave the house at all during the day, so I would have
5  been aware if her company had tried to serve me or call me.  Ms. Jones told me
6  that her company had obtained a judgment against me for about $6,500, and that it
7  had tried to serve me at my previous address in California.  I found it odd that Ms.
8  Jones claimed not to have been aware that I had moved to Georgia from California
9  about five and a half years ago, given that she was able to find current contact
10  information for Dana.

11         7.     I asked Ms. Jones for more details about the debt she was calling to
12  collect.  She told me she was collecting a balance of about $1,700 on my HSBC
13  credit card, on which I defaulted three and a half years ago, in addition to accrued
14  interest, court costs and attorney fees, for a total of about $6,500.  I did not dispute
15  the original credit card balance with Ms. Jones because it sounded more or less
16  accurate, but I told her I did not understand how my account could have accrued
17  that much in interest in only three years.  I also asked her how I could be liable for
18  court costs and attorney fees if I was not even aware that I had been named in a
19  lawsuit.  I told Ms. Jones that the interest and fees she was charging me sounded
20  illegal because my credit card agreement did not state that I could be liable for
21  those charges.  Ms. Jones insisted that I could find those charges in my credit card
22  agreement if I looked closer and instructed me to "just look it up."

23         8.     I also told Ms. Jones that I would prefer to get in touch with the
24  original creditor and make arrangements directly with them.  I wanted to do that
25  because by that point I did not trust Rincon and did not feel confident that if I paid
26  them, they would not just pocket the money rather than applying it to my balance.
27  However, Ms. Jones declined to provide me with contact information for HSBC's
28  collections department, and instead told me that it would be impossible for me to

1  speak to HSBC and that I would have to resolve the matter through her.  She did

2  not explain why.

3       9.      Ms. Jones also declined to send me a letter "validating" my debt,

4  which I requested three times throughout our conversation.  She said that if she

5  sent me a validation letter, that would "start the clock all over again" on whatever

6  remedies they wanted to seek against me, which could include a lawsuit.  That

7  statement made me even more suspicious because it was inconsistent with Ms.

8  Jones' original claim that Rincon was trying to serve me with papers in an ongoing

9  suit and that it had already obtained a judgment against me.  My impression was

10 that Ms. Jones was using all these references to potential litigation, to a judgment

11 and to service of process as a scare tactic to get me to pay up.

12      10.     Throughout the conversation, Ms. Jones reiterated many times that

13 this debt was something I absolutely needed to take care of within the next day or

14 two.  At first, she wanted me to pay the entire $6,500 up front.  When I told her I

15 did not have that type of money available, she started reading me items from my

16 credit report, such as an auto loan I have, and asking me if I was current on those

17 debts.  I am not sure why she did that, but my impression was that she mentioned

18 the auto loan to show me that she had access to my credit report, presumably as an

19 intimidation tactic.  That bothered me, because I am in the process of trying to

20 catch up on old debts and repair my credit, and my understanding is that inquiries

21 to my credit report might hurt my credit score.  She also asked if I own my home

22 and suggested that I consider selling it right away to raise money to pay Rincon.

23      11.     Because I did not think Rincon was a legitimate company, I did not

24 agree to pay the company anything.

25      12.     After I hung up, I looked up Rincon Filing on www.google.com to

26 find out who they were.  I found several websites that listed complaints published

27 by other people Rincon had contacted.  The complaints described experiences

28

1  similar to mine, in which Rincon used threats of arrest and legal action to
2  intimidate people into paying amounts much larger than their original debt.

3       13.    Soon after my conversation with Ms. Jones, I mailed Rincon a letter
4  demanding that they stop contacting me or my relatives until they had validated my
5  debt in writing.

6       14.    About two days after my initial conversation with Ms. Jones, she
7  called me again, but I did not answer because I was not willing to make any
8  payments to Rincon until they had validated my debt.  Ms. Jones left me a voice
9  message asking me to call her back regarding our previous conversation.  I have
10 not received any more calls from Rincon since then, nor have I received a written
11 validation of the debt that I had requested from the company..

12      15.    On May 8, 2011, I filed complaints against Rincon with the Better
13 Business Bureau, the California Attorney General and the Federal Trade
14 Commission.

15      16.    More recently, sometime in mid-to-late-June, I received another
16 collections-type call around 7 p.m.  This call I believe was from a company other
17 than Rincon, but I do not remember the name.  The caller informed me I owed
18 about $6,500 on the same HSBC credit account Ms. Jones had called me about.  He
19 then asked me if I was prepared to pay that amount immediately.  I assumed that
20 what happened is that Rincon sold that account to this new company. Because I
21 had concluded that Rincon was a scam, I decided to hang up on this second caller.
22 I have not received any similar calls since then.

23      I declare under penalty of perjury that the foregoing statement is true and
24 correct.  Executed on July 15, 2011, in Lawrenceville, Georgia.

25
26
27                                   _Tracy L. Well_____
28                                   Tracey Wells

4217

Wesner, Ralph



## DECLARATION OF RALPH WESNER

I, Ralph Wesner, make the following statement:

1.      I am more than 18 years of age and I reside in Elkhart, Texas.

2.      My first contact with Union Filing Services was on the afternoon of March 15, 2011, when a male, who refused to identify himself, called my home and spoke with my wife, Cindy Wesner. This man told Cindy that he was with a process service company named "Union Filing Services." He said that he was calling because he needed to serve our niece, Katrina Wesner, and that he needed Cindy to give him Katrina's contact information to do so. Cindy told him that she had not been in contact with Katrina for years, and that she had no idea what this was pertaining to. The man then told her that it was about a court action against Katrina regarding a vehicle Katrina was trying to steal and that there had been a subpoena issued against her. Cindy again said that she did not know anything about this. The man then transferred Cindy to a person named David Allen who did tell Cindy his name and also gave her his contact phone number, (866)767-8814.

3.      Mr. Allen told Cindy that there was an open case against Katrina that is pending, and that Katrina had three hours to pay them the money she owed. He gave Cindy Katrina's case number, #1065-01797. Mr. Allen told Cindy that she would be hampering with an open court case if she did not cooperate, and that the sheriff would come to our house and arrest her if she did not give him Katrina's contact information. Mr. Allen threatened Cindy, and said that he had our home address and phone number and knew where to send the police to arrest her. He said that everyone in the family would go to jail if we knew her address and did not give it to them. He also told Cindy that if Katrina did not call him within three hours, Katrina would go to jail too.

4.      Later that same day, I looked up Union Filing Services on the internet. I found numerous websites with complaints made against Union Filing Services.

1  All of the complaints state that the company was fraudulent, and many people
2  listed similar stories to my own. I then called Mr. Allen at the phone number he
3  provided Cindy. Mr. Allen also told me that I could be arrested for not cooperating
4  with the court action against Katrina. He told me that Cindy and I were listed as a
5  reference on Katrina's loan, and therefore he had the right to call us and even arrest
6  us. He said that he had a court case number, but refused to give that to me. Mr.
7  Allen refused to give me any information about the alleged case against Katrina.
8  He also did not give me information about the company he worked for, other than
9  its name – Union Filing Services. I asked to speak to Mr. Allen's boss, and I was
10  told I could not do so.

11       5.    After getting off the phone with Mr. Allen, I looked up Union Filing
12  Service on the internet and called another number for that company that I found on
13  one of the complaint websites. I thought I might be able to get some more
14  information if I spoke to a different person with Union Filing Services. I asked the
15  receptionist who answered the phone for some basic company information, such as
16  the company's address. After the receptionist informed me that the company was
17  located in California, I decided to call the FTC because I realized that it was an
18  interstate issue at that point.

19       6.    That same day, I called the FTC to file a complaint against Union
20  Filing Services. The FTC also told me to call the FBI and file a complaint, which I
21  did. The FBI Duty Agent with whom I lodged the complaint later called me back
22  to tell me that he contacted Union filing Services and told the company not to call
23  us anymore.

24       7.    I have not been in contact with Katrina since she was child so I did not
25  know Katrina's address or phone number. I obtained Katrina's phone number
26  from my mother. I called within about five hours after Cindy received the initial
27  telephone call from Union Filing Services. Katrina told me that she had owed
28  somewhere between $3,000 to $5,000 dollars on a car loan over five years ago, but

1   that the issue had been resolved.  Katrina said there had been a lawsuit filed against
2   her concerning the auto loan  and that the court case number of that case matched
3   what was provided to Cindy.  Katrina said, however, that the case was closed and
4   was no longer an active matter as Cindy and I were lead to believe by the Union
5   Filing Services representative.

6          8.      I gave Katrina Union Filing Services' phone number.  Katrina did call
7   the number and called me back shortly after she talked to them.  Katrina said that
8   she told the Union Filing Services representative she spoke with that they were
9   mistaken and that she no longer owed money for the car.  According to Katrina, the
10  representative insisted that she owed money and threatened that they were going to
11  go to her home and arrest her.  She was home alone with her baby and was scared
12  that the police would also take her baby away.  Katrina then called her local police
13  who came to her home.  Katrina called Union Filing Services while the police were
14  at her house and they listened in on her call with the company.  The police told
15  Katrina that she had nothing to worry about and that she was not going to jail.

16         9.      Since the first phone call that Cindy and I had with Mr. Allen, Mr.
17  Allen and a man named Mark Davis have called our home maybe three or four
18  more times, even after the FBI Duty Agent told them not to contact us.  The last
19  time Mr. Allen called was sometime in May 2011.  I took that call and told Mr.
20  Allen that I knew the court case involving Katrina was closed, and I then asked that
21  he remove my name and number from their call list, and any of their affiliates' call
22  lists as well.  I told him that I had contacted the FTC who had referred me to the
23  FBI.  Mr. Allen responded, something to the effect of "why don't you call your

1  state attorney general too?" Shortly after that, Mr. Allen hung up on me. That was
2  the last time I had any contact with Union Filing Services.
3      I state under penalty of perjury that the foregoing statement is true and
4  correct. Executed on _18 July_, 2011 in Elkhart, Texas.
5
6
7  Ralph Wesner
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Wolfe, Pamela

## DECLARATION OF PAMELA WOLFE

1.     My name is Pamela Wolfe. I am more than 18 years of age and reside in Wichita, Kansas. The following statements are within my personal knowledge.

2.     Over a year ago I began receiving telephone calls at my work phone number from a company that gave me the impression that it was a legal office representing a creditor to whom I owed money. I do not remember the name of the company that called, but I usually ignored the calls. On or around May 7, 2010, the Human Resources department of my employer, Intrust Bank, told me that it had been contacted by someone from a collection agency who claimed that I was going to be served with papers unless I called the collection agency back before 1:00 p.m. I was extremely embarrassed to receive this call at work because my employer is a fairly small bank.

3.     I called the number the Human Resources department had given, 866-883-868, and spoke with a woman named Ms. Parker. Ms. Parker told me that I had to make a payment to "West Management" immediately or I would be served with a summons that day. Ms. Parker asked me to give her my checking account number and my authorization to have $100 withdrawn from my account. She said if I did this, her company would cease calling me at my business number. Ms. Parker told me that West Management was trying to collect on a debt that I owed to HSBC Bank USA, N.A. ("HSBC"). I gave Ms. Parker my checking account number and authorized them to withdraw $100 only.

4.     I then asked Ms. Parker for documentation because I thought that the HSBC credit card debt that West Management was trying to collect had been handled by the Debt Reduction Law Center ("DRLC"), a California firm that I had hired for debt consolidation. Ms Parker assured me that she was collecting on an HSBC credit card debt, but she got flustered when I asked for details

222

1   about the HSBC account West Management was trying to collect. Ms. Parker

2   then transferred me to her supervisor who was very rude, pushy, and

3   condescending. I asked the supervisor to provide documentation for Ms.

4   Parker's assertion that West Management was collecting on an HSBC credit

5   card balance. The supervisor proceeded to tell me that I had several accounts

6   showing as delinquent on my credit bureau report and that I should just pay

7   West Management to have this one taken care of. I told her that I wanted to

8   check with the company I had hired to handle my debts before making any

9   payment to them. The supervisor responded that I needed to make at least one

10  payment, or I would continue to receive calls at work. I told her that I would

11  accept the $100 withdrawal from my checking account to stop the collection

12  calls at my office  The supervisor told me that I would receive an email

13  providing the documentation that I requested..

14       5.      I received that day an email from a person named "JR Parker"

15  from the email address "primewestrecovery@gmail.com" with an attachment.

16  **Attachment 1** is a true and correct copy of the email I received and the

17  attachment with personal information redacted. The attachment was a

18  settlement letter from a company called "West Management and Recovery"

19  with the address, 541 North Main Street, Suite 104-261, Corona, CA 92880,

20  and the phone number, 866-883-8681. The letter advised me that "As of May

21  7, 2010 West Management Group is prepared to settle this account in full for

22  the balance of $2,232.00 to satisfy the above referenced account, provided that

23  the funds are received **NO LATER THAN** September 30th, 2010 in the form

24  of 11 payments." The settlement letter noted that I was expected to make one

25  monthly payment of $123.20 and nine monthly payments of $223.20 to settle

26  this account. My payment to the company of earlier that day was also noted in

27  the letter. It was only when I received this settlement letter that I leaned that

28  "West Management and Recovery" and Prime West Recovery were the same

1   company.

2        6.     That evening I sent an email to DRLC explaining that I had been

3   contacted by a collection agency in California regarding an HSBC credit card

4   that I believed that DRLC had settled in 2008. I then received an email from

5   DRLC informing me that it was in the process of getting a zero balance letter

6   that would prove that the account had been settled. **Attachment 2** is a true and

7   correct copy of my email correspondence with DRLC with personal

8   information redacted.

9        7.     Shortly after that email exchange, I received the zero balance

10   letter from DRLC, which I then scanned and emailed to Prime West

11   Management. I subsequently called Ms. Parker who acknowledged receiving

12   this information. Shortly thereafter I noted that my checking account had been

13   credited for a full refund of the $100 that had been debited from my account by

14   Prime West.

15        8.     On May 18, 2010, I filed a complaint regarding the debt collection

16   practices of Prime West Management with the Federal Trade Commission.

17      I declare under penalty of perjury that the foregoing is true and correct.

18   Executed on _July 18, 2011_ , at Wichita, Kansas.

19

20

21

22                       _Pamela Wolfe_

23                       Pamela Wolfe

24

25

26

27

28

3

**From:** Prime West Recovery [mailto:primewestrecovery@gmail.com]
**Sent:** Friday, May 07, 2010 2:43 PM
**To:** ▓▓▓▓▓▓▓▓▓▓
**Subject:** STIP LETTER

As of May 7th, 2010 West Management Group is prepared to settle this account in full for the balance of $2,232.00
to satisfy the above referenced account, provided that the funds are received **NO LATER THAN** September 30th,
2010 in the form of 11 payments. Your document is attached.
JR Parker

# W E S T  MANAGEMENT

Office: 866-883-8681 | Fax: 951-272-1727
Email: primewestrecovery@gmail.com
541 N. Main St. Suites 104-261
Corona, CA 92880-2048
*************************************************

If you require legal advice, legal expertise or need to make court filings, please seek the advise of a
licensed attorney. The information in this email is confidential and maybe legally privileged. Access to
this email by anyone other than the intended addressee is unauthorized. If you are not the intended
recipient of this message, any review, disclosure, copying, distribution, retention, or any action taken or
omitted to be taken in reliance on it is prohibited and may be unlawful. If you are not the intended
recipient, please reply to or forward a copy of this message to the sender and delete the message, any
attachments, and any copies thereof from your system

Wolfe declaration Attachment 1

# *W E S T* Management

**541 North Main Street, Suites 104-261, Corona, CA 92880**
**PH# 866-883-8681**

DATE: May 7th, 2010

*Personal and Confidential*

NAME: PAMELA WOLFE
Address: ▄▄▄▄▄▄▄
City, State, zip: WICHITA, KS ▄▄▄▄

RE: Original Creditor: HSBC
Original Account: ▄▄▄▄▄▄▄▄▄
File No: 1021-01506
Current: $2,232.00

As of May 7th, 2010 West Management Group is prepared to settle this account in full for the balance of $2,232.00 to satisfy the above referenced account, provided that the funds are received NO LATER THAN September 30th, 2010 in the form of 11 payments.

| 05/07/10 | 05/14/ | 10 | 05/31/10 | 06/15/ | 10 | 06/30/10 | 07/15/10 | 07/31/10 | 08/15/ | 10 | 08/31/ | 10 | 09/15/10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $100.00 | $223. | 20 | $123.20 | $223. | 20 | $223.20 | $223.20 | $223.20 | $223.20 | | $223.20 | | $223.20 |

| 09/30/10 |
|---|
| $223.20 |

There is no grace period. If funds are not received in our office by the due date, this settlement offer agreement will be considered NULL and VOID.

Once the funds for the above referenced account have cleared your bank and we receive the authorized signature, the West Management Group will release you from all claims and liabilities pertaining to this account and our trade line with the major credit bureaus will be updated to PAID IN FULL.

If you are unsure of whether the payment will be received in our offices on or before the due date, you may contact the undersigned Account Manager to obtain instructions for sending funds via OVERNIGHT DELIVERY SERVICES, or CREDIT CARD.  Please feel free to contact us at any time if you should have any questions regarding your account.

Sincerely,
West Management & Recovery
THIS IS AN ATTEMPT TO COLLECT A DEBT BY A DEBT COLLECTOR AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Credit Card Number

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | |

Exp Date

Authorized Signature: _____

West Management and Recovery
Fax# 951-272-1727
541 N. Main St.
Suites 104-261
Corona, CA 92880

**226**                    Wolfe declaration Attachment 1

**From:** RIZA TACSAGON █████████████████████

**Sent:** Friday, May 07, 2010 4:31 PM

**To:** 'Pam Wolfe'

**Cc:** kim nguyen

**Subject:** RE: question

Dear Pam Wolfe,

We are on the process of getting a zero balance letter. It is a proof that we have paid the HSBC account before.

If you have any questions, send us an email at clientservices@drlawcenter.com, or call us during business hours at: 1 (888) 835 8555. We would like to remind you to send us the document that you will be receiving from any debt collector thru fax number ███████████████. Please do not forget to include your complete name or client ID# **4045315** for easy reference.

Please make sure you provide us with any email address changes to keep your contact

information current.

We value you as our client and appreciate the opportunity to serve you.

Thank you.

Respectfully yours,

RIZA

Client Services Department

**THE LAW OFFICES OF EMILIO FRANCISCO & ASSOCIATES**

1011 Clay Street, Oakland, CA 94607

http:www.drlawcenter.com

**From:** Pam Wolfe ████████████████████████

**Sent:** Friday, May 07, 2010 8:20 PM

**To:** clientservices@drlawcenter.com

**Subject:** question

I am a former client and an needing some help. I was contacted today by a collection agency in California regarding a HSBC credit card that they are suing me. I believe this account was paid by you in a settlement. I am trying to trace it back and have the arbitration arrangement that was sent through your company back in 2008. Would you still have records on file regarding that settlement?

I have attached a pdf file of the arbitration but need the account number that was associated with that. If you could provide me with any information from that settlement I would appreciate it.

Thanks

Pamela Wolfe

███████████████
████████

Wichita, Ks.████████

_____ Information from ESET Smart Security, version of virus signature database 4507 (20091014) _____

The message was checked by ESET Smart Security.

http://www.eset.com

**Wolfe declaration Attachment 2**

_____ Information from ESET Smart Security, version of virus signature database
4507 (20091014) _____
The message was checked by ESET Smart Security.
http://www.eset.com

Wolfe declaration Attachment 2