John J.E. Markham, II (CA Bar No. 69623)
MARKHAM & READ
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax: (617) 742-8604
Email: jmarkham@markhamread.com

Attorney for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                              Plaintiff,<br><br>    vs.<br><br>RINCON MANAGEMENT SERVICES, LLC, a California limited liability company, also d/b/a "Rincon Debt Management," "Rincon Filing Services," and "Pacific Management Recovery"; et al.,<br>                              Defendants. | CASE NO: ED CV 11-01623- VAP (SPx)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO MODIFY THE PRELIMINARY INJUNCTION PREVIOUSLY ISSUED IN THIS CASE; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>DATE:      January 30, 2012<br>TIME:       2:00 p.m.<br>CTRM:     No. 2<br>Hon. Virginia A. Phillips<br><br>Filed Concurrently with Declaration of Jason R. Begley, Exhibits, and (Proposed) Order |

TO PLAINTIFF AND THE RECEIVER, AND ATTORNEYS OF RECORD:

This motion is made following conferences of counsel pursuant to L.R. 7-3 which took place on December 14, December 19, and December 20, 2011 and which did not resolve the matters.

PLEASE TAKE NOTICE that, unless the Court will allow this motion to be heard earlier upon subsequent application of the Defendants, all Defendants will move this Court on January 30,

2012, at 2:00 p.m. or as soon thereafter as this matter can be heard, in Courtroom No. 2 of the United States District Court for the Central District of California, Eastern Division, the Honorable Virginia A. Phillips, presiding, at 4100 Main Street, Riverside, California, for an Order modifying the preliminary injunction entered on November 10, 2011 (Docket No. 40), in the following particulars upon the following grounds, all as will be presented in more detail in the papers accompanying this motion:

(1)   Directing the Receiver, Richard Weissman, Esq. (the "Receiver") to pay, from the approximately **$2,500,000.00** million in cash seized from defendants' bank and merchant accounts, the amount of **$150,000.00** to each of the Defendants Jason R. Begley and Wayne W. Lunsford ("Begley" and "Lunsford") so that they may use this money, representing approximately 5% of all the funds and other liquidatable assets that have been seized, to support themselves and their families, to manage their business affairs (subject to FTC oversight), and for any other lawful purpose;

**<u>Reason:</u>** These defendants have not been been found liable for any violation of any federal statute, nor had any ability to testify on their own behalf, nor to cross-examine any of the persons whose sworn or unsworn statements (many being or containing hearsay) were used against them to obtain the current preliminary injunction, nor even yet had any discovery opportunity. Yet all their liquid assets and and all the money being held in trust is now frozen and most of their businesses are in effect being wound up, resulting in constructive liquidation, without court order, all before they have had any chance to test the evidence submitted by the FTC.  Allowing them to have this money, a relatively small portion, 5%, of the total assets seized, leaves intact and under the control of the FTC and the Receiver over **$2,000,00**0 in funds in defendants' bank accounts, approximately **$800,000.00** in investments, approximately **$36,000,000.00** in lawful debt purchased by defendants and not yet collected (which, while worth nowhere near its face value, can be

NOTICE OF MOTION AND MOTION TO MODIFY PRELIMINARY INJUNCTION

collected or sold for an estimated **$2,000,000.00** (the Receiver suggests that the amount could be even higher)), accounts receivable on debts already settled by defendants which are valued at **$1,500,000.00** (and which the Receiver has estimated is worth considerably more), and are in an on-going process of collection by the Receiver, and office equipment located in 11 different offices that had a purchase price of approximately **$400,000.00**, all of which assets can stand for any potential disgorgement judgment that might be entered against the defendants if and to the extent one is ordered by this Court;

(2)     Directing the Receiver to pay to those who were working for defendant entities as debt collectors, as of the time the Temporary Restraining Order of this Court stopped the defendants' collection activities, the amounts due to them as commissions for their colllection work, work which is now resulting in payments for the benefit of the Receiver;

**Reason:**  As shown in the accompanying papers, many of the debt collectors have sworn that they did not violate the FDCPA, and defendants believe that many more of the collectors likewise did not. The commission payments due to them are for collections which are now being undertaken by and for the benefit of the Receiver, and thus is an obligation of the defendants and the Receiver that should be honored.

(3)     Directing the Receiver to forthwith pay all debts and obligations Defendants had agreed to pay on behalf of defendant companies, as guarantors, and all other obligations of the defendants as of the date the Receivership was imposed, including but not limited to lease payments, mortgage payments, car payments, credit card payments, vendor and contract payments, among others;

**Reason:**  The two individual defendants have been found liable of nothing.  Unless this part of this motion is granted, their credit and business reputations will be ruined for the foreseeable future, causing substantial injury to their ability to support their families.  This is an

unfair consequence pre-judgment and can be easily avoided if the Receiver pays bills as they become due.

(4)     Ordering expedited discovery, dispositive motions, and trial, if required, so that, if a resolution of the FTC's claims cannot be achieved by the parties, this matter can proceed to trial expeditiously to (1) allow defendants the earliest opportunity to defend against the FTC's claims and resume control over their business and personal assets, which amount to in excess of $6 million, under the control of the Receiver, and (2) conserve the costs of having these assets managed for an extended period of time by a costly Receiver, who in turn has retained the services of security personnel, management staff, and forensic accountants, and has incurred other substantial costs. The sooner there is a trial, the less costly the Receivership; and,

(5)     Directing the Receiver to account *forthwith* for the fees and costs incurred since he assumed oversight and control of the defendants personal and business accounts and assets, with itemized bills and invoices to show what bills have and have not been paid to date, and to respond to this motion with specificity with respect to operation of this Receivership.

**Reason**:   Defendants believe, based upon the activities observed to date, that further Court oversight is warranted and a prompt accounting is appropriate in order to preserve the assets of the Receivership to the fullest extent possible and prevent unnecessary expense.

This motion is made pursuant to the inherent authority of this Court to modify the previously-issued Preliminary Injunction at any time for good cause shown, and because:

(i) Defendants can demonstrate by sworn testimony, submitted herewith, that they did not engage in the wholesale violation of the Fair Debt Collection Practices Act and other applicable laws to the extent of justifying and requiring the seizure of their companies and all of their assets, much less justifying such seizure before trial;

(ii)  Any disgorgement order that might emanate from the debt-collection violations that the FTC may be able to demonstrate will be subtantially less than the amount of money and other assets of defendants that has been seized and is now being held;

(iii)  Insofar as the the role of the Receiver is concerned, it should be minimized to conserve assets and prevent the Receiver from taking actions with defendants' assets that he is not, by knowledge or experience, the most suitable to undertake, and because his services in undertaking these actions would be very costly. While he remains in place to guard the seized assets and make sure they remain intact to stand for any potential disgorgement order, the Receiver does not have authority to liquidate assets, and should not undertake any actions that will necessarily result in the need for liquidation of companies that are no longer being operated, without consultation with defendants, pending trial or other determination on the merits;  and,

(iv) Defendants will also show that, unfortunately, the Receiver has disregarded many communications made to him by defendants, landlords, utility companies, creditors, and others, regarding outstanding debts and obligations of the businesses, as to some of which Mr. Begley has personal guarantees and thus is exposed to personal liability due to the inaction of the Receiver, all is as more fully set forth in the accompanying Declaration of Jason Begley.

This motion is based on the following Memorandum of Points and Authorities, the Declaration of Jason R. Begley, and the exhibits attached thereto, including Declarations of many debt collectors formerly associated with Defendants. Defendants will  move for a hearing on this motion to be heard as soon after January 1, 2012, as is convenient to the Court.

1   Dated: December 21, 2011                    Respectfully submitted,

2                                                MARKHAM & READ

3

4                                         By: /s/ John J.E. Markham, II
                                              _____
5                                             John J.E. Markham, II
                                              Attorneys for All Defendants
6                                             Jason Begley, Wayne Lunsford, and all related
                                              entities.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO MODIFY PRELIMINARY INJUNCTION

# MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Evidence on Which this Motion is Based . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Growth and Corporate Structure of Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

Collection of Debt by Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

The Actions of the Receiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

THE EVIDENCE PRESENTED BY THE FTC IS NOT SUFFICIENT TO JUSTIFY THE
TOTAL ASSET FREEZE NOW IN PLACE, MUCH LESS THE ACTIONS OF THE
RECEIVER THAT WILL NECESSITATE LIQUIDATION OF DEFENDANT
COMPANIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

The Applicable Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . 20

# TABLE OF AUTHORITIES

## CASES

Federal Trade Commission v. Amy Travel Service., Inc.,
    875 F. 2d 564 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Federal Trade Commission v. Febre,
    128 F.3d 530 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Federal Trade Commission v. Figgie Intern., Inc.,
    994 F.2d 595 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Federal Trade Commission v. Sec. Rare Coin & Bullion Corp.,
    931 F.2d 1312 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Flynt Distrib. Co. v. Harvey,
    734 F.2d 1389 (9th Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

Johnson v. Couturier,
    572 F.3d 1067 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Securities & Exchange Commission v. Bilzerian,
    814 F. Supp. 116 (D.D.C. 1993) aff'd, 29 F.3d 689 (D.C. Cir. 1994) . . . . . . . . . . . 17, 18

Securities & Exchange Commission v. Blatt,
    583 F.2d 1325 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

Securities & Exchange Commission v. ETS Payphones, Inc.,
    408 F.3d 72 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Winter v. Natural Res. Defense Council, Inc.,
    555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). . . . . . . . . . . . . . . . . . . . . . . . .16-17

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants respectfully submit this Memorandum in support of their motion to modify the Preliminary Injunction entered by this Court (Docket No. 40) on November 10, 2011 (hereinafter "Injunction").

### Introduction

Defendants seek to modify the Injunction entered by this Court because in its current form it has resulted in the complete shutdown of most of defendants' businesses and a takeover of their liquid and other assets, even some acquired years in advance of their involvement in the debt collection business at issue in this action. Defendants are financially paralyzed, their assets are wasting and the Receiver, rather than preserving assets to answer to any potential judgment, is acting in such a way as to reduce or eliminate the value of certain of defendants' businesses. Because defendants Jason Begley and Wayne Lunsford, the owners of all liquid and businesses assets under the control of the Receiver (hereinafter "Begley and Lunsford") cannot pay company and personal bills, their reputations and credit are being destroyed.

The injunction entered by this Court was premised on a determination that so much of defendants' debt collection activity took place in violation of the Fair Debt Collection Practices Act that they would have to disgorge _all_ of their assets as ill-gotten gains. This determination was made on a showing which was, as defendants seek to convince the Court, incomplete, inaccurate, and unsupported by the facts. By this motion and memorandum and the accompanying declarations, defendants seek to provide a more balanced picture of the circusmtances of this case, which, they assert, do not justify the extreme actions taken by the FTC and the Receiver.

While the FTC's sworn submissions suggest improper actions by an unknown number of collectors, some were identified more than once, and there were no more than 105 complaints made, in total. Assuming for the sake of argument that perhaps ten per cent of the over 350 debt collectors

---

1

who worked for defendants at the time of the FTC takeover acted in violation of law to some extent, the FTC has not substantiated wholesale wrongdoing of the scope contended, and declarations submitted by the defendants in support of this motion counter the FTC's assertions. Application of the standardized formula used in FTC cases to assess "ill-gotten gains" for the purposes of determining a proper disgorgement amount, in light of the showing herein of legitimate collections, establish, defendants assert, adequate grounds to justify the loosening of the current stranglehold that governs Begley's and Lunsford's lives and businesses.

Allowing distribution of cash to each defendant to allow them to support themselves and their families, and requiring that they be allowed to participate to a degree in the management of their businesses, so as to assure that there is something left when the Receiver's job is done, would not result in a diminution in security for any future disgorgement order, because (1) there would remain frozen substantial sums to repay ill-gotten gains once any such amount is determined by the Court, (2) the two individual defendants, Begley and Lunsford, would not face financial ruination, and (3) their assets could be more effectively safeguarded. Of course, the FTC believes it is entitled to a significant sum as disgorgement of ill-gotten gains. Defendants agree that while disgorgement of ill-gotten gains is the law, the amount due is nowhere near that which the FTC claims. However, there has been no trial yet, and not even one deposition, much less any courtroom testimony by which the defendants can test the unilateral and largely hearsay assertions on which the present Injunction is based.

**Evidence on Which this Motion is Based**

**Background**

As the Declaration of Jason R. Begley, sworn to December 21, 2011 ("Begley Dec.") demonstrates throughout, Defendants Jason Begley and Wayne Lunsford are not the lying, cheating, thieving men that the FTC and the Receiver would have this Court believe. They did not engage in

or supervise the wholesale violation of federal law asserted by the FTC and they did not attempt to hide any assets.

Begley and Lunsford have known each other for many years. In 2009, they decided to join forces in a debt collection business. Begley Dec., para. 21.  They formed various entities over time, sometimes using online legal services, in an attempt to organize their various business and personal ventures. *Id.* For the purposes of this discussion, all such entities will be referred to as the "Rincon-related entities."  Ultimately they hired a local corporate attorney, Samuel G. Lockhart, Esq., to assist them in structuring their business and personal matters, including tax and estate planning. *Id.* They also continued to work with a reputable accounting firm, Brylaw, to organize and manage their businesses, provide regular profit and loss reports, and prepare year-end tax returns and other tax reporting records.  *Id.*

**Growth and Corporate Structure of Defendants**

Their debt collection business expanded rapidly, too rapidly. As the Begley Declaration states at paragraphs 13 through 20, debt collection is a major industry in the United States that grew rapidly, starting in 2008, because of the economic downturn.  As their business grew, they continued to establish new entities, managed by on-site managers. Begley and Lunsford did not simultaneously set up the ten separate entities that were operating at the time the TRO was served, and there is no justification for any suggestion that they were set up in order to disguise the source of their earnings or to insulate themselves from liability.[1]

In April, 2009, Begley and Lunsford opened their first company, Pacific Management Recovery, LLC.  Eight months later it had grown to 30 collectors and they then opened a second office. Begley Dec. para. 21. Their growth accelerated so that by this past October, at the time of the

---

[1]    Based upon the very incomplete showing of defendants before the hearing held on the preliminary injunction on November 7, 2011, this Court found that there was "an attempt to disguise the operation by creating more and more of these companies and even detailing which one were the successors." [Transcript, page 6.] Those were not at all defendants' motives, as is shown in the text and in the Begley Declaration.

3

FTC takeover, there were ten offices, each with one manager and approximately 30 collectors, earning an estimated $150,000.00 per month.  Their growth had come too fast. They had too many collectors, too many offices to manage, too many leases, and too many demands on their time. *Id.,* para 23. The names of the collection entities through which they operated as of October, 2011 are set forth below along with bank at which each had its separate account. The banks were mainstream, reputable banks at which Begley and Lunsford also had their personal accounts. The accounts were transparent and defendants cooperated fully with the Receiver to provide the information requested. Begley Dec. para 26, n. 1 and 44.[2] The entities were:

| Entities Formed | Bank |
| --- | --- |
| Pacific Management Recover, LLC | Citi |
| Prime West Management Recovery, LLC | Citi |
| Union Management Services, LLC | Citi |
| City Investment Services, LLC | Citi |
| Rincon Management Services, LLC | Bank of America |
| Global Filing Services, LLC | Bank of America |
| National Filing Services, LLC | Bank of America |
| Rockwell Management Services, LLC | Bank of America |
| Maple Filing Services, LLC | Bank of America |
| Prime Western Investments, LLC | Bank of America |

The structure had become unwieldy. In consultation with their attorney, accountant, and merchant banker, Begley and Lunsford decided to do some restructuring. *Id.*, para. 25.

Before they consolidated, defendants had operated in the manner shown in Exhibit A-1 to the Begley Declaration. They had one debt-buying company, Portfolio Investment Group, LLC ("Portfolio Group"), which bought debt from various debt brokers. Once Portfolio Group bought a batch of debt, it was parceled out to the various collection entities identified above. These entities each collected the debt in their own name, and deposited their collections into their own, separate

---

[2]    At the Court noted at the preliminary injunction hearing, "I am very impressed by the amount of information he [referring to the Receiver] put together . . . ."  The reason for the abundance of information was that none of it was hidden and defendants cooperated fully with the Receiver. They had set up a structure that was transparent, though eventually unwieldy.

NOTICE OF MOTION AND MOTION TO MODIFY PRELIMINARY INJUNCTION

bank accounts. Often the debt payment agreements the entities reached with individuals, usually for a large discount, provided for payment by credit card, either in a lump sum or to be paid in installments. These credit card payments were made by the debtor into a "merchant account" in the name of the collecting entity. A merchant account is an account managed by a merchant account company that allows anyone to pay any retailer, or other company having a merchant account, by credit card over the phone through the merchant account company. Payments were deposited into the entity's merchant account, and thereafter fees due to the merchant account company were withdrawn from the same account.[3] Every time defendants opened a new collection office, they opened a new merchant account under that company or office's name and Jason Begley personally guaranteed the account for any "charge backs." *Id*. at para. 27.

By 2011 defendants thus had ten merchant accounts, each collecting installment payments for those with whom debts had been settled and who were paying by credit card. Defendants' merchant account operator, PayTek, Inc., questioned why they had so many merchant accounts, since each entity did the same thing and defendants really only needed one account. *Id*., para. 28. It urged consolidation into one merchant account and defendants complied and restructured as depicted in Exhibit A-2 to the Begley Declaration. As that exhibit shows, in June, 2011, defendants created a new entity, Portfolio Investment Financial, LLC ("PIF"). PIF bought debt from Portfolio Group (discussed above), which had in turn bought the debt directly from independent debt brokers. Thereafter, PIF was and remained the owner of the debt and assigned the debt for collection to

---

[3]     As discussed in the Begley Declaration at paragraphs 27 and 28, and footnote 2, merchant account operators are in his experience very focused on the businesses opening merchant accounts. Many persons perpetrate fraud by credit card by opening a merchant account, placing repeated unauthorized charges, or charges for goods never delivered, against their victims' credit cards, sweeping the funds from the merchant account into which these fraudulently-obtained proceeds are paid, and then disappearing, leaving the merchant account operator to repay on the charge-backs. The operators are thus very leery of multiple accounts and they expressed to defendants their concerns. However, defendants' companies had a very low charge back rate, approximately one percent (until the FTC action started and it increased) which indicates that collections were properly made because those from whom they collected did not charge back the payments, as they had a right to do. As stated in the text, the vast majority of the collectors were honorable and law-abiding, and many of them ended up being thanked by those from whom they collected. *See* the declarations of collectors attached to the Begley Declaration at Exhibit J.

collection entities, as depicted on Exhibit A-2. The collection entities pursued collections as they had done before, except that they did not take payments from debtors in their own name, but rather in the name of PIF. When an agreement was reached, payment was made to PIF. Payments by check were deposited into PIF's bank account. When the payment was by credit card, it was made into PIF's newly-formed merchant account, which was established to replace the closed merchant accounts that had previously been operating for the collection entities. *Id.* at para. 28.

After receiving payments, PIF would disburse monies back to each collection entity to pay the managers and collectors, and pay the operating costs such as rent, telephone, insurance, advisory services and other business expenses. The balance would go as needed to purchase new debt from Portfolio Group, which PIF would then assign to the collection entities. Any remaining money would be disbursed to Jason and Wayne. *Id.*, at paras. 29 and 30.

All of these payments and money transfers were obvious and transparent. There was no attempt to hide any of this money. It can all be traced. Payments from debtors were made to PIF, which in turn used that money (1) to buy more debt from Portfolio Group, and (2) to fund the collection entities for payment of wages and other costs. The remainder was paid to Jason and Wayne through subchapter S corporations or their family trusts. That money was derived from the profits of their businesses, after all wages and expenses were paid, and paid to them as the owners of the companies. Begley Dec., at paras. 28-31.

The only issue with respect to this money is whether the FTC can show that any of it, or any reasonable approximation of it, can be considered ill-gotten gains from improper collections and thus subject to disgorgement. The structures in and of themselves do not support any such assertion. There is absolutely no difficulty in tracing the proceeds of the business. The Receiver's extensive First Report shows that. Therefore, the corporate structure in and of itself forms no basis for imposition of a protective receivership with the complete control currently being exercised.

There is likewise no fraud or other improper purpose to be inferred from the creation of new entities in 2011, all of which are named in the Begley Declaration, at paragraph 35. Their creation and management were completely transparent. Each had its own bank account and was created as part of a plan by Lunsford and Begley to get out of the retail debt collection business. They created entities that they could operate and ultimately sell as part of a turn-key business package to any interested party, including existing managers. The package would include a company name and established bank account, $3,000,000.00 in new debt, and a license to use the Simple Debt software. *See*, Begley Declaration, para. 33-37.

Likewise the structure created to hold personal assets of Begley and Lunsford, and how profits flowed from the corporate entities to the owners, reveal no improper design and are also completely transparent. *See*, Begley Declaration, para 31, and Exhibit A-3. Money from the collection entities, after payment of expenses and the purchase of new debt, was distributed to Lunsford and Begley through legitimate tax and estate planning structures, in consultation with their attorney and accountant. The FTC and the Receiver have proffered no evidence that these were improperly structured entities.  There was nothing improper about the transfers of profits to Begley and Lunsford from their businesses; they were the owners.

**Collection of Debt by Defendants**

Declarations from sixteen of the defendants' best and most prolific collectors, each categorically denying that he or she collected debt in violation of the FDCPA, are attached to the Begley Declaration as Exhibit J.  *See*, Begley Dec., para. 8. Each denies telling debtors that they were lawyers, sheriffs, or process servers, and further denies saying anything menacing to anyone in the military. Each declarant is willing to be cross-examined and is within the jurisdiction of this Court and thus is available to the FTC for a deposition.

Moreover, defendants required each new collector, all of whom were independent contractors, to sign a contract containing the following acknowledgment (Begley Dec., para. 42 and Exhibit B):

> As part of Contractor's services, Contractor will be provided access to Accurint software, which grants Contractor access to databases containing certain debtors' personal information.  Contractor agrees and acknowledges that any personal information obtained in connection with any services Contractor provides to Company, including information obtained through the use of Accurint or similar software, will be used in accordance with the State and Federal Fair Debt Collection Practices Acts and not for any improper purpose. . . .

Begley and Lunsford met with the managers on a monthly basis, and their standard practice was to remind their managers of the need to comply with the FDCPA. Furthermore, they never provided scripts threatening sheriff visits or arrests. Begley Dec., para 7.

The alleged wholesale nature of the violations is seriously cast into doubt by the numbers discussed next below. A comparison of the number of complaints to the over 600,000 conversations that were uneventful, and the tens of thousands of agreements made and kept with debtors to pay a part of their debt, do not square with the inference the FTC seeks this Court to draw. Rather it corroborates the conclusion drawn from the statements of defendants' major collectors, Begley Dec, collective Exhibit J, that oftentimes the debtors with whom they were dealing were appreciative of the discounted settlement offered and the ability to obtain a "paid as agreed" letter.

The 47 debtor declarations submitted by the FTC seek to substantiate 43 claims of unlawful debt collection, a few of which resulted in payment of $3,936.90.[4] Many of these declarants recite something he or she was told by someone else as to what a collector had said. Of the 62 complaints submitted by the Better Business Bureau, some of which may overlap with those submitted by the FTC, most complainants did not pay anything, and total dollars paid appear to be approximately $15,000.00. Measured against this showing of less than $20,000.00 in challenged payments is a

---

[4]    This total is juxtaposed against the approximately $6 million in assets seized by the FTC and the Receiver to date. The relatively miniscule percentage of complaints does not at all support the assumption that any problem within the defendants' ten offices was universal or systematic.

NOTICE OF MOTION AND MOTION TO MODIFY PRELIMINARY INJUNCTION

quite substantial contrary showing. To begin with, defendants have settled a total of 29,089 debts with consumers, many of whom expressed thanks for getting the debts behind them. Begley Dec., para. 9 and Exhibit J. Of those who did make a deal, prior to the takeover by the FTC, less than one per cent of the debtors on installment plans making credit or debit card payments have sought to undo, or charge back, their payments after committing to them. This is a very low chargeback rate for this industry. Begley Dec., para 9.

Most compelling for the defendants are the number comparisons. *See*, Begley Dec., paras. 7, 9, 11, 41 and 43. After a two-year investigation, the FTC submitted 105 consumer complaints, some of which may be duplicative and only 47 of which, relating to 43 debts, were sworn. Begley Dec., paras. 11, 41. Approximately 62 were unsworn. *Id.* Setting aside that there has been no cross-examination of any of these complainants and much of what the FTC relies upon is hearsay, the numbers are telling. As is shown in the Begley Declaration at paragraphs 42 to 43, in 2011 the Simple Collect program used by defendant companies captured notes and details regarding every call that was made, every call resulting in a conversation, every deal made with a debtor to pay, and the terms of that payment. What follows is summarized from voluminous documents or data that can be reviewed by the FTC electronically or in hard copy if they wish to print it; the data is in the possession of the Receiver. [5] This data shows for this last year only (the FTC relies on complaints going back more than two years):

---

[5]     Simple Collect is a data entry and retrieval process that captures every call made and ties it to the debt about which that call is made. The collector opens the data base and locates a debt in their system, since all were entered into the computer when purchased. The name of the debtor, his or her contact information, the account number and the type of debt is entered. Then, any time a call is made, the information learned from that call is also entered. So if a debtor does not answer, hangs up, says he has declared bankruptcy or has hired an attorney, or makes an agreement to pay, or says he will call back, or to call him back, that is noted in the computer. The next time that debt is retrieved, the data will inform the collector of the history. Once a debt has been settled, that is noted and that debt goes to a different part of the data base so that callers will not call again. The program will track the debt payments and trigger a flag on the debt if it is not paid as agreed, whereupon the computer will place that debt in a follow-up file so someone can call the debtor. By this system defendants can tell exactly how many calls were made and how many calls resulted in any particular result. Begley Dec., para. 41 and fn. 3.

NOTICE OF MOTION AND MOTION TO MODIFY PRELIMINARY INJUNCTION

(i)  their collectors made **674,811** calls in the year 2011 which resulted in a conversation between a collector and a debtor, meaning that the ratio of total complaints (105 for two years) to completed calls (in 2011 only) is 1 complaint for every 6,427 calls, or 0.00155%.

(ii)  The ratio of <u>sworn</u> complaints (47, on 43 debts) to completed calls where discussions took place is much lower, since there were fewer sworn complaints:  1 complaint for every 15,693 conversations, or  0.006372%.

(iii)  Calls in 2011 resulted in 29,089 separate agreements by which debtors agreed to pay a part of their debt.  This means that *4.3*% of those with whom defendants made telephone contact made a payment agreement. This also means that for every person who complained under oath, more than 600 persons agreed to make payments on their obligations without complaint about defendants' debt collection process.

These comparisons and raw numbers support the defendants' assertions that they did not engage in a wholesale violation of the Fair Debt Collection Practices Act that could justify the draconian remedies sought by the FTC.

**The Actions of the Receiver**

The Court entered a temporary restraining order on October 13, 2011. The FTC had been investigating this case for two years, based on the dates of some of the complaints, yet never once contacted Lunsford and Begley to caution them about what was occurring. One wonders why a regulatory agency would allow what they believed to be such a harmful debt-collection enterprise to continue to operate, instead waiting until it had amassed a mound of paper to present to this Court, *ex parte*. In any event, without prior warning, all of defendants' offices were seized, access to business and personal records was blocked, all bank accounts were frozen, assets were confiscated, and all operations were shut down. Begley and Lunsford worked with the Receiver at their main office at Montecito Avenue, Corona, for approximately two weeks, and provided him with

explanations and information about their business practices and the location of offices, bank accounts and assets. Then he abruptly locked defendants out and closed the office for approximately two weeks, not even allowing them to retrieve personal belongings.  Only with the full cooperation of Begley and Lunsford was the Receiver able to identify additional related entities and locate additional bank accounts.  To date he has seized an estimated $6 million in cash and assets.

What the Receiver hasn't done is protect the continuing operation of the businesses.  As of December 7, 2011, there were at least six offices, complete with computer equipment and furniture, that had not yet been visited, almost two months after taking over operations from defendants.  One office, in Iowa, was evicted from its premises for nonpayment and the local manager was forced to remove furniture and equipment to his home garage.  Not until December 9, when the Receiver travelled personally to Iowa to visit the manager's garage and oversee the shipment of remaining computers to Southern California, was any effort made to manage this site, resulting in what appears to have been a very costly process after allowing the business to be evicted. As of December 20, the local manager, who has not been paid since September, was still awaiting promised payment from the Receiver for expenses he incurred at the Receiver's request.

While focused on collecting cash, hiring forensic accountants, and paying security guards, the Receiver did not make timely payments to the merchant account that collects payments on installment plans, and thus debtors, who were expecting to continue paying on outstanding obligations, in return for which they would be sent a "paid as agreed letters" that they could submit to credit reporting agencies, could not make agreed-upon payments, thereby dissipating the assets of the companies under receivership. Begley Declaration, para. 46. There has been no showing that these payments were not lawfully obtained, and indeed the Receiver has now resumed these collections for the benefit of the Receivership.

The defendants' collection offices were and remain closed, and its main office, which managed customer service calls, was closed for approximately two weeks after the Temporary Restraining Order was entered. When operations resumed, records indicated that over 5,500 telephone calls to the office had gone unanswered.  Begley Dec., para. 48. Customer service had come to a standstill, not only threatening the on-going viability of the Rincon-related entities, but severely restricting its cash flow.  Now, some two months later, the Receiver has advised that he is planning to expand the staff in order to manage collection of accounts that the FTC has alleged were established as the result of unlawful conduct by the defendants.[6]

Further, the Receiver has not paid telephone and utility bills so that on December 7, the remaining operational office, on Montecito Avenue in Corona, was without telephone or internet service, and was thus unable to receive telephone calls from debtors seeking information about their payments.  Instead, debtors were calling defendants' vendors, the debt brokers who initially sold the debt to the Rincon-related entities, trying to figure out how to take care of their obligations.  These callers include active-duty service members.  Begley Declaration, Para. 47 and Exhibit E.

Rents have not been paid, leases have not been renegotiated, landlords cannot get responses, vendor contracts are being ignored, and the businesses have essentially come to a halt.  Jason Begley has personally guaranteed on-going business vendor contracts to Lexis-Nexis/Accurint and Experian, each in the amount of $40,000 per month, and the Receiver has not honored those business obligations.  Begley Dec., para. 49 and Exhibit F. Begley's  credit is thus being ruined, and the ability of the businesses to function is being substantially compromised.

The Receiver's First Report re Order to Show Cause (Doc No. 30) suggests, repeatedly, that Jason Begley and Wayne Lunsford were disreputable businessmen who put their personal financial preferences ahead of the companies they ran and the contractors with whom they did business.

---

[6]      We point out here that regardless of where the money will end up, as part of a disgorgement order, as the FTC claims, or released to the defendants as lawfully collected assets, both parties to this case have the same interest in maximizing the worth of the assets.

NOTICE OF MOTION AND MOTION TO MODIFY PRELIMINARY INJUNCTION

There is no factual basis for this assertion.  Begley and Lunsford were the sole owners of the operating businesses.  They paid their bills on time, they paid their collectors on commission, and they had the sole right to the profits from the businesses.  Referring to personal payments as "preference disbursements" (*see* Para. 28) casts them in a light that is simply not justified by the facts.

Likewise, the Receiver asserts that on the day he took over the business, October 13, $696,000 was owed in commissions (for an October 15 payday), but there were "inadequate funds to pay them."  This is patently false, as demonstrated by a review of paragraphs 4 through 6 of the same report, which indicate that the Rincon-related entities had on deposit on the day of the seizure cash in separate bank accounts $878,000, $75,000, and $126,000, for a total of $1,079,000.00, or $383,000.00 more than was needed to meet the payroll that, to this day, remains unpaid.  By this motion defendants request that those payment obligations be honored.

## ARGUMENT

**THE EVIDENCE PRESENTED BY THE FTC IS NOT SUFFICIENT TO JUSTIFY THE TOTAL ASSET FREEZE NOW IN PLACE, MUCH LESS THE ACTIONS OF THE RECEIVER THAT WILL NECESSITATE LIQUIDATION OF DEFENDANT COMPANIES**

### Summary of Argument

This motion does not seek to undo any part of the preliminary injunction restricting defendants' debt collection activities, nor does it seek return of most of the frozen assets -- only approximately 5 per cent payable to defendants for living expenses pending resolution of this case, plus amounts due to collectors for unpaid commissions.  If this motion is granted, substantial assets will be preserved for the benefit of the FTC *if* it in fact proves the vast pattern of bad acts it alleges. It has not yet done so. While the FTC has produced evidence of some violations, it has not established thus far that the violations were on such a massive scale as would warrant a total

shutdown and a total freeze, much less what now appears to be a process that will result in the inevitable liquidation of many of the assets.[7]

Indeed, in the complaints submitted by the FTC, sworn and unsworn, there is reported less than $20,000.00 paid as a result of alleged misconduct, whereas over the last three years these defendants have settled well over $10 million in debt from almost 30,000 debtors.  In these circumstances, returning 5% of the assets to defendants so they can survive and preserve their credit, while keeping the remainder under receivership, is fully warranted. This is particularly so given defendants' counter-showing (above) that rebuts the notion, as yet unproven, of any wholesale wrongdoing. The FTC showing of violations is *de minimis* given the showing made in the Begley Declaration that (1) many of the top collectors swear to conducting themselves in compliance with the law, having proper conversations with debtors grateful for having settled their debts and obtaining a "paid as agreed" letter to assist with their credit, and (2) collectors employed by defendants engaged in over 600,000 telephone conversations with debtors, with relatively few shown as complaining.[8]

---

[7]    The Receiver has focused not only on the debt collection entities, but also on other businesses owned by the defendants, and other personal assets.  He has made inquiries concerning the value of a house in Colorado owned by Mr. Begley which was acquired by him five years before he commenced any debt collection. The Receiver has consulted auctioneers about the sale of computers and other office equipment and has researched the auctioning off of defendants' debt portfolio. He has seized assets of an automobile company. He has failed to manage real estate leases, allowing for multiple evictions, has not paid telephone, utility or vendor bills necessary to keep businesses operational, causing shut downs, and has even declined a request to pay employment taxes due to the State of California, stating they would constitute no more than a claim against the Receivership.  These are not the actions of someone maintaining the status quo and do not comport with defendants' due process rights, since it occurs before they have had any trial or discovery.

[8]    As the Begley Declaration states, at paras. 7, 9. 11 and 41, the 47 sworn FTC complaints relate to only 43 debts; none of the 62 Better Business Bureau complaints are sworn. Many of the declarations and statements contain hearsay, which further erodes the showing. *See*, *Flynt Distrib. Co. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir.1984) ("The trial court may give even inadmissible evidence *some weight*, when to do so serves the purpose of preventing irreparable harm before trial.") (emphasis added) Yet Simple Collect records capturing every phone conversation show a total of 674,811 conversations in 2011. Thus, the total complaints, sworn and unsworn, received by the FTC over the two years it was running this investigation would amount to only 0.00155% of the conversations held only in 2011. The FTC submission is not even close to a representative sample.

NOTICE OF MOTION AND MOTION TO MODIFY PRELIMINARY INJUNCTION

Not only is the number of complaints submitted by the FTC insufficient to justify a total freeze of both business assets and personal assets of Begley and Lunsford, neither is the structure of the various entities formed by Begley and Lunsford with the advice of a lawyer and an accountant. The structure is totally transparent, there is no overseas cash transfer or attempt to hide assets, all bank accounts are in reputable banks, the companies of defendants were set up for legitimate business purposes (Begley Dec., para. 31) and none of them were "shells" set up to disguise assets or limit liability. The explanation set forth in the Begley Declaration for the structure devised by their lawyer and accountant makes sense and is credible.

Moreover, the defendants have been completely cooperative with the Receiver, which is why he was able to make such a complete showing to this Court, about which the Court observed at the hearing on November 7, 2011 as follows: "I am very impressed by the amount of information that he put together in that declaration and the amount of investigation and detail that is in his investigation . . . " Hearing Transcript, 11/07/11 p. 19. Virtually all of that information was provided by the defendants or derived from their disclosed corporate structure and banking operations.

Finally, there has been no improper dissipation of the assets of the collection companies. As the Begley Declaration shows, at paragraphs 19 to 32, after all the company expenses were paid and new debt was purchased from their debt sellers, remaining money was transferred periodically to the family trusts of Begley and Lunsford or to other personal entities. They owned the companies from which that money was transferred, so it was their money. There was nothing improper about its transfer to them, or to trusts set up by an attorney for estate planning. Moreover, all the transfers were traceable and none placed the money beyond reach of the FTC, as demonstrated by how easily it became known to the Receiver and was thereafter seized. There are no overseas bank accounts. The only arguably extra-territorial asset is one made through Brylaw, a firm that has in the past arranged investments for Begley and Lunsford, and involves an estimated $800,000.00 investment in

NOTICE OF MOTION AND MOTION TO MODIFY PRELIMINARY INJUNCTION

Brazilian bonds made *before* the TRO was entered. The Receiver was told of the transfer and has been in direct contact with Larry Stephens at Brylaw.  Brylaw is located within this district, within the jurisdiction of this Court.

The defendants have not had a trial, nor any discovery opportunity. It is simply too soon to take all their money, usurp control over all their businesses, and allow those businesses and assets to dissipate in the manner documented in the Begley Declaration. Accordingly, it is appropriate to loosen the restraints to the extent sought by this motion and order an expedited trial and interim relief.  Since the FTC came crashing in with assertions of massive violations,  using a massive submission to obtain an ex parte order stripping defendants of their funds, freezing their ability to operate any business, and arrogating to itself and to the Receiver the complete control over which defendants debts to pay and which to let go unpaid, subject to the authority of this Court, the FTC should be ready to justify its actions and try this case.

Alternatively, it should allow some loosening of the total control it now has.  Those charged with criminal offenses quite frequently have greater pre-trial freedom. Unless there is some loosening of the restraints until there is a prove-up as contemplated by the rules of evidence, with cross-examination and rebuttal rights, defendants have suffered and are continuing to suffer a truly staggering violation of their due process rights. More liberal restraints can fully serve the interests of the FTC while preventing the wholesale, ruinous shut down of the personal and professional lives of these two individual defendants, who have thus far been proven liable for nothing.

**The Applicable Law**

The Supreme Court recently clarified that preliminary injunctive relief is available only if plaintiffs "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Defense Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 375, 172 L.Ed.2d 249 (2008). (emphasis added). It went on to emphasize that:

NOTICE OF MOTION AND MOTION TO MODIFY PRELIMINARY INJUNCTION

> "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with their characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a *clear* showing that the plaintiff is entitled to such relief."

*Id.*, at 375-76.(emphasis added).

As indicated earlier, defendants do not seek any lifting of the injunctive restraints on debt collection. However, applying the just-quoted language to the size of the asset freeze (we seek only a 5% allowance) makes plain that this modest asset return should be allowed. It should equally apply to any pre-trial (or pre-summary judgment) shutdown of businesses which might necessitate ultimate liquidation. Under the facts now presented there has not been the required "clear showing" that irreparable harm is "likely" unless there is a full freeze (as opposed to a 95% freeze) of defendants' assets. A 95% freeze is more than adequate based on the showing thus far,  and the return of $150,000 for each defendant removes the FTC from unwarranted interference in their personal and family lives as it establishes their monthly living allowances. Distribution of only 5 per cent of the total assets to the defendants allows them to live, care for their families, and manage their affairs without intrusive interference by the FTC while this case is being decided.

Again defendants refer to the evidence they have presented that refutes claims of a vast pattern of wrongdoing that the FTC claims has taken place.  Courts must look at prevention of unjust enrichment only; anything more would be a penalty.  *F.T.C. v. Febre*, 128 F.3d 530, 536-37. (7th Cir. 1997); *F.T.C. v. Figgie Intern., Inc*., 994 F.2d 595 (9th Cir. 1993).  The "power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing.  Any further sum would constitute a penalty assessment."  *See, SEC v. ETS Payphones, Inc.,* 408 F.3d 727, 735 (11th Cir. 2005), quoting *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978). The courts' equitable power may only be exercised over property that is causally related to the illegal actions of the defendant*.  S.E.C. v. Bilzerian*, 814 F. Supp. 116, 121 (D.D.C. 1993) <u>aff'd,</u> 29 F.3d 689 (D.C. Cir. 1994).  "As such, 'the loss complained of must proceed directly and *proximately*

*from the violation claimed and not be attributable to some supervening cause*.'"  *S.E.C. v. Bilzerian,* 814 F. Supp. 116, 121 (D.D.C. 1993) aff'd, 29 F.3d 689 (D.C. Cir. 1994).  Thus, it can be only to the extent that the millions of dollars of assets now in receivership are causally related to the wrong-doing that they are available for disgorgement.

We agree with the FTC that it "can prove its claims from a *small number of injured consumers*[9] from which the court can infer a pattern or practice of deceptive behavior." FTC Memorandum of Points & Authorities, (Docket. No. 4, page 30, *citing FTC. v. Sec. Rare Coin & Bullion Corp*., 931 F.2d 1312, 1316 (8th Cir. 1991); *FTC v. Amy Travel Service., Inc.* (875 F. 2d 564, 572 (7th Cir. 1089). However, not only have defendants presented factual evidence of many proper collections, the existence of which undermines the FTC's wholesale assertions, the remarkably small percentage of challenged collections is simply insufficient to allow for a reasonable inference of a pattern or practice of deceptive behavior.  Furthermore, the facts of the cases cited by the FTC are nothing like this case; they involve demonstrated widespread wrongdoing in a post-judgment, appellate contest.  For example, in *Security Rare Coin*, *supra,* "Security Coin is out of business and some 9,000 consumers are entitled to relief." *Id*. at 1315. That represented *all* of the consumers involved and was a very substantial number. In that case the record reflected that every consumer suffered the same misrepresentation, and, unlike in this case, there was no contrary evidence offered. It was also a decision entered after a determination on the merits, not at a preliminary injunction.

*Amy Travel*, the other cases cited by the FTC, also involved an enormous number of defrauded consumers, each of which had been bilked by misrepresentations about the worth and utility of a travel voucher sold to them by defendant's high-pressured sales people. The result was based on proof presented by the FTC at a trial, not pretrial and not on un-crossexamined submissions, and is summarized by the appellate court as follows:

---

[9]    The FTC's citation is presumably a tacit acknowledgement that a small number of complaints is all they have.

NOTICE OF MOTION AND MOTION TO MODIFY PRELIMINARY INJUNCTION

The defendants were quite successful at marketing their vacation vouchers. Defendants claim that approximately 35,000 certificates were sold wholesale to other companies and 25,000 were sold directly to consumers. Twelve thousand to 13,000 trips were taken by 25,000 people and some 17,000 customers were waiting for trips when the operation was shut down by the FTC. Gross revenues were around $1.5 million in 1986 and $4.5 million in 1987.

Consumer complaints about the defendants resulted from a number of the defendants' practices. Many consumers complained that the defendants misused their credit card numbers. A number of witnesses testified that when contacted by the salesperson, they were not told that they would be charged for a purchase-the witnesses claim the salesperson asked for a credit card number for the sole purpose of verifying the customer's credit worthiness.

Defendants ran into other troubles with banks handling defendants' credit card transactions. The difficulties arose because of the high number of consumers who disputed the charges made to their accounts by the defendants. These disputes resulted in chargebacks to the defendants' accounts when consumers refused to pay. The magistrate took note of one bank that eventually suffered over $700,000 in consumer chargebacks. A number of banks terminated defendants' accounts due to consumer complaints.

*Id.*, at 569. Not only is the activity at issue in *Amy Travel* massive in scope compared to the showing made in this case, the court of appeals, in affirming, noted that it was "unrebutted." *Id.* Even so, the circuit court noted, there was only a partial freeze pretrial, *not* a liquidation, and that the two defendants had been provided with pretrial distributions of $50,000.00 and $70,000.00, respectively, and a reasonable living allowance.

The assets freeze here is total and financially strangles the defendants. Not only have they put in substantial counter-evidence showing substantial proper collections, asset freezes are only allowed when the FTC can "show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). This the FTC simply cannot show. Fraud alone is not sufficient to make this showing, nor is the lack of sufficient assets to satisfy the entire claim sufficient: "[W]hile the existence of any significant restitution claim makes it seem possible that Defendants may dissipate assets, the Court simply does not find that the FTC has met its burden of showing a likelihood of dissipation." *Id.* 572 F.3d at 1085.

---

19

NOTICE OF MOTION AND MOTION TO MODIFY PRELIMINARY INJUNCTION

None of the elements warranting a freeze are present in the case before this Court. There has been no secreting of assets, no transfer by defendants of cash overseas, and the Receiver has in hand all of the defendants assets. Thus a credible case can be made that the entire freeze should be vacated. Yet the defendants' claims are more moderate and thus truly well-grounded. All they seek is return of approximately 5% of the assets that were seized and frozen, and an order directing that the Receiver take much better care and not waste, much less prepare for liquidation, the remaining 95% of defendants' assets. The Receiver should pay bills as they become due so that the companies and the defendants remain viable and thus more valuable, regardless of the outcome of this case.

This motion seeks to have a trial at the earliest possible date so that these issues can be resolved and the defendants can be relieved from the oversight of the Receiver and the FTC as soon as practicable.   In the interim, the Receiver should be ordered to consult with the individual defendants concerning the on-going operation of their businesses, and the best way of moving forward to manage and, if appropriate, given the current state of affairs, sell assets. If the defendants, the FTC and the Receiver agree on a particular sale, a stipulation can be entered into and filed. Finally, the Receiver should be ordered to file an accounting so that the defendants can be apprised of how the assets are being managed and be given the opportunity to propose less costly alternatives.

## CONCLUSION

The motion to modify the preliminary injunction should be granted in accordance with the terms of the Proposed Order submitted with this motion.

Dated: December 21, 2011                          Respectfully submitted,

MARKHAM & READ

By:  /s/ John J.E. Markham, II
John J.E. Markham, II
Attorneys for All Defendants
Jason Begley, Wayne Lunsford, and all related entities.

# CERTIFICATE OF SERVICE

1

2        IT IS HEREBY CERTIFIED that service of the foregoing document has been made this 21st Day of

3    December, by electronic service, which effected service on the following:

4    MARICELA SEGURA, CA Bar No. 225999
     RAYMOND E. MCKOWN, CA Bar No. 150975

5    e-mail: msegura@ftc.gov and rmckown@ftc.gov

6    FEDERAL TRADE COMMISSION
     10877 Wilshire Blvd., Suite 700

7    Los Angeles, CA 90024
     Telephone: (310) 824-4343

8    Facsimile: (310) 824-4380

9
     *Attorneys for Plaintiff*

10   FEDERAL TRADE COMMISSION

11   RICHARD WIESSMAN, ESQ., CA Bar No. 54781
     Email: rweissman@rwreiver.com

12   12121 Wilshire Blvd., Suite 600

13   Los Angeles, CA 90025
     Telephone: (310) 481-6780

14   Facsimile: (310) 481-6786

15   RECEIVER

16

17   Dated: December 21, 2011                 /s/ John J.E. Markham, II
                                                  John J.E. Markham, II
18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO MODIFY PRELIMINARY INJUNCTION