John J.E. Markham, II (CA Bar No. 69623)
MARKHAM & READ
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax: (617) 742-8604
Email: jmarkham@markhamread.com

Attorney for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>  Plaintiff,<br><br>        -- vs. --<br><br>RINCON MANAGEMENT SERVICES, LLC, a California limited liability company, also d/b/a "Rincon Debt Management," "Rincon Filing Services," and "Pacific Management Recovery", et al.,<br><br>  Defendants. | CASE NO: ED CV 11-01623- VAP (SPx)<br><br>**DECLARATION OF JASON BEGLEY IN SUPPORT OF DEFENDANTS' MOTION TO MODIFY THE PRELIMINARY INJUNCTION PREVIOUSLY ISSUED IN THIS CASE**<br><br>DATE:     January 30, 2012<br>TIME:      2:00 p.m.<br>CTRM:     No. 2<br>Hon. Virginia A. Phillips<br><br>Filed Concurrently with Motion, Memorandum, Exhibits, and (Proposed) Order |

I, JASON R. BEGLEY, declare under penalty of perjury as follows:

1.      I am a defendant in this action and along with the other individual defendant,

Wayne W. Lunsford ("Lunsford"), I co-own all of the entity defendants named as parties in this

case. All of those entities were set up by us, with the assistance of our attorney and accountant,

to assist in the debt acquisition and debt collection businesses at issue in this action, or to manage our personal financial affairs.  Lunsford and I are equal partners in this business and we are both residents of this area.  I live in Riverside, California and Lunsford lives in nearby Corona, California.  Based upon information known to me and about which I can testify from my own personal knowledge, I make this declaration to support the defendants' motion to modify the present preliminary injunction issued by this Court and to set forth information which I believe has not been previously considered by this Court.

**Preliminary Statement**

2.      As I hope to be able to show this Court on our motion and in this declaration, neither I nor my co-defendant Wayne Lunsford engaged in or allowed the wholesale violation of the Fair Debt Collection Practices Act ("FDCPA") as depicted in the papers submitted by the Federal Trade Commission ("FTC").  While the FTC has obviously been preparing for the filing of this case and its motions for quite some time, and were thus fully ready to make the extensive filing it did on the date of its choosing, over the course of its two-year investigation the FTC never contacted us, advised us of complaints, or demanded that we change our practices.  Instead, we were surprised by the FTC filing and were absolutely unprepared to respond.  I am submitting this declaration to explain our business and seek an expedited hearing or trial so that this Court can determine on the evidence just what really happened in connection with our debt collection business and in turn craft an order that would allow us to preserve our business, our reputation, and assets lawfully acquired.

3.      On October 13, 2011, pursuant to this Court's Temporary Restraining Order, and without prior warning, our offices were seized, access to business and personal records was restricted, our bank accounts were frozen, our assets were confiscated, and our operations were shut down. While we worked with the Receiver, Mr. Weissman, at our main office at Montecito

Avenue, Corona, for approximately two weeks, and provided him with explanations and information about our business practices and the location of offices, bank accounts and assets, thereafter he locked us out, and shut down the office, not even allowing us to retrieve personal belongings.  We were shell-shocked, with all of our accounts frozen and unable to pay personal bills, acquire personal items for our families, or meet the payroll (commission payments) of the persons we owed for having done collection work, the proceeds of which the FTC and the Receiver now receive and control.  The TRO hit us just two days before we were scheduled to pay approximately 350 people who had worked with us – we pay monthly – and as a result we have been threatened by many of them. Internet websites have revealed where we live and suggested we "be paid a visit." My wife moved out of the house for two weeks out of fear for her personal safety.

4.    With all of this occurring, we did not fully understand the legal process and while we were represented by corporate counsel, we did not make a full presentation to this Court, stating our side of the issues in the preliminary injunction motion. In fact, at the hearing on the preliminary injunction, this Court noted that we had submitted only "a very brief opposition points and authorities". [Hearing Transcript, p. 4.]  We have now been able to put together a presentation which we respectfully present to this Court in support of our motion seeking the modification of the preliminary injunction.

5.    In this declaration I set forth, under separate captions (1) a summary of why we seek the modifications, (2) the background and growth of our companies, (3) a discussion of the facts and documents showing the proper nature of many of our collections, (4) the hardship imposed by the present seizure order of this Court and how we ask this Court to modify its prior order to free up

some of the presently seized assets, and (5) various ways by which we propose to modify the full control now being exercised by the Receiver, and the reasons for such modification.

### Summary of Grounds for Modification

6.     We seek a modification because, while the FTC has demonstrated instances of wrongful conduct, we believe that the majority of our collections were undertaken legitimately and in accordance with the law. Corona is the home of dozens of debt collection businesses, and most of our collectors had prior experience with other agencies.  We made an effort to operate on a more professional business model, and met with managers monthly to stress compliance with the law and, most specifically, to never mention the word "sheriff" in the process of collecting debts. While the FTC demonstrates that we obviously had some bad actors, and we expanded too fast (as we show below) to provide adequate monitoring of the hundreds of collectors making calls,  and we should take responsibility for the bad collections, they did not represent the majority of collections or close to it.  We do not believe that the FTC and the Receiver should be entitled to take over our businesses and seize millions of dollars based upon the limited showing of allegedly unlawfully collected payments totaling only in the thousands of dollars.

7.     The FTC submitted 105 complaints received since 2009. Of those, only 47, referring to only 43 debts, were sworn statements; 62 were online complaints to the Better Business Bureau. Many of the sworn statements contain not only statements by the person complaining, but quote from other people who, in unsworn conversations, told of supposed third-party conversations. Based upon this number of complaints, the FTC has incorrectly assumed that all collectors used inappropriate scripts found in some of our offices. However, as of December 7, the FTC had not even visited six of the offices in which we did business.  They only went to four out of the offices operating at the time the preliminary injunction was entered.  Second, as owners, we never provided

scripts threatening sheriffs' visits or arrest, and at monthly managers meetings we specifically reminded managers that collectors should comply with the law.

8.      Submitted with this Motion to Modify are sworn declarations from 16 of our largest collectors by dollar volume. Their declarations show that the top collectors from our companies did not collect in the manner shown on the scripts found by the FTC in fewer than half our offices. They did not threaten arrests, say they were from a law firm or threaten any kind of harm to anyone in the military. These people are all willing to so testify and we submit that their conduct is much more exemplary of how the debt we purchased was collected than the complaints cited by the FTC.

9.      As will be explained further below (see paragraph 41), notes of all of the telephone collection calls we made in 2011 can be retrieved by electronic record. Any time a conversation occurred between a collector and a debtor or other person, as opposed to simply a voice-mail, hang-up call or the like, the conversation was noted by the caller. Records reflect notes being entered for 674,811 calls in 2011; such records are not available for 2010. We have settled 29,089 debts with consumers.  Many payments are made in installments over time, and prior to the takeover by the FTC, less than 1 per cent of the debtors on installment plans making credit or debit card payments had sought to undo, or charge back, their payments after committing to them, a very low chargeback rate in this industry.  105 complaints over two years represents less than one tenth of one percent of all calls made in 2011 alone. Plainly, not all or even most of the debts we settled are claimed to be illegitimate or improperly handled.

10.      Moreover, we assume that the Receiver and the FTC must likewise not believe that all of the collections were obtained in violation of law since the Receiver is still collecting debt

repayments. Payments by check arrive by mail at our office, and he is presumably depositing those funds in the Receiver account with the agreement of the FTC.

11. I understand that this Court assesses the amount of any required disgorgement based on a reasonable approximation of any ill-gotten gains. Taking away all of our business and personal assets is, I respectfully submit, not warranted on the showing made by the FTC of the number of total complaints compared to the total of conversations, particularly considering the sworn declarations of collectors that have been submitted and less than $20,000.00 claimed to have been collected in violation of the FDCPA. It is very unfair to us personally, particularly before we have had any opportunity to take discovery and present any testimonial evidence or make any proof. We will discuss below why widespread and improper debt collection statements can not be fairly assumed.

### Background and How Our Companies Grew

**Debt Collection In General and Our Debt Collection Businesses**

12.     This Court indicated at the hearing on the preliminary injunction that the structure of our companies and trusts indicated that we were attempting to hide assets and insulate ourselves from liability. We ask this Court to consider the following information which we now present to refute that observation.

13.     The debt collection business is big business in the United States. It may not be considered a high-end business, like real estate development or investment banking, but it is legal and legitimate, and provides necessary services and cash flow to financial and other businesses and institutions, as well as employment to thousands. I have had four years of experience working in the debt sale and collection market and I have gained knowledge of the practices and operation of debt sale and collection. One very large subset of delinquent debt is the many billions of dollars of

credit card debt owed by consumers to banks and credit card companies, which, if it cannot be readily collected, will be written off and sold at a large discount to legitimate debt collection companies. In fact, I have been led to believe that under certain banking laws, the banks can not carry debt on their books after a relatively short amount of time and thus need to write it off.

14.     To sell the debt, banks assign it to auctioneers which in turn auction this "fresh debt," as it is called when first purchased from the banks, to large debt-collection agencies in multi-million dollar batches for approximately 12-20% of its face value. These agencies, called "primary paper" debt collection agencies, collect what they can of this fresh debt, and theirs is the highest collection yield because the debt is fresh and thus has not yet been subjected to any debt collection effort apart from that of the banks which initially extended the credit. Since the consumers frequently hold out until after the bank unloads the debt and it is thereafter written down, there is considerable debt collection potential in this "fresh" debt for the primary debt collectors.

15.     The primary debt collectors set about collecting the debt but, at some point, collections on a particular batch of fresh debt reaches a point at which it is no longer worth the time of their employees to attempt to collect on it further. When this occurs, they will offer for sale the remaining uncollected debt in the batch to what is called the "secondary paper" collection market of debt buyers. We are primarily in this "secondary paper market" and purchase our debt not from a bank or credit card company, but from various debt brokers that buy up this paper and sells it to entities like us.

16.     We can normally buy this secondary paper for 2 to 4 per cent of its face value. We can thereafter normally collect this debt for 4 to 13 per cent of its face value.

17.     Since starting our business in 2009, we have purchased approximately $500 million worth of debt and have collected approximately $13 million, or approximately 2.6 per cent.  We have in the pipeline from current collection efforts approximately $1.5 million due in installments from persons who have agreed to settle their debts with us in exchange for a "paid in full letter" which we send once they have made all the agreed-upon payments. Most of these installments are paid by debit or credit card through our merchant bank, but those operations have been suspended by the actions of the Receiver (see below).  Additional amounts are paid by check, which are being collected by the Receiver.

18.     Apart from what we have already settled and have in the pipeline, we have remaining debt in our portfolio, in relation to which no collections efforts have yet commenced, which has a face value of $36 million. If collections are allowed to be made from this debt, there is approximately $2 million we would expect to collect using our system and without violating the Fair Debt Collection Practices Act ("FDCPA.") as has been the case, I believe we can show at a hearing, with most of our collections.

### Our Structure and the Companies We Formed

19.     We did not set up the ten separate entities we were operating at the time the TRO was served in order to disguise the source of our earnings, or to insulate ourselves from liability. Based upon the very incomplete showing we made before the hearing on the preliminary injunction on November 7, 2011, this Court found that there was "an attempt to disguise the operation by creating more and more of these companies and even detailing which one were the successors." [Transcript, page 6.] Those were not at all our motives nor the result of how we were structured, or how we had just recently restructured.

20.     Our structure and number of offices was the result of our rapid growth as we sought to take advantage of the debt market which, since 2008, has grown rapidly because of the downturn in the economy and resulting non-payment of credit card debt. Credit card debt is unsecured and thus the first type of debt to be delayed by those who owe it, unlike car loans secured by re-possessible cars, and deeds of trust or mortgages on foreclosable homes.  Since 2008 this debt has literally exploded.

21.     In April, 2009, Wayne Lunsford and I opened the doors of our first company, Pacific Management Recovery, LLC.  For roughly eight months we owned and operated this one office and it grew from having one collector to thirty. At this point we saw the potential to expand and so we did.  We opened Prime West Management and placed one manager in each of what were by then our two offices to oversee the collectors in what were then our two locations.

22.     We continued to grow at a very fast pace. Debtors with whom we made contact were often times, not always but frequently, quite willing to pay under the program we offered. We offered them a negotiated rate, with our collectors trying to get as much of the debt paid as was possible and the debtor trying to negotiate it downward. Normally, our collectors took a substantial discount. Also, they promised, and we always delivered on this promise, that when the negotiated debt was paid per agreement, the debtor would get a letter from us to send to the three major credit bureaus attesting that the debt involved, properly indentified, had been "paid in full." This was helpful to their credit and, along with the discount, was attractive to many debtors, so we had success collecting many debts.

23.     We continued to add offices as our business grew.  All of our offices were in Southern California, with the exception of one in Iowa. The high unemployment rate in Corona and

Declaration of Jason R. Begley

Riverside meant that many people needed work and were willing to work as debt collectors, non-employee independent contractors working on commission. Each office had a manager responsible for running one or more offices, each with 20 to 30 collectors, and each office was collecting approximately $150,000.00 per month.  Often we had more collectors than desks available so when the most recently formed office grew to capacity, we opened another office. We came to realize, however,  that our growth had been too fast. We had too many collectors working for us, too many offices to manage, too many leases, and too many demands on our time.

24.     The names of the collection entities through which we operated as of July, 2011 are set forth below. Each had a separate bank account in a local branch of a national bank, as indicated. The banks were mainstream reputable banks at which we also had our personal accounts. The Receiver had no difficulty finding out where all the money was and all the entities involved because we gave him this information; we did not try to hide it and our structure was transparent.

| Entities Formed (owned by Lunsford and Begley) | Bank Account At: |
|---|---|
| Pacific Management Recover, LLC | Citi |
| Prime West Management Recovery, LLC | Citi |
| Union Management Services, LLC | Citi |
| City Investment Services, LLC | Citi |
| Rincon Management Services, LLC | Bank of America |
| Global Filing Services, LLC | Bank of America |
| National Filing Services, LLC | Bank of America |
| Rockwell Management Services, LLC | Bank of America |
| Maple Filing Services, LLC | Bank of America |
| Prime Western Investments, LLC | Bank of America |

25.     The structure had become unwieldy. In consultation with our attorney, our accountant, and our merchant banker, Wayne Lunsford and I decided to do some restructuring.

26.     However, we did not restructure in the manner described next below to hide assets, launder cash or to insulate ourselves from liability. Indeed, as the Court will see, the consolidation actually brought all assets and debt into one company and made accounting for collections and managing the cash proceeds obtained by the collection efforts easier, and certainly easier to follow and locate.[1]

27.     Before we consolidated we operated in the manner shown in *Exhibit A-1*. We had one debt-buying company, Portfolio Investment Group, LLC ("Portfolio Group"), which bought debt from various debt brokers. Once Portfolio Group bought a batch of debt, it was parceled out to the various collection entities identified above. These entities each collected the debt in their own name, and deposited their collections into their own, separate bank accounts. Often the debt payment agreements the entities reached with individuals, usually for a large discount, provided for payment by credit card, either in a lump sum or to be paid in installments. These credit card payments were made by the debtor into a "merchant account" in the name of the collecting entity. A merchant account is an account managed by a merchant account company that allows anyone to pay any retailer, or other company having a merchant account, by credit card over the phone through the merchant account company. Payments were deposited into the entity's merchant account, and thereafter fees due to the merchant account company were withdrawn from the same account. [2] Every time Wayne Lunsford and I opened a new office, we applied for a new merchant

---

[1]     At the Court noted at the preliminary injunction hearing, "I am very impressed by the amount of information he [referring to the Receiver] put together . . . ."  The reason for the abundance of information was that none of it was hidden and we cooperated fully with the Receiver. We had set up a structure that was transparent, though eventually unwieldy.

[2]     Merchant account operators are in our experience very focused on the businesses opening these merchant accounts. Many persons perpetrate fraud by credit card by opening a merchant account , placing repeated unauthorized charges, or charges that are for goods never delivered, against their victims' credit

account under that company or office's name and I personally guaranteed the account, meaning that if paying customers "charged back," that is, sought to reverse their payment (which they can do for any time up to 4 months), and the merchant account operator had to debit the money from our account, I would, by my guarantee, have to make up any shortfall if there were more charge backs than money left in the account.

28.     After we had opened all these offices, each with their own separate merchant accounts, in June, 2011, our merchant account operator, PayTek, Inc., questioned why we had multiple merchant accounts owned by multiple corporations, since they all did the same thing and we really only needed one account. Our explanation was that we operated each company as a separate entity and that we preferred to keep each office relatively small, with its own account. However, our merchant account operator requested that we restructure our collections so they could all be paid, to the extent paid by credit cards of the debtors, into a single credit card merchant account, rather than 10. For this reason we opened Portfolio Investment Financial, LLC ("PIF") which fit into our structure as depicted in *Exhibit A-2*.  After being formed in June, 2011, PIF bought all the debt from Portfolio Group, the company discussed above, which had in turn bought the debt directly from our debt brokers. Thereafter, PIF was and remained the owner of the debt and assigned the debt for collection to collection entities, as depicted on *Exhibit A-2*. The collection entities pursued collections as they had done before, except that they did not take payments under their own name, but rather in the name of PIF. When an agreement was reached, payment was

cards, sweeping the funds from the merchant accounts into which these fraudulently-obtained proceeds are paid, and then disappearing, leaving the merchant account operator to repay on the charge-backs. So the operators are very leery of multiple accounts and they expressed to us their concerns. I note however that all of our companies had a very low charge back rate, approximately one percent (until the FTC action started and it increased to five percent, still low for debt collectors, but higher than our business experienced). This is evidence, I submit, showing that many of our collections were properly made because those from whom we collected did not charge back the payments, as they had a right to do.

made to PIF, by either check or credit card, and then deposited into PIF's newly-established bank account. When the payment was by credit card, it was made into PIF's newly-established merchant account which was set up to replace the many merchant accounts we had been operating for the collection entities, which in turn ceased to operate in order to accommodate our merchant account operator.

29.     PIF would then disburse monies back to each collection entity to pay the managers of each office, the collectors, and the operating costs such as rent, telephone, insurance, and advisory services and other business expenses. PIF's monthly collections would also go as needed to purchase new debt so we could assign it to the collection entities. All of these payments were obvious and transparent. There was no attempt to hide any of this money. It was after-expense money collected by our entities and it was our money to disburse in the manner we had set up. The only issue with respect to this money is whether the FTC can show that any of it can be shown to be "ill-gotten gains", and with all due respect, that is simply not how we ran the businesses. We submit that the proof will show that while we apparently made mistakes, the scope is nowhere near as big as the FTC suggests, and their seizure of our property and ruination of our business is simply not warranted. In any event, the assertions by the FTC that we were forming companies in a manner to hide money or shield ourselves from liability are false.

30.     Money was disbursed to Wayne Lunsford and me, and our family trusts, as depicted in *Exhibit A-3*, and we had two distribution methods. Distributions from both Portfolio Group and PIF were paid into our family trusts as royalty payments for intellectual property rights to software and collection processes that were critical elements to the operation of our businesses. We were

also paid salaries by two subchapter S corporations that collected payments from the collection entities for our services, as depicted on *Exhibit A-3,*

      31.    The change from the *Exhibit A-1* to the *Exhibit A-2* structure, which added PIF to consolidate credit card payments, and the structuring of the trust and corporate entities by which Wayne Lunsford and I were compensated, as depicted in *Exhibit A-3,* were done in the manner advised by our attorney Sam Lockhart, who in fact set up these entities, and our accountant, Larry Stephens. They were made for the reasons stated above, as well as for tax and estate planning purposes, and not to disguise or hide anything. Again, each of the entities, along with our family trusts, had local branch bank accounts in major banks. There are not any transfers from these accounts to any overseas offshore accounts. Moreover, the change in structure showed in *Exhibit A-2*, allowing the collections from all the collection entities enumerated above to be paid into one separate entity, PIF, made liability, if there is any, to individuals, much easier to establish. That new structure would also allow any successful claimants to collect much easier because all the money was collected in the name of one entity and paid to one entity, rather than to the ten separate collection entities as had been the past practice before this restructuring.

      32.    None of the companies were "shells." They had initially had been owned by Wayne Lunsford and myself, and operated by managers. They were viable collection entities. They had bank accounts in their names. After the restructuring as described in *Exhibit A-2*, they were likewise not shells, they simply collected in the name of the debt owner, PIF, and all of the collections made by the collectors working for them were paid to PIF where they could easily be traced.

      33.    In the course of restructuring, as depicted in *Exhibit A-2*, we had decided that we wanted to remove ourselves completely from the retail debt collection business.  This decision

preceded any action by the FTC.  As part of our effort to diversify, we had spent more than a year working to develop a very effective debt-collection record keeping software program called "Simple Collect" which is owned by Debt Tech Solutions, LLC, a company owned by Wayne Lunsford and me, and Michael Huck, who is not a party to this FTC action. The Simple Collect software program is described in detail in footnote 3, below.

34.     We decided that instead of collecting debt, as we had been doing, we would instead buy it and then re-sell it with a package of debt collection aids to those who want to collect debt on their own. That way, we would be out of the retail debt-collection business and management problems caused by the many persons acting as debt collectors in our companies. We planned to turn PIF, which bought our debt from our debt seller, into a debt seller itself. We were planning to offer to interested parties, that is, independent debt collection companies, a start-up package, for a fee of $120,000.00, comprised of: (i) $3,000,000.00 in debt at face value, sold to the buyer so it would own the debt and be able to collect that debt in its own right for its own account, (ii) use of our Simple Collect software program to help with the tracking and accounting of the debt we had sold to them as described above, and (iii)  occupancy of one of the offices we had leased under one of our existing companies, which lease would be changed to a sublease in the buyer's name to use as their collection office, already set up with 35 work stations, including desks, chairs, computers and telephones.  In essence, we would be offering a turn-key debt collection operation in which we would have no ownership or management interest or other involvement. The new collector would collect on the initial debt purchased from us, meaning the $3,000,000.00, and could use the proceeds to buy more debt from us, or from somebody else of the many debt sellers with whom we would compete. We would not be involved in collections, at all.

35.     We spoke to some of our existing managers about our plan to get out of the collection business and instead transfer businesses to them. Some expressed interest, and in furtherance of this plan we arranged for the formation of new business entities, in the names of our managers, not ourselves. The managers, who already had primary responsibility for running their individual offices, opened their own bank accounts for their entities.  While we had signature authority, it was not our intention to do business in the names of the new businesses. The entities formed in 2011 included:

Eagle Filing Services, Inc.
Superior Filing Services, Inc.
Universal Filing Services, Inc.
Asset Filing Services, Inc.
Nationwide Filing Services, Inc.
Capital Filing Services, Inc.
County Filing Services, Inc.
Raincross Filing Services, Inc.
Worldwide Filing Services, Inc.
Statewide Associates Group
Westcoast Filing Services, Inc.
Southcoast Filing Services, Inc.
Irvine Group and Associates

None of these entities was used to hide proceeds or to insulate us from liability. Indeed each of the bank accounts were opened in local branches of Citibank or Bank of America.

36.     We had engaged in conversation about this new model and the start-up package, with most of our managers and although no formal agreement had taken place yet, many were on board so we continued to operate with this new structure in mind. We hoped to sell many of these start-up packages to them and have the new entities as a customer base to which we could sell more debt.

37.     However, on October 13, 2011, before this new model could materialize, the FTC served us with their complaint, seized our entire business, and froze all of our accounts, business and personal.

### Our Collection Activities

38.     I have reviewed the declarations provided by the FTC that reflect approximately 105 complaints to that agency or the Better Business Bureau and agree that the statements reflect conduct which, if true, would violate the FDCPA.  While we stressed in our monthly meetings with managers the importance of following the law, there are sufficient complaints that demonstrate that some collectors did not abide by the rules. But I do not believe that this was a sustained protocol in the offices and I also believe that it was not widespread. Based upon the facts that follow, I believe that it was caused by some renegades. We grew too fast and we used some bad collectors. People drafted and exchanged bad scripts, but they were not provided by management. The FTC makes much of one post-it note on one wall above a work-station that I was not aware of, very small and hand-written, stating that collections in that company were not governed by the FDCPA.  We were governed by the FDCPA and take responsibility for the lack of compliance that apparently occurred to what I believe was a very limited extent at some offices in our organization.

39.     However, I never used a script, and never authorized use of one that violated the law.  My partner, Wayne Lunsford, has a background in debt collection and based on our three-year working relationship and our on-going discussions, I do believe he has violated the law as the FTC alleges.  None of the many, high volume debt collectors who have submitted declarations operated in that manner. As their declarations show, they collected within bounds and indeed ended up with

many customers who appreciated getting the discounted debt behind them, along with a "paid in full" letter we sent to them. They frequently expressed their gratitude.

40.    At a hearing, as many of these collectors as the Court wished us to present would be available to testify. We believe that the number of FDCPA-compliant collectors far exceeds those who acted badly. And while I am told that the FTC can frequently impose liability on us as supervisors or owners for violations of the FDCPA for the proper amount of ill-gotten gains from such violations, and that the Court need only determine that amount by reasonable approximation, the small number of complaints by people who actually paid their debts casts substantial doubt on by the FTC claims that this was a wholesale and systematic violation.

41.    The FTC identifies 105 complaints (only 47, referring to 43 debts, were sworn) over the two years this investigation has been going on. To begin with, my attorneys have not yet been able to cross-examine any of the complaining debtors about memory, motive (there is a civil lawsuit pending and we are a target of a smear campaign by a website), mistake, and possible misidentification of the debt-collection company. Moreover, and we think more importantly, 105 complaints is the most compelling argument for relaxation of the current injunction because, as is shown by our stored Simple Collect data which I summarize here from voluminous documents that can be reviewed by the FTC electronically or in hard copy if they wish to print them:[3]

---

[3]    Simple Collect is a data entry and retrieval process that captures every call made and ties it to the debt about which that call is made. The collector opens the data base and locates a debt in our system, since all have entered into the computer when they are purchased by us. The name of the debtor, his or her contact information, the account number and the type of debt entered. Then, any time a call is made, the information learned from that call is also entered. So if a debtor does not answer, hangs up, says he has declared bankruptcy or has hired an attorney, or makes an agreement to pay, or says he will call back, or to call him back, that is noted in the computer. The next time that debt is retrieved, the data will inform the collector of the history. Once a debt has been settled, that is noted and that debt goes to a different part of the data base so that callers will not call again. That new data place will track the debt payments and trigger a flag on the debt if it is not paid as agreed, whereupon the computer will place that debt in a follow-up file so someone

(i)   Our collectors made *674,811* calls in the year 2011 which resulted in a conversation between a collector and a debtor, meaning that the ratio of total complaints (105 for two years)  to completed calls (in 2011 only) is 1 complaint for every 6427 calls, or 0.00155%.

(ii)  The ratio of <u>sworn</u> complaints (47, on 43 debts) to completed calls where discussions took place is much lower, since there were fewer sworn complaints:  1 complaint for every 15,693 conversations, or  0.006372%.

(iii)  Calls in 2011 resulted in 29,089 separate agreements by which debtors agreed to pay a part of their debt.  This means that *4.3*% of those with whom we made phone contact made a payment agreement. This also means that for every person who complained under oath, more than 600 persons agreed to make payment on their obligations without complaint about our collection process. We believe that this supports our position that the vast majority of our collectors did not violate the FDCPA.

42.      These numbers are in line with the declarations provided by the collectors who have submitted them. Moreover, while the FTC presented one, handwritten, small post-it note found on one wall above one computer work station in one part of one office suggesting that the FDCPA did not apply, it did not identify the owner or writer of the note and did not present to the Court the standard form non-disclosure agreement that we asked our collectors to read and sign. A copy of it is annexed as *Exhibit B* and provides in part, in section 10.1:

> Improper Use of Personal Information
>
> As part of Contractor's services, Contractor will be provided access to Accurint software, which grants Contractor access to databases containing certain debtors' personal information.  Contractor agrees and acknowledges that any personal information obtained in

---

can call he debtor. By this system we can tell exactly how many calls were made and how many calls resulted in any particular result.

Case 5:11-cv-01623-VAP-SP   Document 45-1   Filed 12/21/11   Page 20 of 26   Page ID #:2008

connection with any services Contractor provides to Company, including information obtained through the use of Accurint or similar software, will be used in accordance with the State and Federal Fair Debt Collection Practices Acts and not for any improper purpose. . . .

Each collector is required to sign the Non-Disclosure Agreement in order to be eligible for payment of commission.  All signed agreements are in the Montecito Avenue office under the control of the Receiver.

### The Actions of the Receiver, the Need for Court Oversight, and the Personal Hardships Imposed

43.     While Mr. Weissman has been appointed by this Court as a Receiver, there has been no trial and the FTC has not proven its case against us.  Based on only 47 declarations under oath, that reflect total payments of only $3,936.90, the FTC and the Receiver have seized business and personal assets in excess of $6 million, including $2.5 million in cash.  At the same time, Mr. Weissman is systematically ruining our businesses, even those that are not related to debt collection.  He is depriving Wayne Lunsford and me, and the people who worked for us, the ability to support themselves and their families.  He is ruining my credit by not paying bills as to which I have given a personal guarantee.  He has not paid utility bills so that telephone and internet service to our main office has been turned off.  He has not taken control of the offices that we were renting, allowing the disappearance of furniture and equipment.  He has not paid rents or made arrangements for termination of leases on which I have personal guarantees, has advised me that he will not make timely payments of California employment tax contributions, and is moving ahead to liquidate our business and personal assets.  We respectfully request that this Court order the Receiver to sustain our businesses, not destroy them, pay $150,000 to each of us so that we can stabilize our personal finances and provide for our families pending the resolution of this case, and

20
Declaration of Jason R. Begley

allow us to manage our personal affairs without oversight, pending further hearing on the need for and actions of the Receiver.

44.    Wayne Lunsford and I have cooperated fully with the Receiver and have provided him with information about all bank accounts, entities, business operations and expenses, and everything else he has asked for.  In exchange, he has accused us of looting our businesses for our personal benefit while he has failed to continue to operate our businesses in a commercially reasonable way, has exposed me to personal liability on guarantees of business debts, and has caused my credit rating to be irretrievably harmed, which will in turn impact my ability to continue to build businesses in the coming years.  Specifically, Mr. Weissman suggested to this Court in his First Report Re: Order to Show Cause (Document 30), at paragraph 30, that we were making "preference distributions" to ourselves, without noting that all business debts were current.  Next, he alleges, in paragraph 32, that the business could not be restarted "particularly in light of the alleged $696,000 in commissions claimed to be payable and **inadequate funds to pay them"**. [Emphasis added].  That is absolutely false. We provided Mr. Weissman with information on our operating account which, at the time he seized it, had over $800,000 in cash, designated for payments to our managers and collectors, payments he has not made.  Instead, those funds are now available to pay the Receiver's fees, travel expenses, and payments to security details and forensic accountants.

45.    Furthermore,  while he has been provided with a list of all properties that we have rented in connection with our collection enterprises, in California and one in Iowa, as of December 7  Mr. Weissman had not visited each site or made contact with the landlords. *See Exhibit C.* We have personal property remaining at sites at which the Receiver has not paid rent, and we believe

that computers have in fact been stolen from at least one office that was not secured.   The Receiver has failed to pay rents due on leases that are personally guaranteed by me.  I have forwarded demands from landlords to him, and am advised that he has failed to respond to inquiries from landlords and their counsel, as evidenced by emails attached to this declaration as *Exhibit D*.  On December 7, 2011, pursuant to an advance arrangement with Mr. Weissman and the FTC to view documents at our Montecito Avenue office in order to assist in completing additional financial forms, I was unable to review leases to determine the potential extent of my personal liability on these guarantees. The leases had been removed from the premises by the Receiver and were unavailable, despite a specific request having been made by my counsel to the FTC that all documents be available at the premises.  At the time of that visit, Mr. Weissman was not present, but had assigned two security guards to oversee my visit with my attorney and Ms. Segura of the FTC.

46.     As discussed above, collection of amounts due under repayment agreements is on-going, and the bulk of funds collected, approximately $400,000 per month, was collected via credit or debit card payment through our merchant bank, PayTek, Inc.  After the Receiver took over and froze our bank accounts, I was notified by PayTek that it was unable to process an automatic debit of $42,000, which it was owed for its services to date, and which it generally was paid through automatic debit.  I advised Mr. Weissman of this obligation, but it was not paid soon enough, PayTek terminated our service, and automatic payments have gone uncollected.  Essentially, our business has been shut down.  Payments made by check, a relatively small percentage of our collections, have, on information and belief, been diverted to the Receiver for processing. We have not received any accounting for such payments.

47.     Not only have the actions of the Receiver decimated our business and credit, businesses with whom we do business are also being harmed.  One of our primary debt brokers, BAL Financial, has contacted us by email and telephone several times to complain that they have not been paid as agreed.  All emails have been forwarded to the Receiver.  Most recently, on December 14, 2011, I received the email attached as *Exhibit E*, notifying us that the broker is receiving an overwhelming number of calls from persons with whom the Rincon-related entities have entered into payment agreements, complaining about the absence of any way to reach us.  These callers include active duty service members.

48.  While we visited the Montecito office on December 7, I learned that the telephone and internet bills had not been paid, so that the two remaining employees had no telephone or internet service at the time of our visit.  Thus, any persons with on-going repayment plans who called for customer service could not get through.  Previously, during the two weeks that the office was closed after the Receiver took over, I am informed and believe that over 5,500 calls went unanswered in our corporate office, and am further informed that our charge-back rate through our merchant bank has skyrocketed from less than one per cent, a very low industry percentage, to over 5 per cent, and continues to grow.  Those who want to pay, and clear their credit, are precluded from doing so.  Further, for those who have made payments and to whom we promised "paid in full" letters, we are precluded form completing the transaction and issuing those reports for the benefit of credit reporting agencies.  Mr. Weissman has not assumed any of the responsibility for the on-going operation of our business, other than to collect cash.

49.  More recently, I have learned that Mr. Weissman has failed to pay Accurint, a Lexis/Nexis entity, for services for which we contracted relating to identification and location of

debtors. *See* Exhibit F. Our agreement with Accurint requires a minimum payment of $40,000 per month, which I personally guarantee**.** I have a similar personal guarantee for the services of Experian, a national credit reporting agency. Again, my personal reputation is being harmed by the inaction of the Receiver.

50.     On November 16, 2011, attorney Maricela Segura of the FTC advised our attorney, Sam Lockhart, that Wayne Lunsford and I would be paid living expenses for November and December.  November payments were made, but we did not receive the promised December payments until December 12, 2011, and then only after repeatedly requesting payment.  We have no commitment for continued payments beyond December.  Both Wayne Lunsford and I are the sole supporters of our respective families, and rely on this income to pay for family living expenses. While the Receiver suggests that we paid ourselves in preference to on-going business expenses, implying that we were somehow stealing from our companies, in fact we paid all of our debts when due, ran legitimate business enterprises, relied on the advice and assistance of reputable lawyers and accountants, owned 100 per cent of the businesses, and should be allowed to continue to support ourselves in a reasonable manner pending the resolution of this FTC action.  After all, Mr. Weissman is using the money we collected for his own expenses and business purposes.

51.   The money and property being marshaled by Mr. Weissman, and the on-going collections, are not all derived from the proceeds of our debt collection businesses.  I have come to learn that Mr. Weissman has contacted a realtor in Colorado to arrange for the sale of a home that I own there. *See Exhibit G.*  The house was acquired in 2004, five years before we became involved in the debt collection business at issue, and I understand it has no equity.   He is also moving ahead to liquidate our business property. See *Exhibit H.*

52.  To the extent the money being collected is from the debt collection business, the very collectors who obtained the agreements to pay those lawful debts are the same collectors who, because of their status as independent contractors, Mr. Weissman has refused to pay for their services.  As of the time the FTC took control of our business, we owed, **and had funds on hand to pay**, a "payroll" of approximately $700,000.00, due October 15, over 350 managers and independent-contractor collectors.  Our failure to pay those amounts due has resulted not only in undue hardship to the managers and collectors themselves, but threats against us and a harsh campaign against us on an internet website.  Confidential information taken from our private company databases has been published, including names of collectors and information about collections.  To our knowledge Mr. Weissman has taken no action to attempt to remove this information from the website or stop the threats against us or the companies he oversees.

53.  Mr. Weissman has complained to us that despite his requests, we have failed and refused to provide to him a business plan for continuing operation of our businesses.  First, Mr. Weissman uses multiple email accounts (rweissmanreceiver@gmail.com, rweissman@rwreceiver.com and RichardW@rwreceiver.com) and we are often left confused as to the best way to reach him.  Second, we provided him with a proposed business plan for PIF on October 25, 2011 (Exhibit I), when we believed we could continue to operate our businesses. Mr. Weissman rejected our business plan, and after several weeks went by, we determined that it was not feasible to attempt to restart those businesses.  We then decided we would stop managing retail debt collection and instead operate only as a debt broker, as we had been planning, and advised Mr. Weissman of our intention.  He nevertheless insisted that we provide "FDCPA-compliant" scripts to be used for debt collection operations before we could resume any business operations, despite

our repeated explanations that we would only be continuing to service existing agreements, not collect new debt. We have also advised Ms. Segura of the FTC that we are not interested in resuming the retail debt collection business, and thus would not be using any scripts.

54.     We would like resolve the FTC takeover as quickly as possible to stop the dissipation of our assets, particularly when we do not believe that the FTC's claims are adequately substantiated or are of anywhere near the scope alleged. We want to resume our non-debt collection businesses, resume paying our employees (Mr. Weissman cut office employee salaries to minimum wage), pay our debts and obligations, resurrect my destroyed credit, and set about to reestablish our businesses and take care of our families. We do not want our businesses liquidated, and do not believe the Receiver can justify such extreme actions.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of December, 2011 in Riverside, California.

Jason R. Begley