1   MARICELA SEGURA, CA Bar No. 225999
    RAYMOND E. MCKOWN, CA Bar No. 150975
2   e-mail: msegura@ftc.gov and rmckown@ftc.gov
    FEDERAL TRADE COMMISSION
3   10877 Wilshire Blvd., Suite 700
    Los Angeles, CA 90024
4   Telephone: (310) 824-4343
    Facsimile:  (310) 824-4380
5
    Attorneys for Plaintiff
6   FEDERAL TRADE COMMISSION

7                   UNITED STATES DISTRICT COURT
8                   CENTRAL DISTRICT OF CALIFORNIA

9

10  FEDERAL TRADE COMMISSION,          Case no. EDCV11-01623

11                          Plaintiff,
                        v.
12                                      OPPOSITION TO DEFENDANTS'
    RINCON MANAGEMENT              MOTION TO MODIFY THE
13  SERVICES, LLC, et al.          PRELIMINARY INJUNCTION
                                    ENTERED ON NOVEMBER 10, 2011
14                        Defendants.

15                                          Hearing:
                                    Date: Monday, January 30, 2012
16                                  Time: 2:00 p.m.
                                    Place: U.S. Courthouse, courtroom 2
17                                  3470 Twelfth Street, Riverside, CA
                                    92501
18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      The overwhelming evidence presented establishes that Defendants'
        violations of the FTC Act and the FDCPA were widespread and
        support the asset freeze ordered by the Court . . . . . . . . . . . . . . . . . . . 1

        A.      Defendants' documents and consumer statements establish that their
                law violations were widespread . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     The asset freeze as ordered by the Court is appropriate and should
        not be modified . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      The potential amount of consumer redress and disgorgement far
                exceeds the amount of money contained in Defendants' frozen
                accounts; thus those assets should be preserved . . . . . . . . . . . . . . . 6

        B.      The asset freeze is well-founded as a likelihood of dissipation of
                assets has been shown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        C.      A cash disbursement of $300,000 to Defendants for living expenses is
                unwarranted and unsupported by the applicable case law . . . . . . . . 9

        D.      Equity does not favor paying collectors for their wholesale violation
                of the law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.    The Receiver's role should not be limited and Defendants should not be
        allowed to take control of their business or assets . . . . . . . . . . . . . . . . . . 11

        A.      Defendants should not be allowed to resume control of the business or
                their assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.      The Receiver should be allowed to scale-down Defendants' operation
                given that they no longer want to continue commercial debt collection 12

        C.      Defendants have not been cooperative with the FTC and the Receiver 14

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1

TABLE OF AUTHORITIES

2

Case:                                                                    Page (s)

3
*FTC v. Amy Travel Service, Inc.,*
     875 F.2d 564, 572 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4
*FTC v. Gem Merch. Corp.,*
5    87 F.3d 466, 469 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

6
*FTC v. Kitco of Nevada, Inc.,*
     612 F.Supp. 1282, 1293-94 (D. Minn. 1985) . . . . . . . . . . . . . . . . . . . . . . . 2

7
*In re Nat'l Credit Mgt. Grp.,*
8    21 F.Supp.2d 424, 442 n.31 (D.N.J. 1998)   . . . . . . . . . . . . . . . . . . . . . . . . 4

9
*Johnson v. Couturier,*
     572 F.3d 1067, 1085 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

10
 *SEC v. ETS Payphones, Inc.,*
11    408 F.3d 727, 734 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

12
*SEC v. Forte,*
     589 F.Supp.2d 689, 693 (E.D. Pa 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

13
*SEC v. Private Equity Mgmt. Group,*
14    2009 WL 2058247 *3-4 (C.D. Cal. 2009)  . . . . . . . . . . . . . . . . . . . . . . . 9, 10

15
Statute:

16
15 U.S.C. § 1692g(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**I.      The overwhelming evidence presented establishes that
Defendants' violations of the FTC Act and the FDCPA were
widespread and support the asset freeze ordered by the Court**

3

      A.      <u>Defendants' documents and consumer statements establish that their
law violations were widespread</u>

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

      In issuing the preliminary injunction at the hearing on November 7, 2011, the Court reviewed, in detail, the voluminous evidence of Defendants' violative collection practices, including Defendants' standard talk off scripts, closing scripts, collector rebuttal answers to frequently asked questions, and legal resources guiding collectors in how to best menace consumers with the legal process.  These scripts and guidelines all support the central deception perpetrated by Defendants, that the consumer is a defendant in a lawsuit and must pay their purported debt to settle the action.  The scripts were contained in employee handbooks that were found in Defendants Jason Begley and Wayne Lunsford's office at the corporate headquarters (docket ("dkt") # 25-1 p.23–25-4 p.9), in managers' offices at some of the collections rooms (dkt # 25-4 p.10, 25-1 pp. 6-7), and numerous loose leaf copies of these scripts and guidelines were found on collectors' desks at the four offices the FTC entered on October 13 and 14, 2011 pursuant to the temporary restraining order ("TRO.").  *See e.g.,* dkt ## 25 pp.6-7.  Copies of these same scripts, rebuttals, and legal resources were also found at four additional offices run by Defendants that FTC investigator Ann Stahl visited in late December 2011, while accompanied by one of receiver Richard Weissman's staff members.  *See* third declaration of Ann Stahl ("third Stahl dec.") ¶¶ 9-29, Attachments ("Att") 3-21.[1]  These deceptive scripts and guidelines were the <u>only</u> scripts and guidelines

22

23

24

25

26

27

28

    [1]  The scripts and other collector instructions were not found at the office located at 1181 California Ave., Suite 203, which appeared to have been cleared of documents.  *See* third Stahl dec. ¶ 10.  The FTC did not inspect the office located in Cedar Rapids, Iowa because that office was shuttered  in October 2011, when the lease purportedly expired.  The computer equipment that was contained at the Iowa office was later obtained by receiver Richard Weissman and shipped to Los Angeles.  Declaration of FTC counsel Maricela Segura ¶ 5.

1    found in Defendants' offices and squarely establish that it was their pattern and
2    practice to collect debt in violation of the FTC Act and the FDCPA.

3          In addition to Defendants' own documents, the Court also considered the
4    dozens of consumer declarations and hundreds of complaints from consumers
5    victimized by Defendants' illegal collection scheme. *See e,g.,* dkt ## 6-6-9, dkt #7
     pp. 9-12. The consumer complaints alone, which were submitted against numerous
6    entity names, all run by Defendants, show that the illegal collection practices
7    alleged in the FTC's complaint were widespread. These consumer declarations
8    and complaints provided sufficient basis upon which the Court inferred a pattern
9    and practice of deceptive and abusive behavior by Defendants, and upon which the
10   Court issued the preliminary injunction. *See FTC v. Kitco of Nevada, Inc.*, 612
11   F.Supp. 1282, 1293-94 (D. Minn. 1985); *FTC v. Amy Travel Service, Inc.*, 875
12   F.2d 564, 572 (7th Cir. 1989).

13         Now, in what is in effect a motion for reconsideration, Defendants claim that
14   the asset freeze, as ordered, is not supported by the evidence. In their motion,
15   Defendants do not claim that the FTC's case is an issue of mistaken identity, that
16   the scripts and guidelines presented by the FTC were forged, or that the documents
17   were not used by collectors they employed. Instead, Defendants take issue with
18   the extent of the deceptive practices taking place in their offices, which they admit
19   did occur. In support of their motion Defendants submit 16 cookie-cutter
20   declarations from those they claim to be their prolific collectors (*see* Motion at 7,
21   Exhibit J) and a declaration from defendant Jason Begley to argue that the
22   violations that did take place were *de minimus*. Motion at 14.[2]

23         What is most telling about these declarations is not what they say, but what
24   they do not say. None of these declarations attaches a copy of a script or guideline
     compliant with the FDCPA that was widely used by Defendants' collectors. Nor
25

26         [2] Submitted in support of the FTC's Opposition is the declaration of
27   Defendants' former collector Ted Gay, who worked for Defendants from July 2009
     to approximately January 2010. Mr. Gay describe the script he was told to follow
28   during his employment as a "dialer" for Defendants which is substantially similar
     to the initial talk off script submitted by the FTC.

2

do they discuss the details of any training program provided to Defendants' collectors concerning compliance with the FDCPA.  On this point, Mr. Begley's declaration states simply that they "reminded" managers that collectors should comply with the law.  Begley ¶ 7.  In addition, he admits that some collectors did not abide by the rules, that they used some bad collectors, and that they drafted and exchanged bad scripts, but that those scripts were not provided by management.  Begley ¶ 38.[3]  Mr. Begley's finger-pointing, however, flies in the face of the stubborn fact that these "bad" scripts were the <u>only</u> scripts found throughout Defendants' offices and were the only scripts included in employee handbooks found in the very office that he and Mr. Lunsford shared.  *See* dkt # 25-1 p.23, 25-3 p. 13, 25-3 p.47.[4]  Even assuming that defendants Begley and Lunsford did not openly condone the use of these scripts, they notably did not take any corrective measures to bring "bad" collectors into compliance with the law.  Begley and Lunsford were well-aware that their collectors were engaging in violations of the law because they had copies of the numerous lawsuits, Attorney General complaints, cease and desist letters, and judgments issued against their numerous entities in their corporate office.  *See e.g.,* dkt # 25-7 pp. 2-57 (Stahl Att. 26 (Attorney General complaints)), dkt #25-7 pp. 59-79 (Stahl Att. 27 (cease and desist letters)), dkt #25-8 pp. 21-55 (Stahl Att. 29 (BBB complaints)).  Indeed,

---

[3]  Mr. Begley also said the following about Wayne Lunsford:  that he has a background in debt collection, and that "based on our three-year working relationship and our on-going discussions, I <u>do</u> believe he has violated the law as the FTC alleges."  Begley ¶ 39.  Whether a typo or not, the sentiment is supported by the evidence establishing Defendants' widespread violations of the FTC Act and the FDCPA.

[4]  One of these handbooks was found in Mr. Lunsford's desk and was for a company called Irvine & Associates.  *See* dkt 25-1 p.5 (Stahl ¶ 11), dkt #25-3 p.47 (Att. 4).  This is one of the collections companies Defendants formed and hoped to sell to collectors as part of a "turn-key" collection operation.  *See* dkt 45-1 pp. 15-16 (Begley ¶¶ 34, 35).  Presumably, the handbook and scripts were part of that turn-key package that Defendants were hoping to sell.

1
2
3
4
5
6
7
8

Begley engaged in his own deception in some of his own responses to Attorney General complaints in which he stated *"National Filing Services is a filing service, we do not make outbound calls, nor do we ever disclose any information to a third party[.]" See e.g.,* dkt #25-7 pp. 17, 33, 37 (emphasis added).  Neither Begley nor Lunsford did anything to stop the illegal collections practices that they knew were rampant throughout their companies.  Instead, they benefitted handsomely from the money earned through the scheme.  *See e.g.,* dkt#32 p. 9 (noting that Begley and Lunsford swept over $2.2 million of company funds into their trusts, and another $1 million into their individual consulting businesses).

9
10
11
12
13
14
15
16
17
18

Moreover, neither Mr. Begley's declaration, nor the declarations submitted by the 16 collectors, set forth any evidence that Defendants sent validation notices to consumers or provided verification of the debt to those consumers who disputed their debt.  *See* 15 U.S.C. § 1692g(a).  On this issue, the only evidence before the Court are consumer statements that they did not receive validation notices, and/or verification of their debt.  *See e.g.,* dkt #4 p.22-23, third Stahl dec. ¶ 16, Att. 8, ¶ 28.  In short, the overwhelming evidence establishes that the law violations alleged in the FTC's complaint were an integral part of Defendants' business model, that these practices were widespread, and the preliminary injunction entered by the Court was appropriate.

19
20
21
22
23
24
25

Instead of responding to the evidence presented by the FTC, Defendants rely on the fall-back argument that there was a low ratio of consumer complaints relative to the calls made by collectors.  Defendants argue that this ratio  proves that they did not engage in widespread violations of the FTC Act and the FDCPA.  Motion at 9-10.  Defendants further claim that they had a credit card charge-back rate, which they claim indicates that most of their collections were in compliance with the law.  Motion at 5 n.3.  Even assuming arguendo, that Defendants' numbers regarding the ratios are correct, their argument fails.

26
27
28

First, complaints filed with consumer protection agencies often represent many other consumers who do not complain.  *See e.g., In re Nat'l Credit Mgt.*

4

1  *Grp.*, 21 F.Supp.2d 424, 442 n.31 (D.N.J. 1998) (more than 200,000 consumers

2  subjected to deceptive practice although complaints totaled only 280).  Second,

3  even if  many consumers did not complain to consumer protection agencies, this

4  does not establish that Defendants' collectors followed the law, it only establishes

5  that many consumers did not file complaints with consumer protection agencies.

6  As discussed above, many consumers bypassed that complaint process and instead

7  wrote cease and desist letters to Defendants themselves, or hired attorneys to do

8  this for them.  This also does not count the consumers who tried to resolve their

9  problem by talking to Defendants' managers over the phone.  While Defendants

10  repeatedly claim that the FTC submitted only 105[5] consumer complaints, they are

11  silent on the numerous letters, lawsuits,  and Attorney General complaints their

offices received directly.

12       Finally, even if Defendants did have a one percent credit card charge-back

13  rate as they assert, it does not prove they have complied with the law.  Indeed, a

14  low charge-back rate makes particular sense in light of the facts of this case.  As

15  evidenced by the scripts, consumers who agreed to pay Defendants were under the

16  impression that they were settling a lawsuit.  Indeed, Defendants provided

17  consumers with "Offers of Settlement," some of which stated, "Our client agrees to

18  accept in full the sum of [$_____].  Upon receipt of certified funds and

19  authorized signature, we will file dismissal of the action."  *See* dkt #25-7 at p. 52.

20  Consumers who have paid to settle a lawsuit are very unlikely to charge back the

21  settlement payment because doing so would only cause the other party to reinstate

22  the lawsuit.  Indeed, one of Defendants' settlement agreements dated October 11,

23  2011, just days before they were served with the TRO, contains a note from a

24  consumer confirming that she understood she was settling a lawsuit.  The note

25

26  [5]  In support of the TRO, the FTC summarized 213 consumer complaints
made to the FTC (*see* dkt #7 pp. 4-12 (Gale dec. ¶¶ 4-1), and later submitted

27  numerous Better Business Bureau complaints against a number of other entities
Defendants' controlled.  *See* dkt 25-1 p.13, #25-8 p. 20.

28

states: *"as agreed you will not continue with this pending litigation as long as commitment is fulfilled . . . [p]lease also provide pending court case # & circuit court papers are filed in [t]hank you for your assistance."* third dec. Stahl ¶ 8, Att. 7. We assert that this is <u>not</u> the type of consumer who would turn around and request a charge back. It simply would make no sense in light of the transaction. Thus, Defendants' purportedly low charge back rate does not establish that they have complied with the law.

**II.     The asset freeze as ordered by the Court is appropriate and should not be modified**

Defendants' request that the Court order the release of nearly $1 million from the approximately $2.5 million that has been frozen should be denied. Defendants' argument that they are requesting release of only 5% of the total assets frozen by the Court is misleading. Motion 2.[6] They are actually requesting the release of approximately $996,000 to be distributed as follows: $150,000 for each of the two individual defendants, and approximately $696,000 to pay the collectors' payroll that was due around mid-October. *See* Motion at 2, 3, *see also* dkt #30 at pp. 4, ¶ 7, p.11, ¶ 12 (receiver's report). Defendants' argument in support of releasing nearly 40% of the $2,500,000 of the money frozen in Defendants' bank accounts are essentially twofold: (I) that the violations which occurred were so minimal that the value of the assets frozen potentially exceeds the amount needed for consumer redress (Motion at 2, 9-10, 13-14), and (ii) the finding that there was a likelihood of dissipation of assets, or other inability to recover money damages, was in error. Motion at 19, 20. Both of Defendants' arguments fail.

---

[6] Defendants also add into the equation estimates for other assets held by Defendants, such as the uncollected debt portfolio, the accounts on payment plans pursuant to settlement agreements, and the value of the office equipment from their various offices. Two of these items–the value of the debt portfolio and the office equipment–are unsupported estimates, because to the FTC's knowledge there have been no appraisals made of the resale value of these items.

A.      The potential amount of consumer redress and disgorgement far exceeds the amount of money contained in Defendants' frozen accounts; thus those assets should be preserved

As discussed above, Defendants have not established that their law violations were *de minimus*.  They simply have not, and cannot refute the consumer complaints and the company documents showing that it was Defendants' pattern and practice to deceive consumers into believing that they were defendants to a fictitious lawsuit.  Nevertheless, even if we assume that some of their collections were done legitimately, the potential judgment amount  would still likely exceed that amount of money that has been frozen pursuant to the preliminary injunction.  The Receiver has stated estimated that the amount of money Defendants have taken in during the time they have been in operation is approximately $21 million.  Dkt #30 at p. 4, ¶ 1.3.B.  Mr. Begley puts this number at approximately $13 million.  Dkt #45-1 p. 8, Begley dec. ¶ 17.  Taking Mr. Begley's total revenue figure of $13 million as a starting point, without conceding its accuracy, even if we assume for the sake of argument that only one fourth of Defendants' collections were conducted illegally, this would still bring the total judgment amount to approximately $3.25 million.  This is in excess of the money that has been frozen, which must be preserved for redress to Defendants' consumer victims.  Moreover, as discussed above, given that the illegal scripts and collector instructions were found throughout their business premises, there is simply no basis to assume that most of their collection business has been conducted in compliance with the law.

B.      The asset freeze is well-founded as a likelihood of dissipation of assets has been shown

The asset freeze imposed by the Court was warranted because the evidence shows that Defendants are likely to conceal, dissipate, or otherwise divert their assets without an asset freeze.  *See Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).

At the hearing on the preliminary injunction, the Court considered the

7

voluminous evidence that Defendants use the corporate form, multiple bank accounts, and trusts to shield themselves, their assets and their activities from the reach of any enforcement action. *See e.g.,* dkt 25-1 pp. 7-10 (Stahl ¶¶ 18-21, Atts. 9-25, ¶ 26-28, Atts. 29-30), docket #25-11 pp. 5, 7-8 (Second Gale ¶ 10, 15, 16, Atts. 7, 14, 16)), #25-2 p.32 (Lunsford email to Huck regarding adding 11 new dbas to existing companies); *see also* Second Stahl dec. ¶ 2, Att. 38 (corporate organizational chart). While Begley tries to explain the numerous entities, dbas, and offices as the result of their company's "rapid growth," (dkt #45-1 Begley dec. ¶ 20), he does nothing to explain why he and Mr. Lunsford could not continue their growing collection business under one company instead of 20 different companies in several different locations. Moreover, the structure makes no sense given that Defendants purchased debt through one company–Portfolio Investment Group, LLC (*id*. Begley dec. ¶ 27), and that another company–Portfolio Investment Financial, LLC–took in all the funds from the various collection company bank accounts, which left those companies underfunded. *See* Dkt #30-1 Schultz report at p.8. The structure of Defendants' complex web of multiple bank accounts and entities shows that Messrs. Begley and Lunsford sought to insulate themselves from liability, while allowing them the ability to control the cash flow and divert substantial amounts of money to their personal trusts. *See id*. (Schultz report p. 8).

More importantly, the FTC has presented evidence that Defendants have already dissipated company assets. For the period Defendants' have been in operation, Messrs. Begley and Lunsford have siphoned off over $2.2 million into trusts that they own *(*dkt # 7 pp. 25-26 (Gale ¶ 45 (calculating over $1.2 million paid to Skyridge Legacy Trust controlled by Begley), Gale ¶ 45 (calculating over $1 million paid to WAL Legacy Trust controlled by Lunsford)), and another $1 million into their personal management and consulting companies. *See* docket # 7-4 pp. 38-45 (Gale Att. 28), docket #7-4 pp. 47-50, 7-5 pp. 1-3 (Gale Att. 29).

With respect to the money in Defendants' trusts, attorney Samuel Lockhart

8

told this Court that the money had not been diverted or dissipated and was sitting in the bank accounts held by Messrs. Lunsford's and Begley's trusts.  Not so. Segura dec. ¶¶ 8-10.  After the preliminary injunction hearing, the FTC learned that approximately $787,000 from the bank accounts held by the trusts was provided to a firm called Brylaw for a Brazilian bond investment.  Segura dec. ¶ 10, Att. 3; *see also* Motion at 15.  Demand was made to Defendants to deliver to receiver Richard Weissman documentation regarding the Brazilian bond venture. Segura dec. ¶ 10, Att. 4.  Defendants have not provided any documentation concerning the purported Brazilian bond investment, but instead told FTC counsel that this was done pursuant to a "hand shake" deal. *Id*. ¶ 10.  Nor have Defendants executed any documents to effectively transfer control of the purported investment to Mr. Weissman.  *Id*. at ¶ 11.   Whether this investment is real or fictional, the result is that $787,000 in money obtained from the defendant business entities is no longer available for consumer redress.

C.    A cash disbursement of $300,000 to Defendants for living expenses is unwarranted and unsupported by the applicable case law

Defendants Jason Begley and Wayne Lunsford argue that each of them should be provided $150,000 of the frozen funds because a trial has not been held on the merits and they need the money to care for their families.  Motion at 2. Defendants' request is not supported by the facts of this case, or the applicable law.

First, what the motion fails to highlight is that the FTC has already released funds for living expenses for November and December 2011, and is currently in discussion with defense counsel for a potential release of living expenses in January 2012.  Segura dec. ¶¶ 12, 13 Att. 5.[7]  The money released to Defendants

---

[7] Defendants' request that the Court direct the receiver to pay all debts, including "mortgage payments" and "car payments" is an overreach given that the Defendants have already received cash disbursements for November and December 2011 to cover some of these expenses.

1   for living expenses, which was agreed to by the FTC, was based on actual

2   reasonable and necessary living expenses substantiated by copies of bills provided

3   by Messrs. Begley and Lunsford.  Counsel for Defendants and counsel for the FTC

4   went over the expenses line by line and determined which expenses were

5   reasonable and necessary, and which expenses were not.  *Id*. ¶ 12.  Money was

6   therefore released to Defendants to pay their property taxes, mortgages, insurance,

7   reasonable car payment, health insurance, and each was provided with a food and

8   household expense allowance, among other things.  *Id*. ¶ 12.  The process engaged

9   in by the parties was more than fair and provided Defendants with an adequate

10  amount of money to meet their reasonable and necessary living expenses.

11          Second, the primary purpose of an asset freeze is to preserve assets to assure

12  complete and meaningful redress for injured consumers at the conclusion of the

13  case.  *See SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005) (asset

14  freezes are particularly critical in cases in which funds obtained through fraud must

15  be preserved in order to provide for the possibility of effective final relief); *FTC v.*

16  *Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996).  Thus, courts that have

17  addressed requests for release of living expenses from frozen funds have balanced

18  defendants' interest in having money to pay for living expenses against the

19  government's interest in preserving potentially forfeitable funds.  *SEC v. Forte*,

20  589 F.Supp.2d 689, 693 (E.D. Pa 2009).  Courts have also considered whether the

21  living expenses requested by defendants are reasonable and necessary, and have

22  routinely denied a release of funds to pay for luxuries.  *See Forte*, 589 F.Supp.2d

23  689, 693-94 (E.D. Pa 2009); *SEC v. Private Equity Mgmt. Group,* 2009 WL

24  2058247 *3-4 (C.D. Cal. 2009).  Courts have also denied requests for living

25  expenses where no documentation has been submitted specifying or verifying the

26  amounts requested.  *See Forte*, 589 F.Supp.2d at 694.

27          Here, Defendants' request for a blanket release of $150,000 each from the

28  frozen accounts is unreasonable and unsupported by the law.  Any release of funds

from frozen assets must be tied to actual reasonable and necessary living expenses, which Defendants' request is not.  Their mere wish to rid themselves of the FTC's interference in their personal lives is simply an insufficient basis to release such significant amounts of money.  Moreover, the preliminary injunction does not apply to lawfully obtained after-acquired assets.  Dkt #40 at p. 11 (Preliminary Injunction Section II.D.)  Providing Defendants with a blanket release of money takes away any incentive they may have to find lawful employment, or run a legitimate business.  In addition, Defendants have not been left to fend for themselves, have already received a disbursement of funds for living expenses for the last two months, and are in discussions with the FTC regarding a potential release of funds for January 2012.  Thus, the FTC respectfully requests that the Court deny Defendants' request for a release of $300,000 to them for living expenses.

> D.     Equity does not favor paying collectors for their wholesale violation of the law

In their Motion, Defendants also renew their request that the Court order Receiver Richard Weissman to pay commissions due collectors as of the date he took over the business premises.  Motion at 3, 13.  These commissions are estimated to be $696,000.  Dkt #30 at pp. 4, ¶ 7, p.11, ¶ 12 (Receiver's report).  In balancing the equities, the collectors' interest in receiving payment for calling consumers and menacing them with a fictitious lawsuit does not outweigh the consumers' interest in full and effective relief.  This is especially true where evidence has been presented to show that Defendants deceptively attempted to collect non-existent debts.  Dkt #4 p. 19 (TRO Memo), *see also* dkt #25 p. 10 (supplemental brief in support of the preliminary injunction).

**III.    The Receiver's role should not be limited and Defendants should not be allowed to take control of their business or assets**

Defendants argue that the Receiver's role should be limited because,

11

1   essentially, despite their complete cooperation with him from the beginning of this

2   action, he has failed to take actions, such as securing premises and paying leases,

3   which has caused harm to the business.  Motion at 10-11.  Defendants further argue

4   that they should be allowed to resume control over their business and assets, and

5   that the Receiver should be barred from liquidating any assets.  Motion at 4, 5. As

6   discussed further below, Defendants are wrong and their requests should be denied.

7       A.   Defendants should not be allowed to resume control of the business
             or their assets

8   Defendants' request that they be allowed to "resume control" over their

9   business and personal assets (motion at 4), and that the Court should enjoin the

10  Receiver from selling business assets should be denied.  As the FTC argued in its

11  reply in support of the preliminary injunction, given Defendants' track record of

12  law violations, their attempts to evade detection by forming multiple entities and

13  dbas, and as discussed their role in dissipating company assets, there is simply no

14  basis to hand the reins of the business back over to Defendants.  *See* dkt 32 p. 13-

15  14.  The overwhelming evidence clearly establishes that Defendants have never run

16  a legitimate debt collection business and that they have directed collectors to

17  engage in illegal activity for their benefit.  *See e.g.,* dkt #32 at pp. 13-14.

18  However, even if we took Defendants' version of events as true–that their business

19  grew to fast, that they used bad collectors, but did not direct the bad behavior (*see*

20  dkt 45-1 p.17 (Begley ¶ 38)–the conclusion is the same:  Defendants are incapable

21  of running a lawful debt collection business.  Thus, Receiver Richard Weissman's

22  control is needed not only to preserve assets and the status quo for the pendency of

23  the action, but also to ensure that no further violations of the law occur.

24      B.   The Receiver should be allowed to scale-down Defendants' operation
             given that they no longer want to continue commercial debt collection

25  Defendants first stated to the FTC that they did not want to continue in the

26  commercial debt collection business on or around December 7, 2011, and have

27  restated that position in their motion.  *See* dkt #45-1 p. 26 (Begley ¶ 53).  Segura

28

12

¶ 14.  Prior to this point, Defendants expressed that they wanted to continue collecting debt on a scaled-down basis under Mr. Weissman's supervision, but that this did not happen because they did not submit a business plan that the Receiver considered viable or FDCPA-compliant scripts.  Segura ¶ 14, Att. 6.  Nevertheless, under either scenario–the no debt collection plan, or the scaled-down plan–it is clear that the receivership no longer requires leases on eight separate offices throughout Corona and Riverside.  Nor does it require the amount of office equipment that is currently being held in these idle offices.  Though it makes sense, from an asset preservation standpoint, to scale-down the business operation, Defendants argue that the Receiver should not be provided the authority to liquidate any part of the business.  Motion at 5.  Defendants' position is indefensible because forcing the receivership to hold excess unused computers and furniture until the case is resolved will result in a needless waste of resources that should be preserved for potential redress and disgorgement.

Defendants' argument that Mr. Weissman does not have the knowledge or experience to sell off aspects of the collection business is unpersuasive.  First, as Mr. Weissman's legal biography makes clear, he does have experience in "operating and liquidating debt collection agencies" in his prior role as California State Conservator for the Department of Consumer Affairs.  Dkt #15 p.5.  Second, on a call with counsel for the FTC and defense counsel, Mr. Weissman invited Messrs. Begley and Lunsford to work with him to obtain the best possible sale price for the portfolio of debt that had not been collected.  Segura ¶ 15.  Selling the debt portfolio made sense in light of the fact that Defendants have stated they have no intention of resuming their commercial debt collection business.  However, as of yet, neither defendant has offered to assist Mr. Weissman in this manner.  *Id*. Defendants should not be allowed to needlessly roadblock the selling of receivership assets, and Mr. Weissman should be allowed to terminate leases for offices that are no longer in use, and sell unnecessary office equipment and

13

1   furniture.  Mr. Weissman should also be allowed to seek a purchaser for the yet

2   uncollected debt portfolio pursuant to prior due diligence regarding the debt

3   portfolio and the potential purchaser.

4          C.     <u>Defendants have not been cooperative with the FTC and the Receiver</u>

5          Defendants repeatedly state that they have been cooperative and have

6   provided full information about their business practices and the locations of their

7   businesses.  *See e.g.,* Motion at 11.  This is not true.  In fact, after the TRO was

8   served Defendants did not provide information to the FTC or the Receiver about

9   the five additional offices they operated, which has contributed to the loss of

10  evidence and receivership assets.

11         Shortly after the TRO was served on Defendants, counsel for the FTC were

12  told by counsel for Defendants that the FTC had entered all of their business

13  premises and that the collections businesses had been essentially shut down by the

14  TRO.  Segura ¶ 2.  However, Defendants at the time actually operated at least five

15  additional offices that the FTC and the Receiver did not enter–four in Riverside

16  and Corona, California and one in Cedar Rapids, Iowa.  Segura ¶¶ 3-5.  These

17  additional offices housed collections businesses, which included the entities

18  County Filing, Inc., Capital Filing, Inc., and Statewide Associates Group, which

19  Defendants argued were separate entities wholly owned by Defendants' former

20  managers.  Defendants did not provide the FTC with information about these

21  additional companies, but argued that the additional companies should not be

22  under order because they were not owned by Messrs. Begley and Lunsford.  *Cf.*

23  Segura  ¶ 3, Att. 1.

24         However, we now know from Mr. Begley's declaration that although it was

25  Defendants' plan to sell these additional entities to their managers as part of a turn-

26  key collection business, no formal agreements were in place, and the plan did not

27  materialize because of the TRO.  Dkt 45-1 pp.16-17.  The import of this statement

28  is that the additional companies were owned and operated by Defendants at the

time the TRO was served.  Thus, pursuant to the TRO, Defendants were required to

14

provide the FTC with access to the offices for these companies, and were required to provide the Receiver with full information about the companies. *See* dkt #5 p. 17 (TRO Section IX., p. 22 (TRO Secton XII), dkt #5 p. 23 (TRO Section XII.F). Defendants did not comply with these provisions of the TRO. Instead, Defendants continued to argue that these entities were wholly separate from Defendants' business up until the preliminary injunction was entered. This forced the FTC and the Receiver to make the showing through substantial evidence and analysis that the additional entities were in fact owned and operated by Messrs. Begley and Lunsford. *See e.g.,* dkt ## 25 pp.13-14, #30 pp.10-12.

Defendants' failure to comply with the TRO has done more than cause a waste of litigation time and resources, but has likely contributed to the loss of evidence and receivership assets. For example, on or around December 5, 2011, Mr. Lunsford contacted the property manager at one of the offices stating that there had been a theft at one of the offices. Segura ¶ 7, Att. 2.[8] The fact that some of the additional offices appeared to be cleared of equipment comports with FTC investigator Ann Stahl's observations during her visits of the four additional offices in late December 2011. *See* Stahl ¶ 29. This probably would not have happened had Defendants told Mr. Weissman about those locations back on October 13, 2011 when the TRO was served. Had Mr. Weissman been informed about these locations, he would have secured the premises and changed the locks as he did with all of the other offices when he took over on October 13, 2011. Moreover, the FTC would have had the opportunity to image the hard drives of the computers to ensure that no data was lost. In short, Defendants have not cooperated with Mr. Weissman as touted throughout their Motion (dkt 45-1 p. 2-3 (Begley ¶ 3), p. 4 (Begley ¶ 7), p. 21 (Begley ¶ 44)), but instead their failure to comply with the TRO has facilitated the spoliation of evidence and loss of

_____

[8] It is unclear how Mr. Lunsford was aware of the theft, and why he did not alert the FTC to the incident.

15

1  receivership property.

2  **IV.    CONCLUSION**

3           For the reasons set forth above, the FTC  respectfully requests that the

4  preliminary injunction entered on November 10, 2011, should remain in full force

5  and effect and should not be modified in the manner Defendants request.  Plaintiff

6  further requests that Defendants' request  for $300,000 in living expenses, and

7  payment of commissions due their collectors, should be denied.  In addition,

8  Plaintiff requests that the Receiver be allowed to sell unnecessary equipment and

9  receivership assets with or without Defendants' participation in the sale process.

10

11 Dated: January 9, 2012                    Respectfully submitted,

12

13                                      ___/s/  Maricela Segura_____
                                        Maricela Segura
14                                      Raymond E. McKown
                                        Attorneys for Plaintiff
15                                      FEDERAL TRADE COMMISSION

16

17

18

19

20

21

22

23

24

25

26

27

28

16