1  MARICELA SEGURA, CA Bar No. 225999
   RAYMOND E. MCKOWN, CA Bar No. 150975
2  e-mail: msegura@ftc.gov and rmckown@ftc.gov
   FEDERAL TRADE COMMISSION
3  10877 Wilshire Blvd., Suite 700
   Los Angeles, CA 90024
4  Telephone: (310) 824-4343
   Facsimile:  (310) 824-4380
5
   Attorneys for Plaintiff
6  FEDERAL TRADE COMMISSION

7

8               UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
9

10 FEDERAL TRADE COMMISSION,          Case no.  EDCV 11-01623

11                       Plaintiff,
                                      DECLARATION OF FTC COUNSEL
12          v.                        IN SUPPORT OF OPPOSITION TO
                                      MOTION TO MODIFY THE
13 RINCON MANAGEMENT               PRELIMINARY INJUNCTION
   SERVICES, LLC, *et al.*,           ENTERED ON NOVEMBER 10, 2011
14                       Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    I, Maricela Segura, declare as follows:

2        1.      I am an attorney in the Los Angeles office of the Federal Trade

3    Commission ("FTC").  I am one of the attorneys representing the FTC in this

4    matter.

5        2.      Defendants' business locations: On October 13, 2011, the FTC

6    obtained a temporary restraining order ("TRO") against the Defendants in this

7    matter.  Pursuant to that order, on October 13 and 14, 2011, FTC staff engaged in

8    immediate access of Defendants' business premises that it knew of at the time,

9    which were listed in the TRO.  *See* dkt #5 p.17 (Section IX.).  On October 13 and

10   14, FTC counsel, Ray McKown and I met with defense attorney Samuel Lockhart

11   at various points during the day.  Our meetings took place at Defendants'

12   headquarters located at 980 Montecito Dr., Suite 205, Corona, CA.  We discussed

13   the TRO provisions and the affect of our immediate access.  I asked Mr. Lockhart

14   if Defendants had any other offices engaged in debt collection and he said that we

15   had entered all of the offices and that the business had been effectively shut down.

16       3.      Leading up to the hearing on the preliminary injunction, counsel for

17   the FTC and Mr. Lockhart discussed matters of settlement and the completion of

18   financial statements.  We asked him about the additional entities such as, County

19   Filing, Maple Filing, and Statewide Associates that were not named in the

20   complaint, but for which the FTC found evidence to show that they were

21   collecting debt in the same manner as Defendants, and were in fact controlled by

22   Defendants.  Mr. Lockhart maintained that those entities were wholly separate

23   companies from Defendants and that they were owned by Defendants' former

24   managers who, in effect purchased the business from Defendants.  Mr. Lockhart's

25   position forced the FTC and the Receiver to litigate the issue and make a showing

26   to the Court that all of the entities were under the control of Defendants and were

27   in essence their alter egos.  *See* dkt 30 p.6 (Receiver's report).  Mr. Lockhart

28   asserted that for this reason he did not represent these entities.  **Attachment 1** is a

2

1    true and correct copy of an email from Mr. Lockhart regarding these entities.

2        4.    As it turned out, these entities were newly formed companies that

3    occupied five additional offices at addresses that were not listed within the TRO,

4    and were not entered and secured by the Receiver on October 13, 2011.  Because

5    Defendants argued that the entities did not belong to them, the FTC marshaled

6    evidence to show that the additional companies were in fact owned by Defendants.

7    *See e.g.,* dkt #25 pp. 14-15.  The Receiver did the same in his report.  Dkt # 30 pp.

8    6-7, 8-9.  We now know from Mr. Begley's declaration, that in fact these

9    businesses were not separately owned as the plan to sell the collection companies

10   to their former managers never materialized.  *See* dkt # 45-1 p.17.

11       5.    One of these entities, Rockwell Management, maintained an office in

12   Cedar Rapids, Iowa, but I was informed by Defendants' former employee Edward

13   Polaco that the office was closed when the lease term had expired at the end of

14   October 2011.  Mr. Polaco and an associate cleared the office of furniture and

15   equipment and Mr. Polaco stored the equipment in his garage until the Receiver

16   made arrangements to ship it to Los Angeles in early Dgecember 2011.

17       6.    On December 7, 2011, I met with defendant Jason Begley and

18   defense attorney Elizabeth Reed at Defendants' headquarters at 980 Montecito

19   Dr., Suite 205 in Corona.  During this visit the FTC was provided with a list of

20   Defendants' office locations with the associated property management firm and

21   contact information.  *See* Attachment 21 to third Stahl declaration.  The list was

22   provided to the FTC by Defendants' bookkeeper Shewan Edney, who is currently

23   working for the Receiver.

24       7.    Shortly after receiving the address list on December 7, 2011, I began

25   to reach out to the landlords and legal counsel for the landlords of these additional

26   buildings to inquire about the units and whether they were secured.  It was at this

27   time that, Glen Dresser, a lawyer for one of the property management firms

28   informed me that Wayne Lunsford had just contacted the property about a

1   purported theft in the office the firm managed.  Mr. Dresser then  forwarded an

2   email to me from Mr. Lunsford in which he notified the property manager of the

3   purported theft.  **Attachment 2** is a true and correct copy of an email string

4   forwarded to me by Mr. Dresser, which includes Mr. Lunsford's email regarding

5   property stolen from one of the offices.  This purported theft was never brought to

6   the FTC's attention by Defendants.

7        8.    <u>Non-documented investments</u>.  On or around October 18, 2011, Mr.

8   Weissman forwarded to me a notification from Wells Fargo bank regarding the

9   balances in the bank accounts that had been frozen.  Wells Fargo is the bank that

10  holds accounts for the trusts belonging to Messrs. Begley and Lunsford, Skyridge

11  Legacy Trust ("Skyridge") and WAL Legacy Trust ("WAL"), respectively.  The

12  notice from Wells Fargo indicated that approximately $289,707 had been frozen

13  in the Skyridge account, and another $607,244 had been frozen in the WAL

14  account.  Thus, a total of $896,951 had been frozen between the two trust

15  accounts.  The bank record analysis done by FTC investigator Bruce Gale

16  estimated, however, that approximately $2.2 million was paid directly to these

17  trusts by the business entity defendants.  *See e.g.,* dkt #32 at p.9.  It became

18  apparent, therefore, that over $1.2 million of the money that was deposited into

19  the trust accounts was now missing.

20       9.    In the course of discussing a release of living expenses to Defendants

21  with Mr. Lockhart, we asked him to account for the over $1.2 million that was no

22  longer in the Skyridge and WAL accounts.  Mr. Lockhart stated that he would ask

23  his clients to account for the money and we agreed that this would be done in the

24  form of declarations from Messrs. Begley and Lunsford.  **Attachment 3** is a true

25  and correct copy of Messrs. Lunsford and Begley's declarations seeking to

26  account for the withdrawals from their trusts.

27       10.   The declarations revealed that approximately $787,000 ($550,000

28  from Skyridge and $235,000 from WAL) had been transferred to a firm called

1  Brylaw for an investment in Brazilian bonds.  Counsel for the FTC requested

2  documentation regarding the Brazilian bonds and demanded that the investment

3  be turned over to receiver Richard Weissman.  After some back and forth on this

4  issue, Mr. Lockhart ultimately told the FTC that there was no paperwork

5  regarding the investment as it was a "handshake" deal between Messrs. Begley

6  and Lunsford and Larry Stevens of Brylaw.  Mr. Lockhart also tried to explain

7  that the investment was not in the purchase of the Brazilian bonds, but in the

8  movement of those bonds from one financial exchange to another.  **Attachment 4**

9  is an email from Mr. Lockhart to Mr. Weissman and counsel for the FTC

10  regarding, in part, the Brazilian bond investment and Mr. Weissman's response.

11      11.    To date, no documentation has been forthcoming regarding the

12  Brazilian bond investment and Defendants have not executed any documents to

13  transfer that investment to the receivership.  Defense counsel, John Markham, has

14  stated that he will work with the FTC to arrange a call between Mr. Larry Stevens

15  and a financial analyst with the FTC's Bureau of Economics to further investigate

16  the nature of the investment.  Nevertheless, the investment, as it stands now,

17  represents almost $787,000 of what might otherwise be receivership assets that are

18  not under the control of the Receiver, or available for consumer redress.

19      12.    Living expenses paid to Defendants.  In November 2011, Mr.

20  Lockhart requested that counsel for the FTC agree to a release of money from the

21  frozen bank accounts to provide Messrs. Begley and Lunsford with living

22  expenses.  I told Mr. Lockhart that we would only agree to release money for

23  reasonable and necessary living expenses and asked that his clients substantiate

24  they living expenses by providing copies of bills and invoices.  Defendants

25  provided the requested documentation and counsel for the FTC and defense

26  counsel discussed the living expenses, item by item, for each individual defendant.

27  On this basis we agreed to release money to Messrs. Begley and Lunsford for

28  living expenses for November and December 2011.  Among other items, money

1  was released to pay for Messrs. Begley and Lunsford's property taxes, mortgages,

2  insurance, food, household expenses, and health insurance.

3      13.   On December 22, 2011, defense counsel, John Markham, requested

4  that the FTC release $150,000 to each of his clients for their living expenses, and I

5  responded that we would not agree to such a release of funds.  However, FTC

6  counsel Ray McKown asked Mr. Markham to tell the FTC whether or not

7  Defendants' monthly expenses had changed, so that we could evaluate a release of

8  reasonable and necessary living expenses for January 2012, as we had done for

9  November and December 2011.  I reiterated this request in an email to Mr.

10  Markham on January 1, 2012.  **Attachment 5** is a true and correct copy of my

11  email to Mr. Markham regarding the living expenses.

12      14.   <u>Continued business operations.</u>.  After the TRO was entered, defense

13  counsel, Sam Lockhart made clear that it was Defendants intention to resume

14  operation of their debt collection business under oversight of the Receiver.

15  Defendants stated intention to resume their debt collection was the subject of

16  numerous discussions between the FTC and Mr. Lockhart, and was also discussed

17  between Defendants and the Receiver.  Defendants submitted a business plan to

18  the Receiver, but ultimately that plan was not put into place because the Receiver

19  required that Defendants collection scripts that were certified by defense counsel

20  to be compliant with federal law.  **Attachment 6** is a true and correct copy of Mr.

21  Weissman's email to Defendants and the FTC regarding Defendants' continued

22  debt collection and his request for scripts.  Defendants did not produce the

23  requested scripts to Mr. Weissman.  Instead, at my meeting with Mr. Begley and

24  his counsel on December 7, 2011, I was told that Defendants no longer wanted to

25  continue in the debt collection business.

26      15.   On December 20, 2011, defense counsel John Markham, receiver

27  Richard Weissman, and FTC counsel Maricela Segura and Ray McKown had a

28  conference call to discuss case-related issues.  On that call, the parties discussed

1  the potential sale of the portfolio of uncollected debt.  Receiver Richard Weissman

2  told defense counsel that he invited Messrs. Begley and Lunsford's assistance in

3  brokering a sale of the debt portfolio to ensure that the receivership obtained the

4  best price on the private market.  To date, it does not appear that Messrs. Begley

5  or Lunsford have extended their assistance to Mr. Weissman in selling the

6  portfolio of uncollected debt.

7          I declare and certify under penalty of perjury that the foregoing is true and

8  correct.  Executed at Los Angeles, California on January 9, 2012.

9

10                              __/s/_Maricela Segura_____
                               Maricela Segura
11                             Attorney for Plaintiff
                               FEDERAL TRADE COMMISSION
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Segura, Maricela**

---

| | |
|---|---|
| **From:** | Samuel Lockhart <slockhart@lock-law.com> |
| **Sent:** | Wednesday, October 26, 2011 3:28 PM |
| **To:** | Segura, Maricela |
| **Cc:** | McKown, Raymond |
| **Subject:** | RE: FTC v. Rincon Management Service, LLC et al. |

Ms. Segura:

As I expressed during our conversation of earlier this afternoon, I do not represent: Eagle Filing Services; Universal Filing Services; Worldwide Filing Services; Asset Filing Services; Westcoast Filing Services; Nationwide Filing Services; Raincross Filing Services; Statewide Associates Group; Superior Filing Services; Irvine Group and Associates; Southcoast Financial Services; Prime Western Investments.

During our prior conversation you mentioned "flow charts" that identify a link among various entities you believe to be owned or controlled by Jason Begley and/or Wayne Lunsford.  It is my understanding that the "flow charts" you reference were created by attorneys retained by Jason, Wayne and/or their affiliated entities and are thus attorney work product and are protected as attorney client communication.  Please be advised that Jason, Wayne and/or any of their related entities have not waived any privilege.  By this email correspondence we demand that you not disclose any information or document reflecting any information that is protected by the attorney client privilege.

Your prompt attention to this matter is appreciated.

Regards,


SAMUEL G. LOCKHART
PRINCIPAL | LOCKHART LAW FIRM, P.C.
41690 IVY ST., SUITE B
MURRIETA, CA 92562
PH: (951) 200-7691
FAX: (951) 200-7692

---

**From:** Segura, Maricela [msegura@ftc.gov]
**Sent:** Wednesday, October 26, 2011 12:11 PM
**To:** Samuel Lockhart
**Cc:** McKown, Raymond
**Subject:** FTC v. Rincon Management Service, LLC et al.

Sam,

Ray and I want to talk to you about the *ex parte* motion we discussed with you previously that would modify the TRO to add Section VII. "Financial Institutions" section that the Court struck.  Also, as we discussed, we are also prepared to move to include within the TRO numerous other debt collection companies controlled by Mr. Begley and Mr. Lunsford.  These entities are: Rockwell Management Services; Capital Filing Services; County Filing Services; Maple Filing Services; Eagle Filing Services; Universal Filing Services; Worldwide Filing Services; Asset Filing Services; Westcoast Filing Services; Nationwide Filing Services; Raincross Filing Services; Statewide

**Segura Attachment 1**

Associates Group; Superior Filing Services; Irvine Group and Associates; Southcoast Financial Services; Prime Western Investments.

In addition, we will move that the umbrella entities that are controlled by Mr. Begley and Mr. Lunsford, that are participating in the debt collection business should also be under order.  These entities, as you may know, either receive management fees from the debt collection companies, or purchase the debt portfolios, and include the following entities: Portfolio Investment Group, LP; Portfolio Investment Financial, Inc.; Portfolio Investment Partners, Inc.; Bagels Consulting, Inc.; Lunsford Investment & Management Services, Inc.; Heavy Hitters, Inc.; JBEG, LLC and Spiff Money, LLC.

You previously told us that you were going to consider whether your clients would agree that the additional entities were subject to the TRO and under receivership, but we have not heard back from you.  Please give us a call as soon as you can so that we can discuss what your position is on these modifications to the TRO.  If we do not hear from you, we are prepared to file the motion by the end of the day today, or tomorrow morning.  If we file, you will have 24 hours to respond to the motion.  We hope that we will be able to come to a stipulation that the additional entities are subject to the TRO.

Thank you.
Maricela

_____

Maricela Segura, Attorney
Federal Trade Commission
Western Region - Los Angeles
10877 Wilshire Blvd., Suite 700
Los Angeles, CA 90024
Main: (310) 824-4343
Fax: (310) 824-4380

**Segura Attachment 1**

**Segura, Maricela**

| | |
|---|---|
| **From:** | Glen <gombd@aol.com> |
| **Sent:** | Friday, December 09, 2011 1:12 PM |
| **To:** | Segura, Maricela |
| **Subject:** | Re: email from Wayne Lunsford/ re: Prime West Management |

E mail string is below. It appears that there is only 10 days of data and oldest information it is overwritten daily. If receiver supplies a flash drive they offered to back up what they had.

**lFrom:** Wayne Lunsford [mailto:wayne.heavyhitter@gmail.com]
**Sent:** Wednesday, December 07, 2011 1:27 PM
**To:** Michael Aimola
**Cc:** Richard Seide; jason.heavyhitters@gmail.com; Elizabeth Read
**Subject:** Re: stolen property

Here you go.


Richard Weissman
Receiver
12121 Wilshire Blvd., Suite 600
Los Angeles, CA. 90025
Tel: (310) 481-6780
Fax: (310) 481-6786
RichardW@rwreceiver.com
Thank you.

On Dec 7, 2011, at 9:34 AM, Michael Aimola <MAimola@jmrc.com> wrote:

Wayne,
Keep in mind that the recorded data only goes back 10 days and drops a day daily. Unless you believe that your property was stolen in the last 10 days the backup may not be of much use to you.
Also can you supply us with the name and contact information of the receiver?
Thanks.
Michael
Michael S. Aimola, CPM®
J & M Realty Company
41 Corporate Park, Suite 240
Irvine, California 92606
Telephone: 949-261-2727 Ext. 245
Facsimile: 949-261-2828
maimola@jmrc.com

**From:** Wayne Lunsford [mailto:wayne.heavyhitter@gmail.com]
**Sent:** Wednesday, December 07, 2011 9:20 AM
**To:** Michael Aimola
**Cc:** Richard Seide; jason.heavyhitters@gmail.com; Elizabeth Read
**Subject:** Re: stolen property
Thank you Micheal for getting back to me. I will get that 64 gig flash drive for you as soon as I can.
As far as the office. Im working with our attorneys this week on setting a day that we can remove our office equipment. We are under the provision of a TRO so what we can do is restricted. A receiver has been appointed to take care of these matters, but he is not. I apologize for all this.

**Segura Attachment 2**

Just to let you know that this is on top of our priority list.

Thank you.

On Dec 6, 2011, at 2:51 PM, Michael Aimola <MAimola@jmrc.com> wrote:

Wayne,
We have attempted to back up the camera on to an external hard drive but because of the age of the recording device (+10 years old) and the external hard drive (+/- 1 year) they are not compatible and we were not able to do it.  My security monitoring company indicates that if we used a 64 Gig USB Flash Drive it should allow us to back up the camera.  If you want to supply us with the flash drive we will try to back up the camera on to it.  Let me know what you want to do.
I'm also waiting to hear back from you regarding turning over the suite.  This needs to be done immediately.  Please call me.
Michael
Michael S. Aimola, CPM®
J & M Realty Company
41 Corporate Park, Suite 240
Irvine, California 92606
Telephone: 949-261-2727 Ext. 245
Facsimile: 949-261-2828
maimola@jmrc.com

**From:** Michael Aimola
**Sent:** Monday, December 05, 2011 5:37 PM
**To:** 'Wayne Lunsford'; Richard Seide
**Subject:** RE: stolen property
**Importance:** High
Wayne,
Because the camera system operates in an office environment it is anticipated that an incident would be identified within a day or two for that reason the security cameras maintain 10 days' worth of data.  Do you have any idea when the theft occurred?  We did review the access card data and the last time a card was swiped was Denise on September 17 at 5:00 PM.
To affect the turnover of the suite I would request that you empty it of all Prime West's possessions and then we could set up a time to meet.
Michael
Michael S. Aimola, CPM®
J & M Realty Company
41 Corporate Park, Suite 240
Irvine, California 92606
Telephone: 949-261-2727 Ext. 245
Facsimile: 949-261-2828
maimola@jmrc.com

**From:** Wayne Lunsford [mailto:wayne.heavyhitter@gmail.com]
**Sent:** Monday, December 05, 2011 3:47 PM
**To:** Richard Seide
**Cc:** Michael Aimola
**Subject:** Re: stolen property
I know one of my collectors stole the equipment. I'd just like to know who.

Thank you.

**Segura Attachment 2**

Glen Dresser
Law Offices of Glen Dresser
12650 Riverside Drive, Suite 100
Valley Village, CA 91607
Tel. 818 755-4848 x 113
Fax. 818 985-8895

CONFIDENTIALITY NOTICE: This e-mail message and its attachments are intended solely for the addressed recipient and may contain legally privileged and confidential information. Any unauthorized use, disclosure or duplication is prohibited. If you are not the addressed recipient, or received this e-mail message in error, please notify the sender.

CIRCULAR 230 DISCLAIMER: To comply with IRS requirements, please be advised that, unless otherwise stated by the sender, any tax advice contained in this e-mail message and its attachments is not intended or written to be used, and cannot be used, by the recipient to avoid any federal tax penalty that may be imposed on the recipient, or to promote, market or recommend to another any referenced entity, investment plan or arrangement.

Fair Debt Collection Practices Act NOTICE: Federal law requires us to notify
you that this office is attempting to collect a debt. Any information
obtained will be used for that purpose.


-----Original Message-----
From: Segura, Maricela <rmsegura@ftc.gov>
To: 'gombd@aol.com' <gombd@aol.com>
Sent: Fri, Dec 9, 2011 11:28 am
Subject: email from Wayne Lunsford

Mr. Dresser,

Can you please forward me the email from Wayne Lunsford regarding the stolen property?

Thank you.

Maricela

**Segura Attachment 2**

Declaration of Wayne Lunsford

I, Wayne Lunsford, declare as follows:

I have personal knowledge of the facts contained in this declaration, and if called upon to testify I could and would testify competently as to the truth of the facts stated herein.

I have read, and am familiar with Section VI of the Temporary Restraining Order ("TRO") issued in the case commonly referred to as FTC v. Rincon Management Services, LLC, et. al.  At all times after my receipt and review of Section VI of the aforementioned TRO, I have been and currently am in compliance with Section VI of the TRO.

Below I have identified all withdrawals from WAL Legacy Gift Trust (the "Trust") bank account at Wells Fargo Bank by date and amount and have provided an explanation for each withdrawal:

3/15/11:  $75,000.  This was repayment of funds paid by Lunsford Investments to the Trust.

3/22/11:  $150,000.  This was an investment into Barbies through Brylaw that turned out poorly and only returned $25,500 (see deposit on 6/6/11).

4/7/11:  $25,000.  These were funds that were transferred to Lunsford Investments as a loan.  I then withdrew that money from Lunsford investments to spend on various things, such as a pool for my home.

4/13/11:  $50,000.  These were funds that were transferred to Lunsford Investments as a loan.  I then withdrew that money from Lunsford investments to spend on various things, such as a pool for my home.

5/12/11:  $25,000.  These were funds that were transferred to Lunsford Investments as a loan.  I then withdrew that money from Lunsford investments to spend on various things, such as a pool for my home.

6/8/11:  $125,000 and $110,000.  Transfer to Brylaw accounting firm for the purchase of Brazilian bonds in a joint venture with Jason Begley and Brylaw.

7/12/11:  $10,000.  Check to Grandparents for repayment of prior debt.

8/16/11:  $210,000.  This was a check from WAL to WAL.  So, the funds were never transferred out of WAL.

8/26/11:  $100,000.  Initial investment into Heavy Hitters Motors, Inc.

Also, the bank accounts identified in the Personal Financial Statement I previously submitted to the Federal Trade Commission is, to the best of my knowledge, a complete list of all of my

**Segura Attachment 3**

business, personal and revocable and irrevocable trust accounts.  I do not recall ever setting up a separate bank account for my Revocable Living Trust.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration is executed on November __, 2011, at Riverside, California.


_____
Wayne Lunsford

**Segura Attachment 3**

Declaration of Jason Begley

I, Jason Begley, declare as follows:

I have personal knowledge of the facts contained in this declaration, and if called upon to testify I could and would testify competently as to the trust of the facts stated herein.

I have read, and am familiar with Section VI of the Temporary Restraining Order ("TRO") issued in the case commonly referred to as FTC v. Rincon Management Services, LLC, et. al. At all times after my receipt and review of Section VI of the aforementioned TRO, I have been and currently am in compliance with Section VI of the TRO.

Below I have identified all withdrawals from Skyridge Legacy Gift Trust bank account at Wells Fargo Bank:

2/4/11: $75,000. Repayment of funds initial used to open the account (See corresponding deposit on 1/6/11).

3/18/11: $250,000. This is an investment I made through Larry Stephens of Brylaw for the purchase of Barbie dolls, where I lost heavily. The entire return on that investment is reflected through deposit 6/3/11 of $42,500 - a loss of $207,500.

8/25/11: $300,000. Purchase of Silver and Gold from California Numismatic. The Silver and Gold is located at my Corona house.

8/31/11: $100,000. Represents the initial investment in Heavy Hitters Motors.

9/28/11: $98,500. This withdrawal results from a check that bounced, as is reflected in the description line, "Return Item Charge."

9/29/11: $550,000. This was money for an investment in Brazilian bonds through Brylaw accounting firm. These funds were returned on 10/3/11 by Brylaw when there was uncertainty as to whether the investment was going to work out.

10/7/11: $550,000. Once the purchase of the Brazilian bonds as an investment solidified, I transferred money to Brylaw for the purchase of the Brazilian bonds in a joint venture with Wayne Lunsford and Brylaw.

Also, the bank accounts identified in the Personal Financial Statement I previously submitted to the Federal Trade Commission is, to the best of my knowledge, a complete list of all of my business, personal and revocable and irrevocable trust accounts. I do not recall ever setting up a separate bank account for my Revocable Living Trust.

**Segura Attachment 3**

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration is executed on November __, 2011, at Riverside, California.

Jason R. Begley

**Segura Attachment 3**

**Segura, Maricela**

| | |
|---|---|
| **From:** | Richard Weissman <RichardW@rwreceiver.com> |
| **Sent:** | Thursday, November 17, 2011 10:30 AM |
| **To:** | Samuel Lockhart; Segura, Maricela; McKown, Raymond |
| **Cc:** | Viktor A Badalyan; James Schultz |
| **Subject:** | RE: Investments |

Sam,

    Then I suggest that you instruct Larry to obtain all of the pertinent financial information relative to the amount of the bonds held, the name of the company that issued the bonds and the name and contact information of the company "owning" the bonds. From your comment, that entity also holds the bonds.

    At this stage, Sam, the information being transmitted is terribly oblique and incomplete. I request that henceforth your replies on behalf of your clients are complete with all the information that we both know the court requires if you were filing paperwork for it to obtain living expenses or any other relief for their benefit. Multiple communications requesting the same basic information is inefficient, ineffective and very costly to your clients. I'm trying to minimize the cost and they are not assisting in that regard.

    As to the Black Canyon investment, to what account(s) were the $137,500 deposited on or about Sept. 15, 2011.  What was the nature of that investment? The 10% return is very high in this economy.  Was it a public or private investment? What was it's term?  Any documentation on it? If so, please forward a copy.

    Thanks. Rich

Richard Weissman
Receiver
12121 Wilshire Blvd., Suite 600
Los Angeles, CA. 90025
Tel: (310) 481-6780
Fax: (310) 481-6786

---

**From:** Samuel Lockhart [mailto:slockhart@lock-law.com]
**Sent:** Thursday, November 17, 2011 10:14 AM
**To:** Richard Weissman; msegura@ftc.gov; rmckown@ftc.gov
**Subject:** Investments

All:

I have spoken with Larry Stephens regarding (1) the Black Canyon Investment; and (2) the Brazilian Bond investment.  The Black Canyon Investment has been paid out in its entirety.  Jason invested $125,000 that was repaid in full at 10% interest as of September 15, 2011.  So, the total return on his investment was $12,500.

The Brazilian bonds are not held in a "street name" or by a broker.  The Bonds are held by their owner, a Brazilian corporation.  The Bonds are currently listed on Brazil's CETIP.  Contact with the bond owner is restricted to Larry Stephens only - i.e. Jason and Wayne have no contact with the Bond owner.

Regards,

SAMUEL G. LOCKHART
PRINCIPAL | LOCKHART LAW FIRM, P.C.
41690 IVY ST., SUITE B
MURRIETA, CA 92562
PH: (951) 200-7691

**Segura Attachment 4**

Fᴀx: (951) 200-7692

**Segura Attachment 4**

**Segura, Maricela**

---

| | |
|---|---|
| **From:** | Segura, Maricela |
| **Sent:** | Sunday, January 01, 2012 11:31 AM |
| **To:** | 'John Markham' |
| **Cc:** | McKown, Raymond; 'RichardW@rwreceiver.com' |
| **Subject:** | RE: Living Expenses |

John,

Just to set things straight with regard to the living expenses, on our conference call on December 20, 2011, Ray McKown asked you to tell us whether your clients' monthly bills have changed, so that we could evaluate what amount we could agree to release for January if any.  We reiterated this request during our telephone conference on December 22, 2011.  You have not gotten back to us with this information, so we had nothing to use as a baseline.

As you should know, we went through a lengthy process of coming up with the amounts we were willing to release for November and December.  Those living expense releases were based on actual expenses substantiated by copies of bills for Messrs. Begley and Lunsford provided to us by Sam Lockhart.  We went line by line with Sam to determine what expenses were reasonable and necessary.   It appeared that a number of expenses did not meet that criteria.  At that time, Mr. Begley, for one, possessed four vehicles and was holding mortgages on two homes.  Mr. Begley stated that he was going to sell one of his vehicles and terminate the lease on the other.  I believe he stated that he would sell his motorcycle – has he done this?  If so, what has he done with that money?  This is the level of detail regarding your clients expenses that we need to evaluate a living expense release from frozen funds.

I want also to respond to Wayne Lunsford's email sent on December 30, 2011 with the re line of "hardship."  When we released funds for November and December, it was based on monthly expenses that he substantiated.  We were never told that he needed additional money to pay for a special baby formula.  The $150 we released for diapers and formula, was based on research regarding the reasonable cost for such things, and my recent personal experience.  In addition to that, we released $150 for household goods, $100 for clothing and another $800 for food.  Taken together, this $1,200 a month for food, diapers, and household goods is reasonable.  This, of course, is apart from the mortgage, insurance, health insurance, car payment, and utility bills we released money to pay.  Mr. Lunsford never stated that any of his family members needed special medication.  If he had done so and substantiated the request, this would have been taken into account as well.  What Mr. Lunsford instead provided, were copies of some bills, and a number of unsubstantiated requests to pay for items in dollar amounts that appeared unreasonable and far out of the norm.  For example, he requested the following monthly expenses with no substantiation or explanation: $2,000 for clothing; $331 for cell phone coverage; $3,000 for food, and $770 for house maintenance, among other items.  It is true that we did not fund Mr. Lunsford's full request for living expenses, which totaled over $20,000 monthly and included requests for items that courts have held to be luxuries that are not to be funded from frozen assets.

Given the recent email traffic about the living expenses, it is even more pressing that you respond to Ray's request regarding the current state of your clients' expenses.  Again, if nothing has notably changed from the bills they have previously submitted, let us know that, and also let us know whether Mr. Begley has sold his motorcycle, or any other vehicle.  Please do so by Monday, January 2, 2012, so that we can evaluate their living expense request.

Best,
Maricela

---

Maricela Segura, Attorney
Federal Trade Commission
Western Region - Los Angeles
10877 Wilshire Blvd., Suite 700
Los Angeles, CA 90024

**Segura Attachment 5**

Main: (310) 824-4343
Fax: (310) 824-4380

**From:** John Markham [mailto:JMarkham@markhamread.com]
**Sent:** Friday, December 30, 2011 11:43 AM
**To:** Segura, Maricela; McKown, Raymond; RichardW@rwreceiver.com
**Subject:** Living Expenses

Maricela, Ray, and Richard:

See below. Is this really necessary. Can you not find it in your sense of fairness to pay their expenses today so they can keep going?

Please consider this.

Thank you.

John


MARKHAM & READ

One Commercial Wharf West

Boston, Massachusetts 02110

Tel:  (617) 523-6329

Fax: (617) 742-8604



Website:  www.markhamread.com



**MARKHAM & READ is a law office.  This document may contain confidential matters or matters protected from disclosure by the attorney-client privilege.  Any inadvertent disclosure of the content of this document to any unintended recipient is not intended to be, nor is it, a waiver of this privilege.**

**If you have received this email in error, please advise us by return email.  Thank you.**


-----Original Message-----
From: Wayne Lunsford [mailto:wayne.heavyhitter@gmail.com]
Sent: Friday, December 30, 2011 10:18 AM
To: John Markham

**Segura Attachment 5**

Cc: jason.heavyhitters@gmail.com; Elizabeth Read
Subject: Living exspences

Good morning John, I hope you guys had a great Christmas.

I have absolutely no money. I can not pay bills that are due on the first. I need some help please. Can we figure some thing out with the FTC ASAP in the mean time like we have for previous months? At least just to keep food on the table and lights on.

I'm sure that Jason and his wife are are in the same boat.

We

Thank you.

**Tracking:**

**Segura Attachment 5**

| Recipient | Read |
|---|---|
| 'John Markham' | |
| McKown, Raymond | Read: 1/4/2012 8:00 AM |
| 'RichardW@rwreceiver.com' | |

**Segura Attachment 5**

**Segura, Maricela**

| | |
|---|---|
| **From:** | Richard Weissman <RichardW@rwreceiver.com> |
| **Sent:** | Wednesday, November 30, 2011 6:46 AM |
| **To:** | Sam Lockhart (slockhart@lock-law.com); Jason Begley; Wayne Lunsford |
| **Cc:** | Segura, Maricela; McKown, Raymond; Sandra Stevens |
| **Subject:** | FTC v. Rincon Management: Collection Scripts |
| **Attachments:** | 11.29.11 WEISSMAN LTR Lockhart re Scripts.pdf |

Gentlemen,

    Please review the attached letter regarding continuing business operations in response to Jason's November 25, 2011 email to me. Thank you.

Richard Weissman
Receiver
12121 Wilshire Blvd., Suite 600
Los Angeles, CA. 90025
Tel:  (310) 481-6780
Fax: (310) 481-6786

**Segura Attachment 6**

# RICHARD WEISSMAN

Receiver
12121 Wilshire Blvd.
Suite 600
Los Angeles, CA 90025
Tel: (310) 481-6780
Fax: (310) 481-6786

IN REPLY REFER TO:
27675/900

NOVEMBER 29, 2011

Mr. Wayne Lunsford
Mr. Jason Begley
c/o Samuel Lockhart, Esq.
41690 Ivy Street, Suite B
Murietta, CA. 92562

Re:          Business Continuation Proposal Correspondence

Gentlemen:

I am responding to Jason's email dated November 25, 2011, in respect to restarting the collection process of the debt portfolio.

While Jason has sent two collection business restart proposals to me, I believe I have appropriately responded to each, either directly to the principals or through your counsel, both in writing and telephonically. I have not received any response thereto. I do not have the proposals in front of me as I prepare this letter, but I recall my objections and concerns as follows:

1.  The proposed personnel budget is too high.  Given the economic circumstances of the Inland Empire, my recollection of proposed $50,000 to $60,000 annual salaries for what appear to be general office requirements is unsupportable.

2.  Starting with a few collectors is fine. I do not recall what number you were proposing or whether you were suggesting that they recover what is due them from September's collections. What is due them already will not be made up going forward. The accrued commissions will be claims against the receivership estate in the same manner as the other collectors who will not be engaged going forward.  A reasonable draw during the first month to sustain the newly engaged collectors pending collections and payment of commissions would be considered.

3.  I am still unclear what location or locations you desire to retain for future operations. I have submitted to Sam via email one landlord's proposal for termination of a lease but I have not had a response from him or you.  I believe it was from Dolphin Partners' counsel. There are 10 or more other locations that have not been addressed. I need a proposal from you what to do with all of the other offices you leased and operated, and those that you most recently leased but in which you evidently did not commence any business.

One of the business addresses we have is in Fontana, which appears to be a house. Please

advise me whose house it is and whether any collection or other business is being conducted there by you or for your benefit, or whether we have a wrong address. If so, what is the correct address for an office building.

The landlord for the Rincon property is being very aggressive in asserting a large claim for future rent because of the large amount of space you have there. I am endeavoring to effect a reasonable workout with him but if not resolved this week or next, I will so advise you.

4.  I am still prepared to meet with Ms. Loop regarding her engagement to call the "declines" and "charge backs" if you consider that productive for collections of the settled receivables. I can meet with her early next week.

5.  I will review your proposal of HHI-Motors, if I actually received one. I will review my emails from you. I recall that there seemed to be a basis for operating Motors on a minimal budget provided the cost of purchasing vehicles was closely coordinated with me. If this item was merely the subject of an in-person or telephonic conversation, then please submit a formal, reasonable proposal.

6.  The last item for purposes of this letter is the most important: you and your counsel are responsible for developing and providing to me proposed collectors' scripts that are "certified" by your counsel that they comply with the Federal collections guidelines. Their preparation is for your business and is your responsibility, not mine. It has been about 45 days since we met on October 14, 2011, when we first discussed the issue of the scripts.

My function is and will only be as a monitor of your approved plan. I have inquired about the scripts several times, including in my letter to Sam yesterday (addressing other issues). Given I have not received any scripts to review, much less to submit to the FTC or Court, Jason's stated concern in his email about correcting your mistakes and getting on with your business is a bit hollow. I have repeatedly supported your restart position provided there is a viable plan. The absolutely fundamental and critical element to your proceeding is acceptable "scripts". Without them, nothing will happen except liquidation.

I will provide you until December 16, 2011, to submit counsel "certified" scripts for consideration. If not nothing is received, I will develop a receivership action plan for the Court's consideration for the disposition of the assets. I am open to discussing with you and counsel other courses of action you may suggest that would protect the assets the Court controls through the receivership.

Very truly yours,

Richard Weissman
Receiver for Rincon Management Services, LLC
et al.

RW/jm
cc:    Maricela Segura, Esq.

**Segura Attachment 6**