MARICELA SEGURA, CA Bar No. 225999
RAYMOND E. MCKOWN, CA Bar No. 150975
e-mail: msegura@ftc.gov and rmckown@ftc.gov
FEDERAL TRADE COMMISSION
10877 Wilshire Blvd., Suite 700
Los Angeles, CA 90024
Telephone: (310) 824-4343
Facsimile: (310) 824-4380

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>RINCON MANAGEMENT SERVICES, LLC, *et al.*,<br><br>Defendants. | Case no. EDCV 11-01623<br><br>DECLARATION OF FORMER EMPLOYEE TED GAY IN SUPPORT OF THE FTC'S OPPOSITION TO MOTION TO MODIFY THE PRELIMINARY INJUNCTION ENTERED ON NOVEMBER 10, 2011 |

# DECLARATION OF TED GAY

I, Ted Gay, state as follows:

1. I am over eighteen years of age and reside in Corona, California.

2. Between July 2009 and January 2010, I worked as a collector for Union Management Services, LLC ("Union") and Pacific Management Recovery, LLC ("Pacific"). Prior to my employment with Union and Pacific, I had no experience working as a debt collector.

3. In or around July 2009, I was looking for employment in order to live in the Corona area. I saw an ad on Craigslist for a debt collection company in Corona, California. The Craigslist ad did not specify the name of the employer. I called the telephone number listed with the advertisement, and spoke directly to a man named Sam Alexis Marquez ("Alex"). I recall that we had a very brief telephone interview. Alex subsequently asked me to come in for an in-person interview at 355 North Sheridan Street, Corona, California 92880.

4. When I got to the office, I met with Alex, who told me that he had worked in the banking business and discovered debt collection was a great way to make money very quickly. Alex hired me that day and gave me a short training related to my responsibilities as an initial caller to individual debtors. Alex told me that Union collected on old credit card debt, some of which came from Household Bank's private label credit cards for Home Depot and other retail entities. He told me that these types of past-due credit card accounts were more lucrative for collectors because the debtors generally paid their debts.

5. My training at Union consisted of talking to Alex for about 30 minutes and then sitting with other collectors for a couple of hours to listen in on their calls. I was hired to start at Union as a "dialer." Alex told me that my job was to call a debtor's place of employment and pretend that I was a process server seeking to serve the debtor with court papers relating to a lawsuit. Alex gave to me a packet of documents, including some scripts, documents containing company

1  information, such as the commission structure, and documents intended to
2  motivate employees. The scripts we used were called "talk off" scripts. I was
3  given a copy of the "standard talk off" script my first day. That script contained
4  the name "Mike Davis" and "Candice Wright," which collectors could use to
5  identify themselves to people they called.

6      6.    During the course of my initial employment with Union, John Cook
7  ("John") was the office manager. At some point during my employment, he left
8  the office to manage another branch office. His assistant, Barbara O'Neil
9  ("Barbara"), replaced him and at that point the office name was changed to Pacific
10 Management Recovery.

11     7.    During the course of my employment, Alex, John, and Barbara
12 instructed me to call debtors and inform them that they were about to be served a
13 summons by a process server. On my calls I was supposed to verify whether
14 someone would be available to accept the service of process. I would then leave a
15 telephone number for the debtor to call back so that he or she could make
16 arrangements to deal with the prospective lawsuit. My goal was to convince the
17 debtor or his employer that I worked at a process server's office and was simply
18 seeking some information on how to best serve the individual with court papers at
19 the job or home.

20     8.    I knew when I started that I was not a process server who was going to
21 serve papers on the people I called. When I brought this up to the manager John,
22 he told me that Union had a licensed process server on its staff who would serve
23 papers. During the course of my employment with both Union and Pacific, I was
24 never introduced to the supposed licensed process server. Not long after I started it
25 also became apparent that no lawsuits had been filed against the debtor despite
26 what I had said. I never saw evidence of legal papers.

27     9.    Although all of the dialers were required to represent themselves as
28 process servers, it was against company policy for collectors to state that they were

police officers, deputy sheriffs, or threaten a debtor with arrest. Nonetheless, I observed other dialers make such threats. If Alex, John, or Barbara overheard anyone making a threat of arrest to a debtor, they told the dialer not to do this. I knew of no instance where anyone was fired for making such threats. The supervision of the dialers was quite lax because management spent more time with the closers, who were responsible for generating the income that would provide the funds to pay commissions to the dialers, the closers, and management.

10. In the course of my six-month employment as a dialer, the initial script, the standard talk off, was modified several times. However, even with those modifications, the gist of the script stayed the same and I was always to represent myself as a process server. At no point during my employment did the management provide me with any instructions on how to comply with the Fair Debt Collections Practices Act.

11. Toward the end of my employment, Barbara gave me the authorization to train new dialers. She also gave me scripts to be used by closers in anticipation of my taking on this new role. I recall that the closer scripts referred to a demand letter that was supposedly sent to the debtor 45 days prior to the initial call. However, I saw no evidence of such letters mailed to debtors while I was employed with Union and Pacific. I also recall that the closer scripts included wording to indicate that I was working for a group of investors who had purchased the debtor's account from the original creditor. I was instructed to put the caller on hold, while I consulted the "investors" on what amount they were willing to accept as settlement in order to dismiss the lawsuit. However, this was merely a ruse to pressure the debtor to accept whatever settlement terms the closer sought. The closer script made me even more uncomfortable than the dialer scripts. I particularly objected to the generation of "Spiff" or bonus income for the closers and the manager that was derived from exorbitant and nonexistent court costs and legal fees. I knew that this was false because there was no indication in any of the

3

1  computer records to which I had access that a lawsuit had been filed. Also, the
2  supposed court costs and legal fees were the same for every debtor, which just
3  could not be right. The information on the computer that I had for each debtor
4  stated nothing about a lawsuit, and only indicated the credit card name, the amount
5  of the original debt, and the amount of interest to be collected, as well as other
6  personal information for the debtor.

7  12. I finally decided to quit the company because I learned that two
8  individuals whom I had contacted as a dialer were subject to unauthorized debiting
9  of either a credit card or a checking account. In one instance an individual's
10 checking account was subject to an early debit which caused the account to go into
11 a deficit. When I asked Barbara, to resolve this matter, she got into an angry
12 argument with the debtor and used obscenities to close this conversation.

13 13. I recall Wayne Lunsford, one of the owners of Union and Pacific, had
14 visited the office located on North Sheridan Street on many occasions. He took a
15 great deal of interest in what both the dialers and the closers said during their
16 telephone contacts with the debtors. He was fully aware that the dialers
17 represented themselves as process servers and that closers referred to lawsuits and
18 court costs to obtain additional funds from the debtors. He even offered a bonus
19 out of his own pocket of $50 for anyone who could close a debtor for a $1000 or
20 more.

21 I declare under penalty of perjury that the foregoing is true and correct.
22 Executed on 1/9 , 2012 in Corona, California.

Ted Gay

4